## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMES S. POWELL, II, on behalf of )
himself and all others similarly situated, )
)   Case No.: 2:25-cv-10479
      Plaintiff, )
)   JURY TRIAL DEMANDED
v. )
)
GENERAL MOTORS, LLC )
)
      Defendant. )

## CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**                              **Page**

INTRODUCTION ...................................................................................................1

THE PARTIES.......................................................................................................2

JURISDICTION AND VENUE ...........................................................................3

FACTUAL ALLEGATIONS ................................................................................3

    A.    Overview of the Engine Defect in the Class Vehicles .........................7

    B.    Background on Engine Bearings..........................................................8

    C.    GM's Knowledge of the Engine Defect..............................................14

          1.    GM's knowledge of the Engine Defect from pre-sale testing and publication to dealers..............................................14

          2.    GM's knowledge of the Engine Defect from complaints on the NHTSA website ............................................................16

          3.    GM's knowledge of the Engine Defect from complaints on third-party websites and forums ...........................................41

          4.    GM's knowledge of the Engine Defect from its dealers and legal actions.................................................................................43

    D.    The Engine Defect is a Material Fact that GM Failed to Disclose ...........................................................................................46

    E.    Plaintiff's Experience ........................................................................48

CLASS ACTION ALLEGATIONS ......................................................................50

COUNT I: Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act By Means Of Unfair Business Practices ........................................................................................55

COUNT II: Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act By Means of Deception .....................................61

COUNT III: Violation of the State Consumer Protection Statutes .........................64

PRAYER FOR RELIEF ........................................................................................68

JURY DEMAND ...................................................................................................70

PLAINTIFF James S. Powell II ("Plaintiff"), on behalf of himself and all others similarly situated, files this Complaint against Defendant General Motors, LLC ("GM"), based on personal knowledge as to his own actions and on information and belief, based on the investigation of counsel, as to GM's conduct and practices.

## INTRODUCTION

1.      Plaintiff brings this class action individually and on behalf of a Class of similarly situated individuals (referred to collectively as "Class Members") who purchased or leased specified models and years of GM vehicles (the "Class Vehicles" as further defined herein), which are equipped with GM's L87 V8 engines. The Class Vehicles share a common defect regarding the bearings in their engines which are prone to, and have experienced failure, resulting in breaching of the engine block by the connecting rod and/or engine seizure (the "Engine Defect").

2.      The Engine Defect makes continued use of the Class Vehicles unsafe because drivers are unable to sense an issue with their engine prior to the engine failure occurring. This is particularly dangerous because the Engine Defect results in a sudden loss of power of the vehicle, often while it is being driven at high speeds, thus significantly increasing the risk of a dangerous crash and/or injury. Plaintiff and Class Members have therefore purchased or leased vehicles that subject them to serious risk.

3.     In addition to rendering the Class Vehicles unsafe to drive, the Engine Defect significantly reduces the value of the Class Vehicles.

4.     As set forth herein, GM has known about the Engine Defect for several years but failed to disclose it to Class Members prior to their purchases or leases of Class Vehicles.

5.     Moreover, simply replacing the defective engine with the same type of engine does not address the Engine Defect and leaves consumers subject to the same undisclosed safety risk.

6.     GM's actions as alleged herein violate the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS § 505/1 *et seq*, the laws the Consumer Fraud Multi-State Class as set forth herein, and constitute unjust enrichment.

## THE PARTIES

7.     Plaintiff is a citizen and resident of Illinois. On or about October 22, 2022, Plaintiff purchased a new 2023 GMC Yukon Denali manufactured by GM and containing a L87 V8 engine.

8.     Defendant General Motors, LLC is a citizen and resident of Michigan, which regularly does business all over the United States. GM is headquartered in Delaware, and its principal office is located at 300 Renaissance Center, Detroit, Michigan 48265.

## JURISDICTION AND VENUE

9.      This is a class action under Rule 23 of the Federal Rules of Civil Procedure.

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Because Plaintiff and Defendant are citizens of different states, there is minimal diversity.  The total claims of Class Members exceed $5,000,000 exclusive of interest and costs.  There are at least 100 Class Members.

11.     The Court has personal jurisdiction over Defendant because it is headquartered in Michigan.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this judicial district and/or a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

13.     GM manufactures and sells vehicles under several different brand names, including Chevrolet, Buick, GMC, and Cadillac.[1] GM has dealerships across the country under its control, which it authorizes to sell GM's vehicles and to service and repair GM's vehicles.

14.     GM has the ability to control nearly every material aspect of its authorized dealerships, and GM acts as the principal in that relationship. For

---

[1] *See* https://www.gm.com/gm-brands.

3

example, GM: (a) can terminate the relationship with its authorized dealerships at will; (b) is in the business of selling vehicles as are its authorized dealerships; (c) provides tools, resources, and sales materials that the authorized dealerships are required to use in selling GM's vehicles; (d) supervises its authorized dealerships regularly; and (e) requires its authorized dealerships to display GM's logos on signs, literature, products, and brochures within GM's authorized dealerships, make ongoing reporting of sales, maintain a computer network connection with GM, continually train authorized dealerships' sales and technical personnel, use GM's computer software for ordering parts/supplies, participate in GM's training programs, establish and maintain service departments at authorized dealerships, report to GM regarding new vehicles put into service including the purchaser's name and contact information, vehicle VIN number, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, the vehicle's odometer readings, extended service contract sales designations, if any, and names of delivering dealership employees.

15.     GM further exercises control over its authorized dealerships with respect to: (a) financial incentives given to GM's employees; (b) the location of the authorized dealerships with the ability to unilaterally move the location of an authorized dealership; (c) the testing and certification of authorized dealerships personnel to ensure compliance with GM's policies and procedures; and (d)

customer satisfaction surveys, pursuant to which GM allocates the number of GM's vehicles to each dealer, thereby directly controlling dealership inventory and profit.

16.     GM also requires its authorized dealerships to (a) follow GM's rules and policies in conducting all aspects of dealer business, including the delivery of warranties described above, and the servicing of defective vehicles such as the Class Vehicles; (b) identify themselves and to the public as authorized GM dealerships and servicing outlets for GM's vehicles; (c) use service and repair forms containing GM's brand names and logos; (d) perform warranty diagnoses and repairs in accordance with the procedures and policies controlled and set forth in writing by GM; (e) use parts and tools either provided by GM, or approved by GM, and to inform GM when dealers discover that unauthorized parts have been installed on one of GM's vehicles; and (f) provide GM with frequent, periodic statements and records pertaining, in part, to dealership sales and servicing of GM's vehicles.

17.     GM also: (a) requires that vehicle owners go to its authorized dealerships to obtain servicing under GM's warranties; (b) requires authorized dealerships' service and repair employees to be trained by GM in the methods of repair of GM's vehicles; (c) provides technical service bulletins and messages to authorized dealerships detailing issues present in product lines, and repair procedures to be followed; (d) provides authorized dealerships with specially trained service and repair consultants with whom dealerships are required by GM to consult

when dealerships are unable to correct a vehicle defect on their own; and (e) maintains liberal and ongoing audit rights over its authorized dealerships' sales and service departments and directly contacts the customers of dealerships to determine their level of satisfaction with the sales and repair services provided by the authorized dealerships (and gives the authorized dealerships financial incentives or reprimand depending on the level of satisfaction).

18.   GM advertises the safety of its vehicles, including by representing that "GM looks at safety differently. We know road safety is more than just vehicle features, which is why we take a holistic approach, combining **research, technology** and **advocacy** to help keep you and your family safe on the road."[2] (emphasis in original).

19.   It further states on its webpage devoted to "Vehicle Safety" that "[s]afety engineered through a human lens means developing initiatives to support safe driving and technologies that can help mitigate crashes."[3] It adds that "GM is committed to helping create a future with zero crashes." *Id*.

20.   As set forth herein, contrary to its representations that GM prioritizes safety, its sale of Class Vehicles, which contain engines that seize without warning, puts drivers of Class Vehicles at substantial risk.

---

[2] https://www.gm.com/innovation/vehicle-safety/safety-through-a-human-lens.
[3] https://www.gm.com/innovation/vehicle-safety

## A. Overview of the Engine Defect in the Class Vehicles

21.     Defendant manufactures and sells several vehicle models with a L87 V8 engine, including the following vehicle models and years: 2019-2024 Chevrolet Silverado 1500; 2021-2024 Chevrolet Tahoe; 2021-2024 Chevrolet Suburban; 2019-2024 GMC Sierra 1500; 2021-2024 GMC Yukon; 2021-2024 GMC Yukon XL; 2021-2024 Cadillac Escalade; and 2021-2024 Cadillac Escalade ESV (the "Class Vehicles").

22.     As has been reported to the National Highway Traffic Safety Administration ("NHTSA")[4] through numerous complaints and additional Early Warning Reporting Field Reports, Defendant's L87 V8 engine in the Class Vehicles have experienced and are overly susceptible to engine failure causing a loss of motive power resulting from a failure of the engine bearings.[5]

23.     The NHTSA summary states that "[t]he complainants report a bearing failure that may result in either engine seizure or breaching of the engine block by the connecting rod. The complainants report that there is no detectability prior to the failure." *Id*.

---

[4] NHTSA is the federal agency responsible for keeping people safe on America's roadways. *See* https://www.nhtsa.gov/about-nhtsa (accessed 2/18/25).
[5]    https://static.nhtsa.gov/odi/inv/2025/INOA-PE25001-10002.pdf    (accessed 2/18/25).

24.     "Failure or malfunction of the engine results in loss of motive power of the vehicle, which may lead to an increased risk of a crash resulting in injury and/or property damage." *Id*.

25.     According to the NHTSA, approximately 877,710 vehicles have the L87 V8 engine affected by this issue. *Id*.

### B. Background on Engine Bearings

26.     An engine bearing refers to the "main supports for the major moving parts of an engine" which "reinforc[e] the operating loads and reduc[e] the friction these parts generate."[6]

---

[6] https://www.carparts.com/blog/what-are-engine-bearings-and-why-are-they-important/?srsltid=AfmBOooi4xbaeGRfGxpUsRmkDLFNrUNG8zVR-P9hvW4vHam6CElWjj3V (accessed 2/18/25).

27.     The following image shows a sketch of engine bearings, in addition to an engine's connecting rod and crankshaft[7]:



28.     The following image from gmparts.com shows an engine crankshaft bearing set:[8]

---



29.    Engine bearings are "critical to the operation and performance of the engine, and allow the rotating portions of the crankshaft, camshaft, connecting rods, and more to spin with minimal friction or damage. They must be able to withstand the extreme heat and pressures that build while an engine is running. Most engine bearings do not use any type of roller, instead they use a layer of oil between the faces of the two rotating surfaces."[9]

30.    An engine's connecting rod "provides the mechanical linkage between piston and crankshaft."[10] "Together with the crank, the connecting rod converts the

---

[9]                    https://www.oreillyauto.com/shop/b/bearings---seals/engine-bearings/23d73b7c77fc (accessed 2/18/25).
[10]    https://www.sciencedirect.com/topics/engineering/connecting-rods    (accessed 2/18/25).

reciprocating motion of the piston into the rotation of the crankshaft."[11] An image

of a connecting rod is shown on parts.gmc.com:[12]



31.     The engine's crankshaft "is a crank with a number of handles" and has

"one crank throw for each piston and connecting rod."[13] "As the crankshaft rotates,

it travels all the way to the bottom of the cylinder bore, with the connecting rod

transferring that motion to the corresponding crank throw, which converts the

piston's vertical movement into a rotational motion, all driven by the combustion

---

[11]     https://www.theengineeringchoice.com/what-is-connecting-rod/      (accessed
2/18/25).
[12]            https://parts.gmc.com/product/gm-genuine-parts-engine-connecting-rod-
12648238 (accessed 2/18/25).
[13]     https://www.carparts.com/blog/your-guide-to-understanding-the-basics-of-the-
crankshaft-and-camshaft/?srsltid=AfmBOooaX78HiVoBXab4da-
4GPaXYi_rL0oRBw9DF2-pGOx0EavyDbTu (accessed 2/18/15).

events that happen in sequence in the cylinders above the pistons." *Id*. An image of

a GM engine crankshaft is shown below:[14]



32.     A connecting rod bearing "is a type of engine bearing found at the

junction of the connecting rod or piston rod and the crankshaft. Connecting rod

bearings provide a smooth surface to interface with the crankshaft journal, allowing

for smooth articulation of the piston through the path of its stroke. Also called rod

bearings or engine rod bearings, the rod bearings are typically split into two halves,

---

[14]https://parts.gmparts.com/product/gm-genuine-parts-engine-crankshaft-12691777?srsltid=AfmBOorZUSjfXZTuq7vqaUAfy4TCad_xFhaamp2r9IfOKQclERJtgxmL (accessed 2/18/25).

one of which presses into the connecting rod and the other in the rod cap."[15] The

following is an image of a GM engine connecting rod bearing set:[16]



33.     Further, "[c]onnecting rod bearings provide rotating motion of the

crank pin within the connecting rod, which transmits cycling loads applied to the

piston."[17]

34.     As set forth herein, the Class Vehicles have a common defect that

endangers Class Members, passengers, and other drivers, as the defective engine

bearings are prone to failure, resulting in sudden seizure of the engine. Such engine

---

[15]https://www.oreillyauto.com/shop/b/engines---transmissions/connecting-rods--pistons---rings/connecting-rod-bearings/b58a286269b6 (accessed 2/18/25).

[16]https://parts.gmparts.com/product/gm-genuine-parts-engine-connecting-rod-bearing-set-92028817?srsltid=AfmBOoq44riP4zBiPou11bBObBHSMKXKGb9RnBr_vYOG5Kgp9xXKRwv5 (accessed 2/18/25).

[17]https://www.kingbearings.com/wp-content/uploads/2014/10/Engine-Bearings-and-how-they-work.pdf (accessed 2/18/25).

seizure, often occurring while the Class Vehicle is being driven at full speeds on the road, makes it extremely risky for Class Members to continue to drive their Class Vehicles. This is shown by the narratives of consumers set forth below, many of whom experienced sudden engine seizure while driving Class Vehicles at high speeds.

### C. GM's Knowledge of the Engine Defect

#### 1. GM's knowledge of the Engine Defect from pre-sale testing and publication to dealers

35.      On information and belief, GM performs rigorous pre-sale testing of its engine parts, including the engine bearing and the connecting rod. For example, on a webpage for the sale of Chevrolet parts, it states that "GM Genuine Parts Engine Connecting Rod Bearing Pairs are designed, engineered, and tested to rigorous standards, and are backed by General Motors. GM Genuine Parts are the true OE parts installed during the production of or validated by General Motors for GM vehicles."[18]

36.      Further, on information and belief, GM performs quality control specifically relating to its bearings.[19]

_____

[18] https://parts.chevrolet.com/product/gm-genuine-parts-engine-connecting-rod-bearing-set-19317286 (accessed 2/18/25).

[19]    _See_, _e.g.._, https://www.caranddriver.com/news/a15368085/maliboom-faulty-connecting-rod-bearing-causing-engine-failures-in-gm-four-cylinders/.    (accessed 2/18/25).

37.    Accordingly, based on its pre-sale testing of the relevant engine parts, GM was, and/or should have been aware of, the Engine Defect.

38.    Moreover, GM's knowledge of the Engine Defect is specifically shown by an article it published on gm-techlink.com, a website GM maintains for the purpose of providing information and education to its dealers.[20]

39.    The March 24, 2023 article, entitled "V8 Engine Crankshaft Bearing Conditions," states that "[a] no crank condition may be found on some 2019-2023 Silverado, Sierra; 2021-2023 Tahoe, Suburban, Yukon and Escalade models equipped with the 6.2L V8 engine (RPO L87)."[21] It explains that the "no crank condition may be due to a seized engine with an open starter fuse. Various engine sounds, such as a thumping, knocking or rattling, may be present. These conditions may be the result of crankshaft bearing failure."

40.    The article states that in cases of suspected bearing failure, "first check the engine oil and filter for excessive metal debris and bearing material." *Id*. It adds that "if bearing material is identified, remove the engine oil pan and inspect the crankshaft rod and main bearings for any damage. Component replacement or, depending on the extent of damage, engine replacement may be necessary." *Id*. It

---

[20] *See* https://gm-techlink.com/?page_id=445 ("All content is intended for General Motors dealer educational purposes only") (accessed 2/17/25).
[21] https://gm-techlink.com/?p=17349 (accessed 2/17/25).

further states that "[t]he amount of bearing damage determines if the engine should be replaced." *Id*.

41.    Additionally, GM states that "[i]f there is crankshaft main bearing failure, it may be necessary to also replace the oil cooler, oil cooler lines and oil tank, if equipped, along with the damaged engine components." *Id*.

42.    Accordingly, it is indisputable that GM has had knowledge of the Engine Defect prior to March 24, 2023, the date it published the Tech Link with data about the Silverado, Sierra, Tahoe, Suburban, Yukon, and Escalade models.

43.    Further, as set forth below, GM was aware of the Engine Defect through extensive consumer complaints on both the NHTSA Website and various third party websites and forums.

## 2. GM's knowledge of the Engine Defect from complaints on the NHTSA website

44.    GM also had knowledge of the Engine Defect based on consumer complaints on the NHTSA website.

45.    Upon information and belief, the NHTSA sent complaints it received about the Engine Defect directly to GM.

46.     On information and belief, GM also monitors consumer complaints posted on the NHTSA website, as part of its obligation to report safety defects to the NHTSA.[22]

47.     Complaints on the NHTSA may be monitored and searched by vehicle make, model, and year, and a search of the Class Vehicles yields numerous complaints regarding the Engine Defect, as shown by the following overview:

48.     A consumer from North Carolina wrote on December 16, 2021, regarding her 2021 Chevrolet Silverado 1500 that her local dealer found that "two rods had gone through the engine block and the engine needed to be replaced" and that "[t]he manufacturer was made aware of the failure."

---

[22] https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/mvdefectsandrecalls_808795.pdf.



49.    A consumer from Texas wrote on August 1, 2022, regarding her 2021 GMC Yukon that her dealership "found internal engine bearing material in oil indicating internal mechanical failure. Dealership removed engine oil pan and #1 and #2 connecting rods and found bearings spun causing catastrophic engine failure. . . Dealership then followed bulletin #22-NA-074 for replacement of engine oil, cooler lines and engine oil cooler after connecting rod and main bearing damage."



50.     A consumer from New Hampshire wrote on December 27, 2023, regarding their 2023 Chevrolet Tahoe that their "Car completely died. Engine spun a bearing at 10,000 miles."



51.    Another consumer wrote on March 30, 2024, regarding their 2021 GMC Yukon that they had "[t]otal engine failure due to bearing issues in the bottom half of the engine."



52.     A consumer from South Carolina wrote on April 25, 2024, regarding their 2022 GMC Sierra 1500, that their dealer "diagnosed a failure with the rod bearings. The vehicle was repaired. The manufacturer was notified of the failure but provided no assistance."



53.     A consumer from Texas wrote on June 3, 2024, regarding their 2021 GMC Sierra 1500 that their dealer "confirmed a rod bearing failure."



54.     A consumer from Michigan wrote on June 27, 2024, regarding their 2022 GMC Sierra 1500 limited that the crank bearing spun upon inspection by the dealer and that "[t]his is a known problem by the dealerships, GM & repair shops."



55.     A consumer from New Jersey wrote on September 11, 2024, regarding their 2021 GMC Sierra 1500 that a dealer suspected the crankshaft bearing had seized in their vehicle and that the manufacturer was notified.



56.    A consumer from Alabama wrote on December 13, 2024, regarding their 2020 Chevrolet Silverado 1500 that the "[m]ain bearing on crankshaft went out."



57.    A consumer from Michigan wrote on November 21, 2024, regarding their 2021 GMC Yukon that a repair facility found "[s]pun rod bearings on cylinders 1 and 2 damaged the crankshaft."



58.     A consumer from Texas wrote on January 14, 2025, regarding their 2022 Chevrolet Silverado 1500 that that a rod in the motor went through the engine block.



59.    A consumer from Michigan wrote on January 17, 2025, regarding their 2019 Chevrolet Silverado 1500 that the "[e]ngine failed and had to be replaced because of bearing failure."



60.     A consumer from Michigan wrote on January 17, 2025, regarding their 2023 Chevrolet Silverado that their GM dealership informed them "the thrust bearing went out which may have caused damage to the crankshaft."



61.     A consumer from Michigan wrote on January 17, 2025, regarding their 2024 GMC Sierra 1500 that engine bearing failure caused complete loss of power while driving and that the bearing failure was confirmed by the GM dealer.



62.     A consumer from Indiana wrote on January 17, 2025, regarding their 2022 GMC Yukon that after their engine failed on the highway with little children in the car, their dealer diagnosed "main crank thrust bearing failure."



63.    A consumer from Virgina wrote on January 17, 2025, regarding their 2021 GMC Yukon that technicians diagnosed a "spun rod bearing problem that is very common."



64.     A consumer from Texas wrote on January 18, 2025, regarding their 2021 Chevrolet Silverado 1500 that after their engine stopped working while driving on a highway, a Chevy dealer diagnosed that the bearings failed.



65.    A consumer from Nevada wrote on January 18, 2025, regarding their 2022 Chevrolet Silverado that in March 2024 their vehicle suffered a "catastrophic main crankshaft bearing failure resulting in the vehicle losing power on a local highway."



66.    A consumer from Indiana wrote on January 18, 2025, regarding their 2024 Chevrolet Silverado 1500 that in April 2024 their vehicle "spun a bearing in the lower part of the engine after 1147 miles of use."



67.     A consumer from Oklahoma wrote on January 18, 2025, regarding their 2023 GMC Yukon that their engine failed because the "bearings couldn't get oil."



68.     A consumer from New Mexico wrote on January 18, 2025, regarding their 2023 GMC Yukon that, following their belief their vehicle had a defective connecting rod bearing, their local dealership "confirmed the engine was defective and would require replacement."



January 18, 2025 NHTSA ID NUMBER: 11636784

**Components: ENGINE**

**NHTSA ID Number:** 11636784

**Incident Date** November 23, 2024

**Consumer Location** RIO RANCHO, NM

**Vehicle Identification Number** 1GKS2DKL8PR****

**Summary of Complaint**

| CRASH | No |
|-------|-----|
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

While passing on a two-lane road at approximately 70 MPH, the vehicle stalled and acted as if the engine wasn't running. Pulled over to the side of the road and was able to restart the engine after shifting to park. Engine was harder to start than usual and cranked slowly. After restarting, the engine ran fine for the remainder of the trip, but would occasionally have difficulty cranking. After this incident, the engine developed a knock that would vary with engine RPM, and sounded like a defective connecting rod bearing. Pulled the dipstick and noticed metal shavings in the oil. Took the vehicle to local dealership who confirmed the engine was defective and would require replacement. Vehicle has been at the dealership since December 5th waiting for a backordered engine.

1 Affected Product ▾

Copy Link to Information

2023
**GMC YUKON**
SUV 2WD

**3**
RECALLS

INVESTIGATIONS 1

COMPLAINTS 48

★★★★☆
OVERALL SAFETY RATING

69.    A consumer wrote on January 18, 2025, regarding their 2021 GMC Yukon, that after their car went into neutral while driving next to an 18 wheeler with four children in the car, their dealer determined their vehicle "threw a rod and that the that the engine was broken and the whole engine would need to be replaced."

35



70.     A consumer wrote on January 19, 2025, regarding their 2021 Chevrolet Silverado 1500, that after their vehicle turned off on the freeway in June 2022, their dealership told them their vehicle "spun a bearing and threw two rods and needed a new engine."



71.     A consumer from Tennessee wrote on January 23, 2025, regarding their 2022 GMC Sierra 1500 that their vehicle was repaired at a GM dealer in November 2022 for a spun bearing.



72.     Additional recent complaints on the NHTSA website regarding the

Engine Defect include the following:

- January 18, 2025 (2021 GMC Yukon)
- January 19, 2025 (2021 Chevrolet Silverado 1500)
- January 19, 2025 (2022 Chevrolet Silverado 1500)
- January 19, 2025 (2021 Chevrolet Silverado 1500) (bearing failure left driver stranded in middle of busy interstate)
- January 19, 2025 (2023 Chevrolet Silverado 1500)
- January 19, 2025 (2023 Chevrolet Tahoe) (thrown bearing caused vehicle to go to neutral while driving on five lane highway)
- January 19, 2025 (2019 GMC Sierra Limited 1500)
- January 19, 2025 (2021 GMC Sierra 1500) (rod bearing failure caused engine to seize and nearly caused accident and vehicle to go over cliff)
- January 19, 2025 (2022 GMC Sierra Limited 1500)
- January 19, 2025 (2022 GMC Yukon)
- January 19, 2025 (2023 GMC Yukon)

- January 19, 2025 (2023 GMC Yukon)
- January 20, 2025 (2023 Chevrolet Silverado 1500)
- January 20, 2025 (2021 Chevrolet Silverado 1500)
- January 20, 2025 (2022 Chevrolet Silverado 1500)
- January 20, 2025 (2022 GMC Sierra Limited 1500)
- January 20, 2025 (2022 GMC Sierra Limited 1500)
- January 20, 2025 (2023 GMC Yukon)
- January 20, 2025 (2023 GMC Yukon)
- January 21, 2025 (2020 Chevrolet Silverado 1500)
- January 21, 2025 (2023 Chevrolet Silverado 1500)
- January 21, 2025 (2022 Chevrolet Silverado 1500)
- January 21, 2025 (2024 Chevrolet Suburban)
- January 21, 2025 (2022 GMC Sierra Limited 1500)
- January 21, 2025 (2023 GMC Yukon)
- January 22, 2025 (2022 Chevrolet Silverado 1500)
- January 22, 2025 (2022 GMC Sierra Limited 1500)
- January 22, 2025 (2023 GMC Yukon)
- January 22, 2025 (2023 Cadillac Escalade) (bearing issue caused vehicle to shut down and stop on highway with family of 6 in car)
- January 22, 2025 (2021 Chevrolet Suburban) (engine seizure from main bearing failure left family stranded in middle of night for over seven hours)
- January 23, 2025 (2022 GMC Sierra Limited 1500)
- January 23, 2025 (2023 GMC Sierra Limited 1500)
- January 23, 2025 (2021 GMC Yukon)
- January 23, 2025 (2022 GMC Yukon)
- January 25, 2025 (2023 GMC Sierra Limited 1500)
- January 26, 2025 (2021 Chevrolet Tahoe)
- January 26, 2025 (2023 Chevrolet Tahoe)
- January 27, 2025 (2023 GMC Sierra Limited 1500)
- January 27, 2025 (2021 GMC Yukon)
- January 28, 2025 (2021 GMC Yukon)
- January 28, 2025 (2023 Chevrolet Silverado 1500)
- January 28, 2025 (2024 Chevrolet Silverado 1500)
- January 28, 2025 (2023 GMC Sierra 1500)

- January 28, 2025 (2024 GMC Sierra 1500)
- January 29, 2025 (2024 Cadillac Escalade)
- January 29, 2025 (2021 Chevrolet Silverado 1500) (dealer diagnosed failure of crankshaft bearings and connecting rod bearings on September 2024)
- January 29, 2025 (2023 Chevrolet Silverado 1500)
- January 29, 2025 (2023 Chevrolet Tahoe)
- January 29, 2025 (2023 Chevrolet Tahoe)
- January 29, 2025 (2024 Chevrolet Tahoe)
- January 29, 2025 (2023 GMC Sierra 1500) (bearings failure caused engine shut down while driving on highway with three children in vehicle)
- January 29, 2025 (2021 GMC Yukon)
- January 30, 2025 (2024 Chevrolet Silverado 1500)
- January 30, 2025 (2022 Chevrolet Suburban)
- January 30, 2025 (2022 GMC Sierra 1500)
- January 31, 2025 (2021 GMC Yukon)
- February 1, 2025 (2024 Chevrolet Silverado 1500)
- February 2, 2025 (2023 Chevrolet Tahoe)
- February 2, 2025 (2024 GMC Sierra 1500)
- February 3, 2025 (2021 GMC Yukon) (Chevrolet dealer diagnosed crank bearing failure in September 2023)
- February 6, 2025 (2022 Chevrolet Tahoe)
- February 7, 2025 (2019 GMC Sierra 1500)
- February 10, 2025 (2021 GMC Sierra 1500)
- February 10, 2025 (2023 GMC Sierra 1500)
- February 12, 2025 (2023 GMC Sierra 1500)
- February 13, 2025 (2023 GMC Sierra 1500)

73.     Further, there are at least 175 additional complaints on the NHTSA website involving Class Vehicles, that, although they do not specifically reference a bearing issue, refer to the common symptom of a Class Vehicle's engine seizing or locking up.

74.     Upon information and belief, consumers who submitted a complaint to NHTSA also took their Class Vehicles to GM dealers prior to submitting their complaints to NHTSA, and the dealers reported the issues to GM.

### 3. GM's knowledge of the Engine Defect from complaints on third-party websites and forums

75.     GM's knowledge of the Engine Defect is also evidenced by consumer complaints regarding the Engine Defect on various online websites and forums, in which consumers have, for years, complained of the Engine Defect.

76.     GM routinely monitors the internet for complaints about GM vehicles.

77.     Various consumer complaints about the Engine Defect can be found online.

78.     On December 5, 2021, an owner of a 2021 Chevrolet Silverado posted on the website carcomplaints.com that his local dealer found that "two rods had gone through the engine block and the engine needed to be replaced" and that "[t]he manufacturer was made aware of the failure."[23]

79.     On March 8, 2023, a driver complained about a "Spun Crankshaft Bearing" on his 2022 6.2L Yukon on the website tahoeyukonforum.com. He stated

---

[23]https://www.carcomplaints.com/Chevrolet/Silverado_1500/2021/engine/engine-5.shtml (accessed 2/17/25).

that about three weeks prior, after his vehicle switched to neutral when he was driving at 70mph, his local dealership found that the crankshaft bearing had spun.[24]

80.    On April 1, 2023, a driver of a 2022 Sierra 1500 complained about "Main Bearing Fail" on the website silveradosierra.com.[25]

81.    On July 14, 2023, a driver of a 2023 Yukon posted on tahoeyukonforum.com: "Spun Crankshaft Bearing Cause?" and stated that his 2023 Yukon died on May 6, 2023. He added that his dealer said there was a "nationwide backlog for the 6.2L."[26]

82.    On February 26, 2024, a driver complained on the website tahoeyukonforum.com of "Main bearing failure" on his 2023 Yukon Denali, as he was informed by his dealer on or about February 26, 2024.[27]

---

[24]    https://www.tahoeyukonforum.com/threads/2022-6-2l-yukon-spun-crankshaft-bearing.140149/ (accessed 2/17/25).
[25]    https://www.silveradosierra.com/threads/6-2-main-bearing-fail.752695/ (accessed 2/17/25).
[26]    https://www.tahoeyukonforum.com/threads/spun-crankshaft-bearing-cause.142697/ (accessed 2/17/25).
[27]    https://www.tahoeyukonforum.com/threads/main-bearing-failure-on-6-2l-for-me-ugh.146957/ (accessed 2/17/25).

83.     On March 4, 2024, a driver complained about "Main Bearing Failure with a 6.2L at 3,200 miles" on the website tahoeyukonforum.com, stating his local dealer determined his truck had a "spun bearing" and needed a new engine.[28]

84.     On March 18, 2024, a driver of a Yukon Denali stated on tahoeyukonforum.com that his "Denali 6.2 spun a rod bearing at 25k."[29]

85.     On December 12, 2024, a driver of a 2021 Yukon Denali stated on tahoeyukonforum.com that his vehicle "suffered a spun rod bearing at 44k miles," as he was informed by his GMC dealership on or about December 9, 2024.[30]

86.     Upon information and belief, and as referenced in many online comments, consumers who submitted complaints on third-party websites also took their Class Vehicles to GM dealers at or around the time of their online complaints, and the dealers reported the issues to GM.

### 4. GM's knowledge of the Engine Defect from its dealers and legal actions

87.     GM also gained knowledge of the Engine Defect from its dealers and via legal actions involving Class Vehicles with the Engine Defect.

---

[28] https://www.tahoeyukonforum.com/threads/main-bearing-failure-with-6-2l-at-3-200-miles.147085/ (accessed 2/17/25).

[29] https://www.tahoeyukonforum.com/threads/stunned-denali-6-2-spun-a-rod-bearing-at-25k.147553/ (accessed 2/17/25).

[30] https://www.tahoeyukonforum.com/threads/spun-rod-bearing-2021-yukon-denali-6-2-l.151892/ (accessed 2/17/25).

88.   For example, in September 2024, Plaintiff took his vehicle to GM's authorized dealer and told them of a rattling sound heard when accelerating.

89.   The next month, Plaintiff was back because his check engine light was on and a knocking sound was coming from the engine.  Upon examining the oil, the dealer discovered metal in the oil. Upon further examination, the dealer discovered the bearing and connecting rod had broken into many pieces damaging the engine block.

90.   Upon information and belief, GM's authorized dealers report information about the Engine Defect, including Plaintiff's information, to GM.

91.   Legal actions filed by other consumers also demonstrate knowledge by GM's authorized dealers and GM.

92.   For example, in *Sullivan v. General Motors*, 2:24-cv-02309 (E.D. La.), filed on September 24, 2024, the plaintiff alleged that his 2023 Sierra 1500 had the Engine Defect. He further alleges that GM's dealer made the following notations:

> *Customer states there is a knocking sound coming from the engine. Found thrust bearing and crank discolored and rod bearing in pieces in oil pan. Found [truck's] oil is contaminated with metal.*[31]

---

[31] Dkt. 1, ¶ 9.

93.    The plaintiff also alleges that he "directly notified [GM] of the defects, non-conformities, and conditions in the Vehicle."[32]

94.    In another online forum, a consumer with a 2021 Sierra complained in 2023 that he already had two blown engines after only 25,000 miles, with the most recent being because of spun bearings.[33]  He described the incident as follows:

> I was on interstate in bumper to bumper traffic. All I did was take my foot off brake to start rolling. No warnings. Engine locked up and shut down. I'm on pace to have an engine replacement every 7-8 months. Third engine in 22 months.[34]

95.    On February 20, 2023, the consumer described the "official diagnosis," which, upon information and belief, came from a GM dealer: "#3 & 4 rod bearing spun & stacked, crankshaft journals damaged. Full engine replacement."[35]

96.    On February 28, 2023, the consumer indicated he had filed a legal action[36] and on May 2, 2023, he described a settlement: "GM finally settled out of

---

[32] *Id.* ¶ 11.

[33] https://www.silveradosierra.com/threads/2021-at4-25k-miles-two-blown-6-2-engines.751836/?post_id=7376211&nested_view=1&sortby=oldest#post-7376211 (user "Barnes53") (accessed 2/18/25).

[34] *Id.* (Feb. 20, 2023).

[35] *Id.*

[36] *Id.*

court. They are buying the truck back and returning all payments along with collateral costs in addition to covering lawyer costs."[37]

97.     Upon information and belief, GM has had knowledge of the Engine Defect because GM has been subject to other lawsuits or private arbitrations involving the Engine Defect.

### D. The Engine Defect is a Material Fact that GM Failed to Disclose

98.     Based on the above, GM has been aware of the Engine Defect in the Class Vehicles since at least 2022, and likely prior to 2022.

99.     The existence of the Engine Defect is a material fact, because a reasonable consumer would likely consider it important to know, when purchasing or leasing a vehicle, that the engine bearings may cause the engine to seize up and fail while driving, such that the driver, passenger, and other individuals in nearby vehicles are at substantial risk.

100.     Furthermore, the existence of the Engine Defect is also a material fact because a reasonable consumer would likely be induced to change his or her decision to purchase or lease one of the Class Vehicles based on knowing that the engine bearings may cause the engine to seize up and fail while driving, such that the driver, passenger, and other individuals in nearby vehicles are at substantial risk.

---

[37]https://www.silveradosierra.com/threads/2021-at4-25k-miles-two-blown-6-2-engines.751836/page-2?nested_view=1&sortby=oldest (accessed 2/18/25).

101.    Although, as set forth herein, it has known about the Engine Defect for several years, GM failed to inform Plaintiff and Class Members of the Engine Defect prior to their purchases or leases of Class Vehicles.

102.    For example, despite having a webpage specifically entitled "Vehicle Safety," as set forth above, GM failed to make any disclosure relating to the Engine Defect on this webpage.

103.    GM also did not make any disclosures relating to the Engine Defect on any other easily accessible webpage relating to its Class Vehicles or components thereof.

104.    Nor did GM notify its dealers that they should inform potential purchasers of the Class Vehicles about the Engine Defect prior to selling a vehicle.

105.    GM should have disclosed to consumers, and directed its dealers to disclose to consumers, the existence of the Engine Defect in Class Vehicles.

106.    GM also had a duty to disclose the Engine Defect because it presented a safety hazard to consumers.

107.    By failing to make adequate disclosures on its webpages or other materials provided to consumers, and by failing to direct its dealers to make these disclosures, GM prevented consumers from learning about the existence and nature of the Engine Defect prior to their purchases or leases.

108. As a result, GM obtained money from consumers through their purchases or leases of Class Vehicles in transactions in which Class Members lacked material information relevant to their purchases or leases.

109. Plaintiff and Class Members have been damaged by GM's conduct and omissions because they purchased or leased a Class Vehicle of a quality different than promised and, in some instances, have been charged to make attempts to repair the Engine Defect—though no adequate repair is currently known.

**E. Plaintiff's Experience**

110. In October 2022, Plaintiff bought a 2023 Yukon Denali ("Plaintiff's Vehicle") from Laura Buick GMC, Inc., in Collinsville, Illinois.

111. Plaintiff's Vehicle was for Plaintiff's personal use.

112. Before his purchase Plaintiff spent time searching on GM's website several times looking at the 2023 Yukon Denali and its features, but there was no mention of the Engine Defect. Plaintiff also looked at 2023 Yukons offered for sale on the website of Laura Buick GMC, Inc, but there was no mention of the Engine Defect. Nor did the salesperson or any other document inform Plaintiff about the Engine Defect prior to his purchase of Plaintiff's Vehicle.

113. Plaintiff expected that the engine in Plaintiff's Vehicle would function properly and would be free of defects.

114.    The inclusion of the engine that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff.

115.    Plaintiff was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff's Vehicle.

116.    Because of the undisclosed defect, Plaintiff's Vehicle was worth less than what he actually paid for it.

117.    Had Plaintiff been aware of the defect, he would not have purchased the vehicle or would have paid less for it.

118.    In October 2024, Plaintiff brought Plaintiff's Vehicle to Laura Buick GMC, Inc. after the check engine light appeared, where it was diagnosed with the Engine Defect, including metal in the oil, a spun connecting rod bearing, and damage to the engine block. Although his engine was replaced, it was replaced with another L87 V8 engine, and thus the Engine Defect still exists in Plaintiff's Vehicle.

119.    The Engine Defect present in Plaintiff's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff, including by creating a safety risk. Thus, Plaintiff faces the risk of future harm for which legal remedies are inadequate.

120.    GM has not directly disclosed to Plaintiff the existence of the Engine Defect or any fix for the Engine Defect.

121.   Plaintiff also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

122.   Accordingly, without such acknowledgment of or fix for the Engine Defect, Plaintiff will continue to suffer harm for which remedies at law are inadequate.

## CLASS ACTION ALLEGATIONS

123.   **The Class.**  Plaintiff brings this action on his own behalf and as a class action on behalf of all similarly-situated owners and lessees of Class Vehicles.

124.   Specifically, Plaintiff seeks to represent the following Classes:

All persons who reside in Illinois who, within the applicable period of limitations preceding the filing of this lawsuit to the date of class certification, purchased or leased a "Class Vehicle."

(The "Illinois Class")

All persons who reside in California, Florida, Illinois, Michigan, Missouri, Ohio, Oregon, South Carolina, Tennessee, Virginia, or Washington, who, within the applicable period of limitations

preceding the filing of this lawsuit to the date of class certification, purchased or leased a "Class Vehicle."[38]

(The "Consumer Fraud Multi-State Class")[39]

125.    A "Class Vehicle" is defined as a 2019-2024 Chevrolet Silverado 1500; 2021-2024 Chevrolet Tahoe; 2021-2024 Chevrolet Suburban; 2019-2024 GMC Sierra 1500; 2021-2024 GMC Yukon; 2021-2024 GMC Yukon XL; 2021-2024 Cadillac Escalade; or 2021-2024 Cadillac Escalade ESV.

126.    Excluded from the Classes are officers, directors and employees of GM, counsel and members of the immediate families of counsel for Plaintiff herein, and the judge presiding over this action and any member of the judge's immediate family.

---

[38] Plaintiff reserves the right to add or remove states from the Consumer Fraud Multi-State Class
at the time of class certification based on information obtained during discovery. Plaintiff asserts
that the states included in the Consumer Fraud Multi-State Class have similar consumer fraud
laws under the facts of this case. *See* California (Cal. Business & Professions Code §§ 17200 et seq.; Cal. Civil Code § 1750 *et seq*.); Florida (Fla. Stat. § 501.201, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Ohio (Ohio Rev. Code Ann. § 1345.01, et seq.); Oregon (Or. Rev. Stat. § 646.605, et seq.); South Carolina (S.C. Code Ann. § 39-5-10, et seq.); Tennessee (Tenn. Code Ann. § 47-18-101 et seq.); Virginia (VA Code § 59.1-196, et seq.); and Washington (Wash. Rev. Code § 19.86.010, et seq.).

[39] The Illinois Class and the Consumer Fraud Multi-State Class are collectively referred to herein as the "Class" or the "Classes."

127.  This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4).

128.  Plaintiff reserves the right to amend or modify the Class definitions and/or Class Vehicles with greater specificity or division into subclasses prior to class certification and after having had an opportunity to conduct discovery.

129.  **Numerosity.**  The members of each proposed Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the number of Class Vehicles exceeds 800,000.  The precise number of Class Members is unknown at this time, as such information is in the exclusive control of GM and/or third parties.

130.  **Common Questions of Law and Fact and Predominance.**  Numerous questions of law and fact are common to Plaintiff and the Class Members, and predominate over any individual questions.  Such common legal and factual questions include, but are not limited to:

    a.  Whether GM sells or has sold vehicles that have the Engine Defect described herein;

    b.  When GM first learned of the Engine Defect;

    c.  Whether GM has omitted relevant information regarding the Engine Defect from its communications with consumers prior to their purchases or leases;

    d.  Whether and to what capacity GM is able to remedy the Engine Defect;

e.     Whether GM's actions described herein are unfair, deceptive, or constitute an omission of a material fact under ICFA and the consumer protection laws of the states in the Consumer Fraud Multi-State Class;

f.     Whether GM's actions described herein are unethical;

g.     Whether Plaintiff and the Class Members are entitled to compensatory damages, and the amount of such damages based on GM's sale and/or lease of vehicles with the Engine Defect;

h.     Whether injunctive and/or other equitable relief is warranted; and

i.     Whether Plaintiff and the Class Members are entitled to an award of punitive damages as permitted by the Illinois Consumer Fraud and Deceptive Business Practices Act and/or the consumer protection laws of the states in the Consumer Fraud Multi-State Class.

131.   **Typicality.**   Plaintiff's claims are typical of the claims of the Class Members.   Plaintiff and all Class Members have suffered damages as a result of GM's unfair acts and omissions in failing to disclose the Engine Defect prior to their purchases or leases of Class Vehicles.

132.   **Adequacy of Representation.**   Plaintiff will fairly and adequately represent and protect the interests of the proposed Classes.   Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and consumer class actions.

133.   Plaintiff and counsel are committed to prosecuting this action vigorously on behalf of the Classes, and do not have any interests that are contrary to or in conflict with those of the Classes they seek to represent.

134.   **Superiority.**  A class action is superior to all other available methods for fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

135.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications concerning the subject of this action.

136.   Absent a class action, the vast majority of Class Members likely would not be in a position to litigate their claims individually and would have no effective remedy at law through which to vindicate their claims against GM and be made whole.

137.   Class treatment will conserve the resources of the courts and the litigants, and further efficient adjudication of Class Member claims.

138.   **Class Action on Limited Issues.**   Because there are common individual issues among the Class, it is appropriate for this action to be maintained as a class action with respect to particular issues if necessary.

## COUNT I: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICE ACT BY MEANS OF UNFAIR BUSINESS PRACTICES

### (On behalf of Plaintiff and the Illinois Class)

139.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs.

140.    Each Class Vehicle is "merchandise" pursuant to 815 ILCS § 505/1(b).

141.    The advertising, offering for sale, sale, and/or distribution of the Class Vehicles constitutes "trade" or "commerce" pursuant to 815 ILCS § 505/1(f).

142.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2 ("ICFA"), prohibits unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

143.    Pursuant to ICFA, GM has a duty not to engage in any unethical or unfair practice in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

144.    As shown above, GM has known about the Engine Defect since at least early in 2022. Yet it failed to inform Plaintiff and the Illinois Class about the Engine Defect prior to their purchases or leases of Class Vehicles.

145.    At a minimum, GM omitted material facts by not disclosing to Plaintiff and the Illinois Class prior to their purchases or leases that the Class Vehicles have a known issue where bearings may fail and cause the engine to seize up while the vehicle is being driven so that consumers would understand the risk associated with driving a Class Vehicle.

146.    The existence of the Engine Defect is a fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner.

147.    GM's omission of the Engine Defect constituted a failure to disclose material facts that were known to it, or that, upon reasonable inquiry, would be known to it.

148.    Selling or leasing vehicles to Plaintiff and Class Members that contain the Engine Defect, while knowing of the defect but not disclosing it prior to

Plaintiff's and Class Members' purchases or leases, is unfair and unethical and violates generally accepted principles of ethical business conduct.

149.    GM's unfair and unethical actions in failing to inform Plaintiff and the Illinois Class about the known Engine Defect prior to their purchases or leases were therefore purposeful, as GM chose not to give them any information regarding the Engine Defect prior to their purchases or leases, despite having had knowledge of the Engine Defect for many years.

150.    Section 2 of ICFA further prohibits unfair methods of competition and unfair or deceptive acts or practices, including "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act[.]'"

151.    Section 2 also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."

152.    As set forth above, GM engaged in, *inter alia*, the following deceptive trade practices described in Section 2 of the Uniform Deceptive Trade Practices Act in transactions with Plaintiff and the Illinois Class in Illinois which were intended to result in, and did result in, the sale of the Class Vehicles:

a.    Representing that the Class Vehicles have characteristics, uses, and/or benefits that they do not have.

  b.  Representing that the Class Vehicles are of a particular standard, quality, or grade when they are of another.

  c.  Advertising goods with intent not to sell them as advertised.

  d.  Concealing, omitting, and/or suppressing material facts regarding the Engine Defect for the Class Vehicles so as to create a likelihood of confusion or misunderstanding.

153. The acts and practices engaged in by GM, as set forth herein, constitute unfair business practices in violation of 815 ILCS § 505/1 *et seq.* because they: (a) offend public policy; (b) are immoral, unethical, oppressive, or unscrupulous; and/or (c) cause substantial injury to consumers.

154. The aforesaid unfair acts and practices occurred in the course of conduct involving trade or commerce.

155. GM intended that Plaintiff and the Illinois Class rely on the aforesaid unfair acts and practices.

156. Plaintiff is a "consumer" under ICFA because he purchased a Class Vehicle for personal use.

157. Moreover, GM's conduct as set forth herein involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.

158.   Had GM disclosed the Engine Defect, Plaintiff and other members of the Illinois Class would not have purchased or leased the Class Vehicles or would have paid less for them.

159.   As a direct and proximate result of the aforesaid violations of ICFA, Plaintiff and the Illinois Class have suffered an ascertainable loss of money by paying for vehicles with properly functioning engines without being told of the Engine Defect by GM prior to their purchases or leases, but instead received vehicles that had defective engines that were therefore worth a lesser value. Thus, Plaintiff and the Illinois Class paid more than the actual value for the Class Vehicles.

160.   GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the Illinois Class in an amount to be determined at trial.

161.   GM continues to market, advertise, and sell the Class Vehicles in the unfair manner described herein.

162.   The Engine Defect present in the Class Vehicles has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff and the Illinois Class, including by creating a safety risk. Thus, Plaintiff and the Illinois Class face the risk of future harm for which legal remedies are inadequate.

163.   GM has not directly disclosed to Plaintiff and the Illinois Class the existence of the Engine Defect or any fix for the Engine Defect.

164.    Plaintiff and the Illinois Class also desire to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending their money to purchase such vehicles from GM in the future if GM acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff and the Illinois Class to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

165.    Accordingly, without such acknowledgment of or fix for the Engine Defect, Plaintiff and the Illinois Class will continue to suffer harm for which remedies at law are inadequate.

166.    815 ILCS § 505/10 permits the Court to enter injunctive relief to prevent GM's continued violation of the law by continuing to market, advertise, and sell the Class Vehicles in the unfair manner described herein, to oversee a corrective advertising campaign, and/or to oversee other corrective action such as an inspection program and installation of non-defective engines.

167.    GM's conduct as aforesaid was and continues to be wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and others similarly situated and, therefore, warrants the imposition of punitive damages.

168.    Plaintiff has been forced to hire attorneys to enforce its rights under ICFA.

WHEREFORE, Plaintiff and the Illinois Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT II: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICE ACT BY MEANS OF DECEPTION

### (On behalf of Plaintiff and the Illinois Class)

169.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs.

170.    GM's false and/or misleading statements, omissions, and misrepresentations described herein constitute deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of material facts in connection with the sale of merchandise in Illinois.

171.    The acts and practices engaged in by GM, as set forth herein, constitute deceptive and/or fraudulent business practices in violation of 815 ILCS § 505/1 *et seq*.

172.    The aforesaid fraudulent and deceptive acts and practices occurred in the course of conduct involving trade or commerce.

173.    GM intended that Plaintiff and the Illinois Class rely on the aforesaid deceptive advertising, acts and practices.

174.    Had GM disclosed the Engine Defect, Plaintiff and other members of the Illinois Class would not have purchased or leased the Class Vehicles or would have paid less for them.

175.    As a direct and proximate result of the aforesaid violations of ICFA, Plaintiff and the Illinois Class have suffered an ascertainable loss of money by paying for vehicles with properly functioning engines without being told of the Engine Defect by GM prior to their purchases or leases, but instead received vehicles that had defective engines that were therefore worth a lesser value.

176.    GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the Illinois Class in an amount to be determined at trial.

177.    GM continues to market, advertise, and sell the Class Vehicles in the deceptive manner described herein.

178.    The Engine Defect present in the Class Vehicles has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff and the Illinois Class, including by creating a safety risk. Thus, Plaintiff and the Illinois Class face the risk of future harm for which legal remedies are inadequate.

179.    GM has not directly disclosed to Plaintiff and the Illinois Class the existence of the Engine Defect or any fix for the Engine Defect.

180.    Plaintiff and the Illinois Class also desire to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending their money to purchase such vehicles from GM in the future if GM acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff and the Illinois Class to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

181.    Accordingly, without such acknowledgment of or fix for the Engine Defect, Plaintiff and the Illinois Class will continue to suffer harm for which remedies at law are inadequate.

182.    815 ILCS § 505/10 permits the Court to enter injunctive relief to prevent GM's continued violation of the law by continuing to market, advertise, and sell the Class Vehicles in the deceptive manner described herein, to oversee a corrective advertising campaign, and/or to oversee other corrective action such as an inspection program and the installation of non-defective engines.

183.    GM's conduct as aforesaid was and continues to be wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and others similarly situated and, therefore, warrants the imposition of punitive damages.

184.    Plaintiff has been forced to hire attorneys to enforce its rights under ICFA.

WHEREFORE, Plaintiff and the Illinois Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT III: VIOLATION OF THE STATE CONSUMER PROTECTION STATUTES

### (On behalf of Plaintiff and the Consumer Fraud Multi-State Class)

185.    Plaintiff and the Consumer Fraud Multi-State Class reallege and incorporate by reference, as though fully set forth herein, paragraphs 1-138 of this Complaint.

186.    Defendant's conduct as alleged herein violates the consumer protection statutes of each of the states encompassing the Consumer Fraud Multi-State Class.

187.    By its concealment, suppression or omission of material facts in connection with the sale of merchandise as set forth herein, Defendant engaged in deceptive business practices prohibited by the consumer protection statutes of the states in the Consumer Fraud Multi-State Class.

188.    In the course of its business, Defendant willfully concealed, suppressed, or omitted material facts and deceived consumers regarding the Engine Defect in the Class Vehicles, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

189. Defendant is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the consumer protection statutes of the states in the Consumer Fraud Multi-State Class.

190. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

191. As alleged herein, Defendant knew and/or should have known of the Engine Defect, while Plaintiff and the Consumer Fraud Multi-State Class were deceived by Defendant's concealment, suppression or omission into believing the Class Vehicles had working engines not subject to the Engine Defect, and this information could not have reasonably been known by the consumer.

192. The existence of the Engine Defect is a fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner.

193.    GM's omission of the Engine Defect constituted a failure to disclose material facts that were known to it, or that, upon reasonable inquiry, would be known to it.

194.    Defendant's unfair or deceptive acts or practices were likely to and did deceive reasonable consumers, including Plaintiff and the Consumer Fraud Multi-State Class. Defendant intentionally and knowingly concealed, suppressed, or omitted material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Consumer Fraud Multi-State Class.

195.    The existence of the Engine Defect was material to Plaintiff and the Consumer Fraud Multi-State Class. Had GM disclosed the Engine Defect, Plaintiff and other members of the Consumer Fraud Multi-State Class would not have purchased or leased the Class Vehicles or would have paid less for them.

196.    As a direct and proximate result of the aforesaid conduct, Plaintiff and the Consumer Fraud Multi-State Class have suffered an ascertainable loss of money by paying for vehicles with properly functioning engines without being told of the Engine Defect by GM prior to their purchases or leases, but instead received vehicles that had defective engines that were therefore worth a lesser value.

197.    GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the Consumer Fraud Multi-State Class in an amount to be determined at trial.

198.   GM continues to market, advertise, and sell the Class Vehicles in the deceptive manner described herein.

199.   The Engine Defect present in the Class Vehicles has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff and the Consumer Fraud Multi-State Class, including by creating a safety risk. Thus, Plaintiff and the Consumer Fraud Multi-State Class face the risk of future harm for which legal remedies are inadequate.

200.   GM has not directly disclosed to Plaintiff and the Consumer Fraud Multi-State Class the existence of the Engine Defect or any fix for the Engine Defect.

201.   Plaintiff and the Consumer Fraud Multi-State Class also desire to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending their money to purchase such vehicles from GM in the future if GM acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff and the Consumer Fraud Multi-State Class to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

202.   Accordingly, without such acknowledgment of or fix for the Engine Defect, Plaintiff and the Consumer Fraud Multi-State Class will continue to suffer harm for which remedies at law are inadequate.

203.    Plaintiff and the Consumer Fraud Multi-State Class seek injunctive relief to prevent GM's continued violation of the law by continuing to market, advertise, and sell the Class Vehicles in the deceptive manner described herein, to oversee a corrective advertising campaign, and/or to oversee other corrective action such as an inspection program and the installation of non-defective engines.

204.    GM's conduct as aforesaid was and continues to be wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and others similarly situated and, therefore, warrants the imposition of punitive damages.

205.    Plaintiff and the Consumer Fraud Multi-State Class have been forced to hire attorneys to enforce their rights.

WHEREFORE, Plaintiff and the Consumer Fraud Multi-State Class pray for the relief requested in the Prayer for Relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, seeks the following relief:

A.    certification of the Classes pursuant Federal Rule 23;

B.    appointing Plaintiff as the Class Representative and Plaintiff's attorneys as Class Counsel;

C.    awarding Plaintiff and the Classes compensatory damages, in an amount to be proved at trial;

D.      awarding Plaintiff and the Classes injunctive relief as permitted by law or equity, including, but not limited to, enjoining GM from continuing the unlawful practices as set forth herein and ordering GM to engage in a corrective advertising campaign, and to take other corrective action such as the creation of an inspection program and the installation of non-defective engines;

E.      awarding punitive damages for Plaintiff and the Classes under the Illinois Consumer Fraud and Deceptive Business Practices Act and/or under the laws of the states in the Consumer Protection Multi-State Class in an amount to punish GM's egregious conduct as set forth above and to deter GM and others from engaging in similar conduct;

F.      awarding pre-judgment and post-judgment interest;

G.      awarding attorneys' fees and costs; and

H.      providing such further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 18, 2025                    Respectfully submitted,

                                            s/    *Nicholas A. Coulson*
                                            Nicholas A. Coulson (P78001)
                                            Julia G. Prescott
                                            **COULSON P.C.**
                                            300 River Place Drive, Suite 1700
                                            Detroit, Michigan 48207
                                            T: (313) 645-0045
                                            E: nick@coulsonpc.com
                                            E: jprescott@coulsonpc.com


                                            Kevin P. Green*
                                            Daniel S. Levy*
                                            GOLDENBERG HELLER
                                            & ANTOGNOLI, P.C.
                                            2227 South State Route 157
                                            Edwardsville, IL 62025
                                            618-656-5150
                                            kevin@ghalaw.com
                                            daniel@ghalaw.com

                                            Christopher J. Petri*
                                            BYRON CARLSON PETRI & KALB, LLC
                                            411 Saint Louis Street
                                            Edwardsville , Illinois   62025
                                            Telephone: (618) 655-0600
                                            Facsimile: (618) 655-4004
                                            cjp@bcpklaw.com

                                            Mike Arias*
                                            M. Anthony Jenkins*
                                            ARIAS SANGUINETTI WANG &
                                            TEAM, LLP
                                            6701 Center Drive West, 14th Floor

Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
mike@aswtlawyers.com
anthony@aswtlawyers.com

*applications for admission and/or *pro hac vice* admission forthcoming

**Attorneys for Plaintiff**