# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| JAMES S. POWELL, II, CRAIG PERRY, TIFFANY RUSZENAS, EVONNE HENDERSON, KEVIN WRIGHT, ERIC KRUSH, TROY POPIELARZ, JONATHAN BENNETT, LARRY BENSEL, KEVIN FENSTERMAKER, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, LLC,<br><br>        Defendant. | Case 4:25-cv-10479-SDK-KGA<br><br>JURY TRIAL DEMANDED |

## **FIRST AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

THE PARTIES ..................................................................................4

JURISDICTION AND VENUE ..........................................................6

FACTUAL ALLEGATIONS ...............................................................7

    A.    GM's Manufacture, Sale, and Warranty of Class Vehicles .................7

    B.    Overview of the L87 Engine, Engine Bearings, Crankshaft, and Connecting Rod in the Class Vehicles .................................11

    C.    The L87 Engines Are Defective ...........................................20

    D.    GM's Knowledge of the Engine Defect .................................22

        1.    GM's knowledge of the Engine Defect beginning in 2021 from pre-sale testing, internal investigations, and publication to dealers ................................................22

        2.    GM's knowledge of the Engine Defect from complaints on the NHTSA website ...........................................25

        3.    GM's knowledge of the Engine Defect from complaints on third-party websites and forums ..........................43

        4.    GM's knowledge of the Engine Defect from its dealers and legal actions................................................46

    E.    The Engine Defect is a Material Fact that GM Failed to Disclose .....49

    F.    After Much Delay, GM Institutes an Inadequate Recall....................51

    G.    Class Members Have Been and Continue to Be Damaged By GM's Conduct...........................................................................59

    H.    Plaintiffs' Experiences ........................................................65

        1.    Plaintiff Powell ..........................................................65

        2.    Plaintiff Perry...........................................................68

3.      Plaintiff Ruszenas .......................................................72

4.      Plaintiff Henderson .....................................................77

5.      Plaintiff Wright ..........................................................81

6.      Plaintiff Krush ...........................................................84

7.      Plaintiff Popielarz ......................................................88

8.      Plaintiff Bennett ........................................................92

9.      Plaintiff Bensel..........................................................96

10.     Plaintiff Fenstermaker .................................................99

CLASS ACTION ALLEGATIONS .........................................................104

COUNT I:        Common Law Fraud ..................................................109

COUNT II:       Unjust Enrichment ...................................................112

COUNT III:      Breach of the Implied Warranty of Merchantability—
                Uniform Commercial Code .........................................114

COUNT IV:       Violation of the Illinois Consumer Fraud and Deceptive
                Business Practice Act by Means of Unfair Business
                Practices, 815 ILCS 505/1 *et seq.* ................................116

COUNT V:        Violation of the Illinois Consumer Fraud and Deceptive
                Business Practice Act by Means of Deception, 815
                ILCS 505/1 *et seq.* ...................................................121

COUNT VI:       Breach of Express Warranty, 810 ILCS 5/2-313 and
                5/2A-210 ...............................................................123

COUNT VII:      Breach of the Implied Warranty of Merchantability, 810
                ILCS 5/2-314 and 5/2A-212 .......................................127

COUNT VIII:     Violation of the Florida Deceptive and Unfair Trade
                Practices Act, Fla Stat. §§ 501.201, *et seq*..................129

COUNT IX:       Breach of Express Warranty, Fla. Stat. §§ 672.313 and
                680.21....................................................................132

iii

COUNT X:        Breach of the Implied Warranty of Merchantability, Fla
                Stat. §§ 672.314 and 680.212 ....................................................136

COUNT XI:       Violation of the Pennsylvania Unfair Trade Practices
                and Consumer Protection Law, 73 P.S. & 201-1 *et seq*. ............138

COUNT XII:      Breach of Express Warranty, 13. PA. Cons. Stat. §§
                2313 and 2A210....................................................................142

COUNT XIII:     Breach of Implied Warranty of Merchantability, 13. PA.
                CONS. STAT. §§ 2314 and 2A212 ............................................147

COUNT XIV:      Violation of the Montana Unfair Trade Practices and
                Consumer Protection Act, Mont. Code § 30-14-101, *et.*
                *seq*. ....................................................................................149

COUNT XV:       Breach of Express Warranty, Mont. Code § 30-2-313
                and 30-2A-210 ......................................................................153

COUNT XVI:      Breach of Implied Warranty, Mont. Code § 30-2-314
                and 30-2A-212 ......................................................................157

COUNT XVII:     Violation of the Missouri Merchandising Practices Act,
                Mo. Rev. Stat. § 407.010, *et. seq*.............................................159

COUNT XVIII:    Breach of Express Warranty, Mo. Rev. Stat. § 400.2-
                313 and § 400.2A-210 .............................................................164

COUNT XIX:      Breach of the Implied Warranty of Merchantability,
                Mo. Rev. Stat. § 400.2-314 and § 400.2A-212............................168

COUNT XX:       Violation of the Tennessee Consumer Protection Act,
                Tenn. Code Ann. § 47-18-101, *et seq*.........................................169

COUNT XXI:      Breach of Express Warranty, Tenn Code § 47-2-313 and
                § 47-2A-210 ..........................................................................173

COUNT XXII:     Breach of the Implied Warranty of Merchantability,
                Tenn. Code § 47-2-314 and § 47-2A-212....................................177

COUNT XXIII:    Violation of the Oregon Unlawful Trade Practices Act
                § 646.605, *et seq*. ...................................................................178

COUNT XXIV: Breach of Express Warranty, Oregon Rev. Stat. §
72.3130 and § 72A.2100 ............................................................184

COUNT XXV: Breach of the Implied Warranty of Merchantability,
Oregon Rev. Stat. § 72.3140 and § 72A.2120 ...........................187

COUNT XXVI: Violation of the Consumer Fraud Act, Ariz. Rev. Stat.
§§ 44-1521, *et seq*. .....................................................................189

COUNT XXVII: Breach of Express Warranty, Ariz. Rev. Stat. § 47-2313
and § 47-2A210 ..........................................................................193

COUNT XXVIII: Breach of the Implied Warranty of Merchantability,
Ariz. Rev. Stat. § 47-2314 and § 47-2A212 ...............................196

COUNT XXVIX: Violation of the State Consumer Protection Statutes .............198

PRAYER FOR RELIEF ........................................................................202

JURY DEMAND ................................................................................204

PLAINTIFFS James S. Powell II, Craig Perry, Tiffany Ruszenas, Evonne Henderson, Kevin Wright, Eric Krush, Troy Popielarz, Jonathan Bennett, Larry Bensel, Kevin Fenstermaker ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this First Amended Complaint ("Amended Complaint") against Defendant General Motors, LLC ("GM"), based on personal knowledge as to their own actions and on information and belief, based on the investigation of counsel, as to GM's conduct and practices.

## **INTRODUCTION**

1.      Plaintiffs bring this class action individually and on behalf of a Class of similarly situated individuals (referred to collectively as "Class Members") who purchased or leased specified models and years of GM vehicles (the "Class Vehicles" as further defined herein), which are equipped with a GM 6.2-liter V-8 L87 engine (the "L87 Engine"). The Class Vehicles share a common defect because they are equipped with the defective L87 Engine. The L87 Engine is highly susceptible to engine damage and sudden loss of power while the vehicle is being driven. As explained further below, the defect arises from, but is not limited to, the bearings in the L87 Engines which are prone to, and have experienced failure, along with improper crankshaft dimensions and surface finish, resulting in engine damage, breaching of the engine block by the connecting rod and/or engine seizure (the "Engine Defect").

2.     The Engine Defect makes continued use of the Class Vehicles unsafe because drivers are unable to sense an issue with their engine prior to the engine failure occurring. This is particularly dangerous because the Engine Defect results in a sudden loss of power of the vehicle, often while it is being driven at high speeds, thus significantly increasing the risk of a dangerous crash and/or injury. Plaintiffs and Class Members have therefore purchased or leased vehicles that subject them to serious risk.

3.     In addition to rendering the Class Vehicles unsafe to drive, the Engine Defect significantly reduces the value of the Class Vehicles.

4.     As set forth herein, GM has known about the Engine Defect for several years but failed to disclose it to Class Members prior to their purchases or leases of Class Vehicles.

5.     Following an investigation conducted by the National Highway Traffic Safety Administration ("NHTSA")[1], GM acknowledged there are defects in the L87 Engine. A "Recall Report" dated April 24, 2025, states, in part:

> General Motors has decided that a defect which relates to motor vehicle safety may exist in certain 2021 – 2024 model year Cadillac Escalade and Escalade ESV, Chevrolet Silverado 1500, Suburban, and Tahoe, and GMC Sierra 1500, Yukon, and Yukon XL vehicles equipped with the 6.2L V8 gas engine (RPO L87) [the "Recall Vehicles"]. The connecting rod and/or crankshaft

---

[1] NHTSA is the federal agency responsible for keeping people safe on America's roadways. *See* https://www.nhtsa.gov/about-nhtsa (accessed 5/25/25).

engine components in these vehicles may have manufacturing defects that can lead to engine damage and engine failure.[2]

6.     All the Recall Vehicles are included among the Class Vehicles.

7.     GM's recall is ineffective for numerous reasons described below, including, *inter alia*: that it fails to properly identify and notify all persons with a Class Vehicle containing a L87 Engine (such as Plaintiff Wright); it does not flag for replacement all vehicles containing the Engine Defect, including those where the Diagnostic Trouble Code P0016 has not yet been triggered; it does not address the nature of the Engine Defect, but replaces vehicles with the same L87 Engine; it requires all drivers to use a higher-viscosity oil going forward which will reduce fuel efficiency and require more money for gasoline; and it does not compensate Class Members for their overpayment at the time of purchase, their time waiting (sometimes months) for engine replacement without their vehicle, expenses incurred such as tow bills or rental cars, or their inherent diminished value from, among other things, their vehicle being subject to a major engine recall.

8.     Moreover, for the vehicles that are identified by GM's procedure as in need of a replacement engine, simply replacing the defective engine with the same

---

[2] Part 573 Safety Recall Report No. 25V-274, NHTSA (Apr. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF (the "Recall Report").

type of engine does not address the Engine Defect and leaves consumers subject to the same safety risk.

9.     Accordingly, Plaintiffs and the Class seek relief for GM fraud, unjust enrichment, breach of warranties and violation of consumer protection laws.

## **THE PARTIES**

10.     Plaintiff James S. Powell II is a citizen of Illinois. On or about October 22, 2022, Plaintiff Powell purchased in Illinois a new 2023 GMC Yukon Denali manufactured by GM and containing a L87 V8 engine.

11.     Plaintiff Craig Perry is a citizen of Illinois. On or about August 11, 2023, Plaintiff Perry purchased in Illinois a new 2023 Chevrolet Tahoe manufactured by GM and containing a L87 Engine.

12.     Plaintiff Tiffany Ruszenas is a citizen of Florida. On or about December 21, 2023, Plaintiff Ruszenas purchased in Florida a new 2024 Chevrolet Silverado 1500 manufactured by GM and containing a L87 Engine.

13.     Plaintiff Evonne Henderson is a citizen of Pennsylvania. On or about January 9, 2023, Plaintiff Henderson purchased in Pennsylvania a new 2023 GMC Yukon manufactured by GM and containing a L87 Engine.

14.     Plaintiff Kevin Wright is a citizen of Pennsylvania. On or about November 7, 2022, Plaintiff Wright purchased in Pennsylvania a used 2021

4

Chevrolet Silverado 1500 manufactured by GM.  On or about October 23, 2024, the engine in his vehicle failed and was replaced with a L87 Engine.

15.     Plaintiff Eric Krush is a citizen of California. On or about December 2, 2022, Plaintiff Krush purchased in Montana a 2022 Chevrolet Silverado 1500 manufactured by GM and containing a L87 Engine.

16.     Plaintiff Troy Popielarz is a citizen of Missouri. On or about May 25, 2023, Plaintiff Popielarz purchased in Missouri a new 2023 Chevrolet Silverado 1500 manufactured by GM and containing a L87 Engine.

17.     Plaintiff Jonathan Bennett is a citizen of Tennessee. On or about January 6, 2023, Plaintiff Bennett purchased in Tennessee a 2022 Chevrolet Silverado 1500 manufactured by GM and containing a L87 Engine.

18.     Plaintiff Larry Bensel is a citizen of Oregon. In or around November 2022, Plaintiff Bensel purchased in Oregon a 2023 Chevrolet Denali manufactured by GM and containing a L87 Engine.

19.     Plaintiff Kevin Fenstermaker is a citizen of Arizona. On or about December 26, 2023, Plaintiff Fenstermaker purchased in Arizona a used 2022 Chevrolet Tahoe manufactured by GM and containing a L87 Engine.

20.     Defendant General Motors, LLC is a Delaware limited liability company with its headquarters in Michigan. Its principal office is located at 300

Renaissance Center, Detroit, Michigan 48265. GM is thus a citizen of Delaware and Michigan. *See* 28 U.S.C. § 1332(d)(10).[3]

## **JURISDICTION AND VENUE**

21.    This is a class action under Rule 23 of the Federal Rules of Civil Procedure.

22.    This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Because Plaintiffs and Defendant are citizens of different states, there is minimal diversity. The total claims of Class Members exceed $5,000,000 exclusive of interest and costs. There are at least 100 Class Members.

23.    The Court has personal jurisdiction over Defendant because it is headquartered in Michigan.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this judicial district and/or a substantial part of the events or omissions giving rise to the claim occurred in this district.

---

[3] To the extent citizenship is determined by 28 U.S.C. §1332(c), GM is still a citizen of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation, with its principal place of business in Michigan.

## FACTUAL ALLEGATIONS

### A. GM's Manufacture, Sale, and Warranty of Class Vehicles

25.    GM manufactures and sells vehicles under several different brand names, including Chevrolet, Buick, GMC, and Cadillac.[4] GM has dealerships across the country under its control, which it authorizes to sell GM's vehicles and to service and repair GM's vehicles.

26.    GM has the ability to control nearly every material aspect of its authorized dealerships, and GM acts as the principal in that relationship. For example, GM: (a) can terminate the relationship with its authorized dealerships at will; (b) is in the business of selling vehicles as are its authorized dealerships; (c) provides tools, resources, and sales materials that the authorized dealerships are required to use in selling GM's vehicles; (d) supervises its authorized dealerships regularly; and (e) requires its authorized dealerships to display GM's logos on signs, literature, products, and brochures within GM's authorized dealerships, make ongoing reporting of sales, maintain a computer network connection with GM, continually train authorized dealerships' sales and technical personnel, use GM's computer software for ordering parts/supplies, participate in GM's training programs, establish and maintain service departments at authorized dealerships, report to GM regarding new vehicles put into service including the purchaser's name

---

[4] *See* https://www.gm.com/gm-brands.

and contact information, vehicle VIN number, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, the vehicle's odometer readings, extended service contract sales designations, if any, and names of delivering dealership employees.

27.    GM further exercises control over its authorized dealerships with respect to: (a) financial incentives given to GM's employees; (b) the location of the authorized dealerships with the ability to unilaterally move the location of an authorized dealership; (c) the testing and certification of authorized dealerships personnel to ensure compliance with GM's policies and procedures; and (d) customer satisfaction surveys, pursuant to which GM allocates the number of GM's vehicles to each dealer, thereby directly controlling dealership inventory and profit.

28.    GM also requires its authorized dealerships to (a) follow GM's rules and policies in conducting all aspects of dealer business, including the delivery of warranties described above, and the servicing of defective vehicles such as the Class Vehicles; (b) identify themselves and to the public as authorized GM dealerships and servicing outlets for GM's vehicles; (c) use service and repair forms containing GM's brand names and logos; (d) perform warranty diagnoses and repairs in accordance with the procedures and policies controlled and set forth in writing by GM; (e) use parts and tools either provided by GM, or approved by GM, and to inform GM when dealers discover that unauthorized parts have been installed on one

of GM's vehicles; and (f) provide GM with frequent, periodic statements and records pertaining, in part, to dealership sales and servicing of GM's vehicles.

29.    GM also: (a) directs consumers to take their vehicles to authorized dealerships for repairs or services; (b) controls the way in which authorized dealers can respond to consumer complaints or issues; (c) requires that vehicle owners go to its authorized dealerships to obtain servicing under GM's warranties; (d) requires authorized dealerships' service and repair employees to be trained by GM in the methods of repair of GM's vehicles; (e) provides technical service bulletins and messages to authorized dealerships detailing issues present in product lines, and repair procedures to be followed; (f) provides authorized dealerships with specially trained service and repair consultants with whom dealerships are required by GM to consult when dealerships are unable to correct a vehicle defect on their own; and (g) maintains liberal and ongoing audit rights over its authorized dealerships' sales and service departments and directly contacts the customers of dealerships to determine their level of satisfaction with the sales and repair services provided by the authorized dealerships (and gives the authorized dealerships financial incentives or reprimand depending on the level of satisfaction).

30.    GM advertises the safety of its vehicles, including by representing that "GM looks at safety differently. We know road safety is more than just vehicle features, which is why we take a holistic approach, combining **research, technology**

9

and **advocacy** to help keep you and your family safe on the road."[5] (emphasis in original).

31.    It further states on its webpage devoted to "Vehicle Safety" that "[s]afety engineered through a human lens means developing initiatives to support safe driving and technologies that can help mitigate crashes." It adds that "GM is committed to helping create a future with zero crashes."[6]

32.    In connection with its sale of the Class Vehicles, GM provided warranties to Plaintiffs and Class Members for "repairs, including parts and labor, to correct any defect in materials and workmanship."[7]

33.    For many Class Vehicles, the express warranty terms provide "bumper to bumper" coverage for 3 years/36,000 miles and a Powertrain warranty providing coverage for the engine and related components for 5 years/60,000 miles.[8]

34.    The Cadillac-branded Class Vehicles come with longer warranties, specifically 4 years/50,000 miles for bumper-to-bumper coverage, and 6 years/70,000 miles for the Powertrain coverage.[9]

---

[5] https://www.gm.com/innovation/vehicle-safety/safety-through-a-human-lens (accessed 5/26/2025).
[6] https://www.gm.com/innovation/vehicle-safety (accessed 5/26/2025).
[7] https://www.gmc.com/owners/warranty-protection-plans (accessed 5/22/2025).
[8] *Id*.
[9] https://www.cadillac.com/ownership/warranty-repairs (accessed 5/22/2025).

35.     These warranties are collectively referred to herein as the "Limited Warranty."

36.     To the extent privity is required for any of Plaintiffs' express and/or implied warranty claims set forth herein, Plaintiffs and Class Members sufficiently dealt directly with GM (including via advertisements and window stickers by GM directly to Plaintiffs and Class Members), or its agents (including its dealerships) to satisfy any privity requirement with GM. Regardless, such privity is not required because Plaintiffs and Class Members are intended-third-party beneficiaries of the Limited Warranty and implied warranties at issue. The warranties at issue herein were intended to benefit Class Members, not dealers of GM.

### B. Overview of the L87 Engine, Engine Bearings, Crankshaft, and Connecting Rod in the Class Vehicles

37.     GM manufactures and sells several vehicle models with, or which can utilize, a L87 Engine, including the following vehicle models and years: 2019-2024 Chevrolet Silverado 1500; 2021-2024 Chevrolet Tahoe; 2021-2024 Chevrolet Suburban; 2019-2024 GMC Sierra 1500; 2021-2024 GMC Yukon; 2021-2024 GMC Yukon XL; 2021-2024 Cadillac Escalade; and 2021-2024 Cadillac Escalade ESV. Those vehicles listed above in which the L87 Engines were installed are defined herein as the "Class Vehicles."

38.    The L87 Engine is a 6.2-liter, eight-cylinder engine that features a "push-rod" design in a "V" configuration. The L87 Engine is depicted in full and partial view below:





39.     In an engine generally, the cylinders are the basic power units where chemical energy is converted to mechanical work. Each cylinder contains a combustion chamber where the energy is released in the form of high pressure, which causes a piston or plunger to produce work. The combustible fuel mixture (gas and air) enters the chamber through a passage or port each time its associated intake valve opens, and the spent products leave through another port when the exhaust valve opens. Each time a fuel charge explodes in the chamber, the force on the piston is transmitted to a crank by way of a connecting rod. This converts an up-and-down motion to a rotary or turning motion in order to rotate gears, shafts and, eventually, wheels.[10]

40.     The basic process by which the cylinders extract energy from the fuel to do the work starts when the cylinder inhales a fresh charge of fuel and air through the intake port and past the intake valve as the piston proceeds downward. Near the end of its travel, the intake valve closes, and this charge is compressed as the piston moves up with both valves closed. When a spark plug ignites the mixture near the end of the compression stroke, energy is released and pressure builds up, driving the piston downward. Near the end of its downward travel, the exhaust valve opens, and

---

[10] *See* Auto Shop Series: Engine Basics, *Hot Rod*, Jan. 1, 2023 (originally published in September 1971 issue of Hot Rod Magazine), https://www.hotrod.com/features/auto-shop-series-engine-basics-september-1971-982-670-62-1.

the spent products of combustion are exhausted until the piston once again reaches the top or beginning of the intake stroke, and the cycle again repeats itself: intake, compression, power and exhaust, as shown in the diagram below.[11]



41.     Work is done only after the up-and-down piston motion is converted to rotary motion. The connecting rod, which performs this feat, has one end connected to the piston by way of a wrist pin and the other to the crank. As shown in the diagram below, the upper end goes up and down with the piston, and the lower end rotates in a circle with the crank. The portion of the rod between the upper and lower ends sees a complicated mixture of both rotary and oscillating motion, thus making it the most overworked and highly stressed part in the engine.[12]

---

[11] *Id.*

[12] *Id.*



42.     An engine bearing refers to the "main supports for the major moving parts of an engine" which "reinforc[e] the operating loads and reduc[e] the friction these parts generate."[13]

---

[13]https://www.carparts.com/blog/what-are-engine-bearings-and-why-are-they-important/?srsltid=AfmBOooi4xbaeGRfGxpUsRmkDLFNrUNG8zVR-P9hvW4vHam6CElWjj3V (accessed 2/18/25).

43.     The following image shows a sketch of engine bearings, in addition to an engine's connecting rod and crankshaft[14]:



44.     The following image from gmparts.com shows an engine crankshaft bearing set:[15]



---

[14] *See id.*

[15] https://parts.gmparts.com/product/gm-genuine-parts-engine-crankshaft-bearing-set-12591092?srsltid=AfmBOoroZATuqDdI5pHl7lnhl5gIJNT1hsG37JjDw7v-pTK1T7-5pEtb (accessed 2/18/25).

45.     Engine bearings are "critical to the operation and performance of the engine, and allow the rotating portions of the crankshaft, camshaft, connecting rods, and more to spin with minimal friction or damage. They must be able to withstand the extreme heat and pressures that build while an engine is running. Most engine bearings do not use any type of roller, instead they use a layer of oil between the faces of the two rotating surfaces."[16]

46.     An engine's connecting rod "provides the mechanical linkage between piston and crankshaft."[17] "Together with the crank, the connecting rod converts the reciprocating motion of the piston into the rotation of the crankshaft."[18] An image of a connecting rod is shown on parts.gmc.com:[19]



---

[16]https://www.oreillyauto.com/shop/b/bearings---seals/engine-bearings/23d73b7c77fc (accessed 2/18/25).

[17]https://www.sciencedirect.com/topics/engineering/connecting-rods (accessed 2/18/25).

[18] https://www.theengineeringchoice.com/what-is-connecting-rod/ (accessed 2/18/25).

[19] https://parts.gmc.com/product/gm-genuine-parts-engine-connecting-rod-12648238 (accessed 2/18/25).

47.     The engine's crankshaft "is a crank with a number of handles" and has "one crank throw for each piston and connecting rod."[20] "As the crankshaft rotates, it travels all the way to the bottom of the cylinder bore, with the connecting rod transferring that motion to the corresponding crank throw, which converts the piston's vertical movement into a rotational motion, all driven by the combustion events that happen in sequence in the cylinders above the pistons."[21] An image of a GM engine crankshaft is shown below:[22]



---

[20] https://www.carparts.com/blog/your-guide-to-understanding-the-basics-of-the-crankshaft-and-camshaft/?srsltid=AfmBOooaX78HiVoBXab4da-4GPaXYi_rL0oRBw9DF2-pGOx0EavyDbTu (accessed 2/18/15).
[21] *Id.*
[22]https://parts.gmparts.com/product/gm-genuine-parts-engine-crankshaft-12691777?srsltid=AfmBOorZUSjfXZTuq7vqaUAfy4TCad_xFhaamp2r9IfOKQclERJtgxmL (accessed 2/18/25).

48.     A connecting rod bearing "is a type of engine bearing found at the junction of the connecting rod or piston rod and the crankshaft. Connecting rod bearings provide a smooth surface to interface with the crankshaft journal, allowing for smooth articulation of the piston through the path of its stroke. Also called rod bearings or engine rod bearings, the rod bearings are typically split into two halves, one of which presses into the connecting rod and the other in the rod cap."[23] The following is an image of a GM engine connecting rod bearing set:[24]



---

[23]https://www.oreillyauto.com/shop/b/engines---transmissions/connecting-rods--pistons---rings/connecting-rod-bearings/b58a286269b6 (accessed 2/18/25).
[24]https://parts.gmparts.com/product/gm-genuine-parts-engine-connecting-rod-bearing-set-92028817?srsltid=AfmBOoq44riP4zBiPou11bBObBHSMKXKGb9RnBr_vYOG5Kgp9xXKRwv5
(accessed 2/18/25).

49.    Further, "[c]onnecting rod bearings provide rotating motion of the crank pin within the connecting rod, which transmits cycling loads applied to the piston."[25]

### C. The L87 Engines Are Defective

50.    As has been reported to the NHTSA through numerous complaints and additional Early Warning Reporting Field Reports, Defendant's L87 V8 engine in the Class Vehicles have experienced and are overly susceptible to engine failure causing a loss of motive power resulting from a failure of the engine bearings.[26]

51.    The NHTSA summary states that "[t]he complainants report a bearing failure that may result in either engine seizure or breaching of the engine block by the connecting rod. The complainants report that there is no detectability prior to the failure."[27]

52.    "Failure or malfunction of the engine results in loss of motive power of the vehicle, which may lead to an increased risk of a crash resulting in injury and/or property damage."[28]

---

[25]https://www.kingbearings.com/wp-content/uploads/2014/10/Engine-Bearings-and-how-they-work.pdf (accessed 2/18/25).
[26] https://static.nhtsa.gov/odi/inv/2025/INOA-PE25001-10002.pdf (accessed 2/18/25).
[27] *Id*.
[28] *Id*.

53.     According to the NHTSA, approximately 877,710 vehicles have the L87 Engine.[29]

54.     The Recall Report identifies "two primary root causes" for engine damage and failure in the L87 Engines: "(1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish."[30]

55.     GM's admission in the Recall Report confirms the existence of systemic flaws in the L87 Engine's core mechanical components. According to the Recall Report, the Engine Defect is attributable to at least two component parts of the L87 Engine, the crankshaft and the connecting rod as a result of defects with the dimensions and surface finish of the crankshaft, and/or rod bearing damage caused by sediment on the connecting rods and crankshaft oil galleries. Upon information and belief, the Engine Defect is also caused by inadequate rod bearings, which are insufficiently robust to withstand heat and friction.

56.     Even minor deficiencies in the crankshaft or connecting rods can critically undermine the integrity of the engine. Under operating conditions, these deficiencies can cause the components to crack, warp, or fracture without warning. Additionally, when a bearing loses lubrication and/or overheats, it can stick to the

---

[29] *Id.*

[30] https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF.

crankshaft (a "spun" bearing) and/or it can break. Spun and/or broken bearings can prevent the crankshaft from rotating smoothly, leading to broken connecting rods and/or a seized engine.

57.    As described more below, one common symptom of the Engine Defect is that metal debris infiltrates the engine oil and rubs against other parts of the engine. Depending on the size of the debris and the locations where it is carried, this may cause an interference in the operation of the camshaft position actuator and/or the camshaft position actuator solenoid valve, which may in turn trigger Diagnostic Trouble Code ("DTC") P0016. That may in turn cause the vehicle's check engine light to activate. However, the amount of time needed for the P0016 code to trigger—or whether the P0016 code is eventually triggered at all—varies among the Class Vehicles because of the random nature of impacts on various engine parts from metal debris carried by the oil as a result of the Engine Defect. Thus, Class Members sustain substantial damage to their engine components even long before the P0016 code triggers, or even without the P0016 code ever triggering.

### D. GM's Knowledge of the Engine Defect

#### 1.    GM's knowledge of the Engine Defect beginning in 2021 from pre-sale testing, internal investigations, and publication to dealers

58.    On information and belief, GM performs rigorous pre-sale testing of its engine parts, including the crankshaft, connecting rod, and bearings. For example, on a webpage for the sale of Chevrolet parts, it states that "GM Genuine Parts Engine

Connecting Rod Bearing Pairs are designed, engineered, and tested to rigorous standards, and are backed by General Motors. GM Genuine Parts are the true OE parts installed during the production of or validated by General Motors for GM vehicles." [31]

59.     Further, on information and belief, GM performs quality control specifically relating to its bearings.[32]

60.     Accordingly, based on its pre-sale testing of the relevant engine parts, GM was, and/or should have been aware of, the Engine Defect.

61.     Furthermore, GM has known about the L87 Engine Defect and its attendant safety risks for *years*. According to the NHTSA Recall Report, GM conducted three former internal investigations into the Engine Defect. The first one of these closed in February 2022, meaning it was launched in 2021 or earlier.[33]

62.     Moreover, GM's knowledge of the Engine Defect is shown by an article it published on gm-techlink.com, a website GM maintains for the purpose of providing information and education to its dealers.[34]

---

[31] https://parts.chevrolet.com/product/gm-genuine-parts-engine-connecting-rod-bearing-set-19317286 (accessed 2/18/25).

[32] *See, e.g..,* https://www.caranddriver.com/news/a15368085/maliboom-faulty-connecting-rod-bearing-causing-engine-failures-in-gm-four-cylinders/ (accessed 2/18/25).

[33] *See* Recall Report, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF.

[34] *See* https://gm-techlink.com/?page_id=445 ("All content is intended for General Motors dealer educational purposes only") (accessed 2/17/25).

63.     The March 24, 2023 article, entitled "V8 Engine Crankshaft Bearing Conditions," states that "[a] no crank condition may be found on some 2019-2023 Silverado, Sierra; 2021-2023 Tahoe, Suburban, Yukon and Escalade models equipped with the 6.2L V8 engine (RPO L87)." It explains that the "no crank condition may be due to a seized engine with an open starter fuse. Various engine sounds, such as a thumping, knocking or rattling, may be present. These conditions may be the result of crankshaft bearing failure."[35]

64.     The article states that in cases of suspected bearing failure, "first check the engine oil and filter for excessive metal debris and bearing material." It adds that "if bearing material is identified, remove the engine oil pan and inspect the crankshaft rod and main bearings for any damage. Component replacement or, depending on the extent of damage, engine replacement may be necessary." It further states that "[t]he amount of bearing damage determines if the engine should be replaced."[36]

65.     Additionally, GM states that "[i]f there is crankshaft main bearing failure, it may be necessary to also replace the oil cooler, oil cooler lines and oil tank, if equipped, along with the damaged engine components."[37]

---

[35] https://gm-techlink.com/?p=17349 (accessed 2/17/25).
[36] *Id.*
[37] *Id.*

66.     Between April 29, 2021, and February 3, 2025, GM received 28,102 field complaints or incidents in the US potentially related to failure of the L87 engine, including 12 potentially related alleged crashes and 12 potentially related alleged injuries.[38]

67.     Further, as set forth below, GM was aware of the Engine Defect through extensive consumer complaints on both the NHTSA Website and various third party websites and forums.

### 2. GM's knowledge of the Engine Defect from complaints on the NHTSA website

68.     GM also had knowledge of the Engine Defect based on consumer complaints on the NHTSA website.

69.     Upon information and belief, the NHTSA sent complaints it received about the Engine Defect directly to GM.

70.     On information and belief, GM also monitors consumer complaints posted on the NHTSA website, as part of its obligation to report safety defects to the NHTSA.[39]

---

[38] Recall Report.

[39] *See* https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/mvdefectsandrecalls_808795.pdf (accessed 5/26/2025).

71.     Complaints on the NHTSA may be monitored and searched by vehicle make, model, and year, and a search of the Class Vehicles yields numerous complaints regarding the Engine Defect, as shown by the following overview:

72.     A consumer from North Carolina wrote on December 16, 2021, regarding her 2021 Chevrolet Silverado 1500 that her local dealer found that "two rods had gone through the engine block and the engine needed to be replaced" and that "[t]he manufacturer was made aware of the failure."



73.     A consumer from Texas wrote on August 1, 2022, regarding her 2021 GMC Yukon that her dealership "found internal engine bearing material in oil indicating internal mechanical failure. Dealership removed engine oil pan and #1 and #2 connecting rods and found bearings spun causing catastrophic engine failure.

. . Dealership then followed bulletin #22-NA-074 for replacement of engine oil, cooler lines and engine oil cooler after connecting rod and main bearing damage."



74.    A consumer from New Hampshire wrote on December 27, 2023, regarding their 2023 Chevrolet Tahoe that their "Car completely died. Engine spun a bearing at 10,000 miles."



75.    Another consumer wrote on March 30, 2024, regarding their 2021 GMC Yukon that they had "[t]otal engine failure due to bearing issues in the bottom half of the engine."



76.    A consumer from South Carolina wrote on April 25, 2024, regarding their 2022 GMC Sierra 1500, that their dealer "diagnosed a failure with the rod bearings. The vehicle was repaired. The manufacturer was notified of the failure but provided no assistance."



77.    A consumer from Texas wrote on June 3, 2024, regarding their 2021 GMC Sierra 1500 that their dealer "confirmed a rod bearing failure."



78.   A consumer from Michigan wrote on June 27, 2024, regarding their 2022 GMC Sierra 1500 limited that the crank bearing spun upon inspection by the dealer and that "[t]his is a known problem by the dealerships, GM & repair shops."



79.   A consumer from New Jersey wrote on September 11, 2024, regarding their 2021 GMC Sierra 1500 that a dealer suspected the crankshaft bearing had seized in their vehicle and that the manufacturer was notified.



80.   A consumer from Alabama wrote on December 13, 2024, regarding their 2020 Chevrolet Silverado 1500 that the "[m]ain bearing on crankshaft went out."



81.     A consumer from Michigan wrote on November 21, 2024, regarding their 2021 GMC Yukon that a repair facility found "[s]pun rod bearings on cylinders 1 and 2 damaged the crankshaft."



82.     A consumer from Texas wrote on January 14, 2025, regarding a 2022 Chevrolet Silverado 1500 that that a rod in the motor went through the engine block.



83.    A consumer from Michigan wrote on January 17, 2025, regarding their 2019 Chevrolet Silverado 1500 that the "[e]ngine failed and had to be replaced because of bearing failure."



84.    A consumer from Michigan wrote on January 17, 2025, regarding their 2023 Chevrolet Silverado that their GM dealership informed them "the thrust bearing went out which may have caused damage to the crankshaft."



85.     A consumer from Michigan wrote on January 17, 2025, regarding their 2024 GMC Sierra 1500 that engine bearing failure caused complete loss of power while driving and that the bearing failure was confirmed by the GM dealer.



86.     A consumer from Indiana wrote on January 17, 2025, regarding their 2022 GMC Yukon that after their engine failed on the highway with little children in the car, their dealer diagnosed "main crank thrust bearing failure."



87.     A consumer from Virgina wrote on January 17, 2025, regarding their
2021 GMC Yukon that technicians diagnosed a "spun rod bearing problem that is
very common."



88.     A consumer from Texas wrote on January 18, 2025, regarding their
2021 Chevrolet Silverado 1500 that after their engine stopped working while driving
on a highway, a Chevy dealer diagnosed that the bearings failed.



89.     A consumer from Nevada wrote on January 18, 2025, regarding their 2022 Chevrolet Silverado that in March 2024 their vehicle suffered a "catastrophic main crankshaft bearing failure resulting in the vehicle losing power on a local highway."



90.     A consumer from Indiana wrote on January 18, 2025, regarding their 2024 Chevrolet Silverado 1500 that in April 2024 their vehicle "spun a bearing in the lower part of the engine after 1147 miles of use."



91. A consumer from Oklahoma wrote on January 18, 2025, regarding their 2023 GMC Yukon that their engine failed because the "bearings couldn't get oil."



92. A consumer from New Mexico wrote on January 18, 2025, regarding their 2023 GMC Yukon that, following their belief their vehicle had a defective connecting rod bearing, their local dealership "confirmed the engine was defective and would require replacement."



January 18, 2025 NHTSA ID NUMBER: 11636784

**Components: ENGINE**

**NHTSA ID Number:** 11636784

**Incident Date** November 23, 2024

**Consumer Location** RIO RANCHO, NM

**Vehicle Identification Number** 1GKS2DKL8PR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | While passing on a two-lane road at approximately 70 MPH, the vehicle stalled and acted as if the engine wasn't running. Pulled over to the side of the road and was able to restart the engine after shifting to park. Engine was harder to start than usual and cranked slowly. After restarting, the engine ran fine for the remainder of the trip, but would occasionally have difficulty cranking. After this incident, the engine developed a knock that would vary with engine RPM, and sounded like a defective connecting rod bearing. Pulled the dipstick and noticed metal shavings in the oil. Took the vehicle to local dealership who confirmed the engine was defective and would require replacement. Vehicle has been at the dealership since December 5th waiting for a backordered engine. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

2023
**GMC YUKON**
SUV 2WD

**3** RECALLS

INVESTIGATIONS 1

COMPLAINTS 48

★★★★☆
**OVERALL SAFETY RATING**

93.     A consumer wrote on January 18, 2025, regarding their 2021 GMC Yukon, that after their car went into neutral while driving next to an 18 wheeler with four children in the car, their dealer determined their vehicle "threw a rod and that the that the engine was broken and the whole engine would need to be replaced."



94.    A consumer wrote on January 19, 2025, regarding their 2021 Chevrolet Silverado 1500, that after their vehicle turned off on the freeway in June 2022, their dealership told them their vehicle "spun a bearing and threw two rods and needed a new engine."



95. A consumer from Tennessee wrote on January 23, 2025, regarding their 2022 GMC Sierra 1500 that their vehicle was repaired at a GM dealer in November 2022 for a spun bearing.



96.     Additional recent complaints on the NHTSA website regarding the

Engine Defect include the following:

- January 18, 2025 (2021 GMC Yukon)
- January 19, 2025 (2021 Chevrolet Silverado 1500)
- January 19, 2025 (2022 Chevrolet Silverado 1500)
- January 19, 2025 (2021 Chevrolet Silverado 1500) (bearing failure left driver stranded in middle of busy interstate)
- January 19, 2025 (2023 Chevrolet Silverado 1500)
- January 19, 2025 (2023 Chevrolet Tahoe) (thrown bearing caused vehicle to go to neutral while driving on five lane highway)
- January 19, 2025 (2019 GMC Sierra Limited 1500)
- January 19, 2025 (2021 GMC Sierra 1500) (rod bearing failure caused engine to seize and nearly caused accident and vehicle to go over cliff)
- January 19, 2025 (2022 GMC Sierra Limited 1500)
- January 19, 2025 (2022 GMC Yukon)
- January 19, 2025 (2023 GMC Yukon)
- January 19, 2025 (2023 GMC Yukon)
- January 20, 2025 (2023 Chevrolet Silverado 1500)
- January 20, 2025 (2021 Chevrolet Silverado 1500)
- January 20, 2025 (2022 Chevrolet Silverado 1500)
- January 20, 2025 (2022 GMC Sierra Limited 1500)
- January 20, 2025 (2022 GMC Sierra Limited 1500)
- January 20, 2025 (2023 GMC Yukon)
- January 20, 2025 (2023 GMC Yukon)
- January 21, 2025 (2020 Chevrolet Silverado 1500)
- January 21, 2025 (2023 Chevrolet Silverado 1500)
- January 21, 2025 (2022 Chevrolet Silverado 1500)
- January 21, 2025 (2024 Chevrolet Suburban)
- January 21, 2025 (2022 GMC Sierra Limited 1500)
- January 21, 2025 (2023 GMC Yukon)
- January 22, 2025 (2022 Chevrolet Silverado 1500)
- January 22, 2025 (2022 GMC Sierra Limited 1500)
- January 22, 2025 (2023 GMC Yukon)

- January 22, 2025 (2023 Cadillac Escalade) (bearing issue caused vehicle to shut down and stop on highway with family of 6 in car)
- January 22, 2025 (2021 Chevrolet Suburban) (engine seizure from main bearing failure left family stranded in middle of night for over seven hours)
- January 23, 2025 (2022 GMC Sierra Limited 1500)
- January 23, 2025 (2023 GMC Sierra Limited 1500)
- January 23, 2025 (2021 GMC Yukon)
- January 23, 2025 (2022 GMC Yukon)
- January 25, 2025 (2023 GMC Sierra Limited 1500)
- January 26, 2025 (2021 Chevrolet Tahoe)
- January 26, 2025 (2023 Chevrolet Tahoe)
- January 27, 2025 (2023 GMC Sierra Limited 1500)
- January 27, 2025 (2021 GMC Yukon)
- January 28, 2025 (2021 GMC Yukon)
- January 28, 2025 (2023 Chevrolet Silverado 1500)
- January 28, 2025 (2024 Chevrolet Silverado 1500)
- January 28, 2025 (2023 GMC Sierra 1500)
- January 28, 2025 (2024 GMC Sierra 1500)
- January 29, 2025 (2024 Cadillac Escalade)
- January 29, 2025 (2021 Chevrolet Silverado 1500) (dealer diagnosed failure of crankshaft bearings and connecting rod bearings on September 2024)
- January 29, 2025 (2023 Chevrolet Silverado 1500)
- January 29, 2025 (2023 Chevrolet Tahoe)
- January 29, 2025 (2023 Chevrolet Tahoe)
- January 29, 2025 (2024 Chevrolet Tahoe)
- January 29, 2025 (2023 GMC Sierra 1500) (bearings failure caused engine shut down while driving on highway with three children in vehicle)
- January 29, 2025 (2021 GMC Yukon)
- January 30, 2025 (2024 Chevrolet Silverado 1500)
- January 30, 2025 (2022 Chevrolet Suburban)
- January 30, 2025 (2022 GMC Sierra 1500)
- January 31, 2025 (2021 GMC Yukon)

- February 1, 2025 (2024 Chevrolet Silverado 1500)
- February 2, 2025 (2023 Chevrolet Tahoe)
- February 2, 2025 (2024 GMC Sierra 1500)
- February 3, 2025 (2021 GMC Yukon) (Chevrolet dealer diagnosed crank bearing failure in September 2023)
- February 6, 2025 (2022 Chevrolet Tahoe)
- February 7, 2025 (2019 GMC Sierra 1500)
- February 10, 2025 (2021 GMC Sierra 1500)
- February 10, 2025 (2023 GMC Sierra 1500)
- February 12, 2025 (2023 GMC Sierra 1500)
- February 13, 2025 (2023 GMC Sierra 1500)

97.     Further, there are at least 175 additional complaints on the NHTSA website involving Class Vehicles, that, although they do not specifically reference a bearing issue, refer to the common symptom of a Class Vehicle's engine seizing or locking up.

98.     Upon information and belief, consumers who submitted a complaint to NHTSA also took their Class Vehicles to GM dealers prior to submitting their complaints to NHTSA, and the dealers reported the issues to GM.

### 3.    GM's knowledge of the Engine Defect from complaints on third-party websites and forums

99.     GM's knowledge of the Engine Defect is also evidenced by consumer complaints regarding the Engine Defect on various online websites and forums, in which consumers have, for years, complained of the Engine Defect.

100.    GM routinely monitors the internet for complaints about GM vehicles.

101.    Various consumer complaints about the Engine Defect can be found online.

102.    On December 5, 2021, an owner of a 2021 Chevrolet Silverado posted on the website carcomplaints.com that his local dealer found that "two rods had gone through the engine block and the engine needed to be replaced" and that "[t]he manufacturer was made aware of the failure."[40]

103.    On March 8, 2023, a driver complained about a "Spun Crankshaft Bearing" on his 2022 6.2L Yukon on the website tahoeyukonforum.com. He stated that about three weeks prior, after his vehicle switched to neutral when he was driving at 70mph, his local dealership found that the crankshaft bearing had spun.[41]

104.    On April 1, 2023, a driver of a 2022 Sierra 1500 complained about "Main Bearing Fail" on the website silveradosierra.com.[42]

105.    On July 14, 2023, a driver of a 2023 Yukon posted on tahoeyukonforum.com: "Spun Crankshaft Bearing Cause?" and stated that his 2023

---

[40] https://www.carcomplaints.com/Chevrolet/Silverado_1500/2021/engine/engine-5.shtml (accessed 2/17/25).
[41] https://www.tahoeyukonforum.com/threads/2022-6-2l-yukon-spun-crankshaft-bearing.140149/ (accessed 2/17/25).
[42] https://www.silveradosierra.com/threads/6-2-main-bearing-fail.752695/ (accessed 2/17/25).

Yukon died on May 6, 2023. He added that his dealer said there was a "nationwide backlog for the 6.2L."[43]

106.   On February 26, 2024, a driver complained on the website tahoeyukonforum.com of "Main bearing failure" on his 2023 Yukon Denali, as he was informed by his dealer on or about February 26, 2024.[44]

107.   On March 4, 2024, a driver complained about "Main Bearing Failure with a 6.2L at 3,200 miles" on the website tahoeyukonforum.com, stating his local dealer determined his truck had a "spun bearing" and needed a new engine.[45]

108.   On March 18, 2024, a driver of a Yukon Denali stated on tahoeyukonforum.com that his "Denali 6.2 spun a rod bearing at 25k."[46]

109.   On December 12, 2024, a driver of a 2021 Yukon Denali stated on tahoeyukonforum.com that his vehicle "suffered a spun rod bearing at 44k miles," as he was informed by his GMC dealership on or about December 9, 2024.[47]

---

[43] https://www.tahoeyukonforum.com/threads/spun-crankshaft-bearing-cause.142697/ (accessed 2/17/25).
[44] https://www.tahoeyukonforum.com/threads/main-bearing-failure-on-6-2l-for-me-ugh.146957/ (accessed 2/17/25).
[45] https://www.tahoeyukonforum.com/threads/main-bearing-failure-with-6-2l-at-3-200-miles.147085/ (accessed 2/17/25).
[46] https://www.tahoeyukonforum.com/threads/stunned-denali-6-2-spun-a-rod-bearing-at-25k.147553/ (accessed 2/17/25).
[47] https://www.tahoeyukonforum.com/threads/spun-rod-bearing-2021-yukon-denali-6-2-l.151892/ (accessed 2/17/25).

110.   Upon information and belief, and as referenced in many online comments, consumers who submitted complaints on third-party websites also took their Class Vehicles to GM dealers at or around the time of their online complaints, and the dealers reported the issues to GM.

### 4. GM's knowledge of the Engine Defect from its dealers and legal actions

111.   Upon information and belief, GM's authorized dealers report information about the Engine Defect, including Plaintiffs' information, to GM.

112.   GM thus gained knowledge of the Engine Defect from its dealers' reporting of the Engine Defect.

113.   For example, in January 2024, Plaintiff Popielarz took his vehicle to GM's authorized dealer after his engine seized while he was driving on the highway. The vehicle received an engine replacement and remained at the dealer until February 6, 2024.

114.   In October 2024, Plaintiff Fenstermaker had his vehicle towed to GM's authorized dealer in Arizona after his engine seized while he and his family were driving on the highway in Mexico. The vehicle received an engine replacement and remained at the dealer until November 11, 2024.

115.   In September 2024, Plaintiff Powell took his vehicle to GM's authorized dealer and told them of a rattling sound heard when accelerating. The next month, Plaintiff Powell was back because his check engine light was on and a

knocking sound was coming from the engine. Upon examining the oil, the dealer discovered metal in the oil. Upon further examination, the dealer discovered the bearing and connecting rod had broken into many pieces damaging the engine block. Plaintiff Powell's vehicle received an engine replacement and remained at the dealership until December 10, 2024.

116.   In February 2025, Plaintiff Ruszenas had her vehicle towed to GM's authorized dealer in Florida after her engine seized. The vehicle received an engine replacement and remained with the dealer for approximately four weeks. Plaintiff Ruszenas also opened a case with GM headquarters related to the engine seizure.

117.   In May 2025, Plaintiff Perry contacted the GM dealer where he purchased his vehicle after learning about the recall. The service manager at the dealership told him that GM and the dealer knew about the Engine Defect since 2021, including when the vehicle was sold to him in or around August 2023.

118.   On or about May 5, 2025, Plaintiff Henderson had her vehicle towed to a GM dealer after the engine failed. The vehicle remains there as of the date of this filing, awaiting an engine replacement. On or about May 8, 2025, Plaintiff Henderson opened a case with GM about her engine failure. She also filed a claim with the NHTSA, which upon information and belief, notified GM.

119.   Legal actions filed by other consumers also demonstrate knowledge by GM's authorized dealers and GM.

120.   For example, in *Sullivan v. General Motors*, 2:24-cv-02309 (E.D. La.), filed on September 24, 2024, the plaintiff alleged that his 2023 Sierra 1500 had the Engine Defect. He further alleges that GM's dealer made the following notations:

> *Customer states there is a knocking sound coming from the engine. Found thrust bearing and crank discolored and rod bearing in pieces in oil pan. Found [truck's] oil is contaminated with metal.*[48]

121.   The plaintiff also alleges that he "directly notified [GM] of the defects, non-conformities, and conditions in the Vehicle."[49]

122.   In another online forum, a consumer with a 2021 Sierra complained in 2023 that he already had two blown engines after only 25,000 miles, with the most recent being because of spun bearings.[50]  He described the incident as follows:

> I was on interstate in bumper to bumper traffic. All I did was take my foot off brake to start rolling. No warnings. Engine locked up and shut down. I'm on pace to have an engine replacement every 7-8 months. Third engine in 22 months.[51]

---

[48] *Sullivan v. General Motors*, 2:24-cv-02309 (E.D. La.), Dkt. 1, ¶ 9.
[49] *Id.* ¶ 11.
[50] https://www.silveradosierra.com/threads/2021-at4-25k-miles-two-blown-6-2-engines.751836/?post_id=7376211&nested_view=1&sortby=oldest#post-7376211 (user "Barnes53") (Feb. 19, 2023 post and Feb. 20, 2023 post) (accessed 2/18/25).
[51] *Id.* (Feb. 20, 2023 post).

123.   On February 20, 2023, the consumer described the "official diagnosis," which, upon information and belief, came from a GM dealer: "#3 & 4 rod bearing spun & stacked, crankshaft journals damaged. Full engine replacement."[52]

124.   On February 28, 2023, the consumer indicated he had filed a legal action[53] and on May 2, 2023, he described a settlement: "GM finally settled out of court. They are buying the truck back and returning all payments along with collateral costs in addition to covering lawyer costs."[54]

125.   Upon information and belief, GM has had knowledge of the Engine Defect because GM has been subject to other lawsuits or private arbitrations involving the Engine Defect.

### E. The Engine Defect is a Material Fact that GM Failed to Disclose

126.   Based on the above, GM has been aware of the Engine Defect in the Class Vehicles since at least 2022, and likely prior to 2022.

127.   The existence of the Engine Defect is a material fact, because a reasonable consumer would likely consider it important to know, when purchasing or leasing a vehicle, that the crankshaft, connecting rod, and/or rod bearings may

---

[52] *Id.*

[53] *Id.* (Feb. 28, 2023 post).

[54] https://www.silveradosierra.com/threads/2021-at4-25k-miles-two-blown-6-2-engines.751836/page-2?nested_view=1&sortby=oldest (May 2, 2024 post) (accessed 2/18/25).

cause the engine to seize up and fail while driving, such that the driver, passenger, and other individuals in nearby vehicles are at substantial risk.

128.   Furthermore, the existence of the Engine Defect is also a material fact because a reasonable consumer would likely be induced to change his or her decision to purchase or lease one of the Class Vehicles based on knowing that the Engine Defect may cause the engine to seize up and fail while driving, such that the driver, passenger, and other individuals in nearby vehicles are at substantial risk.

129.   Although, as set forth herein, it has known about the Engine Defect for several years, GM failed to inform Plaintiff and Class Members of the Engine Defect prior to their purchases or leases of Class Vehicles.

130.   For example, despite having a webpage specifically entitled "Vehicle Safety," as set forth above, GM failed to make any disclosure relating to the Engine Defect on this webpage.

131.   GM also did not make any disclosures relating to the Engine Defect on any other easily accessible webpage relating to its Class Vehicles or components thereof.

132.   Nor did GM notify its dealers that they should inform potential purchasers of the Class Vehicles about the Engine Defect prior to selling a vehicle.

133.   GM should have disclosed to consumers, and directed its dealers to disclose to consumers, the existence of the Engine Defect in Class Vehicles.

134.   GM also had a duty to disclose the Engine Defect because it presented a safety hazard to consumers.

135.   By failing to make adequate disclosures on its webpages or other materials provided to consumers, and by failing to direct its dealers to make these disclosures, GM prevented consumers from learning about the existence and nature of the Engine Defect prior to their purchases or leases.

## F.  After Much Delay, GM Institutes an Inadequate Recall

136.    Despite knowing of the Engine Defect for years, GM did not issue a stop order and recall report until April 24, 2025. This was over 90 days after the NHTSA announced its investigation and 65 days after this lawsuit was originally filed.

137.   The recall program as currently established is inadequate for several reasons.

138.   First, although there is publicly-available information about the recall program, it appears GM has not adequately communicated information to dealers to commence the recall program.

139.   For example, on or about May 22, 2025, Plaintiff Wright contacted the GM dealer in Pennsylvania where he purchased his vehicle after learning about the recall. Plaintiff Wright was told by the dealer that the dealer was aware of the recall

but that GM has not officially begun the recall program yet and he would have to wait to bring in his vehicle.

140.    Second, GM has designated which vehicles are subject to the recall by Vehicle Identification Number ("VIN"); however, some Class Vehicles have VINs that do not show up as subject to the recall.

141.    For example, Plaintiff Wright's Vehicle required a replacement engine in October 2024, and GM installed a L87 Engine with the Engine Defect. But when the VIN for Plaintiff Wright's Vehicle is entered on GM's website related to the recall, it does not show his vehicle as being subject to the recall.

142.    This consumer reported a similar instance to the NHTSA on May 12, 2025 regarding their 2021 Chevrolet Silverado 1500:

> [T]his is 6.2 l l87 engine that is being recalled **but this vin is not on list**. already had lifters and rods replaced while back. coming home from trip truck made awful noise and I lost power on the interstate. thankfully was able to get out of traffic but waited 3.5 hours for tow. at dealer but cant tell me when they can look at it. 60,200 miles and they are saying well we will see what we can do but your powertrain warranty ended at 60k. [I] have had numerous problems and these are all known by gm especially 2021 6.2l.[55]

---

[55] Consumer Complaint No. 11660510, NHTSA (May 12, 2025), https://www.nhtsa.gov/?nhtsaId=11660510 (emphasis added).

143.   Third, for other Class Members with a Class Vehicle bearing a VIN that is identified as part of the recall, the recall involves a two-step inspection process that will still not capture or remedy all affected vehicles.

144.   In the first step, the technician is instructed to check for the DTC ("Diagnostic Trouble Code") P0016 code.[56]

145.   If the P0016 code is present, then the vehicle is to be quarantined and cannot be sold or delivered. The Service Bulletin says that in this scenario "Additional information will be provided by General Motors in the near future."

146.   If the P0016 code is not present, then the technician is instructed to move to the second step, which involves draining the OW-20 engine oil, replacing it with higher viscosity OW-40 oil, replacing the oil fill cap to indicate OW-40 oil should be used going forward, and adding an insert to the owner's manual regarding the new oil.

147.   The first step of the recall process is insufficient because many Class Vehicles contain the Engine Defect even if the P0016 code is not indicated.

148.   The P0016 code is triggered when the vehicle's powertrain control module ("PCM") detects that the difference between the crankshaft rotational position and the camshaft rotational position is not at the value commanded by the

---

[56] The steps of the recall inspection program are found in Technical Service Bulletin N252494001: L87 Loss of Propulsion, General Motors (April 2025), https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-8641.pdf.

PCM. Both of these shafts must work in complete harmony for safe and efficient operation of the vehicle.

149.   Rotation of the crankshaft drives rotation of the camshaft via the timing chain. These two shafts must be properly synchronized at all times for the engine to operate correctly. As the camshaft rotates it acts to repeatedly open and close the intake and exhaust valves at precisely the right moments. The camshaft rotational position is measured by the camshaft position sensor which continually sends that value to the PCM. As the engine crankshaft rotates it acts to repeatedly move the pistons up and down within their cylinder bores. The crankshaft rotational position is measured by the crankshaft position sensor which continually sends that value to the PCM.

150.   The crankshaft position sensor also triggers the ignition system to give a controlled spark in each cylinder at precisely the right moment relative to the corresponding piston position, which is determined by the crankshaft rotational position, and the corresponding intake and exhaust valve positions, which are determined by the camshaft rotational position.

151.   As the engine operates at varying rotational speeds (rpm) and torsional loads (torque) the PCM continually adjusts the difference between the crankshaft rotational position and the camshaft rotational position so that the engine will operate

correctly. This is done via a camshaft position actuator that operates together with a camshaft phaser magnet and a camshaft position actuator solenoid valve.

152.   The PCM commands the camshaft phaser magnet to cause the solenoid valve to adjust in such a way that the engine oil pressure delivered to the camshaft position actuator produces the desired difference between the crankshaft rotational position and the camshaft rotational position.

153.   The PCM continually compares the commanded difference in the crankshaft and camshaft rotational positions with the actual difference measured by the crankshaft and camshaft position sensors. When the difference between the commanded value and the actual value exceeds a maximum allowable tolerance, the PCM triggers DTC code P0016 to indicate an unacceptable mismatch between the crankshaft and camshaft positions.

154.   Upon information and belief, the cause of the P0016 code being triggered in the Class Vehicles because of the Engine Defect is likely metal debris that has accumulated in the oil. For example, bearing failures from the Engine Defect result in metal debris in the oil that can be carried with the oil to the camshaft position actuator and/or the camshaft position actuator solenoid valve, interfering with their operation, and thus triggering the P0016 code.

155.   But this only occurs after metal debris-producing impacts generated by the Engine Defect have produced sufficient metal debris in the oil and a sufficient

amount of that metal debris in the oil has made its way to the camshaft position actuator and/or the camshaft position actuator solenoid valve to trigger the P0016 code.

156.   Moreover, the amount of time needed for the P0016 code to trigger—or whether the P0016 code is eventually triggered at all—varies among the Class Vehicles because of the random nature of impacts on various engine parts from metal debris carried by the oil as a result of the Engine Defect. Thus, Class Members sustain substantial damage to their engine components even long before the P0016 code triggers, or even without the P0016 code ever triggering.

157.   GM is aware that the Engine Defect can cause engine seizure without any warnings or indications, as in the NHTSA complaint below[57]:

---

[57] Consumer Complaint No. 11655176, NHTSA (Apr. 17, 2025), https://www.nhtsa.gov/?nhtsaId=11655176 (emphasis added).



158.  Accordingly, the recall is inadequate because GM has made the triggering of the P0016 code the determining factor for whether a Class Vehicle gets a replacement engine.

159.  GM released a second service bulletin on May 1, 2025 regarding replacement of engines in the Recall Vehicles. However, the bulletin only covered engine replacement for certain vehicles based on their VIN numbers (presumably those quarantined under Technical Service Bulletin N252494001).[58]

---

[58] *See* Technical Service Bulletin N252494002: L87 Loss of Propulsion, General Motors (May 2025) https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-5347.pdf.

160.   Fourth, the second step of the recall procedure—the oil replacement—is also inadequate.

161.   GM has not explained why the oil-related service is required for Class Vehicles supposedly not qualifying as in need of an engine replacement under the recall procedure.

162.   A change to a high viscosity oil, however, will not remedy out of specification crankshaft dimensions and surface finish.

163.   Moreover, as outlined below, higher viscosity (thicker) oil will materially increase fuel consumption in the Class Vehicles, which will result in a decrease in their fuel efficiency.

164.   Fifth, the recall and engine replacement procedure is also inadequate because even if the harm from the Engine Defect has progressed in a way that triggers the P0016 code, the person will have to wait months, or longer, for replacement parts to become available.

165.   For example, this consumer reported GM's shortage of replacement parts and release of vehicles needing engine replacements to the NHTSA on May 7, 2025, regarding a 2023 Cadillac Escalade:

> GM advised no remedy could be found until service bulletin could be resolved. No repair work to be performed. ***To release to customer as is until engine replacement can be performed***. So GM is forcing us to take back our vehicle on the road with a failing engine that needs replacement but due to not having enough stock to

repair in timely fashion are placing us back on the road until one can become available. This now opens us up for massive catastrophic failure with my family on the road and not to mention others on the highway and public road system. I'm astonished that GM would do this to their customers and jeopardize the safety of their customers and other citizens on the roads. Something has and needs to be done. They are now placing my family and other lives in danger to save money.[59]

166.   Sixth, GM has not redesigned the crankshaft, connecting rod, rod bearings, or other components at the heart of the Engine Defect. Thus, even Class Members whose engine is replaced are only receiving equally defective engines.

### G. Class Members Have Been and Continue to Be Damaged By GM's Conduct

167.   As a result of GM's unlawful conduct outlined herein, GM obtained money from consumers through their purchases or leases of Class Vehicles in transactions in which Class Members lacked material information relevant to their purchases or leases.

168.   Plaintiff and Class Members have been damaged by GM's conduct and omissions because they purchased or leased a Class Vehicle of a quality different than promised and, in some instances, have been charged to make attempts to repair the Engine Defect.

---

[59] Consumer Complaint No. 11659460, NHTSA (May 7, 2025), https://www.nhtsa.gov/?nhtsaId=11659460 (emphasis added).

169.   Class Members have incurred expenses related to the Engine Defect, including, *inter alia*, tow charges, attempted repair invoices, and rental cars.

170.   Even if the recall is effective at replacing engines that no longer contain the Engine Defect, Class Members have still been damaged by GM's conduct.

171.   Even after an effective recall (which this is not), Plaintiffs and Class Members still overpaid for their vehicles at the time of purchase. Regarding Plaintiffs and Class Members who have had engine replacements: Had they been told about the Engine Defect and/or that they would have to go through the process, expenses, and waiting periods involved in remedying the Engine Defect via an engine replacement, Plaintiffs and Class Members would have paid less for their vehicles, or not purchased them at all. Regarding Plaintiffs and Class Members who have not had engine replacements: Had they been told about the Engine Defect and/or that they would not receive an engine replacement, they would have paid less for their vehicles, or not purchased them at all.

172.   Likewise, had Plaintiffs and Class Members been told that they would have to utilize a higher viscosity motor oil that would decrease the advertised fuel efficiency and require more gasoline purchases, they would have paid less for their vehicles, or not purchased them at all.

173.   Relatedly, GM is instructing Plaintiffs and Class Members that they must now utilize higher viscosity oil going forward, which has and will cause

additional damages in the form of less fuel efficiency and paying more for gasoline than they would with the lower viscosity oil that GM recommended at the time of purchase.

174.   That is because a thinner viscosity motor oil significantly improves the fuel economy of a vehicle compared to a thicker/higher viscosity motor oil.[60]

175.   A lower-viscosity 0W-20 motor oil can have an approximately 3% benefit in fuel economy compared to a 0W-40 viscosity motor oil.[61]

176.   It is likely the percentage benefit here is even greater because of the Class Vehicle's use of Dynamic Fuel Management within their engines, under which the number of cylinders used therein is reduced when the full power of the engine is not required.[62] The use of 0W-40 oil will reduce the frequency in which the engines

---

[60] *See*, *e.g.*, Javier Blanco-Rodriguez et al., *Modelling the impact of reducing lubricant viscosity on a conventional passenger car fuel economy and wear protection*, Results in Engineering, Volume 24, December 2024 ("The study confirms that reducing lubricant viscosity can lead to notable improvements in fuel economy"); *see also* "The Overlooked Benefits of Low Viscosity Synthetic Engine Oils," https://www.shell.us/business/fuels-and-lubricants/lubricants-for-business /sector-expertise/fleet/dealers/the-overlooked-benefits-of-low-viscosity-synthetic-engine-oils.html ("Lower viscosity oils can reduce fuel costs . . . Lower viscosity engine oils generally reduce the energy required to keep engine components moving") (accessed 5/20/2025).

[61] *See* Alexander H. Tullo, *Engine oil becomes critical as automakers look to boost gas mileage*, Chemical and Engineering News (February 3, 2019), available at https://cen.acs.org/business/specialty-chemicals/Engine-oil-becomes-critical-automakers/97/i5 (accessed 5/20/2025).

[62] *See* https://carbuzz.com/features/gms-62-v8-l87-engine/ (accessed 5/20/2025).

in Class Vehicles are able to take advantage of the Dynamic Fuel Management, and thus will further erode the prior benefit in fuel economy savings.

177.   Even assuming a 3% difference in fuel economy, the extra amount Class Members will have to pay due to the use of the 0W-40 viscosity oil is substantial.

178.   For example, a 2024 Chevy Suburban that gets an estimated 16 MPG would require 6,250 gallons of gasoline if a Class Member kept the vehicle for a conservative 100,000 miles (100,000/16 MGP). But if 16 MPG is instead 15.5 MPG (16 x .97, based on a 3% decrease in fuel economy) the Suburban would require 6,452 gallons of gasoline for 100,000 miles. This comes to an extra 202 required gallons of gasoline. Assuming a price of $4 per gallon for the recommended premium gasoline for the Class Vehicles, the damages to a Class Member is over $800 because of the change to the 0W-40 viscosity oil.

179.   Moreover, GM knows the importance of fuel efficiency to its consumers. *See*, *e.g.*, https://poweredsolutions.gm.com/products/engines/l87-engine (stating that "[t]he L87 builds upon the previous 6.2L L86 with integral components for Automatic Start/Stop capability and available Dynamic Fuel Management (DFM) for even greater efficiency. Efficient, robust technologies including Direction Injection, Variable Valve Timing, oil-jet piston cooling, and a two-stage oil pump continue to be standard on L87").

180.   Finally, even if Plaintiffs' and the Class Members' vehicles obtain a replacement engine that restores the vehicles to their prior condition (they do not), Plaintiffs and the Class Members still have suffered inherent diminished value because of the Engine Defect and recall.

181.   It is well recognized that a vehicle that has been in an accident and has been fully repaired is still inherently less valuable than an equivalent vehicle that has not been in an accident.[63]

182.   This same principle is true as to vehicles that have been associated with a serious safety recall.[64]

183.   As one company that purchases used vehicles states, the market value of vehicles that are subject to a recall, particularly those involving major defects of critical safety components such as the engine, affect price and lower the market appeal by diminishing confidence and desirability of the vehicle:

> Recalls and manufacturer defects can significantly impact a car's value, affecting its resale price, desirability, and overall reputation in the market. When a vehicle is subject to a recall or has known manufacturing defects, its safety

---

[63] *See*, *e.g.*, "Diminished Value of a Car: Estimations After an Accident," https://www.kbb.com/car-advice/diminished-value-car-estimations-after-accident/ ("[E]very reported accident, big or small, reduces your car's value in the marketplace, even if repairs return it to its pre-accident condition – and that reduction is in addition to the typical loss of value (depreciation) as your car ages.").

[64] *See*, *e.g.*, Raymond S. Hartman, *Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation*, The Review of Economics and Statistics, Vol. 69, No. 2 (May 1987).

and reliability are called into question, making potential buyers hesitant and lowering its market appeal.

One of the main ways a recall affects a vehicle's worth is by reducing consumer confidence. Buyers tend to be cautious when considering a car with a history of mechanical or safety issues, even if those issues have been addressed through a recall. A recall indicates that the manufacturer has acknowledged a problem, but it does not always ensure that every affected vehicle has been properly repaired. This uncertainty can deter buyers, leading them to seek alternatives with a cleaner history. The severity of the defect also plays a crucial role in determining how much a recall impacts a vehicle's value. Minor recalls, such as software updates or minor component replacements, generally have little effect. However, major defects involving critical safety components like brakes, airbags, or the engine can significantly reduce a car's desirability. In extreme cases, vehicles with unresolved recalls may be prohibited from sale or deemed inoperable until necessary repairs are completed, further diminishing their worth.

A recall can also accelerate a vehicle's depreciation rate. While all vehicles lose value over time, those associated with significant recalls often experience a steeper decline.[65]

184.   One study showed that the average engine related recall caused a 25.2%

reduction in resale price.[66]

---

[65] How Do Recalls or Manufacturer Defects Affect a Car's Worth? *Car Buyer USA*, April 3, 2025, https://www.carbuyerusa.com/sell-your-car-blog/how-do-recalls-or-manufacturer-defects-affect-a-cars-worth.

[66] Raymond S. Hartman, *Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation*, The Review of Economics and Statistics, Vol. 69, No. 2 (May 1987).

### H. Plaintiffs' Experiences

#### 1. Plaintiff Powell

185. In October 2022, Plaintiff Powell bought a 2023 Yukon Denali ("Plaintiff Powell's Vehicle") from GM dealer Laura Buick GMC, Inc., in Collinsville, Illinois.

186. Plaintiff Powell's Vehicle was for Plaintiff Powell's personal use.

187. Before his purchase Plaintiff Powell spent time searching on GM's website several times looking at the 2023 Yukon Denali and its features, but there was no mention of the Engine Defect. Plaintiff Powell also looked at 2023 Yukons offered for sale on the website of Laura Buick GMC, Inc, but there was no mention of the Engine Defect. Nor did the salesperson or any other document inform Plaintiff Powell about the Engine Defect prior to his purchase of Plaintiff Powell's Vehicle. Plaintiff Powell also reviewed the window sticker on Plaintiff Powell's Vehicle prior to his purchase, including the stated fuel efficiency.

188. Plaintiff Powell expected that Plaintiff Powell's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

189. The inclusion of the engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Powell.

190.   The inclusion of the represented fuel efficiency relating to Plaintiff Powell's Vehicle was material to Plaintiff Powell.

191.   Plaintiff Powell was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Powell's Vehicle.

192.   Plaintiff Powell was not aware that the fuel efficiency of Plaintiff Powell's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

193.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Powell's Vehicle was worth less than what he actually paid for it.

194.   Had Plaintiff Powell been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

195.   Had Plaintiff Powell been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

196.   In October 2024, Plaintiff Powell brought Plaintiff Powell's Vehicle to Laura Buick GMC, Inc. after the check engine light appeared, where it was diagnosed with the Engine Defect, including metal in the oil, a spun connecting rod bearing, and damage to the engine block.

197.   Plaintiff Powell's Vehicle remained at the dealership until December 10, 2024. Although his engine was replaced, it was replaced with another L87 V8 engine, and thus the Engine Defect still exists in Plaintiff Powell's Vehicle.

198.   Thereafter, Plaintiff Powell learned of the recall and again took his vehicle to the dealer. It was not quarantined because the P0016 code was not triggered and the dealer changed the vehicle to the higher-viscosity oil as described herein.

199.   Had Plaintiff Powell been told: about the Engine Defect; or that he would have to go through the engine-seizure experience and expenses; or that GM would not replace his engine with one free from the Engine Defect; or about the process and waiting periods involved in the recall and in obtaining an engine replacement, he would have paid less for his vehicle, or not purchased it at all.

200.   Plaintiff Powell will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

201.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Powell's Vehicle to its prior condition (it does not), Plaintiff Powell still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

202.   Upon information and belief, the Engine Defect present in Plaintiff Powell's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Powell, including by creating a safety risk. Thus, Plaintiff Powell also faces the risk of future harm for which legal remedies are inadequate.

203.   Plaintiff Powell also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Powell to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

204.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Powell will continue to suffer harm for which remedies at law are inadequate.

## 2. Plaintiff Perry

205.   In August 2023, Plaintiff Perry bought a 2023 Chevrolet Tahoe ("Plaintiff Perry's Vehicle") from GM dealer Dralle Chevrolet & Buick, Inc., in Peotone, Illinois.

206.   Plaintiff Perry's Vehicle was for Plaintiff Perry's personal use.

207.   Before his purchase Plaintiff Perry spent time searching on GM's website several times looking at the 2023 Chevrolet Tahoe and its features, but there was no mention of the Engine Defect. Plaintiff Perry also looked at 2023 Tahoes offered for sale on the website of Dralle Chevrolet & Buick, Inc., but there was no mention of the Engine Defect. Plaintiff Perry also spoke with Greg Dralle prior to entering the dealership and neither he nor any salesperson or any other document informed Plaintiff Perry about the Engine Defect prior to his purchase of Plaintiff Perry's Vehicle. Plaintiff Perry also reviewed the window sticker on Plaintiff Perry's Vehicle prior to his purchase, including the stated fuel efficiency.

208.   Plaintiff Perry expected that Plaintiff Perry's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

209.   The inclusion of the engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Perry.

210.   The inclusion of the represented fuel efficiency relating to Plaintiff Perry's Vehicle was material to Plaintiff Perry.

211.   Plaintiff Perry was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Perry's Vehicle.

212.   Plaintiff Perry was not aware that the fuel efficiency of Plaintiff Perry's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

213.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Perry's Vehicle was worth less than what he actually paid for it.

214.   Had Plaintiff Perry been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

215.   Had Plaintiff Perry been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

216.   In May 2025, Plaintiff Perry contacted the GM dealer where he purchased his vehicle after learning about the recall. The service manager at the dealership told him that GM and the dealer knew about the Engine Defect since 2021, including when the vehicle was sold to him in or around August 2023.

217.   In May 2025, Plaintiff Perry took his vehicle to the GM dealer pursuant to the recall program. It was not quarantined because the P0016 code was not triggered and the dealer changed to the higher-viscosity oil as described herein.

218.   Plaintiff Perry, who has experienced personal loss from a vehicular accident, is afraid to drive Plaintiff Perry's Vehicle.

219.   Had Plaintiff Perry been told about the Engine Defect and/or that he would have to go through the process and waiting periods involved in the recall process, or that GM would not replace his engine with one free from the Engine Defect, he would have paid less for his vehicle, or not purchased it at all.

220.   Plaintiff Perry will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

221.   Furthermore, even if changing the oil viscosity for Plaintiff Perry's Vehicle restored the vehicle to its prior condition (it does not), he still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

222.   Upon information and belief, the Engine Defect present in Plaintiff Perry's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Perry, including by creating a safety risk. Thus, Plaintiff Perry also faces the risk of future harm for which legal remedies are inadequate.

223.   Plaintiff Perry also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would

71

enable Plaintiff Perry to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

224.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Perry will continue to suffer harm for which remedies at law are inadequate.

### 3. Plaintiff Ruszenas

225.   In December 2023, Plaintiff Ruszenas bought a 2024 Chevrolet Silverado 1500 ("Plaintiff Ruszenas' Vehicle") from GM dealer Grieco Chevrolet of Delray Beach in Delray Beach, Florida.

226.   Plaintiff Ruszenas's Vehicle was for Plaintiff Ruszenas personal use.

227.   Before her purchase Plaintiff Ruszenas spent time searching on GM's website several times looking at the 2024 Chevrolet Silverado 1500 and its features, but there was no mention of the Engine Defect. Plaintiff Ruszenas also looked at 2024 Chevrolet Silverado 1500s offered for sale on the website of Grieco Chevrolet, but there was no mention of the Engine Defect. Nor did the salesperson or any other document inform Plaintiff Ruszenas about the Engine Defect prior to her purchase of Plaintiff Ruszenas' Vehicle. Plaintiff Ruszenas also reviewed the window sticker on Plaintiff Ruszenas' Vehicle prior to her purchase, including the stated fuel efficiency.

228.   Plaintiff Ruszenas expected that Plaintiff Ruszenas' Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

229.   The inclusion of the engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Ruszenas.

230.   The inclusion of the represented fuel efficiency relating to Plaintiff Ruszenas' Vehicle was material to Plaintiff Ruszenas.

231.   Plaintiff Ruszenas was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to her purchase of Plaintiff Ruszenas' Vehicle.

232.   Plaintiff Ruszenas was not aware that the fuel efficiency of Plaintiff Ruszenas' Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to her purchase or during or after the recall.

233.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Ruszenas' Vehicle was worth less than what she actually paid for it.

234.   Had Plaintiff Ruszenas been aware of the defect at the time she purchased, she would not have purchased the vehicle or would have paid less for it.

235.   Had Plaintiff Ruszenas been aware of the misstated fuel efficiency at the time she purchased, she would not have purchased the vehicle or would have paid less for it.

236.   In February 2025, Plaintiff Ruszenas' Vehicle experienced complete engine failure while at a stop light, which seized the vehicle completely. Plaintiff Reszenas had to pay to have the vehicle towed to Schumacher Chevrolet.

237.   At that time, the service manager did not inform Plaintiff Ruszenas of any large scale or known engine failure issues, even though this was after the NHTSA had opened its investigation.

238.   Approximately four weeks later, GM replaced the first bad engine with a second L87 Engine that also contained the Engine Defect.

239.   During the four weeks that Plaintiff Ruszenas' Vehicle remained at the dealership, no one from GM or its dealership communicated to Plaintiff Ruszenas the known issue related to the Engine Defect.

240.   After Plaintiff Ruszenas opened a case with GM headquarters related to the warranty on Plaintiff Ruszenas' Vehicle, neither the case manager nor anyone else from GM acknowledged the known issue related to the Engine Defect during the five weeks that the case was open.

241.   Furthermore, GM did not provide Plaintiff Ruszenas with an extended warranty, would not confirm the location build of the replacement engine, and never

provided any financial reimbursement, despite the case manager telling Plaintiff Ruszenas she was entitled to reimbursement. GM closed this case without informing Plaintiff Ruszenas.

242. Plaintiff Ruszenas' Vehicle incurred significant damage during the course of the engine replacement at the GM dealership, including damage to, among others, the transmission, electrical system, bumper, headlights, and fender flairs.

243. Plaintiff Ruszenas immediately contacted GM about these issues as well, and this case has been opened for over six weeks with very little response other than statements that "we're working on it" and "we're overwhelmed with calls."

244. Plaintiff Ruszenas has asked that GM assign her case and any further inspection to a different GM dealer, and she has also inquired about GM buying back Plaintiff Ruszenas' Vehicle, but cannot get a response from GM.

245. Plaintiff Ruszenas is afraid to drive Plaintiff Ruszenas' Vehicle for long distances or on the highway. Currently, she will only drive it at low speeds.

246. Had Plaintiff Ruszenas been told: about the Engine Defect; or that she would have to go through the engine-seizure experience and expenses; or that GM would not replace her engine with one free from the Engine Defect; or about the process and waiting periods involved in the recall and in obtaining an engine replacement, she would have paid less for her vehicle, or not purchased it at all.

247.   Plaintiff Ruszenas will also have to pay more for fuel during her possession of the vehicle than she would have had it not contained the Engine Defect and achieved the represented fuel economy.

248.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Ruszenas' Vehicle to its prior condition (it does not), Plaintiff Ruszenas still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

249.   Upon information and belief, the Engine Defect present in Plaintiff Ruszenas' Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Ruszenas, including by creating a safety risk. Thus, Plaintiff Ruszenas also faces the risk of future harm for which legal remedies are inadequate.

250.   Plaintiff Ruszenas also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending her money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Ruszenas to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

251. Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Ruszenas will continue to suffer harm for which remedies at law are inadequate.

### 4. Plaintiff Henderson

252. In January 2023, Plaintiff Henderson bought a 2023 GMC Yukon ("Plaintiff Henderson's Vehicle") from GM dealer Bowser Automotive in Pleasant Hills, Pennsylvania.

253. Plaintiff Henderson's Vehicle was for Plaintiff Henderson's personal use.

254. Before her purchase Plaintiff Henderson spent time searching on GM's website several times looking at the 2023 Yukon and its features, but there was no mention of the Engine Defect. Plaintiff Henderson also looked at 2023 Yukons offered for sale on the website of Bowser Automotive, but there was no mention of the Engine Defect. Nor did the salesperson or any other document inform Plaintiff Henderson about the Engine Defect prior to her purchase of Plaintiff Henderson's Vehicle. Plaintiff Henderson also reviewed the window sticker on Plaintiff Henderson's Vehicle prior to her purchase, including the stated fuel efficiency.

255. Plaintiff Henderson expected that Plaintiff Henderson's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

256.   The inclusion of the engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Henderson.

257.   The inclusion of the represented fuel efficiency relating to Plaintiff Henderson's Vehicle was material to Plaintiff Henderson.

258.   Plaintiff Henderson was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to her purchase of Plaintiff Henderson's Vehicle.

259.   Plaintiff Henderson was not aware that the fuel efficiency of Plaintiff Henderson's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to her purchase or during or after the recall.

260.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Henderson's Vehicle was worth less than what she actually paid for it.

261.   Had Plaintiff Henderson been aware of the defect at the time she purchased, she would not have purchased the vehicle or would have paid less for it.

262.   Had Plaintiff Henderson been aware of the misstated fuel efficiency at the time she purchased, she would not have purchased the vehicle or would have paid less for it.

263.   On or about September 11, 2023, Plaintiff Henderson took Plaintiff Henderson's Vehicle, with under 17,000 miles on it, to GM dealer Bowser Automotive and indicated that she had heard a tapping and knocking sound while driving. The dealership replaced the belt.

264.   On or about December 18, 2024, Plaintiff Henderson took Plaintiff Henderson's Vehicle to GM dealer Bowser Automotive and indicated that the check engine light had been on, but was now off. The dealership indicated that the OnStar module needed to be replaced.

265.   On or about May 4, 2025, Plaintiff Henderson's Vehicle experienced complete engine failure when the engine of the vehicle seized while Plaintiff Henderson was driving. Plaintiff Henderson had to pay to have the vehicle towed to Budd Baer Buick GMC, where it remains to date.

266.   On or about May 8, 2025, Plaintiff Henderson reported the engine failure incident directly to GM, which opened its own case. Plaintiff Henderson also reported the incident to the NHTSA, which, upon information and belief, sent the report to GM.

267.   Plaintiff Henderson had to rent a vehicle from May 8 to May 12, 2025 to move her daughter into college because the dealer did not have any loaner vehicles available until May 13, 2025.

268.   On May 20, 2025, the dealer notified Plaintiff Henderson that a replacement engine arrived, but they would not begin working on Plaintiff Henderson's Vehicle until the week of May 26, 2025. Plaintiff Henderson's Vehicle remains at the dealer as of the date of this filing.

269.   Had Plaintiff Henderson been told: about the Engine Defect; or that she would have to go through the engine-seizure experience and expenses; or that GM would not replace her engine with one free from the Engine Defect; or about the process and waiting periods involved in the recall and in obtaining an engine replacement, she would have paid less for her vehicle, or not purchased it at all.

270.   Plaintiff Henderson will also have to pay more for fuel during her possession of the vehicle than she would have had it not contained the Engine Defect and achieved the represented fuel economy.

271.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Henderson's Vehicle to its prior condition (it does not), Plaintiff Henderson still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

272.   Upon information and belief, the Engine Defect present in Plaintiff Henderson's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Henderson, including by creating a safety risk. Thus,

Plaintiff Henderson also faces the risk of future harm for which legal remedies are inadequate.

273.   Plaintiff Henderson also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending her money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Henderson to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

274.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Henderson will continue to suffer harm for which remedies at law are inadequate.

### 5. Plaintiff Wright

275.   In November 2022, Plaintiff Wright bought a 2021 Chevrolet Silverado 1500 ("Plaintiff Wright's Vehicle") from Rentschler in Slatington, Pennsylvania.

276.   Plaintiff Wright's Vehicle was for Plaintiff Wright's personal use.

277.   Before his purchase Plaintiff Wright spent time searching on GM's website several times looking at the 2021 Chevrolet Silverado 1500 and its features.

Plaintiff Wright also reviewed the window sticker on Plaintiff Wright's Vehicle prior to his purchase, including the stated fuel efficiency.

278.   Plaintiff Wright expected that Plaintiff Wright's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

279.   The inclusion of the represented fuel efficiency relating to Plaintiff Wright's Vehicle was material to Plaintiff Wright.

280.   In October 2024, Plaintiff Wright's Vehicle required a replacement engine. At that time, despite knowing of the Engine Defect, GM's dealer Ciocca Chevrolet in Quakertown, Pennsylvania installed a L87 Engine with the Engine Defect.

281.   At no time prior to this installation did anyone at GM or GM's dealer inform Henderson about the Engine Defect.

282.   The installation of an engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Wright.

283.   Plaintiff Wright was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to the installation of the L87 Engine into Plaintiff Wright's Vehicle.

284.   Plaintiff Wright was not aware that the fuel efficiency of Plaintiff Wright's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase, after installation of the L87 Engine, or during or after the recall.

285.   On or about May 22, 2025, Plaintiff Wright contacted Ciocca Chevrolet after learning about the recall. Plaintiff Wright was told by the dealer that the dealer was aware of the recall but that GM has not officially begun the recall program yet and he would have to wait to bring in his vehicle.

286.   Had Plaintiff Wright been told about the Engine Defect and/or that GM would install an engine with the Engine Defect, or that he would have to go through the process and waiting periods involved in the recall, or that GM would not replace his engine with one free from the Engine Defect, he would have paid less for his vehicle, or not purchased it at all.

287.   Plaintiff Wright will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

288.   Furthermore, even if changing the oil viscosity for Plaintiff Wright's Vehicle restored the vehicle to its prior condition (it does not), he still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

289.   Upon information and belief, the Engine Defect present in Plaintiff Wright's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Wright, including by creating a safety risk. Thus, Plaintiff Wright also faces the risk of future harm for which legal remedies are inadequate.

290.   Plaintiff Wright also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Wright to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

291.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Wright will continue to suffer harm for which remedies at law are inadequate.

### 6. Plaintiff Krush

292.   In January 2023, Plaintiff Krush bought a 2022 Chevrolet Silverado 1500 ("Plaintiff Krush's Vehicle") from GM dealer Ressler Motors in Bozeman, Montana.

293.   Plaintiff Krush's Vehicle was for Plaintiff Krush's personal use.

294. Before his purchase, Plaintiff Krush spent time searching on GM's website several times looking at the 2022 Chevrolet Silverado 1500 and different trim packages, but there was no mention of the Engine Defect. Plaintiff Krush also reviewed the window sticker on Plaintiff Krush's Vehicle prior to his purchase, including the stated fuel efficiency.

295. Plaintiff Krush expected that Plaintiff Krush's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

296. The inclusion of an engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Krush.

297. The inclusion of the represented fuel efficiency relating to Plaintiff Krush's Vehicle was material to Plaintiff Krush.

298. Plaintiff Krush was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Krush's Vehicle.

299. Plaintiff Krush was not aware that the fuel efficiency of Plaintiff Krush's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

300.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Krush's Vehicle was worth less than what he actually paid for it.

301.   Had Plaintiff Krush been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

302.   Had Plaintiff Krush been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

303.   On or about April 9, 2025, while Plaintiff Krush was driving on the freeway, Plaintiff Krush's Vehicle lost power and shifted into neutral. The vehicle would not shift back into drive. Fortunately, Plaintiff Krush was able to steer the vehicle to the shoulder. Plaintiff Krush stopped the vehicle and turned the engine off, but then the engine would not start. Plaintiff Krush had to pay to have the vehicle towed to Lithia Chevrolet in Redding, California.

304.   The advisor at the dealership that spoke with Plaintiff Krush told him he needed a new engine, but did not tell Plaintiff Krush about the Engine Defect.

305.   Approximately three to four weeks later, GM replaced the bad engine with a second L87 Engine that also contained the Engine Defect.

306.   During the four weeks that Plaintiff Krush's Vehicle remained at the dealership, no one from GM or its dealership communicated to Plaintiff Krush the known issue related to the Engine Defect.

307.   Had Plaintiff Krush been told: about the Engine Defect; or that he would have to go through the engine-seizure experience and expenses; or that GM would not replace his engine with one free from the Engine Defect; or about the process and waiting periods involved in the recall and in obtaining an engine replacement, he would have paid less for his vehicle, or not purchased it at all.

308.   Plaintiff Krush will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

309.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Krush's Vehicle to its prior condition (it does not), Plaintiff Krush still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

310.   Upon information and belief, the Engine Defect present in Plaintiff Krush's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Krush, including by creating a safety risk. Thus, Plaintiff Krush also faces the risk of future harm for which legal remedies are inadequate.

311.   Plaintiff Krush also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such

acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Krush to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

312.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Krush will continue to suffer harm for which remedies at law are inadequate.

### 7.  Plaintiff Popielarz

313.   In May 2023, Plaintiff Popielarz bought a 2023 Chevrolet Silverado 1500 ("Plaintiff Popielarz's Vehicle") from GM dealer Jim Butler Linn Chevrolet, LLC, in Linn, Missouri.

314.   Plaintiff Popielarz's Vehicle was for Plaintiff Popielarz's personal use.

315.   Before owning Plaintiff Popielarz's Vehicle, Plaintiff Popielarz owned a 2021 Chevrolet Silverado 1500. That vehicle did not have the L87 Engine, but it had engine issues related to, *inter alia*, the lifters and bent pushrods. Thus, before purchasing Plaintiff Popielarz's Vehicle, Plaintiff Popielarz spent considerable time researching the engine in the 2023 Chevrolet Silverado 1500. His research indicated that in the L87 Engine, GM had made adjustments to remedy the issues with the prior versions of the 6.2L engines. Plaintiff Popielarz searched on GM's website several times looking at the 2023 Chevrolet Silverado 1500 and its features, but there

was no mention of the Engine Defect. Plaintiff Popielarz also looked at 2023 Silverado 1500s offered for sale on the website of Jim Butler Linn Chevrolet, LLC, but there was no mention of the Engine Defect. Nor did any salesperson or any other document inform Plaintiff Popielarz about the Engine Defect prior to his purchase of Plaintiff Popielarz's Vehicle. Instead, the salesperson at Jim Butler Linn Chevrolet, LLC assured Plaintiff Popielarz that GM had fixed the issues and the engine was no longer a problem in Plaintiff Popielarz's Vehicle. Plaintiff Popielarz also reviewed the window sticker on Plaintiff Popielarz's Vehicle prior to his purchase, including the stated fuel efficiency.

316.   Plaintiff Popielarz expected that Plaintiff Popielarz's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

317.   The inclusion of the engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Popielarz.

318.   The inclusion of the represented fuel efficiency relating to Plaintiff Popielarz's Vehicle was material to Plaintiff Popielarz.

319.   Plaintiff Popielarz was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Popielarz's Vehicle.

320.   Plaintiff Popielarz was not aware that the fuel efficiency of Plaintiff Popielarz's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

321.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Popielarz's Vehicle was worth less than what he actually paid for it.

322.   Had Plaintiff Popielarz been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

323.   Had Plaintiff Popielarz been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

324.   In January 2024, Plaintiff Popielarz's Vehicle experienced complete engine failure when the engine of the vehicle seized while Plaintiff Popielarz was driving on the highway. Plaintiff Popielarz had to pay to have the vehicle towed to Hulett Chevrolet in Camdenton, Missouri.

325.   Plaintiff Popielarz's Vehicle was not immediately serviced at the GM dealership, and no loaner vehicle was available for Plaintiff Popielarz for several days. A few days later, the dealer offered Plaintiff Popielarz a small car as a loaner vehicle. This small vehicle was very difficult for Plaintiff Popielarz to get in and out of because he has had three hip replacements. Plaintiff Popielarz needed a vehicle to

travel between his two business locations, approximately 50 miles apart, so he purchased a 2014 Chevrolet truck.

326.   On February 6, 2024, GM replaced the first bad engine with a second L87 Engine that also contained the Engine Defect.

327.   Plaintiff Popielarz is afraid to drive Plaintiff Popielarz's Vehicle.

328.   Had Plaintiff Popielarz been told: about the Engine Defect; or that he would have to go through the engine-seizure experience and expenses; or that GM would not replace his engine with one free from the Engine Defect; or about the process and waiting periods involved in the recall and in obtaining an engine replacement, he would have paid less for his vehicle, or not purchased it at all.

329.   Plaintiff Popielarz will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

330.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Popielarz's Vehicle to its prior condition (it does not), Plaintiff Popielarz still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

331.   Upon information and belief, the Engine Defect present in Plaintiff Popielarz's Vehicle has not been resolved and is an ongoing defect that continues to

cause harm to Plaintiff Popielarz, including by creating a safety risk. Thus, Plaintiff Popielarz also faces the risk of future harm for which legal remedies are inadequate.

332.   Plaintiff Popielarz also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Popielarz to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

333.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Popielarz will continue to suffer harm for which remedies at law are inadequate.

### 8.  Plaintiff Bennett

334.   In January 2023, Plaintiff Bennett bought a 2022 Chevrolet Silverado 1500 ("Plaintiff Bennett's Vehicle") from GM dealer Duncan Family Automotive in Harriman, Tennessee.

335.   Plaintiff Bennett's Vehicle was for Plaintiff Bennett's personal use.

336.   Before his purchase, Plaintiff Bennett spent time searching on GM's website several times looking at the 2022 Chevrolet Silverado and the High County

Super Cruiser package and technology package as options, but there was no mention of the Engine Defect. Plaintiff Bennett custom ordered his vehicle using GM's website, which also provided information about the vehicle's fuel efficiency.

337.   Plaintiff Bennett expected that Plaintiff Bennett's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

338.   The inclusion of an engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Bennett.

339.   The inclusion of the represented fuel efficiency relating to Plaintiff Bennett's Vehicle was material to Plaintiff Bennett.

340.   Plaintiff Bennett was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Bennett's Vehicle.

341.   Plaintiff Bennett was not aware that the fuel efficiency of Plaintiff Bennett's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

342.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Bennett's Vehicle was worth less than what he actually paid for it.

343.   Had Plaintiff Bennett been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

344.   Had Plaintiff Bennett been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

345.   On or around early May 2025, Plaintiff Bennett received an email through GM's OnStar service that is built into vehicle, that he had an open recall. Plaintiff Bennett went to the national database to run his VIN, which indicated Plaintiff Bennett's Vehicle was subject to a recall for "L87 Engine Loss of Propulsion." Plaintiff Bennett did not understand what that meant, so he called Beaty Chevrolet in Knoxville, Tennessee, the dealership where he had been taking his vehicle for service following the closure of Duncan Family Automotive. Plaintiff Bennett was told on the telephone that there was a recall, and although the dealer did not have the part, Plaintiff Bennett could still bring his vehicle to the dealership for service.

346.   Thereafter, in May 2025, Plaintiff Bennett took his vehicle to Beaty Chevrolet. While there, he saw that GM recommended service at 25,000 miles, which was about the mileage on Plaintiff Bennett's Vehicle. When Plaintiff Bennett asked for the 25,000-mile service, the service advisor, Scott, told Plaintiff Bennett that he did not need that service and that he should not waste his money because he

would be getting a new engine soon. When Plaintiff Bennett asked Scott what he meant by soon, Scott said he did not know and that the dealership was waiting for GM to tell it what to do. Neither Scott nor anyone else from or on behalf of GM explained the Engine Defect or potential risks arising therefrom to Plaintiff Bennett.

347.   Had Plaintiff Bennett been told about the Engine Defect and/or that he would have to go through the process and waiting periods involved in the recall process, or that GM would not replace his engine with one free from the Engine Defect, he would have paid less for his vehicle, or not purchased it at all.

348.   Plaintiff Bennett will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

349.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Bennett's Vehicle to its prior condition (it does not), Plaintiff Bennett still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

350.   Upon information and belief, the Engine Defect present in Plaintiff Bennett's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Bennett, including by creating a safety risk. Thus, Plaintiff Bennett also faces the risk of future harm for which legal remedies are inadequate.

351.   Plaintiff Bennett also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Bennett to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

352.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Bennett will continue to suffer harm for which remedies at law are inadequate.

### 9.  Plaintiff Bensel

353.   In or around November 2022, Plaintiff Bensel bought a 2023 Chevrolet Denali ("Plaintiff Bensel's Vehicle"), from GM dealer Buick GMC of Beaverton in Beaverton, Oregon.

354.   Plaintiff Bensel's Vehicle was primarily for Plaintiff Bensel's personal use.

355.   Before his purchase, Plaintiff Bensel spent time searching on GM's website to research the Chevrolet Denali, but there was no mention of the Engine

Defect. Plaintiff Bensel also reviewed the window sticker on Plaintiff Bensel's Vehicle prior to his purchase, including the stated fuel economy.

356.   Plaintiff Bensel expected that Plaintiff Bensel's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

357.   The inclusion of an engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Bensel.

358.   The inclusion of the represented fuel efficiency relating to Plaintiff Bensel's Vehicle was material to Plaintiff Bensel.

359.   In or around May 2025, GM notified Plaintiff Bensel that Plaintiff Bensel's Vehicle is subject to the recall because of the Engine Defect.

360.   Plaintiff Bensel was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Bensel's Vehicle.

361.   Plaintiff Bensel was not aware that the fuel efficiency of Plaintiff Bensel's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

362.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Bensel's Vehicle was worth less than what he actually paid for it.

363.   Had Plaintiff Bensel been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

364.   Had Plaintiff Bensel been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

365.   Plaintiff Bensel will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

366.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Bensel's Vehicle to its prior condition (it does not), Plaintiff Bensel still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

367.   Upon information and belief, the Engine Defect present in Plaintiff Bensel's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Bensel, including by creating a safety risk. Thus, Plaintiff Bensel also faces the risk of future harm for which legal remedies are inadequate.

368.   Plaintiff Bensel also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such

acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Bensel to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

369.    Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Bensel will continue to suffer harm for which remedies at law are inadequate.

### 10. Plaintiff Fenstermaker

370.    In December 2023, Plaintiff Fenstermaker bought a 2022 Chevrolet Tahoe ("Plaintiff Fenstermaker's Vehicle") from GM dealer AutoNation Chevrolet Mesa in Mesa, Arizona.

371.    Plaintiff Fenstermaker's Vehicle was for Plaintiff Fenstermaker's personal use.

372.    Before his purchase Plaintiff Fenstermaker spent time searching on GM's website several times looking at the 2022 Chevrolet Tahoe and its features, but there was no mention of the Engine Defect. Plaintiff Fenstermaker also looked at 2022 Chevrolet Tahoes offered for sale on the website of AutoNation Chevrolet Mesa, but there was no mention of the Engine Defect. Nor did the salesperson or any other document inform Plaintiff Fenstermaker about the Engine Defect prior to his purchase of Plaintiff Fenstermaker's Vehicle. Plaintiff Fenstermaker also reviewed

the window sticker on Plaintiff Fenstermaker's Vehicle prior to his purchase, including the stated fuel efficiency.

373.   Plaintiff Fenstermaker expected that Plaintiff Fenstermaker's Vehicle would have the stated fuel efficiency and would have an engine that functioned properly and was free of defects.

374.   The inclusion of an engine that is free from defects in the crankshaft, connecting rod, and/or rod bearings and that is not overly susceptible to bearing failure and resulting seizure while driving was material to Plaintiff Fenstermaker.

375.   The inclusion of the represented fuel efficiency relating to Plaintiff Fenstermaker's Vehicle was material to Plaintiff Fenstermaker.

376.   Plaintiff Fenstermaker was not aware of the Engine Defect, and was not made aware of the Engine Defect by GM, prior to his purchase of Plaintiff Fenstermaker's Vehicle.

377.   Plaintiff Fenstermaker was not aware that the fuel efficiency of Plaintiff Fenstermaker's Vehicle would be less than stated because of the Engine Defect, and was not made aware of this fact by GM prior to his purchase or during or after the recall.

378.   Because of the undisclosed defect and misstated fuel efficiency, Plaintiff Fenstermaker's Vehicle was worth less than what he actually paid for it.

379.   Had Plaintiff Fenstermaker been aware of the defect at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

380.   Had Plaintiff Fenstermaker been aware of the misstated fuel efficiency at the time he purchased, he would not have purchased the vehicle or would have paid less for it.

381.   On October 7, 2024, Plaintiff Fenstermaker, with his wife and three children, drove Plaintiff Fenstermaker's Vehicle from Arizona to Mexico. While on a narrow highway in Mexico, the engine on Plaintiff Fenstermaker's Vehicle seized and the vehicle shut down. Plaintiff Fenstermaker was able to pull the car over onto the shoulder, approximately one foot away from the highway, and approximately 30 miles from any help. Plaintiff Fenstermaker tried to call GM's Roadside Assistance several times per the number listed on its website, but no one would answer. Approximately six hours later, a tow truck came and towed the vehicle to Puerto Peñasco, Mexico, at a cost of $390. The wheel, tire, and body of the vehicle sustained damage from this tow. The next day, a mechanic diagnosed the vehicle with total engine failure, at a cost of $690.

382.   Two days later, Plaintiff Fenstermaker had the vehicle towed from Mexico to Arizona, at a cost of $6,790. Plaintiff Fenstermaker had spoken to AutoNation Chevrolet Mesa on approximately ten separate occasions to prepare for the vehicle's arrival via tow; however, when it arrived, AutoNation did not know

how to get the vehicle off of the tow trailer because it was locked up due to engine failure. Plaintiff Fenstermaker thus had to incur $300 to keep the trailer overnight.

383.   On November 11, 2024, AutoNation Chevrolet Mesa confirmed the engine failure, explaining: "Inspected engine oil level and condition, found to be contaminated by bearing material, suspect connecting rod bearing conditions. . . . Removed select connecting rod caps, identified connecting rod bearings have become out of place for multiple cylinders ('spun connecting rod bearings'), conditions have caused no crank no start symptoms and consequential damage to crankshaft and contamination to radiator and engine assembly, conditions require replacement of engine . . . ."

384.   Although the engine in Plaintiff Fenstermaker's Vehicle was replaced, it was replaced with another L87 V8 engine, and thus the Engine Defect still exists in Plaintiff Fenstermaker's Vehicle.

385.   Thereafter, Plaintiff Fenstermaker learned of the recall and again took his vehicle to the dealer. It was not quarantined because the P0016 code was not triggered and the dealer changed the vehicle to the higher-viscosity oil as described herein.

386.   Plaintiff Fenstermaker has lost the normal use of his vehicle, as his seven-year old daughter is afraid to ride in Plaintiff Fenstermaker's Vehicle.

387.   Had Plaintiff Fenstermaker been told: about the Engine Defect; or that he would have to go through the engine-seizure experience and expenses; or that GM would not replace his engine with one free from the Engine Defect; or about the process and waiting periods involved in the recall and in obtaining an engine replacement, he would have paid less for his vehicle, or not purchased it at all.

388.   Plaintiff Fenstermaker will also have to pay more for fuel during his possession of the vehicle than he would have had it not contained the Engine Defect and achieved the represented fuel economy.

389.   Furthermore, even if replacing the engine or changing the oil viscosity restored Plaintiff Fenstermaker's Vehicle to its prior condition (it does not), Plaintiff Fenstermaker still has suffered inherent diminished value because of the Engine Defect and recall as described herein.

390.   Upon information and belief, the Engine Defect present in Plaintiff Fenstermaker's Vehicle has not been resolved and is an ongoing defect that continues to cause harm to Plaintiff Fenstermaker, including by creating a safety risk. Thus, Plaintiff Fenstermaker also faces the risk of future harm for which legal remedies are inadequate.

391.   Plaintiff Fenstermaker also desires to purchase vehicles, including Class Vehicles, from GM in the future and would consider spending his money to purchase such vehicles from GM in the future if GM adequately acknowledged the

existence of the Engine Defect and provided an adequate remedy for the Engine Defect. Such acknowledgment of the Engine Defect and notice of an adequate remedy would enable Plaintiff Fenstermaker to have the confidence to rely on GM's representations in the future when considering whether to purchase GM's vehicles, which would otherwise be lacking.

392.   Accordingly, without such adequate acknowledgment of or fix for the Engine Defect, Plaintiff Fenstermaker will continue to suffer harm for which remedies at law are inadequate.

## CLASS ACTION ALLEGATIONS

393.   **The Class.** Plaintiffs bring this action on their own behalf and as a class action on behalf of all similarly-situated owners and lessees of Class Vehicles.

394.   Specifically, Plaintiffs seek to represent the following Class and Subclasses[67]:

---

[67] The Class and Subclasses described below are collectively referred to herein as the "Class" or the "Classes."

**Nationwide Class:** All persons that purchased or leased a Class Vehicle in the United States during the Class Period.

**Illinois Subclass:** All persons that purchased or leased a Class Vehicle in Illinois during the Class Period.

**Florida Subclass:** All persons that purchased or leased a Class Vehicle in Florida during the Class Period.

**Pennsylvania Subclass:** All persons that purchased or leased a Class Vehicle in Pennsylvania during the Class Period.

**Montana Subclass:** All persons that purchased or leased a Class Vehicle in Montana during the Class Period.

**Missouri Subclass:** All persons that purchased or leased a Class Vehicle in Missouri during the Class Period.

**Tennessee Subclass:** All persons that purchased or leased a Class Vehicle in Tennessee during the Class Period.

**Oregon Subclass:** All persons that purchased or leased a Class Vehicle in Oregon during the Class Period.

**Arizona Subclass:** All persons that purchased or leased a Class Vehicle in Arizona during the Class Period.

**Consumer Fraud Multi-State Subclass:** All persons that purchased or leased a Class Vehicle in California, New Jersey, New York, Ohio, South Carolina, Virginia, or Washington during the Class Period.[68]

---

[68] Plaintiffs reserve the right to add or remove states from the Consumer Fraud Multi-State Subclass at the time of class certification based on information obtained during discovery. Plaintiffs assert that the states included in the Consumer Fraud Multi-State Class have similar consumer fraud laws to each other and/or other subclasses under the facts of this case. *See* California (Cal. Business & Professions Code §§ 17200 *et seq*.; Cal. Civil Code § 1750 *et seq*.); New Jersey

395.    Excluded from the Classes are officers, directors and employees of GM and any of its members, affiliates, parents, subsidiaries, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.

396.    The Class Period is that period within the applicable statute of limitations for this action and extending until a Class is certified.

397.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4).

398.    Plaintiff reserves the right to amend or modify the Class definitions and/or Class Vehicles with greater specificity or division into subclasses prior to class certification and after having had an opportunity to conduct discovery.

399.    **Numerosity.** The members of each proposed Class are so numerous that joinder of all members is impracticable. Upon information and belief, the number of Class Vehicles exceeds 800,000 and GM has identified nearly 600,000 Recall Vehicles. The precise number of Class Members is unknown at this time, as such information is in the exclusive control of GM and/or third parties.

---

(N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); Ohio (Ohio Rev. Code Ann. § 1345.01, *et seq.*); South Carolina (S.C. Code Ann. § 39-5-10, *et seq.*); Virginia (VA Code § 59.1-196, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

400.   **Common Questions of Law and Fact and Predominance.** Numerous questions of law and fact are common to Plaintiff and the Class Members, and predominate over any individual questions. Such common legal and factual questions include, but are not limited to:

a.   Whether GM sells or has sold vehicles that have the Engine Defect described herein;

b.   When GM first learned of the Engine Defect;

c.   Whether GM has omitted relevant information regarding the Engine Defect from its communications with consumers prior to their purchases or leases;

d.   Whether the Engine Defect renders the Class Vehicles unmerchantable;

e.   Whether GM has breached its express and/or implied warranties in connection with the Engine Defect;

f.   Whether and to what capacity GM is able to remedy the Engine Defect;

g.   Whether the Class Vehicles have diminished in value because of the Engine Defect and/or recall;

h.   Whether GM owed a duty to disclose the Engine Defect and fuel economy effects of the recall;

i.   Whether GM misrepresented the Class Vehicles' true performance and fuel economy or the effects of recall on performance and fuel economy;

j.   Whether GM's actions described herein are unfair, deceptive, or constitute an omission of a material fact under the consumer protection laws of the states described herein;

k.   Whether GM's actions described herein are unethical;

l.      Whether Plaintiffs and the Class Members are entitled to rescission;

m.      Whether Plaintiffs and the Class Members are entitled to compensatory damages, and the amount of such damages;

n.      Whether injunctive and/or other equitable relief is warranted; and

o.      Whether Plaintiffs and the Class Members are entitled to an award of punitive damages.

401.   **Typicality.** Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and all Class Members have suffered damages as a result of the same wrongful practices by GM. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class Members.

402.   **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and consumer class actions.

403.   Plaintiffs and counsel are committed to prosecuting this action vigorously on behalf of the Classes, and do not have any interests that are contrary to or in conflict with those of the Classes they seek to represent.

404.   **Superiority.** A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty

to be encountered in the management of this action that would preclude its maintenance as a class action.

405.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications concerning the subject of this action.

406.   Absent a class action, the vast majority of Class Members likely would not be in a position to litigate their claims individually and would have no effective remedy at law through which to vindicate their claims against GM and be made whole.

407.   Class treatment will conserve the resources of the courts and the litigants, and further efficient adjudication of Class Member claims.

408.   **Class Action on Limited Issues.** Because there are common individual issues among the Class, it is appropriate for this action to be maintained as a class action with respect to particular issues if necessary.

## COUNT I: Common Law Fraud

## (On behalf of Plaintiffs and the Nationwide Class)

409.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

410.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

411.   GM is liable for both fraudulent concealment and nondisclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

412.   In connection with its sale and marketing of the Class Vehicles, GM committed fraud by concealing the Engine Defect, including concealing that a purported remedy involving a change to a higher viscosity motor oil would reduce the fuel efficiency of the Class Vehicles and increase the amount consumers will pay for gasoline.

413.   Reasonable consumers would not have expected their Class Vehicles to contain the Engine Defect.

414.   GM knew that these facts regarding the Class Vehicles would be important to consumers in connection with their purchasing decisions, yet ensured that Plaintiffs and Class Members did not discover this information by actively concealing it.

415.   GM intended for Plaintiffs and Class Members to rely on its misrepresentations and omissions—which they did in purchasing the Class Vehicles.

416.   GM had a duty to disclose the Engine Defect, as it was known and/or accessible only to GM, including due to its design, installment, and/or testing of engines in Class Vehicles. As GM knew, the existence and/or nature of the Engine Defect was not known to or reasonably discoverable by Plaintiffs and Class Members.

417.   GM also had a duty to disclose the Engine Defect in light of its affirmative statements regarding the safety and/or reliability of the Class Vehicles and their fuel economy.

418.   GM knew its statements and omissions described herein were misleading, deceptive, and incomplete, in failing to disclose the above facts regarding the Engine Defect.

419.   Because of GM's fraudulent concealments described herein, Plaintiffs and Class Members were injured when they paid for their Class Vehicles but received property of a different character or condition than was promised.[69]

420.   Because of GM's fraudulent concealments described herein, Plaintiffs and Class Members have suffered economic losses, including, but not limited to, overpaying for the Class Vehicles, incurring expenses associated with the Engine

---

[69] The Supreme Court recently explained the history of injury even absent economic loss in common law fraud. *See Kousisis v. United States*, No. 23-909, slip op. at 8-16 (May 22, 2025). The Court noted that "to rescind the fraud-infected contracts, most courts would historically have permitted [a party] to do so even without a showing of economic loss. To obtain a rescission, [the party] would have needed to establish only that it had 'received property of a different character or condition than [it] was promised' ('although of equal value') or, more relevant here, that the transaction had 'prove[d] to be less advantageous than as represented' ('although there [was] no actual loss')." *Id.* at 9 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §110, p. 766 (5th ed. 1984) (Prosser & Keeton)). *See also id.* at 13 ("[C]ommon-law courts did not uniformly condition an action sounding in fraud on the plaintiff's ability to prove economic loss. More specifically, if the action was one for rescission . . . the plaintiff's required 'injury' ordinarily need not be financial.").

Defect, suffering a diminution in the inherent value of the Class Vehicles, and paying an increased amount in gasoline over the course of their time owning and/or leasing their Class Vehicle.

421.   GM's acts were done wantonly, maliciously, deliberately, with intent to defraud, and were in reckless disregard of Plaintiffs' rights and the rights of Class Members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiffs and the Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT II: Unjust Enrichment

### (On behalf of Plaintiffs and the Nationwide Class)

422.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein each of the allegations contained in paragraphs 1-24 and 37-408 of this Amended Complaint.

423.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

424.   Plaintiffs plead this claim separately, and, to the extent necessary, in the alternative to their claims for damages, pursuant to Fed. R. Civ. P. 8(a)(3).

425.   As set forth herein, Plaintiffs and Class Members conferred an economic benefit on GM in paying for their Class Vehicles, specifically under false pretenses in light of GM's misrepresentations and concealment of material

information described herein, and at higher prices than the Class Vehicles were worth due to GM's misrepresentations and omissions addressed herein.

426.   Because of GM's misrepresentations and omissions, Plaintiffs and Class Members lacked knowledge of the existence of the Engine Defect in the Class Vehicles and that the Class Vehicles would require more gasoline and be less fuel efficient than advertised.

427.   GM readily accepted and retained the benefits provided by Plaintiffs and Class Members, who would not have purchased or leased the Class Vehicles, or would have paid less for them, had GM disclosed the Engine Defect and/or accurate fuel efficiency prior to their purchase or lease. GM has thus unjustly profited from selling and leasing Class Vehicles to the detriment of Plaintiffs and Class Members.

428.   It is inequitable and unjust for GM to retain these benefits from its sale of Class Vehicles with the Engine Defect, a defect it concealed and that substantially limits the value of the Class Vehicles and decreases their fuel economy.

429.   Plaintiffs and Class Members lack an adequate remedy at law.

430.   Under principles of equity and good conscience, GM should not be permitted to retain the benefits it derived from Plaintiffs and Class Members through its unjust and unlawful acts.

431.    Plaintiffs and Class Members seek full disgorgement and restitution of the amounts GM has retained as a result of the unlawful and/or wrongful conduct alleged herein, an amount which will be proved at trial.

WHEREFORE, Plaintiffs and the Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT III: Breach of the Implied Warranty of Merchantability—Uniform Commercial Code

### (On behalf of Plaintiffs and the Nationwide Class)

432.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

433.    Plaintiffs bring this claim against GM on behalf of themselves and the Nationwide Class under the laws of all fifty states and Puerto Rico. Every state has adopted § 2-314 of the Uniform Commercial Code (except Louisiana which has its own counterpart), providing that every contract for sale includes an implied warranty that the goods are merchantable. This common question of merchantability as to the Class Vehicles—the heart of any implied warranty claim— predominates over any differences in the various states' implied warranty laws.

434.    For the reasons set forth herein, GM has breached the implied warranty of merchantability. *See, e.g.*, U.C.C. §§ 2-314, 2A-212.

435.    GM is, and at all relevant times has been, a "merchant" and a "seller" of vehicles under U.C.C. § 2-314.

114

436.    Further, GM is, and at all relevant times has been, a "lessor" of vehicles under U.C.C. § 2A-212.

437.    The Class Vehicles are, and at all relevant times have been, "goods" within the meaning of U.C.C. § 2-314 and § 2A-212.

438.    There are implied warranties by law that the Class Vehicles were, *inter alia*, in merchantable condition and fit for their ordinary purpose pursuant to U.C.C. § 2-314 and § 2A-212.

439.    Because of the serious Engine Defect in the Class Vehicles as described herein, the Class Vehicles were not and are not merchantable or fit for their ordinary purpose.

440.    These Class Vehicles, when sold or leased and at all times thereafter, contained a serious Engine Defect, with accompanying serious safety risks. The Class Vehicles were therefore not merchantable or fit for the ordinary purpose.

441.    GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

442.    GM further has actual knowledge of Plaintiffs' and the Class' Engine Defect as they have associated specific VINs that are subject to GM's recall

program. Due to GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT IV: Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act by Means of Unfair Business Practices, 815 ILCS 505/1 *et seq.*

### (On behalf of Plaintiffs Powell and Perry and the Illinois Subclass)

443.   Plaintiffs Powell and Perry incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

444.   Each Class Vehicle is "merchandise" pursuant to 815 ILCS § 505/1(b).

445.   The advertising, offering for sale, sale, and/or distribution of the Class Vehicles constitutes "trade" or "commerce" pursuant to 815 ILCS § 505/1(f).

446.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2 ("ICFA"), prohibits unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

116

447.   Pursuant to ICFA, GM has a duty not to engage in any unethical or unfair practice in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

448.   As shown above, GM has known about the Engine Defect since at least early in 2022. Yet it failed to inform Plaintiffs Powell and Perry and the Illinois Subclass about the Engine Defect and/or the accuracy of the fuel economy of Class Vehicles prior to their purchases or leases of Class Vehicles.

449.   At a minimum, GM omitted material facts by not disclosing to Plaintiffs Powell and Perry and the Illinois Subclass prior to their purchases or leases that the Class Vehicles have a known issue where bearings may fail and cause the engine to seize up while the vehicle is being driven so that consumers would understand the risk associated with driving a Class Vehicle. GM also omitted and/or misrepresented material facts regarding the accurate fuel economy of Class Vehicles.

450.   The existence of the Engine Defect and accuracy of the Class Vehicle's fuel economy is a fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner.

451.   GM's omission of the Engine Defect and accurate fuel economy of Class Vehicles constituted a failure to disclose material facts that were known to it, or that, upon reasonable inquiry, would be known to it.

452.   Selling or leasing vehicles to Plaintiffs Powell and Perry and Illinois Subclass Members that contain the Engine Defect and while omitting and/or misrepresenting material facts regarding the fuel economy of Class Vehicles, while knowing of the defect and accurate fuel economy but not disclosing it prior to Plaintiffs Powell's and Perry's and Illinois Subclass Members' purchases or leases, is unfair and unethical and violates generally accepted principles of ethical business conduct.

453.   GM's unfair and unethical actions in failing to inform Plaintiffs Powell and Perry and the Illinois Subclass about the known Engine Defect and accurate fuel economy of Class Vehicles prior to their purchases or leases were therefore purposeful, as GM chose not to give them any information regarding the Engine Defect and/or accurate fuel economy prior to their purchases or leases, despite having had knowledge of the Engine Defect for many years.

454.   Section 2 of ICFA further prohibits unfair methods of competition and unfair or deceptive acts or practices, including "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act[.]'"

455.   Section 2 also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."

456.   As set forth above, GM engaged in, *inter alia*, the following deceptive trade practices described in Section 2 of the Uniform Deceptive Trade Practices Act in transactions with Plaintiffs Powell and Perry and the Illinois Subclass in Illinois which were intended to result in, and did result in, the sale of the Class Vehicles:

  a.   Representing that the Class Vehicles have characteristics, uses, and/or benefits that they do not have.

  b.   Representing that the Class Vehicles are of a particular standard, quality, or grade when they are of another.

  c.   Advertising goods with intent not to sell them as advertised.

  d.   Concealing, omitting, and/or suppressing material facts regarding the Engine Defect for the Class Vehicles so as to create a likelihood of confusion or misunderstanding.

457.   The acts and practices engaged in by GM, as set forth herein, constitute unfair business practices in violation of 815 ILCS § 505/1 *et seq.* because they: (a) offend public policy; (b) are immoral, unethical, oppressive, or unscrupulous; and/or (c) cause substantial injury to consumers.

458.   The aforesaid unfair acts and practices occurred in the course of conduct involving trade or commerce.

459.   GM intended that Plaintiffs Powell and Perry and the Illinois Subclass rely on the aforesaid unfair acts and practices.

460.   Plaintiffs Powell and Perry are a "consumer" under ICFA because they purchased a Class Vehicle for personal use.

461.   Moreover, GM's conduct as set forth herein involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.

462.   Had GM disclosed the Engine Defect and/or accurate fuel economy of Class Vehicles, Plaintiffs Powell and Perry and other members of the Illinois Subclass would not have purchased or leased the Class Vehicles or would have paid less for them.

463.   As a direct and proximate result of the aforesaid violations of ICFA, Plaintiffs Powell and Perry and the Illinois Subclass have suffered an ascertainable loss of money by paying for vehicles with properly functioning engines without being told of the Engine Defect by GM prior to their purchases or leases, but instead received vehicles that had defective engines that were therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiffs Powell and Perry and Illinois Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

464. Additionally, as set forth above, the value of Plaintiffs Powell's and Perry's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

465. GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the Illinois Class in an amount to be determined at trial.

466. GM's conduct as aforesaid was and continues to be wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiffs Powell and Perry and the Illinois Subclass and, therefore, warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs Powell and Perry and the Illinois Subclass pray for the relief requested in the Prayer for Relief set forth below.

### COUNT V: Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act by Means of Deception, 815 ILCS 505/1 *et seq*.

### (On behalf of Plaintiffs Powell and Perry and the Illinois Subclass)

467. Plaintiffs Powell and Perry incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

468. GM's false and/or misleading statements, omissions, and misrepresentations described herein constitute deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of material facts in connection with the sale of merchandise in Illinois.

469.    The acts and practices engaged in by GM, as set forth herein, constitute deceptive and/or fraudulent business practices in violation of 815 ILCS § 505/1 *et seq*.

470.    The aforesaid fraudulent and deceptive acts and practices occurred in the course of conduct involving trade or commerce.

471.    GM intended that Plaintiffs Powell and Perry and the Illinois Subclass rely on the aforesaid deceptive advertising, acts and practices.

472.    Had GM disclosed the Engine Defect and accurate fuel economy of Class Vehicles, Plaintiffs Powell and Perry and other members of the Illinois Subclass would not have purchased or leased the Class Vehicles or would have paid less for them.

473.    As a direct and proximate result of the aforesaid violations of ICFA, Plaintiffs Powell and Perry and the Illinois Subclass have suffered an ascertainable loss of money by paying for vehicles with properly functioning engines without being told of the Engine Defect by GM prior to their purchases or leases, but instead received vehicles that had defective engines that were therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiffs Powell and Perry and Illinois Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to higher viscosity oil in connection with the recall.

474.   Additionally, as set forth above, the value of Plaintiffs Powell's and Perry's and Illinois Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

475.   GM's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiffs Powell and Perry and the Illinois Subclass in an amount to be determined at trial.

476.   GM's conduct as aforesaid was and continues to be wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiffs Powell and Perry and the Illinois Subclass and, therefore, warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs Powell and Perry and the Illinois Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT VI: Breach of Express Warranty, 810 ILCS 5/2-313 and 5/2A-210
### (On behalf of Plaintiffs Powell and Perry and the Illinois Subclass)

477.   Plaintiffs Powell and Perry re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

478.   Plaintiffs Powell and Perry bring this claim on behalf of themselves and the Illinois Subclass under Illinois law.

479.   Plaintiffs Powell and Perry and members of the Illinois Subclass have complied with the terms of their Limited Warranty.

480.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. 810 ILCS 5/2-104(1); 810 ILCS 5/2-103(1)(d).

481.   With respect to leases, GM is and was at all relevant times a lessor of motor vehicles. 810 ILCS 5/2A-103(1)(p).

482.   The Class Vehicles are and were at all relevant times goods within the meaning of 810 ILCS 5/2-105(1) and 810 ILCS 5/2A-103(h).

483.   In its Limited Warranty, GM expressly warranted that, during the warranty period, it would repair or replace defects in material or workmanship free of charge.

484.   GM also made numerous representations, descriptions, and promises to Plaintiffs Powell and Perry and Illinois Subclass members regarding the performance and efficiency of the Class Vehicles.

485.   GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiffs Powell and Perry and members of the Illinois Subclass purchased or leased their Class Vehicles with the Engine Defect.

486.   Despite the existence of the Limited Warranty, GM failed to inform Plaintiffs Powell and Perry and Illinois Subclass members that the Class Vehicles contained the Engine Defect.

487.   GM breached this warranty to repair defects in materials and workmanship within the Class Vehicles. GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects as set forth herein.

488.   GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

489.   GM further has actual knowledge of Plaintiff Powell's and Perry's Engine Defect as their VINs are subject to GM's recall program. GM's dealer was also in possession of Plaintiff Powell's Vehicle in late October until its engine was replaced with another L87 Engine on or about December 10, 2024. GM has actual knowledge of Plaintiff Perry's Engine Defect as he contacted GM's dealer about the engine in Plaintiff Perry's Vehicle, at which time he was told that GM and the dealer knew about the Engine Defect since 2021.

490.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

491.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

492.   The Limited Warranty also fails in its essential purpose because the contractual remedy thereunder is insufficient to make Plaintiffs Powell and Perry and Illinois Subclass members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, including the incidental and consequential damages already suffered due to GM's improper conduct. Any limitation on Plaintiffs Powell's and Perry's and Illinois Subclass members' remedies would thus be insufficient to make them whole.

493.   Accordingly, recovery by Plaintiffs Powell and Perry and Illinois Subclass members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiffs Powell and Perry and members of the Illinois Subclass seek all remedies allowable by law.

494.   Further, as set forth herein, at the time that GM warranted and sold the Class Vehicles it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles. Plaintiffs Powell and Perry and the Illinois Subclass were thus induced to purchase or lease the Class Vehicles under false pretenses.

495.   Finally, because of GM's breach of warranty as set forth herein, Plaintiffs Powell and Perry and Illinois Subclass members assert, as additional

and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

496.    As a direct and proximate result of GM's breach of its express warranty, Plaintiffs Powell and Perry and Illinois Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs Powell and Perry and the Illinois Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT VII: Breach of the Implied Warranty of Merchantability, 810 ILCS 5/2-314 and 5/2A-212

### (On behalf of Plaintiffs Powell and Perry and the Illinois Subclass)

497.    Plaintiffs Powell and Perry re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

498.    Plaintiffs Powell and Perry bring this claim on behalf of themselves and the Illinois Subclass under Illinois law.

499.    GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. 810 ILCS 5/2-104(1); 810 ILCS 5/2-103(1)(d).

500.    With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. 810 ILCS 5/2A-103(1)(p).

501.   The Class Vehicles are and were at all relevant times goods within the meaning of 810 ILCS 5/2-105(1) and 810 ILCS 5/2A-103(h).

502.   Under 810 ILCS 5/2-314 and 5/2A-212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

503.   Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

504.   As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

505.   GM further has actual knowledge of Plaintiff Powell's and Perry's Engine Defect as their VINs are subject to GM's recall program. GM's dealer was also in possession of Plaintiff Powell's Vehicle in late October until its engine was replaced with another L87 Engine on or about December 10, 2024. GM has actual knowledge of Plaintiff Perry's Engine Defect as he contacted GM's dealer about the engine in Plaintiff Perry's Vehicle, at which time he was told that GM and the dealer knew about the Engine Defect since 2021.

506.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs Powell and Perry and Illinois Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs Powell and Perry and the Illinois Subclass pray for the relief requested in the Prayer for Relief set forth below.

### COUNT VIII: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla Stat. §§ 501.201, *et seq*.

### (On behalf of Plaintiff Ruszenas and the Florida Subclass)

507.    Plaintiff Ruszenas re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

508.    Plaintiff Ruszenas brings this claim on behalf of herself and the Florida Subclass under Florida law.

509.    Each Class Vehicle is "property" or "goods" pursuant to Fla. Stat. § 501.203(8).

510.    By advertising, offering for sale, sale, solicitating, providing and/or distributing the Class Vehicles, GM engages in "trade" or "commerce" pursuant to Fla. Stat. § 501.203(8).

511.    Under the Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201, *et seq.*,"[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

512.  As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the recall, GM engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

513.  GM's omissions regarding the known Engine Defect and misrepresentation of the accurate fuel economy of Class Vehicles, described herein, are material facts that a reasonable person would have considered in deciding whether to purchase a Class Vehicle or to pay less for one.

514.  GM intended Plaintiff Ruszenas and Florida Subclass members to rely on its omissions and misrepresentations regarding the Engine Defect and fuel economy of the Class Vehicles.

515.  Plaintiff Ruszenas and the other Florida Subclass members justifiably acted or relied to their detriment on GM's omissions of material fact and/or misrepresentations regarding the Engine Defect and/or fuel economy of Cass Vehicles, as evidenced by their purchases of Class Vehicles.

516.  Had GM disclosed all material facts regarding the Engine Defect and/or fuel economy of Class Vehicles to Plaintiff Ruszenas and members of the Florida Subclass, Plaintiff Ruszenas and Florida Subclass members would not have purchased or leased Class Vehicles or would have paid less for them.

517.   GM's omissions and/or misrepresentations have deceived Plaintiff Ruszenas and members of the Florida Subclass and were likely to deceive a reasonable consumer, who would believe Class Vehicles contain non-defective engines and the represented fuel economy.

518.   GM's conduct described herein is also unfair because GM knowingly sold Plaintiff Ruszenas and Florida Subclass members Class Vehicles with defective engines that are unsafe for ordinary use. The injuries to Plaintiff Ruszenas and Florida Subclass members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff Ruszenas and Florida Subclass members or to competition under all of the circumstances. Further, GM's sale of Class Vehicles with the Engine Defect is immoral and unethical, and Plaintiff Ruszenas and Florida Subclass members could not reasonably have avoided injury therefrom.

519.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff Ruszenas and Florida Subclass Members have suffered ascertainable loss and actual damages. Plaintiff Ruszenas and Florida Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiff Ruszenas and Florida Subclass members damages in the form of expenses incurred in relation to the Engine Defect

and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

520.   Additionally, as set forth above, the value of Plaintiff Ruszenas' and Florida Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

521.   Plaintiff Ruszenas and the Florida Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under F.S.A. §§ 501.201, *et seq*.

522.   Defendant's acts were done wantonly, maliciously, deliberately, with intend to defraud, and were in reckless disregard of Plaintiff Ruszenas' rights and the rights of Florida Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiff Ruszenas and the Florida Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT IX: Breach of Express Warranty, Fla Stat. §§ 672.313 and 680.21
### (On behalf of Plaintiff Ruszenas and the Florida Subclass)

523.   Plaintiff Ruszenas re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

524.   Plaintiff Ruszenas brings this claim on behalf of herself and the Florida Subclass under Florida law.

525. Plaintiff Ruszenas and members of the Florida Subclass have complied with the terms of their Limited Warranty.

526. GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Fla. Stat. § 672.104(1); Fla. Stat. § 672.103(1)(d).

527. With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Fla. Stat. § 680.1031(p).

528. The Class Vehicles are and were at all relevant times goods pursuant to Fla. Stat. § 672.105(1) and Fla. Stat. § 680.1031(h).

529. In its Limited Warranty, GM expressly warranted that, during the warranty period, it would repair or replace defects in material or workmanship free of charge.

530. Defendant also made numerous representations, descriptions, and promises to Florida Subclass members regarding the performance and efficiency of the Class Vehicles.

531. GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiff Ruszenas and members of the Florida Subclass purchased or leased their Class Vehicles with the Engine Defect.

532. GM breached the warranty to repair defects in materials and workmanship within the Class Vehicles. GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects as set forth herein.

533.   GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

534.   GM further has actual knowledge of Plaintiff Ruszenas' Engine Defect as her VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Ruszenas' Vehicle for approximately four weeks in or around February 2025 until its engine was replaced with another L87 Engine. Plaintiff Ruszenas also contacted GM directly, which opened two separate cases relating to the Engine Defect on Plaintiff Ruszenas' Vehicle. Further, on May 23, 2025, Plaintiff Ruszenas notified GM and its dealer by letter of the Engine Defect in her vehicle.

535.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any demand or notice requirement futile.

536.   The Limited Warranty also fails in its essential purpose because the contractual remedy thereunder is insufficient to make Plaintiff Ruszenas and Florida Subclass members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been

suffered due to GM's improper conduct as alleged herein. Any limitation on Plaintiff Ruszenas' and Florida Subclass members' remedies would be insufficient to make them whole.

537.   Accordingly, recovery by Plaintiff Ruszenas and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff Ruszenas, individually and on behalf of the other Class members, seeks all remedies allowable by law.

538.   Further, as set forth herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff Ruszenas and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

539.   Finally, because of GM's breach of warranty as set forth herein, Plaintiff Ruszenas and Florida Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

540.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff Ruszenas and the other Class members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Ruszenas and the Florida Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT X: Breach of the Implied Warranty of Merchantability, Fla Stat. §§ 672.314 and 680.212

### (On behalf of Plaintiff Ruszenas and the Florida Subclass)

541.   Plaintiff Ruszenas re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

542.   Plaintiff Ruszenas brings this claim on behalf of herself and the Florida Subclass under Florida law.

543.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Fla. Stat. § 672.104(1); Fla. Stat. § 672.103(1)(d).

544.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Fla. Stat. § 680.1031(p).

545.   The Class Vehicles are and were at all relevant times goods pursuant to Fla. Stat. § 672.105(1) and Fla. Stat. § 680.1031(h).

546.   Under Fla. Stat. § 672.314 and § 680.212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

547.   Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

548.   As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

549.   GM further has actual knowledge of Plaintiff Ruszenas' Engine Defect as her VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Ruszenas' Vehicle for approximately four weeks in or around February 2025 until its engine was replaced with another L87 Engine. Plaintiff Ruszenas also contacted GM directly, which opened two separate cases relating to the Engine Defect on Plaintiff Ruszenas' Vehicle. Further, on May 23, 2025, Plaintiff Ruszenas notified GM and its dealer by letter of the Engine Defect in her vehicle.

550.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff Ruszenas and Florida Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Ruszenas and the Florida Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XI: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. & 201-1 *et seq*.

### (On behalf of Plaintiffs Henderson and Wright and the Pennsylvania Subclass)

551.   Plaintiffs Henderson and Wright re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

552.   Plaintiffs Henderson and Wright bring this claim on behalf of themselves and the Pennsylvania Subclass under Pennsylvania law.

553.   Plaintiffs Henderson and Wright, GM, and the Pennsylvania Subclass are "persons" within the meaning of 73 P.S. § 201-2(2).

554.   All of the acts complained of herein were perpetrated by GM in the course of "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

555.   Plaintiffs Henderson and Wright and members of the Pennsylvania Subclass purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. Trade and Commerce §201-9.2.

556.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201 3.

557.   As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the recall, GM concealed material facts and engaged in unfair or deceptive acts in violation of 73 P.S. § 201 3.

558.   Plaintiffs Henderson and Wright and members of the Pennsylvania Subclass were unable to discern that GM's representations were false and misleading because they lacked access to GM's internal analysis regarding the Class Vehicles and their engines.

559.   GM thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

560.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles to Plaintiffs Henderson and Wright, the Pennsylvania Subclass, and the public with intent to mislead.

561.   Having a Class Vehicle which operated with a non-defective engine and accurately represented its fuel efficiency was material to Plaintiffs Henderson and

Wright and members of the Pennsylvania Subclass. Had Plaintiffs Henderson and Wright and members of the Pennsylvania Subclass known that their vehicles had a defective engine and misrepresented their fuel efficiency, they would not have purchased them or would have paid less than they did.

562.  GM knew or should have known that its conduct violated the Pennsylvania UTPA.

563.  GM owed Plaintiffs Henderson and Wright and the Pennsylvania Subclass a duty to disclose the Engine Defect because GM:

    a.    possessed exclusive knowledge that it was manufacturing, selling, and distributing Class Vehicles that did not perform as advertised;

    b.    intentionally concealed the foregoing from Plaintiffs Henderson and Wright and Pennsylvania Subclass members; and/or

    c.    made incomplete representations about the Class Vehicles' characteristics, performance, and fuel economy while purposefully withholding material facts that contradicted these representations.

564.  GM's concealment of the Class Vehicles' Engine Defect and impacts resulting therefrom was material to Plaintiffs Henderson and Wright and the Pennsylvania Subclass.

565.  GM's unfair or deceptive acts or practices were likely to and did deceive reasonable consumers, including Plaintiffs Henderson and Wright and the

Pennsylvania Subclass, about characteristics, performance, and fuel economy of the Class Vehicles and the true value thereof.

566. GM's violations present a continuing risk to the Pennsylvania Subclass as well as to the general public, in light of the serious risk of vehicle crashes in connection with the Engine Defect. GM's unlawful acts and practices complained of herein affect the public interest.

567. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs Henderson and Wright and Pennsylvania Subclass Members have suffered ascertainable loss and actual damages. Plaintiffs Henderson and Pennsylvania Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiffs Henderson and Wright and Pennsylvania Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

568. Additionally, as set forth above, the value of Plaintiff Henderson's and Wright's and Pennsylvania Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

569.   Plaintiff Henderson and Wright and the Pennsylvania Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 73 P.S. § 201-9.2(a),

570.   GM's acts were done wantonly, maliciously, deliberately, with intend to defraud, and were in reckless disregard to the rights of Plaintiffs Henderson and Wright and the rights of Pennsylvania Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiffs Henderson and Wright and the Pennsylvania Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XII: Breach of Express Warranty, 13. PA. Cons. Stat. §§ 2313 and 2A210

### (On behalf of Plaintiffs Henderson and Wright and the Pennsylvania Subclass)

571.   Plaintiffs Henderson and Wright re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

572.   Plaintiffs Henderson and Wright bring this claim on behalf of themselves and the Pennsylvania Subclass under Pennsylvania law.

573.   Plaintiffs Henderson and Wright and members of the Pennsylvania Subclass have complied with the terms of their Limited Warranty.

574.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

575.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

576.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

577.   In connection with the purchase or lease of each of the Class Vehicles, GM provided the Limited Warranties described herein.

578.   GM also made numerous representations, descriptions, and promises to Plaintiffs Henderson and Wright and Pennsylvania Subclass members regarding the performance and efficiency of the Class Vehicles.

579.   The Limited Warranty formed a basis of the bargain that was reached when Plaintiffs Henderson and Wright and members of the Pennsylvania Subclass purchased or leased Class Vehicles.

580.   Despite the existence of the Limited Warranty, GM failed to inform Plaintiffs Henderson and Wright and Pennsylvania Subclass members that the Class Vehicles contained the Engine Defect.

581.   GM breached the express warranty to repair and correct defects in materials and workmanship within the Class Vehicles. GM has not repaired or

adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects set forth herein.

582.    GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

583.    GM further has actual knowledge of Plaintiff Henderson's Engine Defect as her VIN is subject to GM's recall program. Plaintiff also took Plaintiff Henderson's Vehicle to GM's dealer on or about September 11, 2023 and reported engine tapping/knocking and again on or about December 18, 2024 and reported that the check engine light had come on and off. GM's dealer has also been in possession of Plaintiff Henderson's Vehicle since May 5, 2025, after its engine seized. GM also has actual knowledge of Plaintiff Henderson's Engine Defect because she reported the engine failure incident directly to GM on or about May 8, 2025, and GM opened a case on it. Plaintiff Henderson also reported the engine failure incident to the NHTSA, which upon information and belief, sent the report to GM. GM has actual knowledge of Plaintiff Wright's Engine Defect as he contacted GM's dealer about the engine in Plaintiff Wright's Vehicle, at which time he was told he would have to wait to bring his vehicle in because GM had not officially started the recall. Further,

on May 23, 2025, Plaintiffs Henderson and Wright notified GM by letter of the Engine Defect in their vehicles.

584.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

585.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

586.   Moreover, the Limited Warranty also fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs Henderson and Wright and Pennsylvania Subclass members whole and because GM has failed and/or refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein. Any limitation on Plaintiffs Henderson's and Wright's and Pennsylvania Subclass members' remedies would be insufficient to make them whole.

587.   Accordingly, recovery by Plaintiffs Henderson and Wright and Pennsylvania Subclass members is not restricted to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiffs Henderson and Wright and members of the Pennsylvania Subclass seek all remedies as allowed by law.

588.   Further, as set forth herein, at the time GM warranted and sold or leased the Class Vehicles, it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles. Plaintiffs Henderson and Wright and the Pennsylvania Subclass were therefore induced to purchase or lease the Class Vehicles under false pretenses.

589.   Finally, because of GM's breach of warranty as set forth herein, Plaintiffs Henderson and Wright and Pennsylvania Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

590.   As a direct and proximate result of GM's breach of express warranties, Plaintiffs Henderson and Wright and Pennsylvania Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs Henderson and Wright and the Pennsylvania Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XIII: Breach of Implied Warranty of Merchantability, 13. PA. CONS. STAT. §§ 2314 and 2A212

### (On behalf of Plaintiffs Henderson and Wright and the Pennsylvania Subclass)

591.    Plaintiffs Henderson and Wright re-allege and incorporate by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

592.    Plaintiffs Henderson and Wright bring this claim on behalf of themselves and the Pennsylvania Subclass under Pennsylvania law.

593.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

594.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

595.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

596.    Under 13 Pa. Cons. Stat. §§ 2314 and 2A212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

597. Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

598. As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

599. GM further has actual knowledge of Plaintiff Henderson's Engine Defect as her VIN is subject to GM's recall program. Plaintiff also took Plaintiff Henderson's Vehicle to GM's dealer on or about September 11, 2023 and reported engine tapping/knocking and again on or about December 18, 2024 and reported that the check engine light had come on and off. GM's dealer has also been in possession of Plaintiff Henderson's Vehicle after its engine seized since May 5, 2025. GM also has actual knowledge of Plaintiff Henderson's Engine Defect because she reported the engine failure incident directly to GM on or about May 8, 2025, and GM opened a case on it. Plaintiff Henderson also reported the engine failure incident to the NHTSA, which upon information and belief, sent the report to GM. GM has actual knowledge of Plaintiff Wright's Engine Defect as he contacted GM's dealer about the engine in Plaintiff Wright's Vehicle, at which time he was told he would have to wait to bring his vehicle in because GM had not officially started the recall. Further,

on May 23, 2025, Plaintiffs Henderson and Wright notified GM by letter of the Engine Defect in their vehicles.

600.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs Henderson and Wright and Pennsylvania Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs Henderson and Wright and the Pennsylvania Subclass pray for the relief requested in the Prayer for Relief set forth below.

### COUNT XIV: Violation of the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq*.

### (On behalf of Plaintiff Krush and the Montana Subclass)

601.   Plaintiff Krush re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

602.   Plaintiff Krush brings this claim on behalf of himself and the Montana Subclass under Montana law.

603.   GM is a "person" under Mont. Code § 30-14-102(6).

604.   Plaintiff Krush and the members of the Montana Subclass are "consumers" under Mont. Code § 30-14-102(1).

605.   By advertising, offering for sale, sale, leasing, and/or distributing the Class Vehicles, GM engages in "trade" or "commerce" under Mont. Code § 30-14-102(8) directly or indirectly affecting Montana citizens through that trade and commerce.

606.   The allegations set forth herein constitute unfair and/or deceptive trade practices in the conduct of trade or commerce in violation of Montana's Unfair Trade Practices and Consumer Protection Act ("MUTPA"), Mont. Code § 30-14-101, *et seq*.

607.   As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the recall, GM engaged in unfair or deceptive acts in violation of the MUTPA.

608.   Plaintiff Krush and Montana Subclass members were unable to discern that GM's representations were false and misleading because they lacked access to GM's internal testing and data regarding the Engine Defect.

609.   GM thus violated the MUTPA by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; and advertising Class Vehicles with the intent not to sell or lease them as advertised.

610.   GM intentionally and knowingly misrepresented and/or omitted material facts regarding the Class Vehicles with intent to mislead Plaintiff Krush and Montana Subclass members.

611.   GM knew or should have known that its conduct described herein violated the MUTPA.

612.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public as set forth herein.

613.   GM owed Plaintiff Krush and Montana Subclass members a duty to disclose the Engine Defect because GM:

  a.   possessed exclusive knowledge that it was manufacturing, selling, and distributing Class Vehicles that did not perform as advertised;

  b.   intentionally concealed the foregoing from Plaintiff Krush and Montana Subclass members; and/or

  c.   made incomplete representations about the Class Vehicles' characteristics, performance, and fuel economy while purposefully withholding material facts from Plaintiff Krush and the Montana Subclass members that contradicted these representations.

614.   GM's concealment of the Engine Defect and accurate fuel economy of Class Vehicles was material to Plaintiff Krush and Montana Subclass members in that a reasonable person would have considered this to be important in deciding whether or not to purchase a Class Vehicle.

615.   Plaintiff Krush and the Montana Subclass relied on GM to disclose material information it knew, such as the defective nature of the engines in Class

151

Vehicles and the true fuel economy of Class Vehicles, and not to induce them into a transaction they would not have entered had GM disclosed this information.

616.   Had Plaintiff Krush and members of the Montana Subclass known about the Engine Defect and accurate fuel economy of Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

617.   Plaintiff Krush and Montana Subclass members are reasonable consumers who do not expect that their vehicles will suffer from the Engine Defect or misrepresent their accurate fuel economy. That is the reasonable and objective consumer expectation.

618.   GM's unfair or deceptive acts or practices were likely to, and did, deceive reasonable consumers, including Plaintiff Krush and Montana Subclass members, about characteristics, performance, and fuel economy of the Class Vehicles and their true value.

619.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff Krush and Montana Subclass Members have suffered ascertainable loss and actual damages. Plaintiff Krush and Montana Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiff Krush and Montana Subclass

members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

620.   Additionally, as set forth above, the value of Plaintiff Krush's and Montana Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

621.   Plaintiff Krush and the Montana Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under § 30-13-133(1)-(4).

622.   GM's acts were done wantonly, maliciously, deliberately, with intent to defraud, and were in reckless disregard of Plaintiff Krush's rights and the rights of Montana Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiff Krush and the Montana Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XV: Breach of Express Warranty, Mont. Code § 30-2-313 and 30-2A-210

### (On behalf of Plaintiff Krush and the Montana Subclass)

623.   Plaintiff Krush re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

624.   Plaintiff Krush brings this claim on behalf of himself and the Montana Subclass under Montana law.

625.   Plaintiff Krush and members of the Montana Subclass have complied with the terms of their Limited Warranty.

626.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Mont. Code § 30-2-104(1); Mont. Code § 30-2-103(1)(d).

627.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Mont. Code § 30-2A-103(1)(p).

628.   The Class Vehicles are and were at all relevant times goods within the meaning of Mont. Code § 30-2A-103(1)(h)) and Mont. Code § 30-2-105(1).

629.   In connection with the purchase or lease of each of the Class Vehicles, GM provided the Limited Warranty described herein.

630.   In its Limited Warranty, GM expressly warranted that, during the warranty period, it would repair or replace defects in material or workmanship free of charge.

631.   GM also made numerous representations, descriptions, and promises to Plaintiff Krush and Montana Subclass members regarding the performance and efficiency of the Class Vehicles.

632.   GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiff Krush and members of the Montana Subclass purchased or leased their Class Vehicles with the Engine Defect.

633.   Despite the existence of the Limited Warranty, GM failed to inform Plaintiff Krush and Montana Subclass members that the Class Vehicles contained the Engine Defect.

634.   GM breached this warranty to repair defects in materials and workmanship within the Class Vehicles. GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects as set forth herein.

635.   GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

636.   GM further has actual knowledge of Plaintiff Krush's Engine Defect as his VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Krush's Vehicle for approximately three to four weeks in or around February 2025 until its engine was replaced with another L87 Engine. Further, on May 23, 2025, Plaintiff Krush notified GM and its dealer by letter of the Engine Defect in his vehicle.

637.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

638.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

639.   Moreover, the Limited Warranty also fails in its essential purpose because the contractual remedy thereunder is insufficient to make Plaintiff Krush and Montana Subclass members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein. Any limitation on Plaintiff Krush's and Montana Subclass members' remedies would be insufficient to make them whole.

640.   Accordingly, recovery by Plaintiff Krush and Montana Subclass members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff Krush and members of the Montana Subclass seek all remedies allowable by law.

641.   Further, as set forth herein, at the time that GM warranted and sold the Class Vehicles it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles. Accordingly, Plaintiff Krush and the Montana Subclass were induced to purchase or lease the Class Vehicles under false pretenses.

642. Finally, because of GM's breach of warranty as set forth herein, Montana Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

643. As a direct and proximate result of GM's breach of its express warranty, Plaintiff Krush and Montana Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Krush and the Montana Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XVI: Breach of Implied Warranty, Mont. Code § 30-2-314 and 30-2A-212

### (On behalf of Plaintiff Krush and the Montana Subclass)

644. Plaintiff Krush re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

645. Plaintiff Krush brings this claim on behalf of himself and the Montana Subclass under Montana law.

646. GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Mont. Code § 30-2-104(1); Mont. Code § 30-2-103(1)(d).

647. With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Mont. Code § 30-2A-103(1)(p).

157

648.   The Class Vehicles are and were at all relevant times goods within the meaning of Mont. Code § 30-2A-103(1)(h)) and Mont. Code § 30-2-105(1).

649.   Under Mont. Code Ann. § 30-2-314 and Mont. Code Ann. § 30-2A-212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

650.   Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

651.   As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

652.   GM further has actual knowledge of Plaintiff Krush's Engine Defect as his VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Krush's Vehicle for approximately three to four weeks in or around February 2025 until its engine was replaced with another L87 Engine. Further, on May 23, 2025, Plaintiff Krush notified GM and its dealer by letter of the Engine Defect in his vehicle.

653.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Krush and Montana Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Krush and the Montana Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XVII: Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

### (On behalf of Plaintiff Popielarz and the Missouri Subclass)

654.    Plaintiff Popielarz re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

655.    Plaintiff Popielarz brings this claim on behalf of himself and the Missouri Subclass under Missouri law.

656.    This cause of action is brought pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* (the "MMPA"), because GM's actions and conduct described herein constitute unfair or deceptive trade practices in connection with the sale or advertisement of merchandise in trade or commerce.

657.    GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010.

658.    The Class Vehicles constitute "merchandise" within the meaning of Mo. Rev. Stat. § 407.010.

659.   The MMPA broadly prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."  Mo. Rev. Stat. § 407.020.1.

660.   As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the recall, GM engaged in unfair or deceptive acts in violation of the MMPA.

661.   The Missouri Attorney General has promulgated regulations defining the meaning of terms in the MMPA. Accordingly, deception as used in the MMPA "is any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression." 15 C.S.R. § 60-9.020(1). Additionally, omission of a material fact as used in the MMPA is "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." 15 C.S.R. § 60-9.110. And a material fact is "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest

his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner." 15 C.S.R. § 60-9.010.

662. The regulations further provide that reliance, actual deception, knowledge of deception and intent are not elements of deception under the MMPA: "Reliance, actual deception, knowledge of deception, intent to mislead or deceive, or any other culpable mental state such as recklessness or negligence, are not elements of deception as used in section 407.020.1, RSMo." 15 C.S.R. § 60-9.020.

663. In the course of its business, GM willfully failed to disclose and actively concealed the Engine Defect in the Class Vehicles and their accurate fuel economy, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles. GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the MMPA.

664. As alleged herein, GM knew of the Engine Defect in Class Vehicles and their accurate fuel economy, while Plaintiff Popielarz and the Missouri

Subclass were deceived by GM's omissions into believing the Class Vehicles operated as was advertised, and this information could not have reasonably been known by the consumer.

665. GM knew or should have known that its conduct violated the MMPA.

666. GM's unfair or deceptive acts or practices were likely to, and did, deceive reasonable consumers, including Plaintiff Popielarz and Missouri Subclass members, about characteristics, performance, and fuel economy of the Class Vehicles and their true value.

667. Having a non-defective engine in their Class Vehicles and the fuel economy as represented was material to Plaintiff Popielarz and the Missouri Subclass. Had Plaintiff Popielarz and members of the Missouri Subclass known that their vehicles had the Engine Defect and/or reduced fuel economy and/or known of the inadequacy of the recall and its resulting impact on them, they would have not purchased them or paid less for them than they did.

668. Plaintiff Popielarz acted as a reasonable consumer in light of all circumstances and GM's unlawful conduct described herein, including its omission of material facts and/or misrepresentations regarding the existence and nature of the Engine Defect and/or the accurate fuel economy of Class Vehicles would cause reasonable persons to enter into the transaction that resulted in damages.

669.   GM's unfair practices described herein would mislead a reasonable consumer.

670.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff Popielarz and Missouri Subclass Members have suffered ascertainable loss and actual damages. Plaintiff Popielarz and Missouri Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiff Popielarz and Missouri Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

671.   Additionally, as set forth above, the value of Plaintiff Popielarz's and Missouri Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

672.   Plaintiff Popielarz and the Missouri Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under § 407.025.

673.   GM's acts were done wantonly, maliciously, deliberately, with intent to defraud, and were in reckless disregard of Plaintiff Popielarz's rights and the

rights of Missouri Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiff Popielarz and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XVIII: Breach of Express Warranty, Mo. Rev. Stat. § 400.2-313 and § 400.2A-210

### (On behalf of Plaintiff Popielarz and the Missouri Subclass)

674. Plaintiff Popielarz re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

675. Plaintiff Popielarz brings this claim on behalf of himself and the Missouri Subclass under Missouri law.

676. Plaintiff Popielarz and members of the Missouri Subclass have complied with the terms of their Limited Warranty.

677. GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Mo. Rev. Stat. § 400.2-104(1); Mo. Rev. Stat. § 400.2-103(1)(d).

678. With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Mo. Rev. Stat. § 400.2A-103(1)(p).

679. The Class Vehicles are and were at all relevant times goods within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Rev. Stat. § 400.2A-103(1)(h).

680.    In connection with the purchase or lease of each of the Class Vehicles, GM provided the Limited Warranties described herein.

681.    GM also made numerous representations, descriptions, and promises to Missouri Subclass members regarding the performance and efficiency of the Class Vehicles.

682.    GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiff Popielarz and members of the Missouri Subclass purchased or leased Class Vehicles.

683.    Despite the existence of the Limited Warranty, GM failed to inform Plaintiff and Missouri Subclass members that the Class Vehicles contained the Engine Defect.

684.    GM breached the express warranty to repair and correct defects in materials and workmanship within the Class Vehicles. GM has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects set forth herein.

685.    GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

686.   GM further has actual knowledge of Plaintiff Popielarz's Engine Defect as his VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Popielarz's Vehicle in January/February 2024 until its engine was replaced with another L87 Engine. Further, on May 23, 2025, Plaintiff Popielarz notified GM and its dealer by letter of the Engine Defect in his vehicle.

687.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

688.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

689.   Moreover, the Limited Warranty also fails in its essential purpose because the contractual remedy is insufficient to make Missouri Subclass members whole and because GM has failed and/or refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein. Any limitation on Plaintiff Popielarz's and Missouri Subclass members' remedies would be insufficient to make them whole.

690.   Accordingly, recovery by Plaintiff Popielarz and Missouri Subclass members is not restricted to the limited warranty of repair to parts defective in

materials and workmanship, and Plaintiff Popielarz and members of the Missouri Subclass seek all remedies as allowed by law.

691.    Further, as set forth herein, at the time GM warranted and sold or leased the Class Vehicles, it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles. Plaintiff Popielarz and the Missouri Subclass were therefore induced to purchase or lease the Class Vehicles under false pretenses.

692.    Finally, because of GM's breach of warranty as set forth herein, Plaintiff Popielarz and Missouri Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

693.    As a direct and proximate result of GM's breach of express warranties, Plaintiff Popielarz and Missouri Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Popielarz and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below.

### COUNT XIX: Breach of the Implied Warranty of Merchantability, Mo. Rev. Stat. § 400.2-314 and § 400.2A-212

### (On behalf of Plaintiff Popielarz and the Missouri Subclass)

694.   Plaintiff Popielarz re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

695.   Plaintiff Popielarz brings this claim on behalf of himself and the Missouri Subclass under Missouri law.

696.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Mo. Rev. Stat. § 400.2-104(1); Mo. Rev. Stat. § 400.2-103(1)(d).

697.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Mo. Rev. Stat. § 400.2A-103(1)(p).

698.   The Class Vehicles are and were at all relevant times goods within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Rev. Stat. § 400.2A-103(1)(h).

699.   Under Mo. Rev. Stat. § 400.2-314 and § 400.2A-212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

700.   Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

168

701.    As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

702.    GM further has actual knowledge of Plaintiff Popielarz's Engine Defect as his VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Popielarz's Vehicle in January/February 2024 until its engine was replaced with another L87 Engine. Further, on May 23, 2025, Plaintiff Popielarz notified GM and its dealer by letter of the Engine Defect in his vehicle.

703.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff Popielarz and Missouri Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Popielarz and the Missouri Subclass pray for the relief requested in the Prayer for Relief set forth below.

### COUNT XX: Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq*.

### (On behalf of Plaintiff Bennett and the Tennessee Subclass)

704.    Plaintiff Bennett re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

705.    Plaintiff Bennett brings this claim on behalf of himself and the Tennessee Subclass under Tennessee law.

706.   Plaintiff Bennett and members of the Tennessee Subclass are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). GM is a "person[s]" within the meaning of Tenn. Code § 47-18-103(9).

707.   GM is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(24).

708.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

709.   As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the recall, GM engaged in unfair or deceptive acts in violation of Tenn. Code § 47-18-104.

710.   GM's omissions regarding the known Engine Defect, described herein, are material facts that a reasonable person would have considered in deciding whether to purchase a Class Vehicle or to pay less for one.

711.   GM thus violated the Tennessee CPA by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; and advertising Class Vehicles with the intent not to sell or lease them as advertised.

712.   As set forth herein, GM has known about the Engine Defect for many years but did not disclose it to Plaintiff Bennett and members of the Tennessee Subclass prior to their sale or lease.

713.   Further, as addressed herein, the Engine Defect is not something that Plaintiff or Tennessee Subclass members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

714.   GM intended Plaintiff Bennett and Tennessee Subclass members to rely on its deceptive, false and misleading misrepresentations or omissions of material fact in order to increase its sales and profits.

715.   Plaintiff and the other Tennessee Subclass members justifiably acted or relied to their detriment on GM's omissions of material fact regarding the Engine Defect, as evidenced by their purchases of Class Vehicles.

716.   Had GM disclosed all material information regarding the Engine Defect to Plaintiff Bennett and Tennessee Subclass Members, they would not have purchased the Class Vehicles, or they would have paid less for them.

717.   GM's violations present a continuing risk to the Tennessee Subclass as well as to the general public, in light of the serious risk of vehicle crashes in connection with the Engine Defect. GM's unlawful acts and practices complained of herein affect the public interest.

718.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff Bennett and Tennessee Subclass Members have suffered ascertainable loss and actual damages. Plaintiff Bennett and Tennessee Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiff Bennett and Tennessee Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

719.   Additionally, as set forth above, the value of Plaintiff Bennett and Tennessee Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

720.   Plaintiff Bennett and the Tennessee Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Tenn. Code. Ann. § 47-18-109.

721.   GM's acts were done wantonly, maliciously, deliberately, with intent to defraud, and were in reckless disregard of Plaintiff Bennett's rights and the rights of Tennessee Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiff Bennett and the Tennessee Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXI: Breach of Express Warranty, Tenn Code § 47-2-313 and § 47-2A-210

### (On behalf of Plaintiff Bennett and the Tennessee Subclass)

722.   Plaintiff Bennett re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

723.   Plaintiff Bennett brings this claim on behalf of himself and the Tennessee Subclass under Tennessee law.

724.   Plaintiff Bennett and members of the Tennessee Subclass have complied with the terms of their Limited Warranty.

725.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Tenn. Code § 47-2-104(1); Tenn. Code § 47-2-103(1)(d).

726.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Tenn. Code § 47-2A-103(1)(p).

727.   The Class Vehicles are and were at all relevant times goods within the meaning of Tenn. Code § 47-2-105(1) and Tenn. Code § 47-2A-103(1)(p).

728.   In its Limited Warranty, GM expressly warranted that, during the warranty period, it would repair or replace defects in material or workmanship free of charge.

729.   GM also made numerous representations, descriptions, and promises to Tennessee Subclass members regarding the performance and efficiency of the Class Vehicles.

730.   GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiff Bennett and members of the Tennessee Subclass purchased or leased their Class Vehicles with the Engine Defect.

731.   Despite the existence of the Limited Warranty, GM failed to inform Plaintiff Bennett and Tennessee Subclass members that the Class Vehicles contained the Engine Defect.

732.   GM breached this warranty to repair defects in materials and workmanship within the Class Vehicles. GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects as set forth herein.

733.   GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

734.   GM further has actual knowledge of Plaintiff Bennett's Engine Defect as his VIN is subject to GM's recall program. GM also has actual knowledge of Plaintiff Bennett's Engine Defect as he contacted GM's dealer about the engine in Plaintiff Bennett's Vehicle, at which time he was told to bring the vehicle in, but that

the dealer was waiting on GM for further instruction. Further, on May 23, 2025, Plaintiff Bennett notified GM and its dealer by letter of the Engine Defect in his vehicle.

735.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

736.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

737.   The Limited Warranty also fails in its essential purpose because the contractual remedy thereunder is insufficient to make Plaintiff Bennett and Tennessee Subclass members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, including the incidental and consequential damages already suffered due to GM's improper conduct. Any limitation on Plaintiff Bennett's and Tennessee Subclass members' remedies would thus be insufficient to make them whole.

738.   Accordingly, recovery by Plaintiff Bennett and Tennessee Subclass members is not limited to the limited warranty of repair to parts defective in

materials and workmanship, and Plaintiff Bennett and members of the Tennessee Subclass seek all remedies allowable by law.

739.   Further, as set forth herein, at the time that GM warranted and sold the Class Vehicles it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles. Plaintiff Bennett and the Tennessee Subclass were thus induced to purchase or lease the Class Vehicles under false pretenses.

740.   Finally, because of GM's breach of warranty as set forth herein, Plaintiff Bennett and Tennessee Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

741.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff  Bennett and Tennessee Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Bennett and the Tennessee Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXII: Breach of the Implied Warranty of Merchantability, Tenn. Code § 47-2-314 and § 47-2A-212

### (On behalf of Plaintiff Bennett and the Tennessee Subclass)

742.   Plaintiff Bennett re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

743.   Plaintiff Bennett brings this claim on behalf of himself and the Tennessee Subclass under Tennessee law.

744.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Tenn. Code § 47-2-104(1); Tenn. Code § 47-2-103(1)(d).

745.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Tenn. Code § 47-2A-103(1)(p).

746.   The Class Vehicles are and were at all relevant times goods within the meaning of Tenn. Code § 47-2-105(1) and Tenn. Code § 47-2A-103(1)(p).

747.   Under Tenn. Code Ann. § 47-2-314 and § 47-2A-212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

748.   Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

749.   As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers,

and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

750.   GM further has actual knowledge of Plaintiff Bennett's Engine Defect as his VIN is subject to GM's recall program. GM also has actual knowledge of Plaintiff Bennett's Engine Defect as he contacted GM's dealer about the engine in Plaintiff Bennett's Vehicle, at which time he was told to bring the vehicle in, but that the dealer was waiting on GM for further instruction. Further, on May 23, 2025, Plaintiff Bennett notified GM and its dealer by letter of the Engine Defect in his vehicle.

751.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff Bennett and Tennessee Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Bennett and the Tennessee Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXIII: Violation of the Oregon Unlawful Trade Practices Act § 646.605, *et seq*.

### (On behalf of Plaintiff Bensel and the Oregon Subclass)

752.   Plaintiff Bensel re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

753.   Plaintiff Bensel brings this claim on behalf of himself and the Oregon Subclass under Oregon law.

754.   This cause of action is brought pursuant to the Oregon Unlawful Trade Practices Act, Oregon Rev. Stat. §646.605, *et seq.* (the "OUTPA"), because GM's actions and conduct described herein constitute unfair or deceptive trade practices in the sale or lease of a consumer good.

755.   GM was at all relevant times a "person" within the meaning of the OUTPA. Oregon Rev. Stat. § 646.605(4).

756.   The Class Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of the OUTPA. *Id*. § 646.605(6).

757.   The OUTPA prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that… goods… have… characteristics… uses, benefits,… or qualities that [they] do not have; (g) Represent[ing] that… goods… are of a particular standard [or] quality… if they are of another; (i) Advertis[ing]… goods or services with intent not to provide [them] as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." *Id*. § 646.608(1).

758.   As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the Engine Defect, fuel economy of Class Vehicles and the impact of the recall, GM engaged in deceptive business practices prohibited by the OUTPA, including: representing that the Class Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

759.  GM's actions as set forth above occurred in the conduct of trade or commerce. *Id*. § 646.605(8).

760.   In the course of its business, GM willfully failed to disclose and actively concealed the Engine Defect and true fuel economy of the Class Vehicles, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles. GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the OUTPA.

761.  As alleged herein, GM knew of the Engine Defect and true fuel economy of Class Vehicles, while Plaintiff Bensel and the Oregon Subclass were deceived by GM's omissions and/or misrepresentations into believing the engines in

their Class Vehicles were not defective and had the represented fuel economy, and this information could not have reasonably been known by the consumer.

762.   GM knew or should have known that its conduct violated the OUTPA.

763.   As alleged above, GM made representations and/or omissions to Plaintiff Bensel and the Oregon Subclass and the public regarding the Engine Defect and true fuel economy of the Class Vehicles which were either false or misleading.

764.   GM's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiff Bensel and the Oregon Subclass, about the performance and/or safety of the engines in Class Vehicles and the true fuel economy of Class Vehicles. GM intentionally and knowingly misrepresented and/or omitted material facts regarding the Class Vehicles with an intent to mislead Plaintiff Bensel and the Oregon Subclass.

765.   GM's concealment of the Engine Defect and true fuel economy of Class Vehicles was material to Plaintiff Bensel and Oregon Subclass members in that a reasonable person would have considered this to be important in deciding whether or not to purchase a Class Vehicle.

766.   Plaintiff Bensel and the Oregon Subclass relied on GM to disclose material information it knew, such as the defective nature of the engines in Class Vehicles and the true fuel economy of Class Vehicles, and not to induce them into a transaction they would not have entered had GM disclosed this information.

767.   Had Plaintiff Bensel and members of the Oregon Subclass known about the Engine Defect and true fuel economy of Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

768.   Plaintiff Bensel and Oregon Subclass members are reasonable consumers who do not expect that their vehicles will suffer from the Engine Defect or misrepresent their true fuel economy. That is the reasonable and objective consumer expectation.

769.   GM's unfair or deceptive acts or practices were likely to, and did, deceive reasonable consumers, including Plaintiff Bensel and Oregon Subclass members, about characteristics, performance, and the fuel economy of the Class Vehicles and their true value.

770.   GM's violations present a continuing risk to the Oregon Subclass as well as to the general public, in light of the serious risk of vehicle crashes in connection with the Engine Defect. GM's unlawful acts and practices complained of herein affect the public interest.

771.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff Bensel and Oregon Subclass Members have suffered ascertainable loss and actual damages. Plaintiff Bensel and Oregon Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines

and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiff Bensel and Oregon Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

772.   Additionally, as set forth above, the value of Plaintiff Bensel and Oregon Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

773.   Plaintiff Bensel and the Oregon Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Oregon Rev. Stat. § 646.638.

774.   GM's acts were done wantonly, maliciously, deliberately, with intent to defraud, and were in reckless disregard of Plaintiff Bensel's rights and the rights of Oregon Subclass members, warranting an assessment of punitive damages.

775.   Pursuant to Oregon Rev. Stat. § 646.638(2), Plaintiff Bensel is mailing a copy of the complaint to Oregon's attorney general.

WHEREFORE, Plaintiff Bensel and the Oregon Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXIV: Breach of Express Warranty, Oregon Rev. Stat. § 72.3130 and § 72A.2100

### (On behalf of Plaintiff Bensel and the Oregon Subclass)

776.  Plaintiff Bensel re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

777.  Plaintiff Bensel brings this claim on behalf of himself and the Oregon Subclass under Oregon law.

778.  Plaintiff Bensel and members of the Oregon Subclass have complied with the terms of their Limited Warranty.

779.  GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Or. Rev. Stat. § 72.1040; § 72.1030(1)(d).

780.  With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Or. Rev. Stat. § 72A.1030(1)(p).

781.  The Class Vehicles are and were at all relevant times goods within the meaning of Or. Rev. Stat. § 72.1050(1) and Or. Rev. Stat. § 72A.1030(1)(h).

782.  In connection with the purchase or lease of each of the Class Vehicles, GM provided the Limited Warranties described herein.

783.  GM also made numerous representations, descriptions, and promises to Oregon Subclass members regarding the performance and efficiency of the Class Vehicles.

784. GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiff Bensel and members of the Oregon Subclass purchased or leased Class Vehicles.

785. Despite the existence of the Limited Warranty, GM failed to inform Plaintiff Bensel and Oregon Subclass members that the Class Vehicles contained the Engine Defect.

786. GM breached the express warranty to repair and correct defects in materials and workmanship within the Class Vehicles. GM has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects set forth herein.

787. GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

788. GM further has actual knowledge of Plaintiff Bensel's Engine Defect as his VIN is subject to GM's recall program.

789. Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

790.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

791.   Moreover, the Limited Warranty also fails in its essential purpose because the contractual remedy is insufficient to make Oregon Subclass members whole and because GM has failed and/or refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein. Any limitation on Plaintiff Bensel's and Oregon Subclass members' remedies would be insufficient to make them whole.

792.   Accordingly, recovery by Plaintiff Bensel and Oregon Subclass members is not restricted to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff Bensel and members of the Oregon Subclass seek all remedies as allowed by law.

793.   Further, as set forth herein, at the time GM warranted and sold or leased the Class Vehicles, it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles. Plaintiff Bensel and the Oregon Subclass were therefore induced to purchase or lease the Class Vehicles under false pretenses.

794. Finally, because of GM's breach of warranty as set forth herein, Plaintiff Bensel and Oregon Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

795. As a direct and proximate result of GM's breach of express warranties, Plaintiff Bensel and Oregon Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Bensel and the Oregon Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXV: Breach of the Implied Warranty of Merchantability, Oregon Rev. Stat. § 72.3140 and § 72A.2120

### (On behalf of Plaintiff Bensel and the Oregon Subclass)

796. Plaintiff Bensel re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

797. Plaintiff Bensel brings this claim on behalf of himself and the Oregon Subclass under Oregon law.

798. GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Or. Rev. Stat. § 72.1040; § 72.1030(1)(d).

799. With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Or. Rev. Stat. § 72A.1030(1)(p).

800.    The Class Vehicles are and were at all relevant times goods within the meaning of Or. Rev. Stat. § 72.1050(1) and Or. Rev. Stat. § 72A.1030(1)(h).

801.    Under Oregon Rev. Stat. § 72.3140 and § 72A.2120, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

802.    Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

803.    As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

804.    GM further has actual knowledge of Plaintiff Bensel's Engine Defect as his VIN is subject to GM's recall program.

805.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff Bensel and Oregon Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Bensel and the Oregon Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXVI: Violation of the Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*

### (On behalf of Plaintiff Fenstermaker and the Arizona Subclass)

806.   Plaintiff Fenstermaker re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

807.   Plaintiff Fenstermaker brings this claim on behalf of himself and the Arizona Subclass under Arizona law.

808.   This cause of action is brought pursuant to the Consumer Fraud Act, Arizona Rev. Stat. § 44-1521, *et seq.* (the "CFA"). GM's actions and conduct described herein constitute transactions that have resulted in the sale or lease of merchandise to persons. *Id*. § 44-1521.5-7.

809.   Plaintiff Fenstermaker and the Arizona Subclass are "persons" within the meaning of the CFA. *Id*. § 44-1521(6).

810.   The Class Vehicles are "merchandise" within the meaning of the CFA. *Id*. § 44-1521(5).

811.   The CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud,. . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or

damaged thereby, is declared to be an unlawful practice." Arizona Rev. Stat. § 44-1522(A).

812.   As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the Recall, GM engaged in unfair or deceptive acts in violation of the CFA.

813.   GM intentionally and knowingly misrepresented and/or omitted material facts regarding the Class Vehicles with the intent that Plaintiff Fenstermaker and Arizona Subclass members rely on such misrepresentations and/or omissions.

814.   As alleged herein, GM knew of the Engine Defect and true fuel economy of Class Vehicles, while Plaintiff Fenstermaker and the Arizona Subclass was deceived by GM's omissions and/or misrepresentations into believing the engines in Class Vehicles were not defective and that Class Vehicles had the represented fuel economy, and this information could not have reasonably been known by the consumer.

815.   GM knew or should have known that its conduct violated the CFA.

816.   As alleged above, GM made representations and/or omissions to Plaintiff Fenstermaker and the Arizona Subclass and the public regarding the Engine

190

Defect and the fuel economy of Class Vehicles which were either false or misleading.

817.   GM's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiff Fenstermaker and the Arizona Subclass, about the performance and/or safety of the engines in Class Vehicles and/or the true fuel economy of the Class Vehicles. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff Fenstermaker and the Arizona Subclass.

818.   Having Class Vehicles with non-defective engines and that accurately represented their fuel economy was material to Plaintiff Fenstermaker and the Arizona Subclass. Had Plaintiff Fenstermaker and members of the Arizona Subclass known that their vehicles had the Engine Defect and/or misrepresented their true fuel economy, they would have paid less for them than they did or would not have purchased them.

819.   Plaintiff Fenstermaker and Arizona Subclass members are reasonable consumers who do not expect that their vehicles will suffer from the Engine Defect or misrepresent their accurate fuel economy. That is the reasonable and objective consumer expectation.

820.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff Fenstermaker and Arizona Subclass Members have suffered

ascertainable loss and actual damages. Plaintiff Fenstermaker and Arizona Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Plaintiff Fenstermaker and Arizona Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

821.   Additionally, as set forth above, the value of Plaintiff Fenstermaker's and Arizona Subclass member's vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

822.   Plaintiff Fenstermaker and the Arizona Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ariz. Rev. Stat. §§ 44-1521, *et seq*.

823.   GM's acts were done wantonly, maliciously, deliberately, with intent to defraud, and were in reckless disregard of Plaintiff Fenstermaker's rights and the rights of Arizona Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiff Fenstermaker and the Arizona Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXVII: Breach of Express Warranty, Ariz. Rev. Stat. § 47-2313 and § 47-2A210

### (On behalf of Plaintiff Fenstermaker and the Arizona Subclass)

824.   Plaintiff Fenstermaker re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

825.   Plaintiff Fenstermaker brings this claim on behalf of himself and the Arizona Subclass under Arizona law.

826.   Plaintiff Fenstermaker and members of the Arizona Subclass have complied with the terms of their Limited Warranty.

827.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Ariz. Rev. Stat. § 47-2104.A; Ariz. Rev. Stat. § 47-2103.A.4.

828.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Ariz. Rev. Stat. § 47-2104.A.16.

829.   The Class Vehicles are and were at all relevant times goods within the meaning of Ariz. Rev. Stat. § 47-2105.A and Ariz. Rev. Stat. § 47-2A103.A.8.

830.   In connection with the purchase or lease of each of the Class Vehicles, GM provided the Limited Warranties described herein.

831.   GM also made numerous representations, descriptions, and promises to Arizona Subclass members regarding the performance and efficiency of the Class Vehicles.

832.   GM's Limited Warranty formed a basis of the bargain that was reached when Plaintiff Fenstermaker and members of the Arizona Subclass purchased or leased Class Vehicles.

833.   Despite the existence of the Limited Warranty, GM failed to inform Plaintiff Fenstermaker and Arizona Subclass members that the Class Vehicles contained the Engine Defect.

834.   GM breached the express warranty to repair and correct defects in materials and workmanship within the Class Vehicles. GM has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects set forth herein.

835.   GM received notice of the Engine Defect as described herein, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

836.   GM further has actual knowledge of Plaintiff Fenstermaker's Engine Defect as his VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Fenstermaker's Vehicle for approximately one month in October/November 2024 until its engine was replaced with another L87 Engine.

837.   Despite GM's knowledge of the Engine Defect as set forth herein, GM has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any further demand or notice requirement futile.

838.   Further, affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

839.   Moreover, the Limited Warranty also fails in its essential purpose because the contractual remedy is insufficient to make Arizona Subclass members whole and because GM has failed and/or refused to adequately provide the promised remedies within a reasonable time. Much of the damage arising from the Engine Defect cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein. Any limitation on Plaintiff Fenstermaker's and Arizona Subclass members' remedies would be insufficient to make them whole.

840.   Accordingly, recovery by Plaintiff Fenstermaker and Arizona Subclass members is not restricted to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff Fenstermaker and members of the Arizona Subclass seek all remedies as allowed by law.

841.   Further, as set forth herein, at the time GM warranted and sold or leased the Class Vehicles, it knew they failed to conform to the Limited Warranty and were inherently defective, and GM omitted material facts regarding the Class Vehicles.

Plaintiff Fenstermaker and the Arizona Subclass were therefore induced to purchase or lease the Class Vehicles under false pretenses.

842.   Finally, because of GM's breach of warranty as set forth herein, Plaintiff Fenstermaker and Arizona Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

843.   As a direct and proximate result of GM's breach of express warranties, Plaintiff Fenstermaker and Arizona Subclass members have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Fenstermaker and the Arizona Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXVIII: Breach of the Implied Warranty of Merchantability, Ariz. Rev. Stat. § 47-2314 and § 47-2A212

### (On behalf of Plaintiff Fenstermaker and the Arizona Subclass)

844.   Plaintiff Fenstermaker re-alleges and incorporates by reference as if fully set forth herein each of the allegations contained above in this Amended Complaint.

845.   Plaintiff Fenstermaker brings this claim on behalf of himself and the Arizona Subclass under Arizona law.

846.   GM is and was at all relevant times a merchant and seller with respect to the Class Vehicles. Ariz. Rev. Stat. § 47-2104.A; Ariz. Rev. Stat. § 47-2103.A.4.

847.   With respect to leases, GM is and was at all relevant times a lessor of Class Vehicles. Ariz. Rev. Stat. § 47-2104.A.16.

848.   The Class Vehicles are and were at all relevant times goods within the meaning of Ariz. Rev. Stat. § 47-2105.A; Ariz. Rev. Stat. § 47-2A103.A.8.

849.   Under Ariz. Rev. Stat. § 47-2314 and § 47-2A212, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

850.   Because of the Engine Defect described herein and accompanying serious safety risks, Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose for which vehicles are used.

851.   As set forth herein, GM was provided reasonable notice of these issues, including through numerous complaints filed against it directly, through its dealers, and third parties, through the NHTSA investigation, through GM's own recall program, as well as its own internal engineering knowledge.

852.   GM further has actual knowledge of Plaintiff Fenstermaker's Engine Defect as his VIN is subject to GM's recall program. GM's dealer was also in possession of Plaintiff Fenstermaker's Vehicle for approximately one month in October/November 2024 until its engine was replaced with another L87 Engine.

853. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff Fenstermaker and Arizona Subclass members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Fenstermaker and the Arizona Subclass pray for the relief requested in the Prayer for Relief set forth below.

## COUNT XXVIX: Violation of the State Consumer Protection Statutes
## (On behalf of Plaintiffs and the Consumer Fraud Multi-State Subclass)

854. Plaintiffs and the Consumer Fraud Multi-State Subclass reallege and incorporate by reference, as though fully set forth herein, paragraphs 1-408 of this Amended Complaint.

855. As described herein, through its sale and lease of Class Vehicles containing the Engine Defect, including its omissions and/or misrepresentations regarding the fuel economy of Class Vehicles and the impact of the recall, GM engaged in unfair or deceptive acts in violation of the consumer protection statutes of each of the states encompassing the Consumer Fraud Multi-State Subclass.

856. GM's omissions regarding the known Engine Defect and fuel economy of Class Vehicles, described herein, are material facts that a reasonable person would have considered in deciding whether to purchase a Class Vehicle or to pay less for one.

857.   GM thus violated the consumer protection statutes of each of the states encompassing the Consumer Fraud Multi-State Subclass by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; and advertising Class Vehicles with the intent not to sell or lease them as advertised.

858.   As set forth herein, GM has known about the Engine Defect for many years but did not disclose it to members of the Consumer Fraud Multi-State Subclass prior to their sale or lease.

859.   Further, as addressed herein, the Engine Defect is not something that Consumer Fraud Multi-State Subclass members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

860.   GM's omissions regarding the known Engine Defect and misrepresentation of the accurate fuel economy of Class Vehicles, described herein, are material facts that a reasonable person would have considered in deciding whether to purchase a Class Vehicle or to pay less for one.

861.   GM intended Consumer Fraud Multi-State Subclass members to rely on its omissions and misrepresentations regarding the Engine Defect and fuel economy of the Class Vehicles.

862.   Thus, in the course of its business, GM willfully concealed, suppressed, or omitted material facts and deceived consumers regarding the Engine Defect and fuel economy of Class Vehicles, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

863.   Had GM disclosed all material facts regarding the Engine Defect and/or fuel economy of Class Vehicles to Consumer Fraud Multi-State Subclass members, they would not have purchased or leased Class Vehicles or would have paid less for them.

864.   GM's omissions and/or misrepresentations have deceived Consumer Fraud Multi-State Subclass members and were likely to deceive a reasonable consumer, who would believe Class Vehicles contain non-defective engines and the represented fuel economy.

865.   GM's conduct described herein is also unfair because GM knowingly sold Consumer Fraud Multi-State Subclass members Class Vehicles with defective engines that are unsafe for ordinary use. The injuries to Consumer Fraud Multi-State Subclass members are substantial and greatly outweigh any alleged countervailing

benefit to Consumer Fraud Multi-State Subclass members or to competition under all of the circumstances. Further, GM's sale of Class Vehicles with the Engine Defect is immoral and unethical, and Consumer Fraud Multi-State Subclass members could not reasonably have avoided injury therefrom.

866.   As a direct and proximate result of GM's unfair and deceptive trade practices, Consumer Fraud Multi-State Subclass members have suffered ascertainable loss and actual damages. Consumer Fraud Multi-State Subclass members paid for Class Vehicles with properly functioning engines without being told of the Engine Defect but instead received vehicles that have defective engines and are therefore worth a lesser value. Further, as set forth above, GM's unfair and deceptive trade practices have caused Consumer Fraud Multi-State Subclass members damages in the form of expenses incurred in relation to the Engine Defect and increased gasoline expenses due to the change to higher viscosity oil in connection with the recall.

867.   Additionally, as set forth above, the value of Consumer Fraud Multi-State Subclass members' vehicles has been inherently diminished due to GM's recall of the Class Vehicles.

868.   Members of the Consumer Fraud Multi-State Subclass are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under

the consumer protection statutes of the states in the Consumer Fraud Multi-State Subclass.

869.   GM's acts were done wantonly, maliciously, deliberately, with intend to defraud, and were in reckless disregard of the rights of Consumer Fraud Multi-State Subclass members, warranting an assessment of punitive damages.

WHEREFORE, Plaintiffs and the Consumer Fraud Multi-State Class pray for the relief requested in the Prayer for Relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, seek the following relief:

A.   certification of the Classes pursuant Federal Rule 23;

B.   appointing Plaintiffs as the Class Representative and Plaintiffs' attorneys as Class Counsel;

C.   awarding Plaintiffs and the Class rescission as appropriate and authorized under law;

D.   awarding Plaintiffs and the Classes damages, in an amount to be proved at trial;

E.   awarding Plaintiffs and the Classes injunctive relief as permitted by law or equity, including, but not limited to, enjoining GM from continuing the unlawful practices as set forth herein and

ordering GM to engage in a corrective advertising campaign and to take other corrective action;

F.  awarding punitive damages for Plaintiffs and the Classes under applicable law in an amount to punish GM's egregious conduct as set forth above and to deter GM and others from engaging in similar conduct;

G.  awarding pre-judgment and post-judgment interest;

H.  awarding attorneys' fees and costs; and

I.  providing such further relief as may be just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 27, 2025                    Respectfully submitted,

                                       */s/ Kevin P. Green*
                                       Kevin P. Green
                                       Daniel S. Levy
                                       **GOLDENBERG HELLER
                                       & ANTOGNOLI, P.C.**
                                       2227 South State Route 157
                                       Edwardsville, IL 62025
                                       618-656-5150
                                       kevin@ghalaw.com
                                       daniel@ghalaw.com

                                       Mike Arias
                                       M. Anthony Jenkins
                                       **ARIAS SANGUINETTI WANG &
                                       TEAM, LLP**
                                       6701 Center Drive West, 14th Floor
                                       Los Angeles, CA
                                       T: (310) 844-9696
                                       F: (310) 861-0168
                                       mike@aswtlawyers.com
                                       anthony@aswtlawyers.com

                                       Christopher J. Petri
                                       **BYRON CARLSON PETRI &
                                       KALB, LLC**
                                       411 Saint Louis Street
                                       Edwardsville , Illinois   62025
                                       Telephone: (618) 655-0600
                                       Facsimile: (618) 655-4004
                                       cjp@bcpklaw.com

Nicholas A. Coulson (P78001)
Julia G. Prescott
**COULSON P.C.**
300 River Place Drive, Suite 1700
Detroit, Michigan 48207
T: (313) 645-0045
E: nick@coulsonpc.com
E: jprescott@coulsonpc.com

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2025, I caused the foregoing paper to be filed with the Clerk of the Court using the Court's electronic filing system which will forward a copy via e-mail to all counsel of record.

<u>/s/ Kevin P. Green</u>

206