# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY AND LEATRECIA WHITAKER LEE, ALEXIS BRONSON, MITCHELL FAGUNDES, JOSHUA SMOTHERMAN, ANTHONY GARGANO, BRENDAN KIRK, CHARLES MORLOCK, SCOTT ROBINSON, ROCKY SHANKAR, GREG MUNNA, ANTHONY CARRO, JAMES NELSON, JON MICHAEL JONES, EMANUELLE SERRANO, DANNY WINGARD, MARK KAMHOLZ, DANNY TOLIVER, GARVIN EASTMAN, MARC VAILLETTE, KEVIN BAIRD, ADRIENNE ZEIGLER, STEPHEN WILLS, RONALD WARD, GAGE YESBECK, ROBERT HOUCHIN, RONALD BESHEL, JOSHUA POLSON, ANDREW SCHULTZ, GREGORY STEWART, LARRY CHURCHWELL, PAUL MACMILLAN, ANDREW OSER, JASON RAPPAPORT, TRACY CONNOR, JERRY MEYER, GREGORY OWENS, JONATHAN AND BONNIE STEMPIEN, JENNIFER HUNTER, FREDERICK CUFFIE, BENJAMIN MCMURRAY, JACOB CHAPMAN, JUSTIN JOHNSON, JASON RITTEREISER individually and on behalf of all others similarly situated, | Civil Action No. 2:25-cv-10479<br><br>Hon. Shalina D. Kumar<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs,

v.

GENERAL MOTORS LLC,

Defendant.

_____/

## CONSOLIDATED CLASS ACTION COMPLAINT
## <u>AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Timothy and Leatrecia Whitaker Lee, Alexis Bronson, Mitchell Fagundes, Joshua Smotherman, Anthony Gargano, Brendan Kirk, Charles Morlock, Scott Robinson, Rocky Shankar, Greg Munna, Anthony Carro, James Nelson, Jon Michael Jones, Emanuelle Serrano, Danny Wingard, Mark Kamholz, Danny Toliver, Garvin Eastman, Marc Vaillette, Kevin Baird, Adrienne Zeigler, Stephen Wills, Ronald Ward, Gage Yesbeck, Robert Houchin, Ronald Beshel, Joshua Polson, Andrew Schultz, Gregory Stewart, Larry Churchwell, Paul MacMillan, Andrew Oser, Jason Rappaport, Tracy Connor, Jerry Meyer, Gregory Owens, Jonathan and Bonnie Stempien, Jennifer Hunter, Frederick Cuffie, Benjamin McMurray, Jacob Chapman, Justin Johnson, and Jason Rittereiser ("Plaintiffs"), individually and on behalf of the other members of the below-defined Classes, hereby allege against Defendant General Motors LLC ("GM" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## **INTRODUCTION**

1.     This class action lawsuit is brought by Plaintiffs seeking damages and equitable relief individually and on behalf of the other Class Members, each of whom purchased or leased one or more vehicles equipped with a GM 6.2 Liter V8 EcoTec3 L87 engine (the "L87 Engine").

2.     GM equipped the following makes and model years with the L87

2

Engine:

    a) 2021–2024 Cadillac Escalade

    b) 2021–2024 Cadillac Escalade ESV

    c) 2019–2024 Chevrolet Silverado 1500

    d) 2021–2024 Chevrolet Tahoe

    e) 2021–2024 Chevrolet Suburban

    f) 2019–2024 GMC Sierra 1500

    g) 2021–2024 GMC Yukon

    h) 2021–2024 GMC Yukon XL

Those vehicles listed above in which the L87 Engines were installed are defined herein as the "Class Vehicles."

3. The L87 Engine is part of GM's Generation V small block engine family, otherwise known as "EcoTec3." The L87 is in the second generation of the EcoTec3 family of engines.[1]

4. The L87 Engines consistently experience sudden failure, resulting in

---

[1] Exhibit A, *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, https://gmauthority.com/blog/gm/gm-engines/l87/ (last visited Feb. 23, 2026); Exhibit B, *GM 6.2L EcoTec3 L86/L87 Engine Guide - Specs, Problems, Reliability*, MotorReviewer, https://www.motorreviewer.com/engine.php?engine_id=201 (last visited Feb. 23, 2026).

loss of motive power and propulsion during vehicle operation.[2]

5.     The engine failure arises from loss of lubrication between the crankshaft and the bearings (the "Defect" or "L87 Engine Defect").

6.     The sudden loss of power caused by the Defect, often while a vehicle is being driven at high speeds, significantly increases the risk of a dangerous crash and/or injury.

7.     As of April 2025, GM had received 28,102 complaints or incidents related to L87 Engine failure, of which 14,332 involved allegations of loss of propulsion, along with 12 crashes, 12 injuries, and 42 fires potentially related to the Defect.[3]

8.     As of October 2025, the National Highway Traffic Safety Administration ("NHTSA") had received 1,157 reports of engine bearing failure and 4 crashes and fires associated with the Defect.[4]

9.     As explained further below, there is persistent and voluminous consumer outcry to NHTSA, GM, and on various online forums that the L87 engines are defective.

---

[2] Exhibit C, Part 573 Safety Recall Report No. 25V-274, NHTSA (Apr. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF ("Recall Report").
[3] *Id.*
[4] Exhibit II, ODI Closing Resume, NHTSA (Oct. 23, 2025), https://static.nhtsa.gov/odi/inv/2025/INCLA-PE25001-23196.pdf

10.     On April 24, 2025, GM issued a recall related to the Defect that included some, but not all, of the Class Vehicles.

11.     As explained herein, the recall is egregiously inadequate.

12.     The recall does not cover all Class Vehicles, despite NHTSA identifying all Class Vehicles as being associated with the Defect, and despite numerous reports of engine failure in non-recalled Class Vehicles.

13.     The recall, moreover, does not provide for any repair unless vehicles fail certain dealership inspections. As alleged below, there are numerous reports of vehicles "passing" inspection, only to suffer from sudden engine failure shortly thereafter.

14.     Additionally, there are reports of post-recall engine failure in vehicles that *did* receive an engine replacement pursuant to the recall.

15.     Indeed, on January 16, 2026, NHTSA opened a new investigation specifically related to post-recall engine failure in the Class Vehicles.

16.     Further, the recall mandates a change in oil for Class Vehicles that do not receive an engine repair or replacement. Specifically, the recall mandates that Class Vehicles that were previously instructed to use 0W-20 oil switch to the higher viscosity 0W-40 oil.

17.     Not only is this change in oil ineffective in addressing the Defect—as recognized by NHTSA, there have been numerous reports of Class Vehicles

suffering engine failure after switching to the 0W-40 oil—but it imposes new costs on vehicle owners and lessees for which they did not bargain.

18.     The 0W-40 oil is more expensive than the 0W-20 oil that GM instructed to be used with the Class Vehicles at the time of sale.

19.     The 0W-40 oil, moreover, results in decreased fuel efficiency, leading to significantly greater fuel costs over the period of ownership or lease.

20.     The Class Members, as defined herein, did not receive the safe, dependable, and fuel-efficient trucks that they paid for; but, instead, received vehicles that impose greater operating costs and that subject them to a significant risk of sudden engine failure. Had Plaintiffs and Class Members known of the Defect at the time of sale, they either would not have purchased these vehicles or would have paid less for them.

## JURISDICTION AND VENUE

21.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class members are citizens of a different state than GM.

22.     The Court has personal jurisdiction over GM because it is headquartered in Michigan.

23.     Venue is proper in the Eastern District of Michigan pursuant to 28

U.S.C. § 1391(b) because GM resides in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

**A.    Arkansas Plaintiffs**

### 1.    *Timothy Lee and Leatrecia Whitaker Lee*

24.    Plaintiffs and proposed class representatives Timothy Lee and Leatrecia Whitaker Lee ("Plaintiffs" for purposes of these allegations) are residents and citizens of McGehee, Arkansas. On or about July 15, 2023, Plaintiffs purchased a new 2023 Yukon XL from Crain Buick GMC in Conway, Arkansas, an authorized GM dealer. Plaintiffs purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At sale, Plaintiffs' vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiffs were aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiffs purchased their Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiffs' decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiffs or that,

in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

25.     In or around January 2025, Plaintiffs' Class Vehicle experienced catastrophic engine failure while Ms. Lee was driving on a two-lane road passing a commercial vehicle in Arkansas. Specifically, Plaintiffs' Class Vehicle suddenly lost power. Ms. Lee contacted GM and GM had it towed to a GM dealership where the engine was eventually replaced under NHTSA Recall No. 25V-274, which included a change to 0W-40 oil.

26.     On or about August 2, 2025, Plaintiffs' Class Vehicle experienced another catastrophic engine failure while leaving a restaurant after dinner. Plaintiffs' Class Vehicle repeatedly would not start. Plaintiffs had the Class Vehicle towed to a GM dealership for repairs.

27.     In or around January 2026, Plaintiffs' Class Vehicle experienced yet another catastrophic engine failure while on a family trip to Florida. Plaintiffs pulled into a service station to fill up the gas tank, and Plaintiffs' Class Vehicle would not start. Plaintiffs had the Class Vehicle towed to McKenzie GMC in Milton, Florida, an authorized GM dealer, where the engine was eventually replaced again.

28.     The recall repair under Recall No. 25V-274 is an untimely and inadequate remedy that fails to compensate Plaintiffs for their economic damages, and as alleged herein, does not actually remedy the Defect. Plaintiffs incurred

economic damages because of the Defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiffs also incurred out of pockets costs, including towing, a used car purchase, lodging and meals, and a rental car, because Plaintiffs' Class Vehicle was out of commission for a total of multiple months while Plaintiffs' Class Vehicle's engine was being replaced twice under NHTSA Recall No. 25V-274. Plaintiffs also incurred the expenditure of their personal time in arranging, transporting, and waiting for service.

29.     Plaintiffs regularly service the vehicle but are now concerned about driving it due to the dangers resulting from the Defect. Plaintiffs would not have purchased the vehicle had Plaintiffs known about the Defect or the fuel economy consequences of the recall.

**B.    California Plaintiffs**

*1.   Alexis Bronson*

30.     Plaintiff and proposed class representative Alexis Bronson ("Plaintiff" for purposes of these allegations) is a resident and citizen of Oakland, California. On or about September 10, 2022, Plaintiff purchased a new 2022 GMC Sierra 1500 from Brookings Auto Mall in Brookings, South Dakota.  Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and

it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Safety and dependability were the primary reasons Plaintiff purchased the Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

31.     On August 5, 2025, GM notified Plaintiff that the vehicle was subject to NHTSA Recall No. 25V-274. On November 7, 2025, Plaintiff brought the vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred more expensive oil changes and

alternative transportation costs.

32. After bringing the vehicle to a GM-authorized dealer to obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, Plaintiff complained about safety concerns to the dealer throughout a four-day duration of recall testing as reflected in the service invoice and programming receipt.

33. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 2. *Mitchell Fagundes*

34. Plaintiff and proposed class representative Mitchell Fagundes ("Plaintiff" for purposes of these allegations) is a resident and citizen of Fresno, California. On or about December 27, 2022, Plaintiff purchased a used 2022 Cadillac Escalade from Costa Mesa GMC Buick Cadillac in Costa Mesa, California. Plaintiff purchased the Class Vehicle for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for his business. At the point of sale, Plaintiff's vehicle was still covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing

11

messages of dependability and safety. Plaintiff researched the Class Vehicle on GM's website and reviewed GM's brochures before he purchased the Class Vehicle. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

35.     On January 3, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was on a road trip. Plaintiff's Class Vehicle suddenly lost power while towing an empty trailer on Interstate 5 in California. Plaintiff was able to pull off to the side of the freeway and he was stranded there in the rain with very little space between the guardrail and the freeway where semi-trucks were going by. Plaintiff had the Class Vehicle towed to a GM dealership where the engine was eventually replaced. Prior to the engine failure, Plaintiff brought his Class Vehicle to the dealership for an oil change and complained that the vehicle was consuming more oil than it should. He was instructed to bring the Class Vehicle in every 1,000 miles to monitor the oil consumption. In an abundance of caution, Plaintiff brought his Class Vehicle to the dealership just before the road trip where his vehicle suffered

engine failure and asked them to check the oil.

36.     In April or May 2025, Plaintiff learned about the NHTSA Recall No. 25V-274. On September 23, 2025, Plaintiff asked his local GM-authorized dealer if the new engine was subject to Recall No. 25V-274 because the engine is experiencing more oil problems. When the dealership could not reproduce the oil pressure problem, Plaintiff showed them a video of it and they agreed the oil should not do what they saw on the video. At that time, the dealership did nothing and told Plaintiff the new engine in the car was not subject to the recall. Plaintiff's VIN indicates the vehicle is subject to the recall and that the recall service was completed in May 2025, but Plaintiff did not take his vehicle into the dealer at that time (and was later told in September 2025 (by the dealer) that his vehicle was not subject to the recall. Plaintiff suspects that GM considers the recall complete for his vehicle because of its engine replacement earlier that year. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the Defect, Plaintiff also incurred towing and more expensive oil change costs, and the expenditure of his personal time in arranging, transporting, and waiting for service.

37.     GM denied Plaintiff's request for towing reimbursement on February 13, 2025.

38.     Plaintiff regularly services the vehicle but is now concerned about

driving it due to the dangers resulting from the Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

### 3. *Joshua Smotherman*

39.    Plaintiff and proposed class representative Joshua Smotherman ("Plaintiff" for purposes of these allegations) is a resident and citizen of Rocklin, California. On or about March 16, 2025, Plaintiff purchased a used 2024 Cadillac Escalade from Mercedes-Benz of Rocklin in Rocklin, California. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff viewed GM's marketing on Cadillac's website and in brochures. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87

Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

40. On November 11, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

41. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## C.   **Connecticut Plaintiff**

### *1.  Anthony Gargano*

42. Plaintiff and proposed class representative Anthony Gargano ("Plaintiff" for purposes of these allegations) is a resident and citizen of Pocasset, Massachusetts. On or about June 24, 2024, Plaintiff purchased a new 2024 Chevrolet Tahoe from Executive Chevrolet in Wallingford, Connecticut. Plaintiff purchased

the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and towing a trailer. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety including GM television advertisements stating, "Dependability Comes Standard" in GM vehicles. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

43. On May 7, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was on a road trip. Specifically, Plaintiff's Class Vehicle suddenly lost power while towing a car to a racetrack in Ohio. Plaintiff was traveling on I-90 in upstate New York when he suddenly lost power. Plaintiff managed to get the Class Vehicle off the highway and into the breakdown lane. Plaintiff had the Class Vehicle towed to a GM dealership. The dealership, Marty's Chevrolet in

Bourne, Massachusetts, obtained a replacement engine and Plaintiff's Class Vehicle was returned to him on June 13, 2025. Plaintiff was not offered a loaner vehicle and has incurred several thousands of dollars in expenses related to the engine failure.

44.     On June 10, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Because Plaintiff's Class Vehicle was at the dealership getting its engine replaced during this time, Plaintiff understood his engine did not require further repair under the recall and his Class Vehicle has no open recall for the Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred $4,818.47 in out-of-pocket expenses including towing, rental car, and hotels, in addition to the expenditure of his personal time in arranging, transporting, and waiting for service.

45.     On May 9, 2025, Plaintiff contacted GM and asked GM to buy back his Class Vehicle because of the engine defect, but GM refused.

46.     Plaintiff regularly services the vehicle and has been assured by the GM dealership that the replacement engine does not have the L87 Engine Defect, despite the fact of engine failure in replacement engines. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

17

**D.     Florida Plaintiffs**

*1.  Brendan Kirk*

47.     Plaintiff and proposed class representative Brendan Kirk ("Plaintiff" for purposes of these allegations) is a resident and citizen of Naples, Florida. On or about December 27, 2022, Plaintiff purchased a used 2021 GMC Yukon from Autonation Toyota Fort Myers in Fort Myers, Florida. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute for work. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff reviewed news articles, saw GM commercials, watched video reviews online, and had a long history of his family owning GM vehicles prior to purchasing the Class Vehicle. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

48.    On March 22, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was stopped at an intersection in the middle lane of a six-lane road in Naples, Florida. The speed limit on this road is 55 mph, and it was incredibly dangerous as Plaintiff was almost hit multiple times. Plaintiff could not get out of the Class Vehicle due to the fast-moving traffic nor was he able to put the vehicle in neutral or even get it to move.

49.    Plaintiff had the Class Vehicle towed to a GM dealership where they initially thought the problem was the fuel pump. The GM dealer eventually determined that the engine needed to be replaced and ordered a new engine. When the engine arrived at the dealership it was discovered that it was the wrong engine and another engine was ordered. Plaintiff was without his Class Vehicle from March 22, 2025, until August 25, 2025. He was initially not offered a loaner vehicle and paid approximately $1,500 for a rental car.

50.    On April 24, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Plaintiff's Class Vehicle was already at the GM dealership awaiting the engine replacement at that time and did obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred

economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred towing, rental car, more expensive oil change costs, and diminished fuel economy, and the expenditure of his personal time in arranging, transporting, and waiting for service.

51.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## 2.  *Charles Morlock*

52.    Plaintiff and proposed class representative Charles Morlock ("Plaintiff" for purposes of these allegations) is a resident and citizen of Largo, Florida. On or about June 29, 2024, Plaintiff purchased a new 2022 Silverado from Nissan of Clearwater in Clearwater, Florida. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety, specifically reviewing the GM website, Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However,

despite touting the safety and dependability of the Class Vehicle, at no point did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

53.     In August 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On August 12, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

54.     Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 3.  *Scott Robinson*

55.     Plaintiff and proposed class representative Scott Robinson ("Plaintiff" for purposes of these allegations) is a resident and citizen of Naples, Florida. On or

about February 26, 2022, Plaintiff purchased a new 2022 Chevrolet Suburban from Estero Bay Chevrolet in Estero, Florida. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

56.     In early September 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On September 15, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and

inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

57.     Plaintiff notified the GM-authorized dealer that the inspection and change to 0W-40 oil under Recall No. 25V-274 were inadequate to remedy the L87 Engine Defect.

58.     Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 4.  *Rocky Shankar*

59.     Plaintiff and proposed class representative Rocky Shankar ("Plaintiff" for purposes of these allegations) is a resident and citizen of Clermont, Florida. On or about September 6, 2024, Plaintiff purchased a new 2024 Cadillac Escalade from Massey Cadillac of South Orlando in Orlando, Florida. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the

point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

60.    On or about October 15, 2024, the engine shut down temporarily while Plaintiff was stopped at a traffic light. A few days later, on or about October 18, 2024, the engine temporarily failed again when Plaintiff pulled into his parents' driveway. Plaintiff fears that the engine may fail again under more dangerous circumstances. In an abundance of caution, Plaintiff seldom drives the vehicle.

61.    GM has yet to recall Plaintiff's vehicle or otherwise remedy the L87 Engine Defect, even though the vehicle is included in NHTSA's ongoing safety investigation. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value.

62.    Plaintiff regularly services the vehicle but is now concerned about

24

driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## E.   Georgia Plaintiff

### 1.   *Greg Munna*

63.     Plaintiff and proposed class representative Greg Munna ("Plaintiff" for purposes of these allegations) is a resident and citizen of Marietta, Georgia. On or about December 30, 2024, Plaintiff purchased a used 2023 Chevrolet Tahoe from Alm Mall of Georgia in Buford, Georgia. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically reviewed the GM website and saw GM television commercials and product data brochures provided by the dealership. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the

Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

64.     On February 22, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was driving on the interstate. Jim Ellis Chevrolet in Atlanta determined that the engine needed to be replaced and ordered one for the Class Vehicle. Plaintiff's Class Vehicle was at the dealership for more than 3 weeks while he waited for the engine to be replaced and Plaintiff was not initially offered a loaner vehicle.

65.     On August 12, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On August 15, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the Defect, Plaintiff also incurred towing and rental car costs, more expensive oil changes, and costs related to his third-party extended warranty vehicle coverage. Plaintiff also has

incurred expenditure of his personal time in arranging, transporting, and waiting for service.

66.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the Defect or the fuel economy consequences of the recall.

## F.    Illinois Plaintiffs

### 1.  Anthony Carro

67.    Plaintiff and proposed class representative Anthony Carro ("Plaintiff" for purposes of these allegations) is a resident and citizen of Clarksville, Tennessee. On or about March 26, 2024, Plaintiff purchased a used 2023 GMC Sierra 1500 from Laura Buick GMC in Collinsville, Illinois. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute for work. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically reviewed GM's website, saw GM commercials, and reviewed GM's brochures prior to purchasing the Class Vehicle.

Safety and dependability were the primary reasons Plaintiff purchased the Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

68.    On approximately September 1, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On October 14, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred more expensive oil change costs and has noticed lower gas mileage than advertised since the recall repair. He has also noticed that his Class Vehicle is ticking during cold starts this winter.

69.     Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## 2.  *James Nelson*

70.     Plaintiff and proposed class representative James Nelson ("Plaintiff" for purposes of these allegations) is a resident and citizen of Galesburg, Illinois. On or about January 10, 2023, Plaintiff purchased a new 2023 GMC Sierra 1500 from Yemm Chevrolet Buick GMC Chrysler Dodge Jeep Ram in Galesburg, Illinois. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in

an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

71.    In August 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On August 12, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred more expensive oil change costs and the expenditure of his personal time in arranging, transporting, and waiting for service.

72.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## G.    Kentucky Plaintiff

### 1.    Jon Michael Jones

73.    Plaintiff and proposed class representative Jon Michael Jones ("Plaintiff" for purposes of these allegations) is a resident and citizen of Ashland, Kentucky. On or about October 9, 2023, Plaintiff purchased a used 2021 Chevrolet Tahoe from Pure Country Chevrolet in Grayson, Kentucky. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At sale, Plaintiff purchased an extended warranty from the dealership. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety and was a loyal GM customer for many years. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

74.    On April 3, 2024, Plaintiff's Class Vehicle experienced catastrophic

engine failure. Plaintiff's Class Vehicle would not start, and he had it towed to a GM dealership where they initially determined that the issue was the starter. The starter was replaced, but the Class Vehicle would still not start so they replaced the fuse box but that did not work either. The dealership then found that the engine had failed and determined that the engine had to be replaced. Plaintiff was without his Class Vehicle for approximately two months while the engine awaited replacement and Plaintiff paid out of pocket for a rental car during that time.

75.    GM has yet to recall Plaintiff's Class Vehicle or otherwise remedy the L87 Engine Defect, even though the vehicle is included in NHTSA's ongoing safety investigation. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred towing and rental car costs, as well as the expenditure of his personal time in arranging, transporting, and waiting for service.

76.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

## H.   Louisiana Plaintiffs

### 1.  *Emanuelle Serrano*

77.    Plaintiff   and   proposed   class   representative   Emanuelle   Serrano ("Plaintiff" for purposes of these allegations) is a resident and citizen of Tucson, Arizona. On or about December 23, 2022, Plaintiff purchased a new 2022 Chevrolet Silverado 1500 from Ralph Sellers Chevrolet in Baton Rouge, Louisiana. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to and from work. At the point of sale, Plaintiff's vehicle was covered   by   GM's   3-year/36,000-mile   bumper-to-bumper   warranty   and   5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically reviewed GM's website, saw GM commercials, reviewed GM brochures and compared the Class Vehicle with other similar truck brands prior to purchase. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect,

GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

78.    In May 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On August 13, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred more expensive oil change costs.

79.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## 2.  *Danny Wingard*

80.    Plaintiff and proposed class representative Danny Wingard ("Plaintiff for purposes of these allegations) is a resident and citizen of Wetumpka, Alabama. On or about April 24, 2024, Plaintiff purchased a new 2024 GMC Sierra 1500 from

Ross Downing Buick GMC Cadillac in Hammond, Louisiana. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to and from work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically reviewed GM's website and saw TV commercials for new GMC trucks prior to purchasing his Class Vehicle. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

81.    In June 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On October 16, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-

40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

82.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## I.    Maryland Plaintiffs

### 1.  *Mark Kamholz*

83.    Plaintiff and proposed class representative Mark Kamholz ("Plaintiff" for purposes of these allegations) is a resident and citizen of Centreville, Maryland. On or about July 1, 2024, Plaintiff purchased a new 2024 GMC Sierra 1500 from Autonation Buick GMC Laurel in Laurel, Maryland. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and commuting. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase,

Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically recalls seeing television advertisements asserting that GMC trucks are "professional grade" quality and that similar Chevrolet trucks are "like a rock." Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

84.     On May 21, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was traveling at highway speed on I-70 in Maryland on his way to a meeting. Plaintiff's Class Vehicle completely lost power and coasted to the shoulder of the highway. Losing power on a busy highway caused Plaintiff considerable anxiety. Plaintiff had the Class Vehicle towed to a GM dealership in Hancock, Maryland and the dealership determined that the engine had failed. The dealership ordered a new engine and Plaintiff was without his Class Vehicle while the engine was replaced. Plaintiff was advised by the GM dealer in Hancock, Maryland that the engine was being replaced under warranty, but it remains unclear whether this is because of the recall.

85.     GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274, and because Plaintiff's Class Vehicle was at the dealership getting its engine replaced during this time, Plaintiff understood his engine did not require further repair under the recall and his Class Vehicle has no open recall for the Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred an expense of $325.70 on transportation to retrieve his Class Vehicle after the engine was replaced. Plaintiff also incurred the expenditure of his personal time in arranging, transporting, and waiting for service.

86.     After the Class Vehicle's engine failed, Plaintiff contacted GM's customer care and requested GM provide him a different vehicle with a different engine valued at around the $77,350 MSRP that Plaintiff paid for Class Vehicle. GM denied Plaintiff's request.

87.     Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. This is a continued source of major anxiety for Plaintiff who worries that every time he uses the vehicle it may be the day that it fails again. It is particularly stressful on time-sensitive trips such as going to the airport or when he travels a few hundred miles from home because he is concerned that he will be stranded in a remote location

again. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

### 2.  *Danny Toliver*

88.   Plaintiff and proposed class representative Danny Toliver ("Plaintiff" for purposes of these allegations) is a resident and citizen of Midlothian, Virginia. On or about October 23, 2023, Plaintiff purchased a new 2023 GMC Yukon from Buick GMC of Brandywine in Glen Burnie, Maryland. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

89.     In February 2025, Plaintiff's Class Vehicle suddenly lost power while driving on Route 92 towards Ashland, Virginia. The vehicle was towed to Haley Buick GMC in Midlothian, Virginia. The GM dealership was unable to diagnose the issue. Later, in early May 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was driving on the highway. Specifically, Plaintiff's Class Vehicle suddenly lost power while driving in the middle lane on Interstate 95 northbound between Fredericksburg, Virginia and Stafford County, Virginia. Plaintiff barely managed to coast to the side of the highway where he was stranded near fast-moving traffic. Plaintiff had the Class Vehicle towed to a GM dealership, Haley Chevrolet in Midlothian, Virginia. At first, the dealer determined that the Class Vehicle needed an engine replacement. The Class Vehicle remained at the dealership for approximately six months awaiting an available replacement engine. However, Plaintiff never received a replacement engine.

90.     On July 30, 2025, after the second engine failure and while Plaintiff's Class Vehicle remained at the GM dealership awaiting a replacement engine, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On October 31, 2025, the dealership, Haley Chevrolet, informed Plaintiff that his Class Vehicle was no longer approved for engine replacement and that instead his Class Vehicle was required to undergo the inspection procedure pursuant to Recall No. 25V-274.

91.     On November 8, 2025, Plaintiff brought his Class Vehicle to another GM-authorized dealer, Rick Hendrick Chevrolet Buick GMC in Richmond, Virginia to obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274. The dealership indicated to Plaintiff that the inspection procedure under Recall No. 25V-274 fails to accurately identify engines that require replacement. Plaintiff did obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred towing costs, rental car costs, and more expensive oil change costs, and the expenditure of his personal time in arranging, transporting, and waiting for service.

92.     On November 23, 2025, Plaintiff's Class Vehicle experienced engine failure for a third time. The engine suddenly lost all power and the check engine light illuminated while Plaintiff was driving. Plaintiff's Class Vehicle continues to exhibit engine performance issues, including decreased power.

93.     Plaintiff is a disabled United States Marine Veteran and organ

transplant recipient who requires regular medical appointments in Philadelphia. Plaintiff does not trust the Class Vehicle to transport him safely to and from appointments in Philadelphia, but Plaintiff cannot afford to pay for alternative transportation.

94.    Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## J.    Massachusetts Plaintiffs

### 1.   Garvin Eastman

95.    Plaintiff and proposed class representative Garvin Eastman ("Plaintiff" for purposes of these allegations) is a resident and citizen of Bridgewater, New Hampshire. On or about November 29, 2024, Plaintiff purchased a used 2021 GMC Sierra 1500 from Blasius of Attleboro in Attleboro, Massachusetts. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. Plaintiff additionally uses the vehicle for his individually owned IT consulting business. At the point of sale, Plaintiff's vehicle was covered by GM's 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of

GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

96.     On or about November 29, 2024, approximately an hour after purchasing the vehicle, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was driving home from the dealership. Specifically, Plaintiff's Class Vehicle suddenly lost power while Plaintiff and his wife were traveling on Interstate 495 in Massachusetts just as Plaintiff was passing another vehicle. Plaintiff managed to cross lanes and pull over to the breakdown lane, where a message on the dashboard instructed to shift to neutral. The Class Vehicle eventually restarted. Just as Plaintiff attempted to re-enter traffic and reached approximately 50 miles per hour, the engine failed a second time. Plaintiff again managed to pull over to the breakdown lane, and the shift-to-neutral message appeared on the dashboard again. Plaintiff restarted the Class Vehicle and carefully drove the remainder of the way home. Plaintiff promptly brought the Class Vehicle to a GM dealership, Irwin GMC

in New Hampshire, where they were unable to diagnose the problem.

97.    Between December 2024 and March 2025, Plaintiff's Class Vehicle sporadically exhibited a rattling noise from the engine compartment. In early March 2025, the Class Vehicle's check engine light illuminated, which caused the vehicle to fail a state-mandated inspection a few days later. The local mechanic who performed the inspection reset the check engine light and advised Plaintiff that if the check engine light did not come back on after 100 miles, to bring it back and the vehicle would pass inspection.

98.    Shortly thereafter, and before reaching 100 miles after failing the state-mandated inspection, the check engine light illuminated and the engine noises worsened. Plaintiff promptly called the GM dealership, Irwin GMC in New Hampshire, and scheduled a diagnostic appointment. On March 20, 2025, Plaintiff began driving to the dealership when the engine failed for a third time. Plaintiff was driving on Meredith Center Road, a two-lane highway in morning rush hour traffic in a rural area. There was not sufficient shoulder on the roadway for Plaintiff to pull over safely. Plaintiff turned on the hazard lights and managed to coast the Class Vehicle to an intersecting road, nearly colliding with other vehicles as oncoming traffic swerved to avoid the Class Vehicle. The shift-to-neutral message illuminated again. Plaintiff was unable to restart the Class Vehicle, so he had the Vehicle towed to the GM dealership. The dealer indicated that they found metal fragments in the

oil. After two weeks at the dealer, the dealer indicated they did not yet have approval from GM to replace the engine, because GM wanted further diagnostics performed. The vehicle was at the dealer for over two months before the engine was eventually replaced in June 2025. Plaintiff's Class Vehicle continued to exhibit issues after the engine replacement, including dying shortly after start-up.

99.   In July 2025, after Plaintiff's Class Vehicle received an engine replacement, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Because Plaintiff's Class Vehicle had just received an engine replacement, Plaintiff understood his engine did not require further repair under the recall and his Class Vehicle had no open recall for the Defect. Plaintiff also consulted GM customer support, who advised that the new engine would not have the problems involved in the recall. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred towing costs, rental car costs, and the expenditure of his personal time in arranging, transporting, and waiting for service.

100.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 2. Marc Vaillette

101.   Plaintiff and proposed class representative Marc Vaillette ("Plaintiff for purposes of these allegations) is a resident and citizen of Westborough, Massachusetts. On or about June 27, 2022, Plaintiff purchased a used 2022 GMC Sierra 1500 Limited from Imperial Chevrolet in Mendon, Massachusetts. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to work. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Plaintiff also purchased an extended warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically saw GM product placement advertisements for Chevy and GMC trucks prior to purchasing his Class Vehicle and has been a loyal GM customer for over 25 years. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a

higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

102. On September 5, 2023, Plaintiff's Class Vehicle experienced catastrophic engine failure while Plaintiff was traveling on the highway with his daughter. When the Class Vehicle's engine failed, the vehicle completely lost power without warning. Plaintiff coasted to the side of the highway and was able to get the Class Vehicle started again. When Plaintiff dropped off his daughter at home, the Class Vehicle died again. Plaintiff had the Class Vehicle towed to a GM dealership where they found low oil pressure and engine knocking and large pieces of metal in the oil. The GM dealer determined that the engine needed to be replaced and ordered a new engine for the Class Vehicle. Plaintiff waited two to three months for the engine to be replaced and the Class Vehicle continued to have issues after the engine replacement.

103. On or about June 15, 2024, Plaintiff traded in his 2022 GMC Sierra 1500 Limited for a used 2022 GMC Sierra 1500 AT4 at Imperial Chevrolet in Mendon, Massachusetts. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used primarily for transportation needs such as household errands and to commute. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Plaintiff also purchased an

extended warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically saw GM product placement advertisements for Chevy and GMC trucks prior to purchasing his Class Vehicle and has been a loyal GM customer for over 25 years. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

104. On January 8, 2025, Plaintiff's 2022 GMC Sierra 1500 AT4 also experienced catastrophic engine failure. Plaintiff was without his Class Vehicle for 62 days while the engine was replaced. Plaintiff paid out-of-pocket for a rental car while his Class Vehicle was being diagnosed. When Plaintiff learned that the new engine is the same engine that failed in both of his Class Vehicles he decided to trade the Class Vehicle in for a different vehicle with a different engine because he feared the engine would fail again. Plaintiff traded the vehicle in or around May or June 2025 before he learned about the recall for the Defect. Plaintiff incurred economic damages because of the L87 Engine Defect, including overpayment for the Class

Vehicles at purchase, towing, and rental car expenses arising from the engine failures.

105.   Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had Plaintiff known about the L87 Engine Defect.

## K.   Michigan Plaintiffs

### 1.   *Kevin Baird*

106.   Plaintiff and proposed class representative Kevin Baird ("Plaintiff" for purposes of these allegations) is a resident and citizen of Naples, Florida. On or about May 3, 2024, Plaintiff purchased a new 2024 Yukon XL from Young Buick GMC, LLC in Owosso, Michigan. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity

motor oil that materially decreases the vehicle's fuel economy.

107.  On September 26, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On October 1, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

108.  Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 2.  *Adrienne Zeigler*

109.  Plaintiff and proposed class representative Adrienne Zeigler ("Plaintiff" for purposes of these allegations) is a resident and citizen of Southfield, Michigan. On or about February 17, 2024, Plaintiff purchased a certified pre-owned 2022 Chevrolet Tahoe from Serra Chevrolet Southfield in Southfield, Michigan.

Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to work. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety and has been loyal to the brand since she purchased her first car in 2003 when she graduated from college. Safety and dependability were the primary reasons Plaintiff purchased her Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

110. On May 11, 2025 (Mother's Day), Plaintiff's Class Vehicle experienced catastrophic engine failure while Plaintiff was returning home from dinner with her family. Plaintiff's brother, who was driving at the time, noticed that the vehicle was slowing down. Plaintiff observed that the Class Vehicle had shifted into neutral on its own. Plaintiff instructed her brother to turn on the hazard lights,

pull over, and let her take over the wheel. Shortly after, the Class Vehicle shut off completely and would not restart. Plaintiff was eventually able to get the Class Vehicle started again and drove to her parents' house to drop off her family. When Plaintiff attempted to restart the vehicle afterward, the engine was completely unresponsive.

111.   Plaintiff had the Class Vehicle towed to the GM dealership where it remained until June 5, 2025. The GM dealer informed Plaintiff that the Class Vehicle suffered engine failure and it replaced the engine. GM did not notify Plaintiff about NHTSA Recall No. 25V-274before the engine failure and the check engine light never came on before the failure. Earlier that day, Plaintiff had been driving at high speeds on the highway, and had the engine failed at that time, the outcome could have been tragic. Because Plaintiff's Class Vehicle received an engine replacement in June 2025, Plaintiff understood her engine did not require further repair under the recall and her Class Vehicle has no open recall for the Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value.

112.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

L.     **Minnesota Plaintiff**

*1.   Stephen ("Matt") Wills*

113.   Plaintiff and proposed class representative Stephen ("Matt") Wills ("Plaintiff" for purposes of these allegations) is a resident and citizen of Wheaton, Illinois. On or about April 30, 2022, Plaintiff purchased a new 2022 GMC Yukon XL from Lupient GMC in Minneapolis, Minnesota. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

114.   Since the purchase date, Plaintiff's Class Vehicle has excessively

burned oil. Plaintiff's Class Vehicle requires approximately an additional two quarts of oil between each oil change.

115. GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Plaintiff is scheduled to receive Defendant's purported remedy for the Defect under Recall No. 25V-274 from a GM-authorized dealership on February 26, 2026. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff has also incurred the expenditure of his personal time in arranging, transporting, and waiting for service.

116. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## M. Missouri Plaintiffs

### 1. Ronald Ward

117. Plaintiff and proposed class representative Ronald Ward ("Plaintiff" for purposes of these allegations) is a resident and citizen of Branson, Missouri. On or

about November 13, 2023, Plaintiff purchased a certified pre-owned 2022 Chevrolet Silverado 1500 LTD from Reliable Chevrolet LLC in Springfield, Missouri. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to tow his boat. At the point of sale, Plaintiff's vehicle still was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff specifically saw GM commercials advertising the Silverado pickup and reviewed GM's website prior to purchasing the Class Vehicle. He has owned many GM vehicles over the years and trusted the reliability of the GM truck brand. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

118.   In March 2025, Plaintiff's Class Vehicle was misfiring and he brought the vehicle to Pinegar Chevy Buick GMC and they replaced the spark plugs and the

high-pressure fuel pump. When the Class Vehicle began misfiring again about three weeks later, Plaintiff brought his Class Vehicle to Reliable Chevrolet in Springfield for diagnosis. They changed the oil, cut the old oil filter open, and told Plaintiff they discovered metal shavings. The dealership replaced the DOD sensor on a cylinder and the spark plugs and performed an upper engine cleaning. When Plaintiff picked up his Class Vehicle from the dealership on June 6, 2025, he was told to drive it 3,000 miles and bring it in for another oil and filter change and spark plug inspection.

119.   From June 2025 through September 2025, Plaintiff's Class Vehicle began misfiring again and was in and out of the dealership before the dealership finally informed him that it had approval to replace the engine. Plaintiff picked up his Class Vehicle from the dealership on September 25, 2025, but the new engine misfired just like the old one.

120.   Plaintiff's Class Vehicle was at Reliable Chevrolet for his engine issues in May 2025, and Plaintiff was told on May 21 or 22, 2025, that the oil change under NHTSA Recall No. 25V-274 had been completed during that time. But Plaintiff noticed that the oil cap still said 0W20, not the 0W-40 it should have been had the oil change been completed. On May 23, 2025, Plaintiff talked to the technician at Reliable Chevrolet again and was told that his Class Vehicle was not under recall so they did not change the oil or do the recall test. In May and June 2025, Plaintiff's Class Vehicle was in the service department at the dealership multiple times and the

dealership told Plaintiff they were tearing down the engine to inspect the crankshaft and bearings. Plaintiff was then told that GM did not want to do that after all, and the dealer put the engine back together and still did not do the oil change recall test. On June 6, 2025, the vibration test was done, but the oil was not changed, and the Class Vehicle still had the 0W-20 oil cap.

121.   On June 20, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Plaintiff's vehicle was at Reliable Chevrolet from June 30, 2025, to July 10, 2025, and as he understands it, the vehicle did obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274 at that time, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred multiple trips to the dealership over a 6-month period, 43 miles each way and at least three to four hours each trip. In addition, Plaintiff could not tow his boat trailer with any of the loaner vehicles provided by Reliable Chevrolet.

122.   Plaintiff traded in his Class Vehicle on November 7, 2025, due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased

the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## 2. *Gage Yesbeck*

123.   Plaintiff and proposed class representative Gage Yesbeck ("Plaintiff for purposes of these allegations) is a resident and citizen of Chesterfield, Virginia. On or about July 20, 2023, Plaintiff purchased a used 2021 Cadillac Escalade ESV from Cable Dahmer Cadillac in Kansas City, MO. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

124. In August 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. In October 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

125. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## N. Nevada Plaintiff

### 1. Robert Houchin

126. Plaintiff and proposed class representative Robert Houchin ("Plaintiff" for purposes of these allegations) is a resident and citizen Topaz Lake, Nevada. On or about May 30, 2022, Plaintiff purchased a new 2022 Cadillac Escalade from Corwin Buick GMC in Reno, Nevada. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by

or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

127.   In mid-May 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Plaintiff has an appointment on March 13, 2026, to obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because

of the L87 Engine Defect, Plaintiff has also incurred the expenditure of his personal time in arranging and waiting for service.

128.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## O.    New Jersey Plaintiff

### 1.   *Ronald Beshel*

129.   Plaintiff and proposed class representative Ronald Beshel ("Plaintiff" for purposes of these allegations) is a resident and citizen of Middletown, Delaware. On or about June 17, 2024, Plaintiff purchased a new 2024 Sierra AT4 from Barlow Buick GMC, LLC in Woodbury, New Jersey. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in

61

Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

130.   In May 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On October 30, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

131.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

**P.    New Mexico Plaintiff**

*1.  Joshua Polson*

132.   Plaintiff and proposed class representative Joshua Polson ("Plaintiff" for purposes of these allegations) is a resident and citizen of Albuquerque, New Mexico. On or about May 15, 2023, Plaintiff purchased a new 2023 GMC Sierra 1500 from Quality Buick GMC in Albuquerque, New Mexico. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased the Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

133.   Plaintiff's Class Vehicle occasionally exhibits loss of power where it

won't accelerate or stalls as if it is stuck between gears.

134.   In or around April 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Shortly after that, Plaintiff brought his vehicle to a GM-authorized dealer for the recall repair, but the dealer said there was no fix available and indicated it was skeptical that the proposed recall fix would remedy the L87 Engine Defect. In or around September 2025, Plaintiff brought his vehicle to a GM-authorized dealer again to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

135.   Plaintiff regularly services the Class Vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

**Q.    New York Plaintiffs**

*1.  Andrew Schultz*

136.    Plaintiff and proposed class representative Andrew Schultz ("Plaintiff" for purposes of these allegations) is a resident and citizen of Lockport, New York. On or about April 2022, Plaintiff purchased a new 2022 GMC Sierra from Mike Smith Buick GMC in Lockport, New York. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, including visiting GM's website, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

137.    In June 2025, GM notified Plaintiff that his vehicle was subject to

NHTSA Recall No. 25V-274. Shortly after, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred more expensive oil change costs.

138.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## 2.   *Gregory Stewart*

139.   Plaintiff and proposed class representative Gregory Stewart ("Plaintiff" for purposes of these allegations) is a resident and citizen of Saugerties, New York. On or about September 24, 2022, Plaintiff purchased a new 2023 Chevrolet Tahoe from Denoyer Chevrolet in Colony, New York. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for

transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

140.   Since the purchase date, Plaintiff's Class Vehicle has excessively burned oil. Plaintiff's Class Vehicle requires approximately an additional one and a half quarts of oil between each oil change. Plaintiff's Class Vehicle also exhibits an abnormal knocking noise from the engine compartment upon start up.

141.   GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. In September 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, the technician referred to the thicker oil as just a "bandaid" for the underlying

problem, not a fix. This recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff has also incurred the expenditure of his personal time in arranging, transporting, and waiting for service.

142. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

R.    **North Carolina Plaintiff**

1. *Larry Churchwell*

143. Plaintiff and proposed class representative Larry Churchwell ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Mooresville, North Carolina. On or about June 16, 2021, Plaintiff purchased a new 2021 Chevrolet Suburban from Victory Chevrolet in Charlotte, North Carolina. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands

and to commute. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Plaintiff reviewed GM's website, saw commercials, and previously owned GM vehicles. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

144.   In December 2024, Plaintiff's Class Vehicle experienced catastrophic engine failure while his wife was driving late one night. Plaintiff was on the phone with his wife when the low-pressure alert came on the Class Vehicle's dash and she pulled over to the side of the road. Plaintiff had the Class Vehicle towed to a GM dealership where it was determined that the engine had failed. The dealership ordered a new engine, and Plaintiff was without his Class Vehicle for approximately four months while awaiting the engine replacement.

145.   On May 28, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274, but when he asked the service department at his local

GM dealership about it, he was told that there was no remedy available yet. On August 18, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred more expensive oil change costs.

146.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

**S.   Ohio Plaintiffs**

*1.   Paul MacMillan*

147.   Plaintiff and proposed class representative Paul MacMillan ("Plaintiff" for purposes of these allegations) is a resident and citizen of Ridgeville, Ohio. On or about February 21, 2023, Plaintiff purchased a new 2023 Cadillac Escalade from Dave Towell Cadillac in Akron, Ohio. Plaintiff purchased the Class Vehicle

primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

148.   Plaintiff's Class Vehicle requires oil changes unusually frequently. For example, during a two-month period between October 2025 and December 2025, Plaintiff's Class Vehicle required three oil changes. Plaintiff's Class Vehicle exhibits a ticking noise from the engine compartment. On December 11, 2025, Plaintiff was driving the Class Vehicle on a road trip when he heard ticking and knocking noises coming from the engine compartment. Plaintiff pulled over to inspect the problem and found that the engine oil was abnormally low. Out of an

abundance of caution, Plaintiff does not use the Class Vehicle to tow his boat, as he intended when he purchased the vehicle.

149.   Plaintiff brought his Class Vehicle to a GM-authorized dealer on April 8, 2025 for an oil change. At that appointment, Plaintiff requested that the engine be inspected to diagnose the engine issues, but the dealership did not inspect the engine nor note the request in the service notes. Plaintiff brought his Class Vehicle to a GM-authorized dealer again on October 2, 2025 to have the engine checked pursuant to Recall No. 25V-274. However, the dealership did not inspect the engine and simply recommended that Plaintiff use more expensive oil.

150.   GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. Although Plaintiff asked the GM-authorized dealer on October 2, 2025, to inspect the engine under Recall No. 25V-274 on October 2, 2025, they failed to do so. Plaintiff is scheduled to bring his vehicle back to a GM-authorized dealer on March 4, 2026 to obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff has also incurred the expenditure

of his personal time in arranging, transporting and waiting for service.

151.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 2. *Andrew Oser*

152.   Plaintiff and proposed class representative Andrew Oser ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Massillon, Ohio. On or about March 30, 2023, Plaintiff purchased a new 2023 Cadillac Escalade ESV from Lavery Cadillac in Alliance, Ohio. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to and from work. At the point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point did GM disclose

the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

153.   Since he bought the Class Vehicle, Plaintiff has had to add about seven quarts of oil to it between each oil change.

154.   GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274 and on or around June 9, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

155.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 3. *Jason Rappaport*

156.   Plaintiff and proposed class representative Jason Rappaport ("Plaintiff"

for purposes of these allegations) is a resident and citizen of Cleveland, Ohio. On September 11, 2023, Plaintiff purchased a new 2023 Cadillac Escalade from Morris Cadillac Buick GMC in Cleveland, Ohio. Plaintiff purchased the Class Vehicle through his business for both business and personal use. At the point of sale, Plaintiff's vehicle was covered by Cadillac's 4-year/50,000-mile bumper-to-bumper warranty and 6-year/70,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

157.   The engine in Plaintiff's Class Vehicle has problems starting up. On or around February 21, 2025, Plaintiff brought the Class Vehicle to a GM-authorized dealership to address the start-up issues. The dealership kept the vehicle for a week but was unable to diagnose the problem. Again, on or approximately March 5, 2025, Plaintiff brought the Class Vehicle back to the dealership to address the start-up issues, but they were unable to diagnose the problem.

158.   Thereafter, in approximately March 2025, Plaintiff's Class Vehicle suddenly lost power while driving. Plaintiff was able to restart it and brought the Class Vehicle back to the GM-authorized dealership. The dealership indicated that the problem was likely related to the engine connecting rod. Plaintiff's Class Vehicle remained at the dealership for about a month and a half, through May 2025. Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274 was not yet available at that time.

159.   On or about July 24, 2025, Plaintiff's Class Vehicle suddenly lost power for a second time while Plaintiff was driving. Specifically, Plaintiff was leaving Central Cadillac in Cleveland, Ohio where he had just picked up the vehicle. The sudden loss of engine power caused Plaintiff's Class Vehicle to collide with the vehicle in front of it. The collision caused external damage to both vehicles and lasting physical pain to Plaintiff's neck and back.

160.   GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On December 22, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to OW-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including

overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff has also incurred the expenditure of his personal time in arranging, transporting, and waiting for service.

161.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## T.   Oregon Plaintiff

### 1.   *Tracy Connor*

162.   Plaintiff and proposed class representative Tracy Connor ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Forest Grove, Oregon. On or about September 18, 2020, Plaintiff purchased a used 2020 GMC Sierra 1500 from Wilsonville Toyota in Wilsonville, Oregon. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used primarily for transportation needs such as household errands and to commute to work. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive

marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased the Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

163.   On February 7, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure. Plaintiff spent about $17,000 in repairs because the vehicle's warranties had expired in September 2024. Plaintiff spoke to GM about the engine failure, but it declined to cover or assist with the repair costs.

164.   GM has yet to recall Plaintiff's vehicle or otherwise remedy the L87 Engine Defect, even though the vehicle is included in NHTSA's ongoing safety investigation. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred repair costs.

165.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

**U.     Pennsylvania Plaintiffs**

*1.    Jerry Meyer*

166.    Plaintiff and proposed class representative Jerry Meyer ("Plaintiff" for purposes of these allegations) is a resident and citizen of Gratz, Pennsylvania. On or about March 31, 2023, Plaintiff purchased a new 2023 Sierra Denali from Troutman's Chevrolet GMC in Millersburg, Pennsylvania, an authorized GM dealer.

167.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

168.    In August 2025, GM notified Plaintiff that his vehicle was subject to

NHTSA Recall No. 25V-274. In August 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

169.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## 2.   *Gregory Owens*

170.   Plaintiff and proposed class representative Gregory Owens ("Plaintiff" for purposes of these allegations) is a resident and citizen of Kinzers, Pennsylvania. On or about July 27, 2024, Plaintiff purchased a used 2021 GMC Sierra 1500 from Videon Chevrolet in Phoenixville, Pennsylvania. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. Prior to

purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

171.   On March 11, 2025, Plaintiff smelled oil burning while driving the Class Vehicle. Plaintiff brought the vehicle to a GM-authorized dealership, Turner Buick GMC in New Holland, Pennsylvania. The dealership inspected the vehicle and initially diagnosed the issue as an engine leak, which Plaintiff paid approximately $8,000 to have fixed. While the technicians were test driving the vehicle after purportedly fixing it, the Class Vehicle experienced catastrophic engine failure. The vehicle was towed back to the dealership and remained at the dealership for over five months before the engine was eventually replaced. One technician recommended that Plaintiff try to get rid of the vehicle entirely.

172.   On July 8, 2025, GM notified Plaintiff that his vehicle, which was already at a GM-authorized dealer awaiting engine replacement, was subject to NHTSA Recall No. 25V-274. In late August 2025, Plaintiff's Class Vehicle received

a replacement an engine replacement, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff has also incurred repair costs, rental car costs, increased oil change costs, and the expenditure of his personal time in arranging, transporting, and waiting for service.

173.   Plaintiff's Class Vehicle continues to excessively burn and leak oil. Plaintiff is scheduled to bring the vehicle back to a GM authorized dealership this week.

174.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 3.   Jonathan and Bonnie Stempien

175.   Plaintiffs and proposed class representatives Jonathan and Bonnie Stempien ("Plaintiffs" for purposes of these allegations) are residents and citizens of Shickshinny, Pennsylvania. On or about August 26, 2025, Plaintiffs purchased a used 2023 Chevrolet Silverado 1500 from MotorWorld MileOne Autogroup in Wilkes Barre, Pennsylvania. Plaintiffs purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf

of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At sale, Plaintiffs' vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiffs were aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiffs purchased their Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiffs' decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point did GM disclose the Defect to Plaintiffs or that, in an effort to remedy the Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

176.   Within the first month after purchasing the Class Vehicle, the oil level dropped abnormally quickly and the engine made frequent clunking and rapping sounds. On December 30, 2025, Plaintiffs' Class Vehicle experienced catastrophic engine failure. Specifically, Plaintiffs' Class Vehicle suddenly lost power while they were driving home from a doctor's appointment, leaving Plaintiffs stranded in a high-traffic area at the foot of a large hill in freezing temperatures and icy road conditions. Due to the weather conditions, it took three hours for a tow truck to arrive. The towing service was unable to shift the vehicle to neutral, resulting in damage to the tires. Plaintiffs eventually had the Class Vehicle towed to a GM

dealership, Bonner Chevrolet GMC where the engine was eventually replaced on January 29, 2026. Plaintiffs specifically requested that the dealership notify them when the replacement engine became available so that they could inspect it prior to installation, but the dealership did not allow them to do so.

177.   GM never notified Plaintiffs that their vehicle was subject to NHTSA Recall No. 25V-274, nor did GM perform the purported remedy before Plaintiffs purchased the Class Vehicle on August 26, 2025. In October 2025, two months before the engine failed, Plaintiffs learned that their vehicle was subject to Recall No. 25V-274 through their independent research. Plaintiffs promptly brought the vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiffs for their economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiffs incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiffs also incurred towing costs, rental car costs, more expensive oil change costs, other out of pocket costs, and the expenditure of their personal time in arranging, transporting, and waiting for service.

178.   Plaintiffs eventually traded in the Class Vehicle in February 2026 because they were concerned about driving it due to the dangers resulting from the L87 Engine Defect, especially because the dealership failed to warn them about the open recall when they purchased the vehicle and then did not allow them to see the replacement engine prior to installation. Plaintiffs would not have purchased the vehicle, or would have paid less for it, had Plaintiffs known about the L87 Engine Defect or the fuel economy consequences of the recall.

## V.   Tennessee Plaintiff

### 1.   *Jennifer Hunter*

179.   Plaintiff and proposed class representative Jennifer Hunter ("Plaintiff" for purposes of these allegations) is a resident and Smyrna, Tennessee. On or about June 12, 2021, Plaintiff purchased a certified pre-owned 2020 GMC Sierra 1500 from Serra Chevrolet Buick GMC in Madison, Tennessee. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons

Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

180.   In April 2024, Plaintiff's Class Vehicle experienced catastrophic engine failure while she was driving on Interstate 24 toward Murfreesboro, Tennessee with her young children. Specifically, the vehicle suddenly lost power and emitted black smoke. Plaintiff managed to pull off to the side of the highway. Plaintiff had to hail assistance to drive the Class Vehicle towed to a close by GM dealership where the technician noted loss of compression and "cam lobe damage," and ultimately replaced the engine's camshaft. In January 2025, less than a year later, the engine failed a second time. Plaintiff was again driving on Interstate 24 with her young children when the vehicle suddenly lost power. Plaintiff barely managed to drive the vehicle back to the GM dealership. The technician noted flakes of bearing in the engine filter and eventually replaced the engine approximately two and a half months later. The dealership billed Plaintiff approximately $20,000 for each visit, which GM agreed to reduce only after Plaintiff made countless calls and written requests begging for assistance. Plaintiff paid approximately $3,100 in rental car fees

while the Class Vehicle awaited an engine replacement.

181.   Plaintiff's Class Vehicle continues to burn oil excessively. Plaintiff does not trust the Class Vehicle to transport herself and her children safely. However, Plaintiff cannot afford to purchase another vehicle.

182.   GM has yet to recall Plaintiff's vehicle or otherwise remedy the L87 Engine Defect, even though the vehicle is included in NHTSA's ongoing safety investigation.   Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff also incurred towing costs and rental car costs.

183.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## W.   Texas Plaintiff

### 1.   *Frederick Cuffie*

184.   Plaintiff and proposed class representative Frederick Cuffie ("Plaintiff" for purposes of these allegations) is a resident and citizen of El Paso, Texas. On or about September 21, 2024, Plaintiff purchased a certified pre-owned 2024 GMC Sierra 1500 from Cavender Buick GMC West in San Antonio, Texas. Plaintiff

purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and for work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

185.   In or around September 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. On November 12, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred

economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect, Plaintiff has also incurred the expenditure of his personal time in arranging, transporting, and waiting for service.

186.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## X.   Utah Plaintiff

### 1.   *Benjamin McMurray*

187.   Plaintiff and proposed class representative Benjamin McMurray ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Hurricane, Utah. On or about May 30, 2023, Plaintiff purchased a used 2021 GMC Sierra 1500 from Newby Buick GMC in St. George, Utah. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used primarily for transportation needs such as household errands and to commute to and from work. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability were the primary reasons Plaintiff purchased the Class Vehicle. The Class Vehicles' fuel

economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

188.   On May 31, 2025, Plaintiff's Class Vehicle experienced catastrophic engine failure while he was transporting his wife and daughter and towing his horse trailer with two horses to his daughter's rodeo. Plaintiff was going uphill on the highway when the motor made a strange noise and would not downshift. Plaintiff stayed on the throttle until the motor cut out, and there was no safe place to pull over on the hill. Plaintiff's family members had to pick up his wife and daughter and the horses while Plaintiff stayed with the truck awaiting a tow. The event was traumatic for Plaintiff and his family, so much so that his wife and daughter are fearful of driving in the vehicle. Plaintiff reported the engine failure to NHTSA.

189.   Following the engine failure, Plaintiff had the Class Vehicle towed to Newby Buick GMC in St. George, Utah, and the dealer said it had a seized engine that required replacement. GM took four to six weeks to determine whether it would replace the engine under warranty, and Plaintiff's vehicle was not ready for pickup until around September 17, 2025. Even though the engine replacement was covered under warranty pursuant to the recall, he was charged roughly $700 for new spark

plugs and wires, despite having just paid to replace those back in March 2024 during his 100,000-mile service. After the engine replacement, Plaintiff had to bring his vehicle back into the dealer twice when he received a low oil warning message while driving. The first time, the dealer replaced what it suspected was a damaged connector, and the second time it replaced the sensor.

190.    On or around May 8 or 9, 2025, Plaintiff learned about the NHTSA Recall No. 25V-274 online and called his GM dealer to discuss it, but the dealer said no remedy was available for his model year at that time. This was less than a month before his Class Vehicle engine failure. Plaintiff finally received the recall letter from GM in middle to late June while his vehicle was at the dealer awaiting an engine replacement. GM eventually confirmed the engine replacement was because of the Defect and completed under the recall. Because Plaintiff's vehicle received a new engine, it did not receive the 0W-40 oil change under the recall. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and diminished vehicle value. Because of the Defect, Plaintiff's use of the vehicle and its trailer towing function has also been impacted.

191.    Plaintiff's Class Vehicle engine failure was a terrifying event that could have killed or seriously injured him, his family, and his horses. He regularly services the vehicle, but he was and continues to be concerned about driving the Class Vehicle due to the dangers and unreliability posed by the Defect, even after the

engine is replaced. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the Defect.

## Y. Virginia Plaintiff

### 1. *Jacob Chapman*

192. Plaintiff and proposed class representative Jacob Chapman ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Petersburg, Virginia. On or about November 7, 2020, Plaintiff purchased a new 2020 Chevrolet Silverado 1500 from CMA's Colonial Chevrolet in Chester, Virginia. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used primarily for transportation needs such as household errands and to commute to and from work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Safety and dependability, along with the motor size for towing purposes, were the primary reasons Plaintiff purchased the Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87

Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

193.   In or around January 2024, Plaintiff's Class Vehicle experienced catastrophic engine failure. The GM dealer Strosnider Chevrolet in Hopewell, Virginia replaced the engine with a remanufactured engine, and while the repair was covered under warranty, Plaintiff had to pay $5,400 for the labor. The repair took about a month. Not long after the engine replacement, the Class Vehicle's power steering failed, requiring another month-long repair. Plaintiff has not recouped any costs from the engine failure.

194.   GM has yet to recall Plaintiff's vehicle or otherwise remedy the L87 Engine Defect, even though the vehicle is included in NHTSA's ongoing safety investigation. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase and repair-related costs.

195.   In or around May 2024, Plaintiff sold the Class Vehicle. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect.

## Z.   Washington Plaintiffs

### 1. *Justin Johnson*

196.   Plaintiff and proposed class representative Justin Johnson ("Plaintiff for purposes of this paragraph) is a resident and citizen of Spokane, Washington. On

or about February 18, 2024, Plaintiff purchased a used 2023 Chevy Tahoe from Corwin Ford in Spokane, Washington. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands and to commute to work. At the point of sale, Plaintiff's vehicle was still covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety of its vehicles. These representations were communicated to Plaintiff through television advertisements, print and magazine advertisements, dealership materials, and online publications. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety, durability, and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

197. On June 2, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274, but no remedy or fix was available. On September 25,

2025, Plaintiff received notice directing him to bring the vehicle in for a recall inspection under NHTSA Recall No. 25V-274. On October 17, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value. Because of the L87 Engine Defect and the lack of clear and consistent guidance provided to GM-authorized dealers, Plaintiff incurred the cost of an additional oil change, as well as the expenditure of his personal time in arranging, transporting, and waiting for service. These costs and lost time would not have been incurred but for the Defect and the uncertainty surrounding the appropriate maintenance and interim measures.

198.   Since learning of the L87 Engine Defect and the associated risk of engine failure, Plaintiff has ongoing concerns and uncertainty regarding the vehicle's performance and long-term reliability. Any abnormal sound, intermittent roughness, or routine variation in engine operation now causes Plaintiff worry that such symptoms may be early indicators of a more serious failure. The fact that the

vehicle contains a defect capable of causing sudden engine failure has materially altered Plaintiff's use and enjoyment of the vehicle. Plaintiff remains uncertain whether continued operation could result in unexpected breakdown, loss of power, or unsafe driving conditions. This uncertainty has created persistent apprehension each time the vehicle is driven, particularly during longer trips or when transporting family members. Plaintiff also experienced inconvenience due to unclear and evolving direction regarding the defect and recall process. Initial communications did not clearly explain the immediate level of risk, whether continued driving was advisable, or whether more significant repairs might ultimately be required. Plaintiff was required to independently monitor recall developments and coordinate with a dealership for inspection and service scheduling, resulting in disruption and loss of time.

199.   Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the L87 Engine Defect. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

### 1. *Jason Rittereiser*

200.   Plaintiff and proposed class representative Jason Rittereiser ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Seattle, Washington. On or about August 31, 2022, Plaintiff purchased a new 2022 GMC Sierra 1500 from

Brotherton GMC in Renton, Washington. Plaintiff purchased the Class Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it is used for transportation needs such as household errands, travel, and to commute to work. At the point of sale, Plaintiff's vehicle was covered by GM's 3-year/36,000-mile bumper-to-bumper warranty and 5-year/60,000-mile powertrain warranty. Prior to purchase, Plaintiff was aware of GM's uniform and pervasive marketing messages of dependability and safety. Prior to purchasing the Class Vehicle, Plaintiff thoroughly reviewed GM's website and marketing materials and placed an order for this specific vehicle. Safety and dependability were the primary reasons Plaintiff purchased his Class Vehicle. The Class Vehicles' fuel economy was also a material factor in Plaintiff's decision to purchase the vehicle. However, despite touting the safety and dependability of the Class Vehicle, at no point before purchase did GM disclose the L87 Engine Defect to Plaintiff or that, in an effort to remedy the L87 Engine Defect, GM would require owners to use a higher-viscosity motor oil that materially decreases the vehicle's fuel economy.

201. On June 23, 2025, GM notified Plaintiff that his vehicle was subject to NHTSA Recall No. 25V-274. When Plaintiff was notified of the recall, he called the dealership and was informed that while there was an active recall for the engine, there was not a "fix" or explanation to dealerships about how to remedy the defect.

In response, Plaintiff greatly reduced driving the Class Vehicle.

202.   On October 23, 2025, Plaintiff brought his vehicle to a GM-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the L87 Engine Defect under Recall No. 25V-274, which included a change to 0W-40 oil. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the L87 Engine Defect. Plaintiff incurred economic damages because of the engine defect, including overpayment for the vehicle at purchase, increased fuel costs, decreased fuel economy, and diminished vehicle value.

203.   Plaintiff eventually traded in the Class Vehicle around November 2025 because he was concerned about driving it due to the dangers resulting from the L87 Engine Defect especially because the dealership told him it took "6 times" to get the vehicle to pass inspection after the recall. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the L87 Engine Defect or the fuel economy consequences of the recall.

## AA.   Defendant General Motors LLC

204.   General Motors LLC ("GM") is a Delaware limited liability company, with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings

LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation, with its principal place of business in the State of Michigan, and is a citizen of Delaware and Michigan.

205.   At all relevant times to this action, GM designed, manufactured, distributed, sold, leased, serviced and warranted the Chevrolet, GMC, and Cadillac branded Class Vehicles throughout the United States.[5]

## FACTUAL ALLEGATIONS

**A.   GM Manufactures, Sells, and Warrants the Class Vehicles.**

206.   GM manufactures and sells vehicles under several different brand names, including Chevrolet, Buick, GMC, and Cadillac.

207.   GM provided express warranties for the Class Vehicles for "repairs, including parts and labor, to correct any defect in materials or workmanship." For Chevrolet and GMC vehicles, the express warranty terms include three years or 36,000 miles of "bumper to bumper" coverage, whichever comes first, and a Powertrain warranty that covers repairs of the engine and related components due to defects in materials and workmanship for five years or 60,000 miles, whichever

---

[5] Exhibit D, *Our Brands*, General Motors, https://www.gm.com/gm-brands (last visited Feb. 23, 2026).

comes first. The warranty terms for Cadillac-branded Class Vehicles run longer, at four years or 50,000 miles for bumper-to-bumper coverage, and six years or 70,000 miles for the Powertrain coverage.[6]

208.   GM's warranties also expressly provide that, upon sale of the vehicle to a new owner, "warranties that are still active will transfer to the new owner."

209.   The express warranty terms became part of the basis of the bargain when Plaintiffs and the Class Members purchased or leased their Class Vehicles.

210.   With respect to these express warranties, Plaintiffs and each Class Member had sufficient direct dealings with GM to establish privity of contract between GM and Plaintiff or the respective Class Member.

211.   Nonetheless, privity is not required here because Plaintiffs and each Class Member are intended third-party beneficiaries of contracts between GM and its dealers, and of its implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

---

[6] Exhibit E, *GMC Vehicle Warranty and Protection Plans*, https://www.gmc.com/owners/warranty-protection-plans (last visited Feb. 23, 2026); Exhibit F, *A Warranty Worthy of Your Cadillac Vehicle*, https://www.cadillac.com/ownership/warranty-repairs (last visited Feb. 23, 2026); Exhibit G, *Warranty*, https://www.chevrolet.com/owners/warranty (last visited Feb. 23, 2026).

**B.     Class Vehicles are Equipped with the L87 Engine, Which GM Promoted as Safe, Reliable, and High-Performing.**

212.    The L87 Engine is a 6.2-liter, eight-cylinder engine used in certain GM trucks, vans, and sports utility vehicles. The L87 Engine is part of "EcoTec3," GM's Generation V small block family of gas engines, which replaced the Vortec line of engines.

213.    The L87 Engine is used across GM's full-size trucks and SUVs, including the Chevrolet Silverado 1500, Suburban, and Tahoe, the GMC Sierra 1500, Yukon, Yukon XL, and the Cadillac Escalade and Escalade ESV. All Class Vehicles share this same L87 Engine, including its designs, parts, and manufacturing process. The Defect described herein is thus common to all Class Vehicles.

214.    The L87 Engine is depicted in the following image:



215.    The first generation of the EcoTec3 engine family debuted over a

decade ago, in the 2014 model-year Chevrolet Silverado 1500 and GMC Sierra 1500.

216.   The new Ecotec3 engine family was heralded as a complete overhaul of its predecessor with "three state-of-the-art technologies—direct injection, cylinder deactivation and continuously variable valve timing—to make the most of power, torque and efficiency across a broad range of operating conditions."

217.   The L87 Engine is part of the second generation of the EcoTec3 family, and it directly succeeds the 6.2-liter V8 L86 engine. The second generation EcoTec3 engines were designed to further optimize fuel efficiency through "industry-first cylinder deactivation technology."

218.   Jordan Lee, the chief engineer and program manager, endorsed the new EcoTec3 engine family at length, stating, "[t]his is technology no other truck maker can match, and we offer it in every one of our EcoTec3 engines, for every one of our customers," and, "[w]e believe these are the most technologically advanced engines ever offered in light-duty pickups, and they are 100 percent truck – specifically designed for the way customers use trucks in the real world."

219.   GM first introduced the L87 Engine in 2018, among the engine options in the 2019 Chevrolet Silverado 1500 (fourth generation) and 2019 GM Sierra 1500 (fourth generation).

220.   The Class Vehicles are among GM's best-selling and most profitable models. By the end of 2024, GM had sold or leased nearly one million Class Vehicles

with the L87 Engine in the United States alone.[7]

221.   GM heavily promoted the L87-powered vehicles as "rugged," "dependable," "reliable," fuel efficient, and safe, positioning them as premium, durable options for daily drivers, commercial users, and adventure-seekers alike.[8]

222.   GM also touted the Class Vehicles' fuel economy and safety in its representations to consumers.[9]

223.   Through national advertising and dealership promotions, GM emphasized the L87 Engine's capability and longevity—suggesting it was an evolution of proven GM small-block engine technology enhancing fuel efficiency.[10]

---

[7] Exhibit H, *GM recalls nearly 600,000 trucks and SUVs over risk of engine failure*, CBS NEWS (May 22, 2025) GM recalls nearly 600,000 trucks and SUVs over risk of engine failure - CBS News.

[8] Exhibit I, *2022 Chevrolet Silverado 1500 LTD: Rugged, Reliable, and Feature-Packed Pickup*, KUNES (Dec. 24, 2024), https://web.archive.org/web/20251211185140/https://kunesgm.com/blog/2022-chevrolet-silverado-1500-ltd-rugged-reliable-and-feature-packed-pickup. Exhibit J, 2023 GMC Yukon Marketing Brochure, https://web.archive.org/web/20240601075859/https://www.gmc.com/content/dam/gmc/na/us/english/index/about/download-brochures/2023-models/02-pdf/updated/GMTY23CT000_MY23_GMC_YUKON_DESKTOP_071123_INTERACTIVE.pdf (last visited Feb. 23, 2026).

[9] Exhibit K, *Suburban*, CHEVROLET.COM, https://www.chevrolet.com/suvs/previous-year/suburban (last visited February 23, 2026); Exhibit L, *Silverado*, CHEVROLET.COM, https://www.chevrolet.com/trucks/previous-year/silverado/1500 (last visited February 23, 2026).

[10] Exhibit M, Strong Heritage Meets Efficiency, 6.2L V-8 L87, https://poweredsolutions.gm.com/products/engines/l87-engine (last visited Feb. 23, 2026).

C.   **Background on Critical Engine Parts: Crankshaft, Connecting Rods, and Bearings.**

224.   The crankshaft, connecting rods, and bearings work together to provide essential engine functions.[11]

225.   The crankshaft and connecting rods are internal engine components located near the bottom of the engine. They are essential components of the engine's power conversion process, tasked with converting the explosive force of combustion into the rotational power needed to drive the vehicle. They are responsible for converting the reciprocating motion of the pistons (caused by combustion) into rotational motion that ultimately drives the wheels.

226.   Engine bearings reduce friction and allow the crankshaft to rotate smoothly while withstanding the mechanical forces produced by piston operation.

227.   Engine bearings must be able to withstand the extreme heat and pressures that build while an engine is running. Most engine bearings do not use any type of roller, instead they use a layer of oil between the faces of the two rotating surfaces.

228.   Connecting rods connect the crankshaft to the pistons. They take the

---

[11] Exhibit N, Richard McCuistian, *What Are Engine Bearings and Why Are They Important?*, CarParts.com (Jan. 23, 2025), https://www.carparts.com/blog/what-are-engine-bearings-and-why-are-they-important/?srsltid=AfmBOoqDCzIWTYYgnVbxD6qitgj-VWxpPGL6kye0yBkzjZ-B97kFEN71.

reciprocating motion of the pistons and transfer it to the crankshaft.

229.   The engine's crankshaft converts the force generated by combustion into rotary motion.

230.   A connecting rod bearing is a type of engine bearing found at the junction of the connecting rod or piston rod and the crankshaft. Connecting rod bearings provide a smooth surface to interface with the crankshaft journal, allowing for smooth articulation of the piston through the path of its stroke. Also called rod bearings or engine rod bearings, the rod bearings are typically split into two halves, one of which presses into the connecting rod and the other in the rod cap.

231.   Main bearings hold the crankshaft in place and prevent the forces created by the piston and transmitted to the crankshaft by the connecting rods from dislodging the crankshaft, instead forcing the crank to convert the reciprocating movement into the rotation.

232.   Bearings function under the principle of hydrodynamic lubrication, which is defined as a lubrication regime that occurs between sliding surfaces when a full film of oil supports and creates a working clearance. Direct metal-to-metal contact between rotating parts should not happen because of the thin protective oil film between two surfaces. These form a hydrodynamic wedge capable of supporting large loads.

233.   These   parts   endure   extreme   conditions   during   normal   vehicle

operation, including high combustion pressures, intense heat, and rapid rotational forces. Because of the critical role they play, and the severity of the stresses involved, the design, material composition, and manufacturing quality of the crankshaft and connecting rods must meet the highest engineering standards to ensure safe and reliable engine performance.

234.   Even minor deficiencies in the crankshaft or connecting rods—whether due to material weaknesses, design flaws, improper forging, surface defects, or manufacturing variances—can critically undermine the integrity of the engine. Under operating conditions, these deficiencies can cause the components to crack, warp, or fracture without warning.

235.   Damaged or faulty connecting rod bearings can result in rod knock, a knocking or tapping noise from the engine that indicates a change in the clearance between the connecting rod and crankshaft.

236.   When a bearing loses lubrication and overheats, it can stick to the crankshaft (a "spun bearing") and break.

237.   Spun bearings and broken bearings can prevent the crankshaft from rotating smoothly, leading to engine seizure.

238.   Spun bearings and broken bearings can also lead to broken connecting rods.

239.   Both seized engines and broken connecting rods are commonly

reported occurrences in the L87 Engines.

**D.    The L87 Engines are Defective.**

240.   The Class Vehicles all have a defective design that causes insufficient lubrication between the bearings and the crankshaft.

241.   The defective design is evident from the April 2025 Recall Report, which states that "GM's investigation identified 28,102 field complaints or incidents in the US potentially related to failure of the L87 engine due to crankshaft, connecting rod, or engine bearing failure, of which 14,332 involved allegations of loss of propulsion."

242.   The defective design is also evident from the consistent reports of spun bearings found in failed L87 engines.

243.   Normally, there is a thin hydrodynamic film of oil between the bearing surface and crankshaft journal.

244.   When the protective oil film is lost, the result is metal-to-metal contact between the bearing and journal surfaces, which causes scuffing, increased friction, and heat.

245.   The scuffing, friction, and heat cause the component materials to wear, leading to further diminishment of the protective oil film; and, thus, further scuffing, friction, and heat.

246.   Eventually, if there is enough scuffing, friction and heat due to a lack

of lubrication, the bearing will melt, smear and stick to the crank journal, leading to a spun or seized bearing.

247.   Spun bearings can lead to broken connecting rods, another issue that has been repeatedly identified in failed L87 engines.

248.   According to the April 2025 Recall Report, the reported engine failures resulted from defects with respect to the dimensions and surface finish of the crankshaft, and bearing damage caused by sediment on the connecting rods and crankshaft oil galleries.

249.   All these issues, identified by GM in its Recall Report, lead to a loss of lubrication, metal-on-metal contact, scuffing, friction, and heat.

250.   Debris flowing through the engine will scuff the surfaces of the bearings and the crankshaft journal, leading to a loss of oil pressure, and thus, metal-on-metal contact, and scuffing, friction, and increased heat.

251.   The dimensions of the crankshaft affect the clearances between the bearings and the crankshaft journal. Clearances that are too tight lead to increased friction and abrasion by particles; while clearances that are too loose lead to a loss of oil pressure, and resultant metal-on-metal contact, increased friction, and abrasion by particulate.

252.   A rough surface, with gaps and grooves, will lead to oil flowing outside its intended path, causing a loss of lubricity, and resultant metal-on-metal contact,

increased friction, and abrasion by particulate.

253.    The bearings and related components installed in the L87 Engine are insufficiently robust to withstand the unintended heat and friction generated in the L87 Engine environment.

254.    When an engine is not properly constructed, it may maintain sufficient oil pressure during certain driving conditions, like driving under low loads, but suffer low oil pressure during other, normal, driving conditions, such as idling and driving under high loads.

255.    In addition, the novel Dynamic Fuel Management ("DFM") system installed in the L87 Engines deactivates cylinders based on operating conditions. Operating differences will result in differences between vehicles in how frequently cylinders are deactivated. Cylinder deactivation affects the loads placed on connecting rod bearings, which can cause instabilities in the rod bearing oil films.

256.    For these reasons, it is not surprising that all vehicles of the same design do not fail at the same mileage.

257.    As discussed below, GM has identified the Defect in 2021 to 2024 model year Class Vehicles with engines built between March 1, 2021 and May 31, 2024.

258.    GM has not identified any deviations in design or the manufacturing process with respect to the L87 engines built between March 1, 2021 and May 31,

2024, nor has GM identified any specific plants or manufacturing facilities as having unique, flawed manufacturing processes.

259.   This indicates that the Defect pertains to the design, including the materials used, and not inconsistencies in machining.

260.   The commonality of the Defect across 2021 to 2024 model year Class Vehicles with engines built between March 1, 2021 and May 31, 2024, is further evidenced by the fact that GM has instructed that *all* vehicles within this range, apart from those that receive replacement engines, must switch to higher viscosity (0W-40) oil.

261.   GM has not identified any deviations in design or the manufacturing process with respect to the L87 engines between the Class Vehicles manufactured before and after March 1, 2021.

262.   As discussed below, 2019 and 2020 model year Class Vehicles have experienced identical engine failures as the later model year Class Vehicles, and they are accordingly included in NHTSA's investigations into the same defect.

263.   Thus, all Class Vehicles suffer from a uniformly flawed design that results in component wear and loss of lubrication.

264.   The Defect causes "a bearing failure that may result in either engine

seizure or breaching of the engine block by the connecting rod."[12]

265.    Sudden loss of motive power and propulsion during vehicle operation, as is the case with the Defect, significantly increases the risk of crashes and injuries. This is particularly true when the vehicle is being driven at high speeds, in multilane streets, or in high traffic areas.

266.    Sudden engine failure can leave Class Vehicles and their occupants stranded in hazardous traffic conditions, dangerous weather conditions, and remote locations.

267.    Plaintiffs and Class Members therefore purchased or leased vehicles that are unsafe to drive and subject them to serious risk of injury or death.

**E.    Consumers' Experiences Reveal an Extraordinarily Dangerous Uniform Defect.**

268.    Voluminous consumer complaints to NHTSA, as well as other popular consumer forums demonstrate the breadth and severity of sudden engine failure among vehicles equipped with the L87 Engine.

***Consumer Complaints to NHTSA.***

269.    On information and belief, GM regularly monitors consumer complaints to NHTSA regarding its vehicles.

270.    GM tracks trends in NHTSA consumer complaints related to potential

---

[12] Exhibit O, ODI Opening Resume, No. PE25001, NHTSA (Jan. 16, 2025), https://static.nhtsa.gov/odi/inv/2025/INOA-PE25001-10002.pdf.

defects and attendant safety risks.

271.   Countless complaints to NHTSA reported experiences of engine failure that placed consumers and others at alarming levels of risk, including catastrophic engine failure in an intersection with a child in the car,[13] engine failure while driving uphill causing the vehicle to roll backwards,[14] and a vehicle that experienced catastrophic engine failure *three* times at only 23,000 miles.[15]

272.   On December 3, 2021, a consumer in Pipestem, West Virginia experienced an engine failure event in their 2021 GMC Sierra 1500, equipped with the L87 Engine. The vehicle was purchased only seven months prior and had only 15,000 miles. While driving down the interstate, the engine made noises and without any warning had a "noticeable loss of power." They reported the event to GM, who referred them to the nearest GM dealer. The consumer reported, "I feel that the vehicle is unsafe to drive and could cause a [sic] accident if it locks up on the highway. . . .I feel that GM is ignoring a known issue and that this will result in accidents and possible loss of life."[16] GM would not issue a safety recall on the L87

---

[13] Exhibit P, Consumer Complaint No. 11639900, NHTSA (Jan. 31, 2025), https://www.nhtsa.gov/?nhtsaId=11639900. All NHTSA consumer complaints referenced herein are compiled and included in Exhibit P.

[14] *Id.*, Consumer Complaint No. 11300819, NHTSA (Jan. 21, 2020), https://www.nhtsa.gov/?nhtsaId=11300819.

[15] *Id.*, Consumer Complaint No. 11639142, NHTSA (Jan. 28, 2025), https://www.nhtsa.gov/?nhtsaId=11639142.

[16] *Id.*, Consumer Complaint No. 11442943, NHTSA (Dec. 6, 2021), https://www.nhtsa.gov/?nhtsaId=11442943.

Engine until three and a half years later.



273. On June 10, 2022, another consumer in Corpus Christi, Texas experienced an engine failure event in their 2021 GMC Yukon XL, with only 17,067 miles. The consumer was traveling on the highway when "the vehicle suddenly and without warning lost power." The consumer pulled onto the shoulder of the highway, where the vehicle failed to restart. The vehicle was towed to a dealer, where it presented P0016, the same problem code that would be included in the recall service

instructions three years later. The dealer inspected the vehicle and found "internal engine bearing material in oil indicating internal mechanical failure," and "bearings spun causing catastrophic engine failure," as well as a discolored crankshaft from "extreme heat."[17]



---

[17] *Id.*, Consumer Complaint No. 11477035, NHTSA (Aug. 1, 2022), https://www.nhtsa.gov/?nhtsaId=11477035.

274.   On January 22, 2023, a consumer in Medinah, Illinois experienced an engine failure event in their 2022 GMC Sierra 1500 with only 20,000 miles. The engine "seized up while exiting the highway." A GM dealer determined an engine replacement was required, and a service manager said that "it was a *common problem with the 6.2 engine*."[18]



275.   On October 17, 2023, a consumer in Carmel, Indiana experienced an engine failure in their 2022 Chevrolet Tahoe. The vehicle was traveling at 70 miles per hour on the interstate and carrying a family of 5, *including 2 children and an*

---

[18] *Id.*, Consumer Complaint No. 11637538, NHTSA (Jan. 21, 2025), https://www.nhtsa.gov/?nhtsaId=11637538.

*infant*. The consumer reported that the vehicle seized, followed by flashing on the dashboard. There was "no warning at all that the car had problems." They were forced to shelter "on the shoulder of a busy highway" unable to restart the vehicle, requiring police assistance to detour traffic. The dealer determined that the engine had seized and a full engine replacement was required. Although it was under warranty, replacement engines were backordered. The consumer reported it was a "widespread problem with these particular engines" and that there were several other Tahoes at the dealer with the same problem.[19]



---

[19] *Id.*, Consumer Complaint No. 11551432, NHTSA (Oct. 23, 2023), https://www.nhtsa.gov/?nhtsaId=11551432.

276.   On May 16, 2024, a consumer in Missouri experienced an engine failure in their 2022 Cadillac Escalade with only 25,000 miles. The consumer reported total engine failure while they were driving uphill and passing a semi-truck at 60 miles per hour. The failure was not accompanied by any warning lights. The consumer was forced to shelter on the shoulder "at the crest of a large hill, at the end of a merge lane. It was a very dangerous place to stop." The dealer confirmed that the entire engine required replacement and stated that it was "a common problem with that model engine (6.2 L)" and to expect a delay in finding a replacement engine.[20]



[20] *Id.*, Consumer Complaint No. 11596119, NHTSA (June 24, 2024), https://www.nhtsa.gov/?nhtsaId=11596119.

277.   On April 7, 2024, a consumer in St. Louis, Missouri experienced an engine failure in their 2023 GMC Sierra 1500 *while towing a two-horse trailer carrying a horse* in northern Arkansas—much like the engine failure that Utah Plaintiff Benjamin McMurray experienced. The consumer reported the "6.2 engine suddenly locked up causing us to pull on to the shoulder of the road – nearly causing an accident." The vehicle had only 23,000 miles. The GMC dealer replaced the engine under warranty with a "used rebuilt engine." According to the consumer, engine failure in the L87 Engines was no surprise to the dealer: "The dealer had handled *a number of 6.2 engine failures prior to this on*e."[21]



---

[21] *Id.*, Consumer Complaint No. 11636841, NHTSA (Jan. 18, 2025), https://www.nhtsa.gov/?nhtsaId=11636841.

278.   On September 5, 2024, a consumer in Chantilly, Virginia experienced an engine failure event in their 2023 GMC Sierra 1500 with only 22,000 miles. The consumer was traveling uphill at 65 miles per hour on the highway when the engine "seized," and almost caused an accident. The GM service department stated that there was a "design flaw with the 6.2-liter engine" and that there were *two other trucks* at the dealer for the *same seized engine*. The dealer planned to "install a new engine with the same design flaw with the hopes it does not happen again."[22]



November 7, 2024 NHTSA ID NUMBER: 11623928
**Components: ENGINE**

**NHTSA ID Number:** 11623928

**Incident Date** September 5, 2024

**Consumer Location** CHANTILLY, VA

**Vehicle Identification Number** 1GTUUGEL6PZ****

**Summary of Complaint**

| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

While driving my 2023 GMC Sierra 1500 Denali, 6.2-liter engine on the highway, the engine seized at 22,000 miles. GMC has been working on my truck since 9/7/24 and still no truck. The end state is, I was told by the Service Department that there is a design flaw with the 6.2-liter engine (something with the intakes valves being too large, resulting in the valve bending seizing the engine). I was also told, this dealer had two other trucks there now with the same seized engine. Their plan is to install a new engine with the same design flaw with the hopes it does not happen again. This was an extremely unsafe condition as I was travelling at 65 miles per hour on the highway when the engine seized, luckily, I was able to coast to a large shoulder after almost getting into an accident when it seized going uphill.

**1 Affected Product -**

**Vehicle**

| MAKE | MODEL | YEAR |
| --- | --- | --- |
| GMC | SIERRA 1500 | 2023 |

---

[22] *Id.*, Consumer Complaint No. 11623928, NHTSA (Nov. 7, 2024), https://www.nhtsa.gov/?nhtsaId=11623928.

279.   On October 30, 2024, a consumer in Somers, Connecticut experienced an engine failure event in their 2024 Chevrolet Suburban. The consumer was driving in the left lane of a two-lane highway at approximately 65-70 miles per hour when the engine failed without warning. The consumer coasted into the right lane downhill to reach the shoulder. The dealer "immediately" identified the issue as internal engine failure, which the consumer learned was a widespread problem with the 6.2 liter engines. They noted, "If this happens to the wrong person, someone is going to lose their life."[23]



---

280.   On January 3, 2025, a consumer in Buffalo, Minnesota experienced an engine failure event in their 2023 GMC Sierra. The consumer's engine suddenly failed while traveling at 50 miles per hour on a narrow two-lane road, *towing a 5,000-pound trailer*, *in sub-zero temperatures, and heavy winds*, along with their two dogs. There were no warning lights or indicators until "the final 2 seconds" before engine failure. The nearest police officer was an hour away, forcing the consumer to wait in dangerous weather and on a street with almost no shoulder, placing them at grave risk of injury or death. The consumer came to learn this was a "common issue" and that there was a backorder on replacement engines due to high demand. The consumer noted "[h]ad this happened to most other people, the narrative would have ended much differently."[24]

---

[24] *Id.*, Consumer Complaint No. 11635551, NHTSA (Jan. 12, 2025), https://www.nhtsa.gov/?nhtsaId=11635551.



281.   This is just a sample of complaints that consumers have submitted to NHTSA.

### *Consumer Complaints on Other Popular Forums*

282.   GM also monitors consumer complaints and discussions of potential defects on other forums, such as Carcomplaints.com.

283.   Beginning in 2009, GM assembled a task force to monitor social media for customer feedback, and by 2012, GM had established a dedicated Customer and Relationship Service ("CARS") group responsible for scanning social media

platforms and automotive enthusiast forums for consumer complaints.[25] As part of this program, GM employed a team of customer service representatives who monitored over one hundred independent automotive forums, as well as Facebook and Twitter, seven days a week. To facilitate these efforts, GM established a command center at its Detroit headquarters featuring a wall of monitors displaying real-time social media feeds, and the company's social media team responded to between 5,000 and 7,000 customer posts per month.

284.  Consumer complaints from these forums demonstrate the same pattern of engine failures as the NHTSA complaints: sudden engine failures with no warning lights or alarms, sometimes briefly preceded by a knocking or clicking noise, drivers and occupants are exposed to hazardous situations, and dealer determinations involving the engine crankshaft, bearings, and connecting rods.

285.  As early as December 5, 2021, an owner of a 2021 Chevrolet Silverado with only 6,000 miles reported recurring engine failure on Carcomplaints.com, and that their local dealer determined that "two rods had gone through the engine block and the engine needed to be replaced," and GM "was made aware of the failure."[26]

---

[25] Ex. Q, David Barkholz, *GM's social media team helps resolve complaints, keep customers*, AUTOMOTIVE NEWS (Oct. 21, 2013), https://www.autonews.com/article/20131021/OEM06/310219873/gm-s-social-media-team-helps-resolve-complaints-keep-customers/.

[26] Exhibit R, *2021 Chevrolet Silverado 1500 Owner Comments*, CarComplaints.com, No. 23 (Dec. 5, 2021),

286.   In July 2023, a consumer with the username cjlewis posted on Tahoeyukonforum.com, in a thread titled, "Spun Crankshaft Bearing Cause?" that their 2023 GMC Yukon experienced engine failure that May, and they were "[s]till waiting for a new engine." Their dealer stated there was a "nationwide backlog" for the 6.2-liter engines.[27]

287.   In a thread titled "L87 6.2L engine bearing failure" posted in September 2024 on Reddit.com, a user in Texas reported two engine failure experiences in their 2024 GMC Sierra, with only 4,4000 miles. The first failure occurred at a stop light, and the second while in motion, after which he was "luckily" able to coast to a shopping center parking lot. Their GMC dealer determined it was caused by "bearings seized up" and required a full engine replacement. One user responded, "I've had 2 failures now in my 2021 Sierra Denali 6.2L. The first failure came at 19,000 miles and the second 2 weeks ago with only 61k on that motor. Both engines seized while driving. Its [sic] a serious problem." Another user responded, "I've replaced 5, 6.2L L87 engines in the last year. All front main bearing failure."[28]

---

https://www.carcomplaints.com/Chevrolet/Silverado_1500/2021/engine/engine-5.shtml.

[27] Exhibit S, *Spun Crankshaft Bearing Cause?*, TahoeYukon Forum (July 14, 2023), https://www.tahoeyukonforum.com/threads/spun-crankshaft-bearing-cause.142697/.

[28] Exhibit T, *L87 6.2L engine bearing failure*, Reddit, https://www.reddit.com/r/gmcsierra/comments/-1fm1ypy/l87_62l_engine_bearing_failure/ (last visited Feb. 23, 2026).

288.   One 2023 Tahoe owner in Grass Lake, Michigan reported experiencing catastrophic engine failure on a freeway on November 24, 2024, and was unable to reach a safe location. They reported, "[i]t was determined that the #7 crankshaft bearing was the cause of failure and the complete engine was replaced as a result." Another reported total engine failure on the interstate in September 2024 where the "connecting rod bearing seized on crankshaft causing extensive metal contamination throughout engine."[29]

## F.   GM Had Pre-Sale Knowledge of the Defect.

289.   GM knew there was a defect causing sudden engine failure in the Class Vehicles for years before issuing the recall in April 2025.

290.   GM's pre-production testing of the Class Vehicles would have revealed the L87 Engine Defect before the vehicles were released for sale. GM's standard development process, including extensive design validation and durability testing such as Failure Modes and Effects Analysis and Design Validation Plan and Report, are performed to identify defects like the Defect here. This testing subjects vehicle components to rigorous testing under controlled conditions specifically to identify wear patterns and failure modes.[30]

---

[29] Exhibit U, *2023 Chevrolet Tahoe Owner Comments*, CarComplaints.com, Nos.13, 16 (Nov. 24, 2024), https://www.carcomplaints.com/Chevrolet/Tahoe/2023/engine/engine-2.shtml.

[30] Exhibit V, *A New Approach to FMEA in the Automotive Industry*, THE AUDITOR,

291.   The quick onset of field failures following the sale and lease of the Class Vehicles confirms the L87 Engine Defect was present and discoverable at the time of production.

292.   GM also has an obligation to monitor the NHTSA database to identify potential defects in its vehicles, pursuant to the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). GM tracks trends in NHTSA consumer complaints related to potential defects and attendant safety risks in its vehicles.

293.   As demonstrated herein, scores of complaints submitted to NHTSA reveal the prevalence of the Defect in vehicles equipped with the L87 Engine.

294.   GM also tracks trends in consumer complaints on other popular online forums related to potential defects and attendant safety risks in its vehicles.

295.   GM regularly receives warranty data submitted by GM authorized dealers and service departments. Through these warranty submissions, GM was made aware of the Defect and had knowledge of its potential danger.

296.   GM regularly receives and responds to customer calls concerning product defects and safety issues. Through these sources, GM was made aware of the Defect and had knowledge of its potential danger.

---

(Feb. 13, 2018) https://www.theauditoronline.com/a-new-approach-to-fmea-in-the-automotive-industry/; Exhibit W, *Faulty Connecting-Rod Bearing Causing Engine Failures in GM Four-Cylinders*, CAR AND DRIVER, (Dec. 9, 2013) https://www.caranddriver.com/news/a15368085/maliboom-faulty-connecting-rodbearing-causing-engine-failures-in-gm-four-cylinders/.

297.   Many consumer complaints detail GM's direct involvement with consumers following engine failure and its ad hoc efforts to appease impacted consumers, evidencing GM's awareness of the problem. For example, three NHTSA complaints reported that GM: offered to "help with cost" to replace a defective engine, offered a $5,000 voucher toward the consumer's next vehicle, and offered to trade-in the vehicle to "help" but at a significant monetary loss to the consumer.[31]

298.   Between April 29, 2021, and February 3, 2025, GM received 28,102 field complaints or incidents in the United States potentially related to L87 Engine failures, including twelve potentially related alleged crashes and twelve potentially related alleged injuries.

299.   GM also divulged in the April 2025 Recall Report that it had conducted *three* previous internal investigations into the L87 Engine defect, which it closed in February 2022, June 2023, and July 2024, "based on the available safety field information."

300.   Given that GM closed the first of these earlier investigations in February 2022, GM must have launched the investigation in 2021 or earlier, years before issuing the recall.

---

[31] Ex. P, Consumer Complaint No. 11636156, NHTSA (Jan. 15, 2025), https://www.nhtsa.gov/?nhtsaId=11636156; *id.*, Consumer Complaint No. 11603421, NHTSA (July 19, 2024), https://www.nhtsa.gov/?nhtsaId=11603421; *id.*, Consumer Complaint No. 11640523, NHTSA (Feb. 3, 2025), https://www.nhtsa.gov/?nhtsaId=11640523.

301.   GM offered no details of those three prior investigations or the findings to the consumer and driving public.

302.   On March 24, 2023, an article featured on Techlink.com, which GM owns and maintains, described an engine "condition" in "some 2019–2023 Silverado, Sierra; 2021–2023 Tahoe, Suburban, Yukon and Escalade models equipped with the 6.2L V8 engine (RPO L87)" involving main bearing failure in the crankshaft which may cause a "seized engine." The article notes that "if the main bearing debris is sent through the oil galleries and other components are in the lubrication circuit, which are very difficult to completely clean, it could lead to additional damage when installed on a new engine. When there is extensive damage, oil cooler, oil cooler line and oil tank replacement ensures all debris is completely removed and that any bearing failure debris is not transferred into the new service engine."[32] Notably, the article was not distributed to Class Vehicle drivers.

303.   The article further warns that in cases involving suspected bearing failure, drivers should, "check the engine oil and filter for excessive metal debris and bearing material." "If bearing material is identified, remove the engine oil pan and inspect the crankshaft rod and main bearings for any damage. Component replacement or, depending on the extent of damage, engine replacement may be

---

[32] Exhibit X, V8 Engine Crankshaft Bearing Conditions, TechLink (Mar. 24, 2023), https://gmtechlink.com/?p=17349.

necessary."

304.   Legal actions filed by other consumers against GM also demonstrate knowledge of the Defect by GM and its authorized dealers. For example, a consumer with a 2021 GMC Sierra complained in an online forum that he already had two blown engines after only 25,000 miles, with the most recent failure involving spun bearings. On February 20, 2023, after a third engine failure, the consumer described the "official diagnosis," which, upon information and belief, came from a GM dealer: "#3 & 4 rod bearing spun and stacked, crankshaft journals damaged. Full engine replacement."

305.   On February 28, 2023, the consumer indicated that they filed a legal action, and on May 2, 2023, he described a settlement: "GM finally settled out of court. They are buying the truck back and returning all payments along with collateral costs in addition to covering lawyer costs."

306.   In *Sullivan v. General Motors*, 2:24-cv-02309 (E.D. La.), filed on September 24, 2024, the plaintiff alleged that his 2023 GMC Sierra 1500 had the Defect. He alleged that GM's dealer made the following notations: "Customer states there is a knocking sound coming from the engine. Found thrust bearing and crank discolored and rod bearing in pieces in oil pan. Found [truck's] oil is contaminated

with metal."[33]

307.   GM had exclusive knowledge of the uniform Defect at the time of sale of the Class Vehicles and omitted the existence of the Defect from Plaintiffs and Class Members (and dealers). Instead, GM continued selling the Class Vehicles with a known dangerous defect for years before the NHTSA initiated an investigation and GM issued a recall in April 2025.

**G.   The Defect Is a Material Fact That GM Failed to Disclose.**

308.   The existence of the Defect is a material fact because a reasonable consumer would consider it important to know, when purchasing or leasing a vehicle, that the engine may seize up and fail while driving, such that the driver, passenger, and other individuals in nearby vehicles are at substantial risk of stranding and bodily harm.

309.   A reasonable consumer would likely change his or her decision to purchase or lease a Class Vehicle based on knowledge that the engine may seize up and fail while driving.

310.   This is particularly true, safety issues aside, when engine replacements are incredibly expensive repairs.

311.   GM failed to inform Plaintiffs and Class Members of the Defect prior

---

[33] Exhibit Y, *Sullivan v. General Motors*, 2:24-cv-02309, Compl., ¶ 9 (E.D. La. Sept. 24, 2024).

to their purchases or leases of Class Vehicles.

312.   For example, despite having a webpage specifically entitled "Vehicle Safety," as set forth above, GM failed to make any disclosure relating to the Defect on this webpage.

313.   Nor did GM notify its dealers that they should inform potential purchasers of the Class Vehicles about the Defect prior to selling a vehicle.

314.   GM should have disclosed to consumers, and directed its dealers to disclose to consumers, the existence of the Defect in Class Vehicles.

315.   GM also had a duty to disclose the Defect because it presented a safety hazard to consumers.

## H.   Following Investigation by NHTSA, GM Finally Issues a Recall in April 2025.

316.   In response to mounting consumer complaints, on January 16, 2025, the NHTSA Office of Defects Investigations (ODI) opened an investigation into the following models equipped with the L87 Engine: 2019–2024 Chevrolet Silverado 1500; 2021–2024 Chevrolet Tahoe; 2021–2024 Chevrolet Suburban; 2019–2024 GMC Sierra 1500; 2021–2024 GMC Yukon; 2021–2024 GMC Yukon XL; 2021–2024 Cadillac Escalade; and 2021–2024 Cadillac Escalade ESV.[34]

317.   ODI's preliminary evaluation report stated, "[t]he complainants report

---

[34] Ex. O, ODI Opening Resume No. PE25001.

a bearing failure that may result in either engine seizure or breaching of the engine block by the connecting rod. The complainants report that there is no detectability prior to the failure." As of that date, NHTSA had received 39 related consumer complaints.[35]

318.   It further stated: "Failure or malfunction of the engine results in loss of motive power of the vehicle, which may lead to an increased risk of a crash resulting in injury and/or property damage."[36]

319.   Less than a month after opening the investigation, ODI wrote to GM stating that NHTSA had then received "346 reports to date of L87 engine failure" in Class Vehicles, and requesting information from GM about engine seizure in "all MY2019-2024 Chevrolet Silverado 1500, Suburban, Tahoe, GMC Sierra 1500, Yukon, Yukon XL, Cadillac Escalade and Escalade ESV" equipped with the L87 Engine.[37]

320.   On April 24, 2025, GM finally issued a safety recall related to the L87 Engines. The Recall Report states, in part:

> General Motors has decided that a defect which relates to motor vehicle safety may exist in certain 2021 – 2024 model year Cadillac Escalade and Escalade ESV, Chevrolet Silverado 1500, Suburban, and Tahoe, and GMC Sierra 1500, Yukon, and Yukon XL vehicles equipped with the 6.2L V8 gas engine (RPO L87) [the "Recall Vehicles"]. The

---

[35] *Id.*
[36] *Id.*
[37] Exhibit Z, Letter from NHTSA to GM (Feb. 12, 2025), https://static.nhtsa.gov/odi/inv/2025/INIM-PE25001-10010.pdf.

connecting rod and/or crankshaft engine components in these vehicles may have manufacturing defects that can lead to engine damage and engine failure.[38]

321.   According to the April 2025 Recall Report, 597,630 vehicles were potentially involved in the recall.

322.   The April 2025 recall does not cover model year 2019 and 2020 vehicles equipped with the L87 Engine.

323.   GM represented in the April 2025 Recall Report that its investigator identified a problem window through "field data analysis" and engine teardowns:

> GM's updated field data analysis identified a build period from March 1, 2021, to May 31, 2024, with an increased rate of potentially related engine failure claims. GM's investigator reviewed findings from teardowns of field engines and data from a study of new, unused crankshafts. Supplier manufacturing and quality issues were identified at intermittent periods within the suspect build period, including (1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish. These issues can cause or contribute to bearing damage that can lead to loss of propulsion and engine failure.

324.   GM further divulged in the April 2025 Recall Report that it had closed three prior investigations into the problem, and it had identified 28,102 field complaints or incidents in the United States related to engine failure due to crankshaft, connecting rod, or engine bearing failure.

325.   GM's investigation also identified twelve crashes and related injuries

---

[38] Ex. C, Recall Report.

potentially attributable to the Defect, as well as forty-two potentially related engine fires.

326.    On the same day as the recall, GM issued a stop-sale order. Specifically, the dealer bulletin states: "Effective immediately, stop the delivery of certain 2021-2024 model year Cadillac Escalade, Cadillac Escalade ESV, Chevrolet Silverado 1500, Chevrolet Suburban, Chevrolet Tahoe, GMC Sierra 1500, GMC Yukon, GMC Yukon XL vehicles in new or used vehicle inventory."[39]

327.    The stop-sale bulletin further states:

> Parts are not available at this time. Until further instructions are received, involved vehicles that are in dealers' possession (new or used vehicle inventory, GM Certified Used, courtesy transportation vehicles, dealer shuttle vehicles, etc.) must be held and not delivered to customers, dealer-traded, released to auction, used for demonstration purposes or any other dealer use.[40]

328.    On information and belief, GM later lifted the stop sale order for vehicles that completed the recall procedure.[41]

---

[39] Exhibit AA, GM Stop Sale Order (Apr. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCMN-25V274-8422.pdf
[40] *Id.*
[41] Exhibit BB, RCRIT-25V274-3717, Bulletin N252494000, Revision 06 ("All involved vehicles that are in dealer inventory must be held and not delivered to customers, dealer traded, or used for demonstration purposes until the repair contained in this bulletin has been performed on the vehicle."). All GM-issued recall Bulletins referenced herein are included in Ex. BB. Exhibit CC, Stop Sale Reminder (May 1, 2025) https://static.nhtsa.gov/odi/rcl/2025/RCMN-25V274-1418.pdf.

I. **The Recall Program Is Flawed and Inadequate.**

*Background on the Recall Inspection and Remedy Program*

329.   The April 2025 Recall Report stated: "Dealers will inspect, and as necessary, repair or replace the engine," and [v]ehicles that pass inspection will be provided a higher viscosity oil." The remedy program would "be executed under three bulletins: N25494000, N25494001, and N25494002."

330.   The April 2025 Recall Report also stated that GM would begin notifying owners about the recall on June 9, 2025. GM later pushed back the anticipated owner notification date by more than three months to September 30, 2025.[42]

331.   On April 25, 2025, GM issued the first service bulletin in the recall remedy program, Bulletin N252494001.[43] It explained that the N252494001 bulletin series only covers vehicles in dealer inventory.

332.   Bulletin N252494001 instructs dealers to inspect inventory vehicles for Diagnostic Trouble Code ("DTC") P0016. DTC P0016 is triggered when the vehicle's powertrain control module ("PCM") detects that the difference between the crankshaft rotational position and the camshaft rotational position is not at the value commanded by the PCM. Both of these shafts must work in complete harmony

---

[42] Ex. BB, RCLRPT-25V274-1938, Revised Safety Recall Report No. 25V-274 (May 8, 2025).
[43] *Id.*, RCRIT-25V274-6343, Bulletin N25249001, Revision 01.

for safe and efficient operation of the vehicle.

333.   If the code is not set, the bulletin instructs dealers to fill the engine with higher viscosity (0W-40) oil, "which will also require a new oil fill cap, an oil filter replacement, and an owner's manual insert." If the code is set—in other words, the vehicle fails inspection—the bulletin instructs dealers to quarantine the vehicle and await further instructions from GM.[44]

334.   Upon information and belief, inventory vehicles that "passed" inspection under Bulletin N252494001 and received higher viscosity oil were permitted to be sold to customers.

335.   GM reassigned vehicles that were "identified as requiring an engine replacement," to Bulletin N25494002 with the recall status of their VINs set to "Open."[45]

336.   On May 1, 2025, GM issued Bulletin N25494002, which instructs dealers to perform the following procedure:[46]

    a. First, ensure the vehicle has not already had an engine replacement.

    b. Second, check the engine manufacture date.

    c. If the engine was built on or after the 183rd day of 2024 (July 2, 2024), no further action is required.

    d. If the engine was built before the 183rd day of 2024 (July 2,

---

[44] *Id.*

[45] *Id.*, RCRIT-25V274-5347, Bulletin N252494002 Revision, 00.

[46] *Id.*

2024), an engine replacement is required. Replace the engine, transfer the original oil cap to the new engine, and fill with dexos 0W-20 oil.

337. Accordingly, vehicles inspected under Bulletin N25494002 and determined to have an engine manufactured after the specified date were denied an engine replacement under the recall even if they previously failed inspection under Bulletin N25494001.

338. GM made several revisions to Bulletin N25494002, including by adjusting the date from the 183rd day of 2024 (July 2, 2024) to the 153rd day of 2024 (June 2, 2024), further narrowing the scope of vehicles eligible for engine replacement under the recall.[47]

339. GM instructed dealers in mid-May 2025 that Bulletin N25494000 would serve as the primary bulletin under the recall going forward: "The phased launch is now complete. VINs will cease to move from N252494000 to N252494002 as of May 14, 2025. Dealers should refer to N252494000 for instructions going forward."[48] Despite this announcement, GM continued to issue revisions of Bulletin N25494002.[49]

---

[47] *Id.*, RCRIT-25V274-2909, Bulletin N25494002, Revision 01; RCSB-25V274-2184, Bulletin N25494002, Revision 03; RCRIT-25V274-8598, Bulletin N25494002, Revision 03; RCRIT-25V274-5622, Bulletin N25494002, Revision 04; RCRIT-25V274-8773, Bulletin N25494002, Revision 04.
[48] *Id.*, RCMN-25V274-4821, Dealer Communication (May 14, 2025).
[49] *See id.*, RCSB-25V274-2184, Bulletin N25494002, Revision 03; RCRIT-

340.   On May 14, 2025, GM issued Bulletin N25494000, which instructs dealers to perform the following procedure: [50]

> a. If the vehicle either has Diagnostic Trouble Code P0016, "or is not operable," replace the engine. Otherwise, continue.
>
> b. Using a "GM branded PicoScope tool," and GM's "Techline Connect" platform, install a knock sensor to the engine, "record at least 20 seconds worth of data," and upload the recording to GM's PicoScope NVH analysis software," which will return "Pass" or "Fail."
>
> c. If the engine passes the Picoscope test, fill the engine with higher viscosity (0W-40) oil, install a new engine oil cap, and replace the owner's manual.
>
> d. If the engine fails the Picoscope test, replace the engine, transfer the original oil cap to the new engine, and fill with dexos 0W-20 oil.

341.   The Picoscope test measures engine noise and vibrations.

342.   GM made several revisions to Bulletin N25494000. GM added a reference to a Tech Tube video uploaded to GM's Center of Learning,[51] revised the parts list,[52] and changed the original recall correction statement from "Dealers will inspect, and, as necessary, replace the engine" to, "Dealers will inspect the engine. If the vehicle fails the inspection procedure, the engine will be repaired or

---

25V274-8598, Bulletin N25494002, Revision 03; RCRIT-25V274-5622, Bulletin N25494002, Revision 04; RCRIT-25V274-8773, Bulletin N25494002, Revision 04.

[50] *Id.*, RCRIT-25V274-7518, Bulletin N25494000, Revision 01.

[51] *Id.*, RCRIT-25V274-6140, Bulletin N25494000, Revision 03.

[52] *Id.*, RCSB-25V274-9857, Bulletin N25494000, Revision 05.

replaced."[53]

343.   On June 26, 2025, GM again revised Bulletin N25494000 by adding a step to the inspection procedure: dealers must ensure an engine was built on or before the 153rd day of 2024 (June 2, 2024) before proceeding to the Picoscope test.[54] This requirement further narrows the scope of vehicles eligible for engine replacement under the recall.

344.   For vehicles that "pass" the recall inspection, GM issued Special Coverage N252494003, which provides additional coverage "if an engine failure occurs in the vehicle as a result of the condition described above for a period of 10 years or 150,000 miles (240,000 km), whichever occurs first, from the date the vehicle was originally placed in service, regardless of ownership."[55] In order to receive an engine replacement under N252494003, the vehicle must exhibit (1) a seized engine, (2) DTC P0016, or (3) a knocking noise as well as a failed Picoscope test.[56]

345.   As of October 8, 2025, GM reported that it had "remedied" 198,274 out of a total 597,571 vehicles in the recall population. The report defines "remedied" vehicles as vehicles in the recall population that were "either remedied, inspected

---

[53] *Id.*, RCRIT-25V274-7075, Bulletin N25494000, Revision 04.
[54] *Id.*, RCRIT-25V274-3717, Bulletin N25494000, Revision 06.
[55] Exhibit DD, Special Coverage Bulletin, NHTSA (May 23, 2025), https://static.nhtsa.gov/odi/tsbs/2025/MC-11018541-0001.pdf.
[56] *Id.*

without needing remedy, or returned to inventory."[57]

### The Recall Inspection and Remedy Program Is Confusing and Poorly Implemented

346.    As explained above, GM implemented the April 2025 recall through a "phased" program with three bulletins and frequent revisions.

347.    GM's handling of the Defect raises serious concerns about the company's commitment to vehicle safety and transparency.

348.    NHTSA and GM have stated that owners of Class Vehicles can find out whether their vehicles are subject to a recall (and which of the three bulletins applies) if they visit one of two websites and enter their VIN.[58] But that is not correct.

349.    Bulletin N25494002 states: "Remedy solutions for this recall are VIN-specific. VINs are assigned to one of three bulletins. Investigate Vehicle History (IVH) in the GM Global Warranty Management system MUST always be checked to confirm vehicle involvement and MUST but in OPEN status prior to beginning any required inspections and/or repairs. DO NOT use Service Information with VIN search, as it will not verify the VIN eligibility for field actions."[59]

350.    But Class Members cannot access "Service Information with VIN

---

[57] Exhibit EE, Recall Quarterly Report, NHTSA (Oct. 8, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLQRT-25V274-7314.pdf (Oct. 8, 2025).
[58] Exhibit FF, N252494002 Safety Recall FAQs, NHTSA, https://static.nhtsa.gov/odi/rcl/2025/RMISC-25V274-6877.pdf (last visited Feb. 23, 2026).
[59] Ex. BB, RCRIT-25V274-5622, Bulletin N25494002, Revision 04.

search," which means that they can't know which safety recall procedure applies to which Class Vehicles. Access to that information is restricted, requiring a username and password. Many Plaintiffs and Class Members have visited the web pages provided by NHTSA and GM, learning that their vehicles are subject to Safety Recall N25249000. But that may not be correct, because (as just explained) only people with access to "Service Information with VIN search" can learn which of the three specific recall bulletins applies.

### The Recall Does Not Cover All Vehicles with the Defect

351.   GM designated the vehicles that are subject to the recall by VIN number.

352.   However, many Class Vehicles that are purportedly covered by the recall based on the make, model, and year have VINs that do not show up as subject to the recall. Upon information and belief, such vehicles are model year 2021 and 2024 Chevrolet Silverado 1500, Chevrolet Tahoe, Chevrolet Suburban, GMC Sierra 1500, GMC Yukon and Yukon XL, Cadillac Escalade and Escalade ESV vehicles with engines manufactured either before or after GM's "suspect window," of March 1, 2021, through May 31, 2024.

353.   For example, Plaintiff Jon Michael Jones's 2021 Chevrolet Tahoe required a replacement engine in or around April 2024, and GM installed a new L87 Engine with the Defect. But when the VIN for Plaintiff Jones's vehicle is entered on

GM's website, it does not show his vehicle is subject to the recall. Upon information and belief, GM excluded the vehicle from the recall because the new engine was manufactured after May 31, 2024.

354.   A consumer reported one such instance to NHTSA on May 12, 2025, regarding their 2021 Chevrolet Silverado 1500. Upon information and belief, GM excluded their vehicle from the recall because the engine was manufactured before March 1, 2021:

> [T]his is 6.2 l187 engine that is being recalled ***but this vin is not on list***. already had lifters and rods replaced while back. coming home from trip truck made awful noise and I lost power on the interstate. thankfully was able to get out of traffic but waited 3.5 hours for tow. at dealer but cant tell me when they can look at it. 60,200 miles and they are saying well we will see what we can do but your powertrain warranty ended at 60k. [I] have had numerous problems and these are all known by gm especially 2021 6.2l.[60]

355.   A consumer in Magnolia, Texas reported engine failure in their 2024 Cadillac Escalade: "Complete engine failure without warning. Left my family and I stranded on the side of a very busy highway. Dealership confirmed engine failure." The VIN, however, is not covered by the recall. Upon information and belief, GM excluded the vehicle from the recall because it was manufactured after May 31, 2024.[61]

---

[60] Ex. P, Consumer Complaint No. 11660510, NHTSA (May 12, 2025), https://www.nhtsa.gov/?nhtsaId=11660510 (emphasis added).
[61] *Id.*, Consumer Complaint No. 11643215, NHTSA (Feb. 17, 2025)

356.   Similarly, although model year 2019-2020 GMC Sierra 1500s and Chevrolet Silverado 1500s are equipped with the L87 Engine and were included in ODI's January 2025 investigation, GM excluded them from the April 2025 recall.

357.   Despite the fact that GM is not offering any remedy for the L87 Engines in model year 2019 and 2020 Sierras and Silverados, consumer complaints show that L87 Engines in those vehicles have the same Defect as the model year 2021–2024 Class Vehicles and are failing in the same way.

358.   For example, Plaintiff Jennifer Hunter owns a 2020 GMC Sierra equipped with an L87 Engine. The vehicle has engine issues consistent with the Defect, but it is not covered by the recall. The vehicle has suffered two catastrophic engine failures in April 2024 and January 2025. Both times, GM dealers determined the vehicle was not drivable. Following the first failure, and consistent with the Defect, a GM dealer replaced the camshaft, oil, and oil filter. The technician noted:

> C/S: ESC warning light
>
> P030S MISFIRE ON CYLINDER 5 NO COMPRESSION. SQUEAKING FROM VALVE COVER AREA, **CAM LOBE DAMAGED**[.] LIFTER CAME APART[.] (TRACTION CONTROL WARNING ON DUE TO INVALID DATA FROM ENGINE CONTROL MODULE DUE TO MISFIRE CONDITION)
> **REPLACED CAMSHAFT**, LIFTERS, TRAYS, APPLCIABLE GASKETS AND BOLTS, BELTS, EVAC

---

https://www.nhtsa.gov/?nhtsaId=11643215; Exhibit GG, October 2025 ODI Investigation Report, https://static.nhtsa.gov/odi/inv/2025/INOV-EA25007-23192.pdf.

RECHARGED AC, REFILLED COOLANT, RESET FRONT TOE

359.    After the second failure, Plaintiff Hunter brought the vehicle back to the dealer. In addition to the engine failure, she complained of decreased engine power, the smell of burning oil, and abnormal fluctuations of the oil gauge. The dealer replaced the engine, and the GM technician noted "flakes of bearing in filter," a symptom consistent with the Defect:

> NO CURRENT DTCS, OIL PRESSURE IS BELOW 20 PSI AT IDLE, REMOVED OIL FILTER AND CUT OPEN[.] **FLAKES OF BEARING IN FILTER**[.]
> **ENGINE**, RADIATOR/ **OIL COOLER AND COOLER LINE REPLACEMENT DUE TO METAL CONTAMINATION**[.]
> REPLACED ENGINE LONGBLOCK WITH GM REMAN, REPLACED RADIATOR AND OIL COOLER LINES, CHANGED OIL AND FITLER, EVAC RECHARGED R1234YF, REFILLED COOLANT
> AC CLAIM CODE YN#LG1ZZ2ZOOOOFO*OOO
> **OLD ENGINE** SERIAL NUMBER K2192410JC4X3753 **NEW** 40216402

360.    A consumer from Michigan reported on January 17, 2025, about their 2019 Chevrolet Silverado 1500: "Engine failed and had to be replaced because of bearing failure."[62] The vehicle is not covered by the recall.

361.    A consumer from Alabama reported on December 13, 2024, about their

---

[62] Ex. P, Consumer Complaint, No. 11636561, NHITSA (January 17, 2025), https://www.nhtsa.gov/?nhtsaId=11636561.

2020 Chevrolet Silverado 1500: "Main bearing on crankshaft w[ent] out."[63] The vehicle is not covered by the recall.

362.   ODI has taken notice that GM improperly excluded many vehicles with the Defect from the April 2025 recall.[64]

363.   As of October 23, 2025, ODI received 1,157 allegations of engine bearing failure in the L87 Engine, and GM submitted 55,464 related reports, including 46 crashes/fires and 17 injuries.[65]

364.   ODI closed its original investigation that helped initiate GM's April 2025 recall but noted that it "continues to receive allegations of L87 engine failures which fall outside of the scope of [the] recall," and "NHTSA will continue to investigate complaints of engine failure outside the scope of recall."[66]

365.   On the same date, October 23, 2025, ODI opened a new investigation into GM vehicles equipped with the L87 Engine but excluded from the recall "to further evaluate the scope and severity of the potential problem and to fully assess the potential safety-related issues of vehicles built outside the recall scope."[67]

---

[63] *Id.*, No. 11630527 (December 13, 2024), https://www.nhtsa.gov/?nhtsaId=11630527.

[64] Exhibit II, ODI Closing Resume, No. PE25001, NHTSA (Oct. 23, 2025), https://static.nhtsa.gov/odi/inv/2025/INCLA-PE25001-23196.pdf

[65] *Id.*

[66] *Id.*

[67] Exhibit HH, ODI Opening Resume No. EA25007, NHTSA (Oct. 23, 2005), https://static.nhtsa.gov/odi/inv/2025/INOA-EA25007-23191.pdf.

366.   Of the 1,157 reports ODI received regarding engine failures in vehicles equipped with the L87 Engine during the January 2025 investigation, 173 fell outside of the scope of GM's April 2025 recall, including one crash and fire, and GM reported 5,336 incidents related to engine failure in excluded vehicles, including four crashes and fires.[68]

367.   The open October 2025 ODI investigation covers the following Class Vehicles equipped with the L87 Engine but excluded from the April 2025 Recall: model year 2019 and 2020 Chevrolet Silverado 1500 and GMC Sierra 1500 vehicles and—on information and belief—model year 2021 and 2024 Chevrolet Silverado 1500, Chevrolet Tahoe, Chevrolet Suburban, GMC Sierra 1500, GMC Yukon and Yukon XL, Cadillac Escalade and Escalade ESV vehicles with engines manufactured before or after GM's "suspect window," of March 1, 2021 through May 31, 2024.[69]

### Higher Viscosity Oil Does Not Cure the Defect

368.   Prior to the April 2025 recall, GM owners' manuals for the Class Vehicles instructed owners to use 0W-20 oil for the L87 Engine. The manuals

---

[68] *Id.*

[69] Exhibit JJ, ODI October 2025 open investigation, https://www.nhtsa.gov/?nhtsaId=EA25007 (last visited Feb. 23, 2026); Ex. GG, October 2025 ODI Investigation Report, https://static.nhtsa.gov/odi/inv/2025/INOV-EA25007-23192.pdf (listing NHTSA report numbers involved in ODI's October 2025 investigation); Ex. HH.

advised that using the proper viscosity grade was important "to ensure proper engine performance and long life" and to "protect your investment," and cautioned that failure to use the proper oil "can result in engine damage."[70]

369.   The recall program instructs dealers to replace the oil in vehicles that "pass" inspection with higher viscosity (0W-40) oil.

370.   For vehicles that "fail" inspection and receive an engine replacement, the recall program instructs dealers to use the standard 0W-20 oil in the new engines.

371.   According to GM, the thicker viscosity oil offers a further level of protection necessary to avoid future engine failures.

372.   GM has not explained why the switch to 0W-40 oil is necessary for Class Vehicles that purportedly do not require an engine replacement under the recall.

373.   Changing to high viscosity oil does not remedy the Defect.

374.   L87 Engines in Class Vehicles that received higher viscosity oil under the recall continue to fail at an alarming rate, demonstrating that the oil procedure does not resolve the Defect.

---

[70] *See, e.g.*, Exhibit KK, 2022 GMC Sierra Owner's Manual, https://www.carmans.net/2022-gmc-sierra/ (last visited Feb. 23, 2026), *contra* Exhibit LL, 2022 GMC Sierra Owner's Manual, https://contentdelivery.ext.gm.com/content/dam/cope/en_us/public/pdf_assets/active/owners_manuals_browse/22_GMC_Sierra_Sierra_Denali_1500_OM_en_US_U_84719636D_2025MAY15_4P.pdf (last visited Feb. 23, 2026).

375.   For example, Plaintiff Gregory Stewart brought his 2023 Chevrolet Tahoe to Sawyer Chevrolet in Saugerties, New York on September 4, 2025 to be inspected under the recall. The service records state, in part:

> FOLLOWED PROCESS WITH PICOSCOPE AND PASSED. The enigine [sic] oil in the 6.2 V8 (L87) engine for vehicle has been replaced with dexos R SAE OW-40, as indicated on the NEW engine oil cap. For future engine oil changes, use dexos R SAE OW-40[.]

However, the same technician referred to the thicker oil as just a "bandaid" for the underlying problem with the L87 Engine, not a fix. In December 2025, the L87 Engine in Plaintiff Stewart's vehicle began emitting a knocking noise.

376.   A GM technician commenting online also stated that the switch to higher viscosity oil does not remedy the Defect. For example, Reddit commentor RightWinger1776 stated: "Gm tech here. The recall oil change is a patch. All L87's come with a special coverage after the recall has been performed. I got one in today that had the recall done in Aug. motors locked up now."[71]

377.   The commenter went on to explain: "The way I heard it is that Gm knows about the issue. But do not have inventory to perform the repair on every vehicle. So they brought out this recall. Which is time consuming. And 99% of the time the engine passes. Then do the oil change with 0w-40. At that point GM has

---

[71] Exhibit MM, *READ THIS L87 Post Recall-Engine go bye bye*, Reddit, https://www.reddit.com/r/gmcsierra/comments/1p6uo6a/read_this_l87_post_recall engine_go_bye_bye/ (last visited Feb. 25, 2026).

time to repair the issue in house and build replacement engines."[72]

### The Recall Inspection and Remedy Program Fails to Identify Engines Requiring Replacement

378. The recall inspection program involves varying combinations of three tests: an engine manufacture date before either June 2 or July 2, 2024; the presence of Diagnostic Trouble Code P0016; and a "Pass" or "Fail" score from GM's Picoscope analysis software.

379. The engine manufacture date is a poor indicator of engines requiring replacement. GM apparently analyzed field data to identify a build period "with an increased rate of potentially related engine failure claims," but GM itself changed the relevant manufacture date in the inspection procedure midway through the recall program.

380. Diagnostic Trouble Code P0016 is also a poor indicator of engines requiring replacement, because the P0016 code only triggers at a point when the engine components have been significantly damaged from metal debris carried by the oil as a result of the Defect. Thus, Class Members sustain substantial damage to their engine components long before the P0016 code triggers, or even without the P0016 code triggering at all.

381. The Picoscope test, which uses software to determine whether the

---

[72] *Id.*

engine vibration level exceeds a specified tolerance level, is likewise inadequate.

382.   In response to an article by GM Authority regarding the April 2025 Recall, one user commented:

> How do we know the Pico scope works to identify the defects[?] GM technicians I have talked to don't know how it works. The Pico Scope report is sent to GM who then advises whether the engine passed. Quite a conflict of interest.[73]

383.   The unreliability of the Picoscope test is evidenced by Plaintiffs and Class Members whose engines failed after their vehicles "passed" inspection.

384.   Consumer Lindsay Spooner brought her 2023 Cadillac Escalade ESV to a GM dealer on October 3, 2025 to be inspected under the recall. The vehicle "passed" inspection and received higher viscosity oil under the recall procedure. In November 2025, the vehicle suffered catastrophic engine failure while Spooner was driving and was towed to the dealership, requiring a full engine replacement.

385.   Consumer Randal Landers brought his 2023 GMC Yukon to a GM dealer on May 2, 2025 to address a knocking noise coming from the engine. The dealer notified Mr. Landers of the recall but advised that no inspection or repair was required at the time. On September 6, 2025, Mr. Landers brought the vehicle back

---

[73] Exhibit NN, Jonathan Lopez, *L87 Recall: Will GM Dealers Replace Defective Engines, Or Repair Them?*, GM AUTHORITY (June 26, 2025), https://gmauthority.com/blog/2025/06/l87-recall-will-gm-dealers-replace-defective-engines-or-repair-them/#:~:text=The%20recall%20will%20address%20defects,GMC%20Yukon%20XL.

to the dealer to be inspected under the recall. The vehicle "passed" inspection and received higher viscosity oil under the recall procedure. However, the engine continues to exhibit problems upon start-up including a distinct knocking noise, conditions that GM explicitly cites in the 2025 Recall Report as signs of impending engine failure.[74]

386.   Plaintiffs Jonathan and Bonnie Stempien brought their 2023 Chevrolet Silverado 1500 to a GM dealer in October 2025 to be inspected under the recall. The vehicle "passed" inspection and received higher viscosity oil under the recall procedure. However, on December 30, 2025, the engine suffered catastrophic failure while Plaintiffs were driving home, requiring a full engine replacement.

387.   A consumer in Greensboro, North Carolina reported to NHTSA that the engine in their 2023 GMC Yukon experienced catastrophic failure three months after "passing" the recall inspection and receiving the thicker oil service:[75]

> My vehicle was apart of the GM L87 recall. I took it to the dealership and it passed the recall and received the remedy which was an oil change. Now about 3 months later, I was driving in the highway at approximately 70 mph when the vehicle lost power and shifted to neutral. I had to attempt to veer off the highway with no acceleration. Upon getting it to the side of the highway, it wouldn't do anything at all and had to be towed. The dealership has deemed it needs a new engine due to the failure the L87s are facing. We had no warning at all prior to the engine failure, and assumed that after passing a recall it had some degree of safety.

---

[74] *See* Ex. C, Recall Report.

[75] Exhibit P, Consumer Complaint No. 11707538, NHTSA (Dec. 29, 2025) https://www.nhtsa.gov/?nhtsaId=11707538.

388.   Another consumer in Richmond, Virginia reported to NHTSA that the

engine in their 2023 Cadillac Escalade seized after "passing" the recall inspection

and receiving the thicker oil service:[76]

> On December 19, 2023, when pulling out of a parking lot onto the
> street, pressing the gas vehicle jerked and would not accelerate. No
> lights on dash. Drove less than 1 minute and turned down a side street,
> to get out of traffic while going slow/no power. Stopped at stop sign,
> went thru intersection. Went to next intersection, at stop sign, vehicle
> shut off, in the middle of traffic. Still no dash lights. Vehicle would not
> start. Turned on hazard lights. While waiting for tow truck, tried
> cranking several times. After about 3 hours check engine light came on,
> with a red light to the right of check engine light. At the same time as
> the check engine, I received an alert via the Cadillac App 12V error,
> please crank vehicle. Each crank try, dashboard would light up/cycle
> but vehicle never started once it shut off. Tow truck driver thought it
> may be battery. Tried getting vehicle to crank. No joy. Towed to
> dealership which replaced Transmission in August 2025, 3395 miles
> ago to find my engine seized up after recall N252494000
> PERFORMED, Picoscope test and oil type changed. NOW THIS.
> Patience is really being tried. Another month without vehicle. Payments
> are continuing.

389.   Another consumer in San Antonio, Texas similarly reported to NHTSA

that the engine in their 2024 GMC Sierra 1500 failed while driving at highway

speeds just a month after "passing" the recall inspection and receiving the thicker oil

service:[77]

---

[76] *Id.*, No. 11707224, NHTSA (Dec. 27, 2025)
https://www.nhtsa.gov/?nhtsaId=11707224.
[77] *Id.*, No. 11704431, NHTSA (Dec. 11, 2025)
https://www.nhtsa.gov/?nhtsaId=11704431.

While driving my 2024 GMC Sierra Denali Ultimate on the highway, the engine suddenly failed without warning. The truck shut off completely while I was traveling at highway speed. I was fortunate to be able to safely maneuver to the shoulder, but the sudden loss of power created a serious risk of a collision with surrounding traffic. The failure appears to involve the engine or engine control system. The vehicle engine is currently available for inspection upon request. Prior to the incident, there were no warning lights, messages, or unusual symptoms. The shutdown occurred abruptly with no prior indication of a problem. This vehicle previously received the NS25249400 safety recall repair on August 12, 2025, and it reportedly passed all required checks at that time.

390.   Online comments also attest to the fact that engines continue to fail even after the recall inspection.

391.   As one commenter stated: The recall "[d]efinitely isn't enough. They are still failing and some aren't even making it to the next oil change after the recall was done."[78]

392.   A series of GM technicians have stated that the recall inspection is inadequate.

393.   One GM technician posted: "GM tech here in the midwest. Is it just me or is there a super low failure rate with the Pico inspections? Since the recall was issued in May, we have yet to order or replace an L87 because of a failed Pico test and we've inspected at least a few dozen. One of our guys has one with a locked up

---

[78] Exhibit OO, *GM L87 V8 Engine Lawsuit Claims Oil Change 'Fix' Isn't Enough*, Reddit, https://www.reddit.com/r/Silverado/comments/1p8dvd6/gm_l87_v8_engine_lawsuit_claims_oil_change_fix/ (last visited Feb. 25, 2026).

motor that somehow passed inspection last month."[79]

394.   In response, a commenter posted: "It's super low. We even had one with audible bottom end noise that passed. Had to open a TAC case and send in video of the engine noise and pics of the glitter oil to get the engine approved."[80]

395.   Another responded: "Super low. The shop I work at is predominantly Escalades (Cadillac in NYC area) and we've seen one failed Pico. But just last Thursday, we had to rescue one of our techs who got stranded after the engine locked up less than a half hour after it passed the Pico and he changed the oil."[81]

396.   Another responded: "Yeah, Pico pass rate is insanely forgiving, almost pointless."[82]

397.   Another commenter responded: "Had one with a knock, it's passed, locked up the next day on a road trip. Idk what that test does but it doesn't do anything imo."[83]

### Replacement Engines Provided Pursuant to the Recall Are also Defective

398.   The engine replacements provided by the recall also fail to remedy the Class Vehicles as the replacement engines are similarly defective. The ODI opened

---

[79] Exhibit PP, *Question for GM techs regarding L87 recall*, Reddit, https://www.reddit.com/r/Justrolledintotheshop/comments/1mtnv4i/question_for_gm_techs_regarding_l87_recall/ (last visited Feb. 25, 2026).
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

a third investigation into the L87 Engine on January 16, 2026, "to assess the adequacy of the remedy for [the April 2025 Recall]" in light of 36 complaints from owners of Class Vehicles that experienced engine failure *after* completing the recall procedure.[84]

399.   Indeed, as detailed herein, Plaintiffs Timothy and Leatrecia Whitaker Lee  experienced engine failure in their replacement engine.

400.   Thus, there are two open ODI investigations concerning the L87 Engine and recall: the October 2025 investigation posits that the recall is underinclusive; and the January 2026 investigation posits that the recall is ineffective.

## J.      Requiring Class Members to Switch to Higher Viscosity Motor Oil Reduces Fuel Economy and Increases Costs

401.   As stated above, in an April 2025 service bulletin, GM instructed its dealerships to inspect the Class Vehicles for diagnostic code P0016. Vehicles that present this code, which indicates misalignment between the crankshaft and camshaft, will then be "quarantine[d]" for future engine repair or replacement.[85] GM estimated, at the time, that approximately 3% of the vehicle population would

---

[84] Exhibit QQ, ODI Opening Resume No. RQ26001, NHTSA (Jan. 16, 2026), https://static.nhtsa.gov/odi/inv/2026/INOA-RQ26001-10001.pdf; Exhibit RR, *GM's Recalled 6.2L V8s Are Still Blowing Up Even After Being 'Fixed'*, AUTOGUIDE (Jan. 19, 2026), https://www.autoguide.com/auto/manufacturers/gm/gm-s-recalled-6-2l-v8s-are-still-blowing-up-even-after-being-fixed-44629315.
[85] Ex. BB, RCRIT-25274-8641, Bulletin N252494001, Revision 00 at 2.

require engine replacement or repair.[86]

402.   A different change follows for the 97% of Class Vehicles not designated to receive an engine replacement. These Class Vehicles will be outfitted with a new oil filter and cap. They will also receive a new Owner's Manual insert explaining that, moving forward, the Class Vehicles will require a higher-viscosity motor oil, dexos R SAE 0W-40. This replaces the lower-viscosity 0W-20 oil that was recommended when GM originally sold the Class Vehicles and used in the fuel economy certification process that undergirded GM's representations to consumers.

403.   According to GM, "the thicker viscosity oil offers an increased further level of protection" necessary to avoid future engine failures.[87] Put differently, GM concedes that, without the thicker oil, the engines could seize up and fail.

404.   This change will come at a material cost to consumers. The reason is that, due to its physical properties, thicker (higher viscosity) motor oil materially increases fuel consumption. As a GM study of the impact of motor oil viscosity on fuel economy explained, "[e]ngine oil affects vehicle [fuel economy] by influencing the engine friction."[88] In other words, because "[t]hinner oils flow more easily," they

---

[86] Ex. C, Recall Report.

[87] Exhibit HHH, N252494001 Safety Recall FAQs, Answer 4, https://static.nhtsa.gov/odi/rcl/2025/RMISC-25V274-4725.pdf (last visited Feb. 23, 2026)

[88] *Tseregounis et al.*, Engine Oil Effects on Fuel Economy in GM Vehicles— Separation of Viscosity and Friction Modifier, Society of Automotive Engineers (1998).

"reduc[e] resistance and allow[] the engine to operate more smoothly. This translates to less energy—or fuel—required to pump the oil, which means improved fuel economy."[89] Thicker oils have the opposite effect and "hinder fuel efficiency."[90]

405.   This is particularly true where, as here, GM's new guidance is for consumers to use oil (0W-40) that is a full two grades thicker than the original (0W-20).[91] As a point of reference, the viscosity of 0W-40 oil is nearly 50% greater than that of 0W-20 oil at common operating temperatures.[92]

406.   The precise degree of the fuel economy impact from using a higher viscosity motor oil depends on the specifics of the engine model, but the differential between the lower-viscosity (0W-20) and higher-viscosity (0W-40) oil in a given engine is generally understood to be at least 3-4%. This is confirmed by a number of well-respected industry sources and academic studies,[93] including GM's own

---

[89] Exhibit SS, *The Impact of Oil Viscosity on Engine Performance*, Driven Racing Oil (Feb. 14, 2025), https://www.drivenracingoil.com/blogs/news/the-impact-of-oil-viscosity-on-engine-performance.
[90] *Id.*
[91] Grade 0W-30 sits between the original and thicker oil for the Class Vehicles.
[92] *Compare* Exhibit TT, Mobil ESP X4 0W-40 Product Data Sheet (Kinematic Viscosity at 100°C is 13.9), https://www.mobil.com/en/lubricants/for-personal-vehicles/our-products/products/mobil-1-esp-x2-0w-20 (last visited Feb. 23, 2026) *with* Exhibit UU, Mobil ESP X2 0W-20 Product Data Sheet (Kinematic Viscosity at 100°C is 7.9), https://www.mobil.com/en/lubricants/for-personal-vehicles/our-products/products/mobil-1-esp-x4-0w-40 (last visited Feb. 23, 2026).
[93] *See, e.g.*, Exhibit VV, *The Overlooked Benefits of Low Viscosity Synthetic Engine Oils*, Shell, https://www.shell.us/business/fuels-and-lubricants/lubricants-for-business/sector-expertise/fleet/dealers/the-overlooked-benefits-of-low-

testing.[94]

407.    In 2019, GM and Oak Ridge National Laboratory ("ORNL") published

the results of a number of tests on the impacts of different types of motor oil on fuel

economy.[95] In one test, the GM-ORNL team compared a lower viscosity 0W-12 oil

and a higher viscosity 5W-30 oil on a GM 6.2L LT1 engine and found that the lower

viscosity oil resulted in a 4.4% fuel economy improvement. *Id*. at 33.[96]

---

viscosity-synthetic-engine-oils.html (last visited Feb. 23, 2026); Exhibit WW,
Fernando Rovai, et al., *Engine Lubricant Impact in Light-Vehicle Fuel Economy: A
Combined Numerical Simulation and Experimental Validation* (Mar. 22, 2025)
(3% difference in fuel economy between 5W-40 and 5W-20)
https://www.mdpi.com/2075-4442/13/4/137; Exhibit XX, Yimin Mo et al., *Study
on the Influence of Low-Viscosity Engine Oil on Engine Friction and Vehicle
Worldwide Harmonized Light Vehicles Test Cycle Fuel Economy* (Sept. 22, 2020)
(2.08% fuel economy difference between 5W-30, which is less viscous than 0W-
40, and 0W-20) https://saemobilus.sae.org/papers/study-influence-low-viscosity-
engine-oil-engine-friction-vehicle-worldwide-harmonized-light-vehicles-test-
cycle-fuel-economy-2020-01-5062; Exhibit YY, Alexander Tullo, *Engine oil
becomes critical as automakers look to boost gas mileage*, Chemical &
Engineering News (Feb. 3, 2019) (estimating 3% improvement in fuel efficiency
from using lower viscosity motor oil), https://cen.acs.org/business/specialty-
chemicals/Engine-oil-becomes-critical-automakers/97/i5; The Motor Oil Geek,
*STOP Following OEM Oil Advice* (GM Recall Proves Why), at 13:20 (YouTube,
May 3, 2025) available at: https://www.youtube.com/watch?v=pbEdr6Q6cKw
(discussing of impact of Recall's oil change on fuel economy).
[94] *See* Tseregounis, note 67, *supra*; Oak Ridge National Laboratory, ORNL/SPR-
2020/1500, *Development of Ionic Liquid-Additized, GF-5/6 Compatible Low-
Viscosity Oils for Automotive Engine and Rear Axle Lubrication for 4% Improved
Fuel Economy* (2019).
[95] Oak Ridge National Laboratory, ORNL/SPR-2020/1500, Development of Ionic
Liquid-Additized, GF-5/6 Compatible Low-Viscosity Oils for Automotive Engine
and Rear Axle Lubrication for 4% Improved Fuel Economy (2019).
[96] Oil viscosity ratings include two numbers, which reflect the viscosity at different

408.   GM's team found similar fuel economy improvements when comparing the same two oil grades (0W-12 and 5W-30) on a 2015 Chevrolet Tahoe.[97] The report further acknowledges that a motivation to reduce "the viscosity grade of standard internal combustion engine oils" is "an attempt to improve fuel economy," and explains that GM's own modeling shows that "further viscosity reduction has the potential to gain 2-3% [fuel economy improvement] from the engine."[98]

409.   The 2019 GM-ORNL report confirms the results of a 1998 GM study, which found that "[f]uel economy in three GM engines increased with decreasing engine oil viscosity[.]"[99]

410.   Class members using the higher viscosity (0W-40) oil—including a prominent voice in the GM vehicle community—have already noticed an appreciable decrease in fuel economy.[100] Anecdotal evidence like this reflects a perceptible difference in fuel economy from even a layman's perspective.

_____

temperatures: the number before the W is the viscosity level during low temperatures, and the number after the W is the viscosity level at high temperatures. In GM's study, the 0W-12 oil is lower viscosity both at lower temperatures and at higher temperatures than the 5W-30. While the GM study does not provide a perfect analogy to the facts in this case, the difference in oil viscosities in this case is comparable, and in the present case, even greater at high temperatures.

[97] *Id.* at 39.

[98] *Id*. at 7.

[99] Tseregounis, note 67, *supra*.

[100] DONSLIFE, *Should We Be Worried About THIS Too? — 10-Speed Transmission Coverage Confusion Explained*, at 00:45 (YouTube, Sept. 29, 2025), https://www.youtube.com/watch?v=wic3fR4A2Ik.

411.   And while a few percentage points may not seem like a lot, the increased fuel costs add up quickly. Take, for example, a 2024 Cadillac Escalade, with an estimated 16 MPG combined fuel economy, and assume the 3-4% reduction in fuel economy generally recognized by the studies discussed above, including GM's own testing. Over 120,000 miles,[101] the truck will need 7,500 gallons (120,000 miles / 16 mpg) of gasoline. With the thicker oil required by the recall, 16 MPG becomes 15.5 MPG (16 *0.97 = 15.5), which means the truck will now need 7,742 gallons of gasoline to travel the same distance. That's an extra 242 gallons of gasoline. Assume a conservative $4/gallon for the premium gasoline recommended for this engine, and those extra gallons will cost owners almost $1,000.

412.   Moreover, the Class Vehicles' use of DFM technology means that in this case, the general estimate of a 3-4% fuel economy degradation is likely to be an underestimate. In short, at light loads, DFM deactivates certain cylinders and increases the load on the remaining cylinders, resulting in more favorable efficiency

---

[101] This, too, is a Defendant-friendly estimate. GM regularly markets the longevity and durability of the class vehicles, boasting that they can surpass even 200,000 miles of useful life. *See, e.g.*, Exhibit ZZ, *How Long Does a New Cadillac Typically Last?*, Service Cadillac (Mar. 1, 2024), https://www.cadillacatservice.com/blogs/3708/how-long-does-a-new-cadillac-typically-last ("A new Cadillac typically drives between 150,000 and 200,000 miles with proper maintenance."); Exhibit AAA, *How Long Do Cadillacs Last?*, Rydell (July 24, 2025), https://www.rydellcadillac.com/blogs/3685/how-long-do-cadillacs-last ("The Cadillac Escalade ESV is among the top cars that can surpass 200,000 miles.").

conditions. With the change to 0W-40 oil, the parasitic load (friction) in the engine is increased, thereby reducing the amount of cylinder deactivation (and fuel economy savings) potential. Thus, the fuel economy depreciation in these engines is likely to materially exceed the standard 3-4%.[102]

413. The increase in ownership cost from the fuel economy impacts described above would be material to any reasonable consumer. But if there were any doubts about the importance of efficiency in today's motor vehicle market, GM's own advertising dispels them. As shown in a few representative examples below, GM repeatedly touted the efficiency of the Class Engine and the Class Vehicles because it knew what all reasonable consumers know: gasoline is expensive, and money matters.



gm POWERED SOLUTIONS

**6.2L V-8, L87**

**STRONG HERITAGE MEETS EFFICIENCY**

The L87 builds upon the previous 6.2L L86 with integral components for Automatic Start/Stop capability and available Dynamic Fuel Management (DFM) for even greater efficiency. Efficient, robust technologies including Direction Injection, Variable Valve Timing, oil-jet piston cooling, and a two-stage oil pump continue to part of the 6.2L heritage.

GM full size truck L87 engine shown

---

[102] Given the highly complex nature of modern engines and their calibrations, it is likely the change in motor oil will have other detrimental consequences, too, including impacts on drivability and torque.



414. The increased costs of additional fuel are not the only price consumers will pay for this thicker oil. The new, more viscous 0W-40 oil costs considerably more than the originally specified 0W-20 oil in many areas, and has led to increases in oil change costs. For example, Mobil currently sells a quart of Mobil 1 Supercar 0W-40 on Amazon for $14.99 per quart,[103] whereas a quart of dexos SAE 0W-20 oil currently sells for $7.97[104]—a difference of approximately $7 per quart. Assuming two oil changes per year, each of which requires eight quarts, the price difference

---

[103] Exhibit BBB, Mobil 1 Supercar Advanced Full Synthetic Motor Oil OW-40, Amazon.com, https://a.co/d/0dniJHi7.
[104] Exhibit CCC, Valvoline Advanced Full Synthetic SAE OW-20 Motor Oil 1 QT, Amazon.com, https://a.co/d/02pm5lok.

between the two oils could be $112 per year or greater.

415.    GM recognized this, and in November 2025, the company issued Service Bulletin No. 25-NA-339, announcing that a new 0W-40 oil (Mobil FS 0W40 dexosR) would become available to replace the thicker oil that GM has earlier recommended in the first several months of the recall (Mobil 1 0W-40 Supercar).[105] According to GM, the new FS oil would be available "at a significantly more competitive price, closely aligned with what customers typically paid for traditional 0W20 oil."[106]

416.    This is notable for at least two reasons. First, it is a concession that the Supercar 0W-40 oil will cost consumers significantly more per oil change.[107] Second, GM recognizes that, while the FS oil may be "more closely aligned" with the original 0W-20 oil price, it is still more expensive, and it is not universally available, meaning some consumers will still have to purchase the pricier Supercar 0W-40 oil.

417.    Finally, the FS oil is even thicker than the Supercar oil. For the Supercar 0W-40, Mobil reports kinematic viscosities of 12.9 and 69.0 at 100° and 40° C,

---

[105] Exhibit DDD, GM Service Bulletin, https://oemdtc.com/tsb/?number=11025492 (last visited Feb. 23, 2026).
[106] *Id.*
[107] *Id.*; Exhibit EEE, GM Bulletin (Jan. 20, 2026), https://static.oemdtc.com/NHTSA-PDFs/MC-11027714-0001.pdf.

respectively.[108] The kinematic viscosities for the FS 0W-40, in contrast, were 13.8 and 78.3.[109] These may not be dramatic differences, but they are real and further compound the negative effect the recall will have on the Class Vehicles' fuel economy.

418.    On top of all this, the Engine Defect and the resulting decreased fuel efficiency has and will continue to depreciate the resale value of the Class Vehicles.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

419.    Because GM concealed the existence of the L87 Engine Defect, Class Members had no way of knowing about the Defect in the Class Vehicles.

420.    Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein.

421.    Plaintiffs and Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that GM did not report information within its knowledge to federal and state authorities, its dealerships, or

---

[108] Exhibit FFF, Mobil 1 Supercar 0W-40, https://www.mobil.com/en-bo/passenger-vehicle-lube/pds/la-xx-mobil-1-supercar-0w-40#:~:text=Table_title:%20Property%20Table_content:%20header:%20%7C%20Property%20%7C,%C2%B0C%2C%20ASTM%20D97%20%7C%20:%20%2D51%20%7C (last visited Feb. 23, 2026).

[109] Exhibit GGG, Mobil 1 FS 0W-40, https://www.mobil.com/en-pl/passenger-vehicle-lube/pds/eu-xx-mobil-1-fs-0w-40 (last visited Feb. 23, 2026).

consumers; nor would a reasonable and diligent investigation have disclosed that GM had concealed information about the L87 Engine Defect in the Class Vehicles, which was discovered by Plaintiffs only when GM announced the recall. However, the recall itself did not disclose the true nature of the Defect nor provide an effective remedy or a remedy that did not increase costs to Plaintiffs and Class Members.

422.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

**B.   Fraudulent Concealment Tolling**

423.   All applicable statutes of limitation have also been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action. This includes GM's active concealment through misrepresenting the nature of the Defect and stating that the ineffective remedy would remedy the Defect.

**C.   Estoppel**

424.   GM was under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles and the L87 Engine Defect.

425.   GM knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Class Vehicles and the L87 Engine Defect.

165

426.   Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## CLASS ALLEGATIONS

427.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

428.   Plaintiffs seek to represent the following Classes:

a. (**"The Nationwide Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the United States.

b. ("**The Arkansas Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Arkansas.

c. ("**The California Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of California.

d. ("**The Connecticut Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Connecticut.

e. ("**The Florida Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Florida.

f. ("**The Georgia Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Georgia.

g. ("**The Illinois Class"**): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in

166

the State of Illinois.

h. ("**The Kentucky Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Kentucky.

i. ("**The Louisiana Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Louisiana.

j. ("**The Maryland Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Maryland.

k. ("**The Massachusetts Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Massachusetts.

l. ("**The Michigan Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Michigan.

m. ("**The Minnesota Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Minnesota.

n. ("**The Missouri Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Missouri.

o. ("**The Nevada Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Nevada.

p. ("**The New Jersey Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of New Jersey.

q. ("**The New Mexico Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined

herein) in the State of New Mexico.

r. ("**The New York Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of New York.

s. ("**The North Carolina Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of North Carolina.

t. ("**The Ohio Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Ohio.

u. ("**The Oregon Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Oregon.

v. ("**The Pennsylvania Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Pennsylvania.

w. ("**The Tennessee Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Tennessee.

x. ("**The Texas Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Texas.

y. ("**The Utah Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Utah.

z. ("**The Virginia Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined herein) in the State of Virginia.

aa. ("**The Washington Class**"): All persons or entities who purchased or leased one or more of the Class Vehicles (as defined

herein) in the State of Washington.

429.   Excluded from the Classes are Defendant General Motors LLC and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

430.   This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

431.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**.   The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of the Class, the precise number of Class Members is unknown to Plaintiffs, but may be ascertained from GM's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

432.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members,

including, without limitation:

   a.  whether GM engaged in the conduct alleged herein;

   b.  whether GM's alleged conduct violates applicable law;

   c.  whether the L87 Engines contain the L87 Engine Defect;

   d.  whether the L87 Engine Defect renders the Class Vehicles unmerchantable;

   e.  whether GM misled Class Members about the quality of the L87 Engines in the Class Vehicles;

   f.  whether GM had actual or imputed knowledge about the L87 Engine Defect but failed to disclose it to Plaintiffs and the other Class Members;

   g.  whether GM's omissions and concealment regarding L87 Engine Defect were likely to deceive Class Members;

   h.  whether GM breached its express warranty to the Class Members with respect to the Class Vehicles;

   i.  whether Class Members overpaid for their Class Vehicles as a result of L87 Engine Defect;

   j.  whether Class Members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

   k.  the amount and nature of relief to be awarded to Plaintiffs and the other Class Members.

433.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the Class Members purchased or leased Class Vehicles that contain defective GM 6.2

Liter V8 EcoTec3 L87 engines. Neither Plaintiffs nor the other Class Members would have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known of the engine failure defect in the L87 Engines. Plaintiffs and the other Class Members suffered damages as a direct proximate result of the same wrongful practices in which GM engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members.

434. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

435. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole.

436. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class

action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for the Class Members to individually seek redress for GM's wrongful conduct. Even if the Class Members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## **CLAIMS FOR RELIEF**

**A.    Claims Brought on Behalf of the Nationwide Class**

### **COUNT 1**
### **VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
### **(15 U.S.C. §§ 2301, *et seq.*)**
### **(Brought by Plaintiffs individually and on behalf of the Nationwide Class or, in the alternative, each of the State Classes)**

437.    Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

438.    Plaintiffs bring this Count individually and on behalf of the other

members of the Nationwide Class (the "Class," for purposes of this Count) or, in the alternative, each of the State Classes listed herein.

439.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

440.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

441.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

442.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

443.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

444.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period. GM has failed to do so.

445.   GM's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

446.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of GM's written warranty and implied warranty became part of

the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

447. GM breached these warranties, as described in more detail above, by selling Class Vehicles with the L87 Engine Defect.

448. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it, as well as its own internal engineering knowledge. However, GM's recall remedy is both underinclusive and ineffective for the reasons stated above.

449. At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs and the other Class Members resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied. This is particularly true given that GM already issued an inadequate recall that fails to properly remedy the L87 Engine Defect.

450. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be

determined in this lawsuit.

451.   As a direct and proximate result of GM's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the other Class Members have sustained damages in an amount to be determined at trial.

452.   Plaintiffs, individually and on behalf of all the other Class Members, seek all damages permitted by law, including the overpayment for their vehicles and additional costs associated with the insufficient recall, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class Members in connection with the commencement and prosecution of this action.

## COUNT 2
## FRAUDULENT OMISSION
**(Brought by Plaintiffs individually and on behalf of the Nationwide Class or, in the alternative, each of the State Classes)**

453.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

454.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count) or, in the alternative, each of the State Classes listed herein.

455.   GM was aware of the L87 Engine Defect when it marketed and sold the

Class Vehicles to Plaintiffs and Class Members.

456.   Having been aware of the L87 Engine Defect and having known that Plaintiffs and Class Members could not have reasonably been expected to know of the L87 Engine Defect, due to its hidden and technical nature, GM had a duty to disclose the Defect to Plaintiffs and Class Members in connection with the sale or lease of the Class Vehicles.

457.   GM did not disclose the L87 Engine Defect to Plaintiffs or Class Members in connection with the sale of the Class Vehicles.

458.   GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a.   Possessed exclusive knowledge about the L87 Engine Defect;

    b.   Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

    c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

459.   For the reasons set forth above, the L87 Engine Defect comprises material information with respect to the sale or lease of the Class Vehicles.

460.   Plaintiffs and Class Members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

461.   Through its omissions regarding the L87 Engine Defect, GM intended to induce, and did induce, Plaintiffs and Class Members to either purchase a Class

Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

462.   As a direct and proximate result of GM's omissions, Plaintiffs and Class Members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the L87 Engine Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall.   GM's conduct also warrants an assessment of punitive damages, as permitted by law, in an amount sufficient to deter such conduct in the future, the amount of which shall be determined according to proof at trial.

**COUNT 3**
**UNJUST ENRICHMENT**
**(Brought by Plaintiffs individually and on behalf of the Nationwide Class or, in the alternative, each of the State Classes)**

463.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

464.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count) or, in the alternative, each of the State Classes listed herein.

465.   GM is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the L87 Engine Defect that it installed in the Class Vehicles, but

177

nevertheless marketed them for sale to consumers, and benefitted from selling and leasing the Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiffs and Class Members overpaid for these vehicles.

466.   GM has received and retained unjust benefits from Plaintiffs and Class Members, and inequity has resulted.

467.   It is inequitable and unconscionable for GM to retain these benefits.

468.   Because GM concealed the L87 Engine Defect, Plaintiffs and Class Members were not aware of the true facts concerning the Class Vehicles.

469.   GM knowingly accepted the unjust benefits of its wrongful conduct.

470.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Class Members in an amount to be proven at trial.

**B.    Claims Brought on Behalf of the Arkansas Class**

**COUNT 4**
**VIOLATIONS OF THE ARKANSAS**
**DECEPTIVE TRADE PRACTICES ACT**
**(Ark. Code Ann. §§ 4-88-101, *et seq.*)**
**(Brought by Plaintiffs Timothy Lee and Leatrecia Whitaker Lee individually**
**and on behalf of the Arkansas Class)**

471.   Plaintiffs Timothy Lee and Leatrecia Whitaker Lee ("Plaintiffs," for purposes of the Arkansas Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

472.   Plaintiffs bring this claim individually and on behalf of the other members of the Arkansas Class (the "Class," for purposes of this Count).

473.   GM, Plaintiffs, and other Class Members are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

474.   The Class Vehicles are "goods" within the meaning of Ark. Code. Ann. § 4-88-102(4).

475.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense;" or "(2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in deceptive and unconscionable trade practices that violated the Arkansas DTPA as described herein.

476.   GM's omissions regarding the L87 Engine Defect, described herein, are material facts that a reasonable person would have considered in deciding whether

or not to purchase (or to pay the same price for) the Class Vehicles.

477.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

478.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

479.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

      a.   Possessed exclusive knowledge about the L87 Engine Defect;

      b.   Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

      c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

480.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

481.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

482.   In addition to being deceptive, the business practices of GM were unfair

because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

483.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 5**
**BREACH OF EXPRESS WARRANTY**
**(Ark. Code Ann. §§ 4-2-313 and 4-2A-210)**
**(Brought by Plaintiffs Timothy Lee and Leatrecia Whitaker Lee individually and on behalf of the Arkansas Class)**

484.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as

if fully set forth herein.

485.   Plaintiffs bring this claim individually and on behalf of the other members of the Arkansas Class (the "Class," for purposes of this Count).

486.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

487.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

488.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

489.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

490.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

491.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members

were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

492.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

493.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

494.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

495.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to

Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 6
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ark. Code Ann. §§ 4-2-314 and 4-2A-212)
### (Brought by Plaintiffs Timothy Lee and Leatrecia Whitaker Lee individually and on behalf of the Arkansas Class)

496.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

497.   Plaintiffs bring this claim individually and on behalf of the other members of the Arkansas Class (the "Class," for purposes of this Count).

498.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

499.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

500.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

501.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

502.   Because of the L87 Engine Defect, the Class Vehicles were not in

merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

503.  Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

504.  Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

505.  GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the

Defect and resulting recall, and the complaints filed in this matter.

506.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

507.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**C.    Claims Brought on Behalf of the California Class**

**COUNT 7**
**VIOLATIONS OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code §§ 1750, *et seq.*)**
**(Brought by Plaintiffs Alexis Bronson, Mitchell Fagundes, and Joshua**
**Smotherman individually and on behalf of the California Class)**

508.   Plaintiffs Alexis Bronson, Mitchell Fagundes, and Joshua Smotherman ("Plaintiffs," for purposes of the California Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

509.   Plaintiffs bring this claim individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

510.   GM is a "person" as defined by Cal. Civ. Code § 1761(c). Plaintiffs and the Class Members are "consumers" as defined by Cal. Civ. Code § 1761(d).

511.   The Class Vehicles are "goods" as defined by Cal. Civ. Code § 1761(a).

512.    The California Consumer Legal Remedies Act ("CLRA") declares unlawful "unfair methods of competition and unfair or deceptive acts or practices … undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer" certain enumerated items, including: "(a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised. Cal. Civ. Code § 1170. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the CLRA as described herein.

513.    GM's omissions regarding the L87 Engine Defect, described herein, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

514.    GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

515.    Plaintiffs and Class Members justifiably acted or relied to their

detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

516.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

  a.  Possessed exclusive knowledge about the L87 Engine Defect;

  b.  Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

  c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

517.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

518.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

519.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition

under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

520.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

521.   On or about May 19, 2025, Plaintiff Mitchell Fagundes's undersigned counsel provided GM written notice of its violations of the CLRA under California Civil Code § 1782(a) regarding the Class Vehicles.[110] On or about February 24, 2026, undersigned counsel for the California Plaintiffs again provided GM written notice of its violations of the CLRA under California Civil Code § 1782(a).

---

[110] Exhibit III, Plaintiffs' CLRA venue declarations.

**COUNT 8**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code §§ 17200,** *et seq.***)**
**(Brought by Plaintiffs Alexis Bronson, Mitchell Fagundes, and Joshua**
**Smotherman individually and on behalf of the California Class)**

522.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

523.   Plaintiffs bring this claim individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

524.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair competition and unlawful, unfair or fraudulent business acts or practices that violated the UCL as described herein.

525.   GM's omissions regarding the L87 Engine Defect, described herein, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

526.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

527.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine

Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

528.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

a.  Possessed exclusive knowledge about the L87 Engine Defect;

b.  Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

529.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

530.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

531.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of

the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

532. GM's acts and practices are also unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. GM knew or should have known its conduct violated the UCL.

533. As a direct and proximate result of GM's unfair, unlawful, and deceptive trade practices, Plaintiffs and Class Members have suffered an injury in fact and ascertainable loss, including the loss of money or property. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered an injury in fact and ascertainable loss related to the L87 Engine Defect recall. Plaintiffs and Class Members seek to enjoin further unlawful, unfair, and fraudulent acts or practices by GM, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT 9
## VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)
### (Brought by Plaintiffs Alexis Bronson, Mitchell Fagundes, and Joshua Smotherman individually and on behalf of the California Class)

534.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

535.   Plaintiffs bring this claim individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

536.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

537.   GM caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiffs and the Subclass members.

538.   GM violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles despite containing the L87 Engine Defect described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

539.   Plaintiffs and Class Members have suffered an injury in fact, including the loss of money or property, because of GM's deceptive advertising. In purchasing or leasing their Class Vehicles, Plaintiffs and Class Members relied on GM's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. GM's representations and omissions were untrue because the Class Vehicles were sold or leased with a defective engine. Had Plaintiffs and the Class Members known this, they would not have purchased or leased their Class Vehicles or paid as much for them. Accordingly, Plaintiffs and the Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

540.   GM's omissions have deceived Plaintiffs, and those same unlawful and deceptive misrepresentations and omissions have deceived or are likely to deceive members of the consuming public and the other members of the Class.

541.   The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

542. As a direct and proximate result of GM's unlawful and deceptive misrepresentations and omissions about the Class Vehicles, Plaintiffs and Class Members have suffered an injury in fact and ascertainable loss, including the loss of money or property. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered an injury in fact and ascertainable loss related to the L87 Engine Defect recall. Plaintiffs and Class Members seek to enjoin further unlawful and deceptive advertising by GM, to obtain restitutionary disgorgement of all monies and revenues generated because of such advertising, and all other relief allowed under California Business & Professions Code § 17500, *et seq.*

## COUNT 10
### BREACH OF EXPRESS WARRANTY
### (Cal. Com. Code §§ 2313 and 10210)
### (Brought by Plaintiffs Alexis Bronson, Mitchell Fagundes, and Joshua Smotherman individually and on behalf of the California Class)

543. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

544. Plaintiffs bring this claim individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

545. GM is a "merchant" with respect to motor vehicles under Cal. Com.

Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

546.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

547.    Plaintiff and Class Members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

548.    Class Members who leased Class Vehicles in California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

549.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

550.    In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

551.    GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

552.    GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

553.    Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

554.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

555.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

556.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

557.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

558.    As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 11
### VIOLATIONS OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Cal. Civ. Code §§ 1791.1 and 1792)
### (Brought by Plaintiffs Alexis Bronson, Mitchell Fagundes, and Joshua Smotherman individually and on behalf of the California Class)

559.    Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

560.    Plaintiffs bring this claim individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

561.    Plaintiffs and the Class Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

562.    The Class Vehicles are "consumer goods" within the meaning of Civ. Code § 1791(a).

563.    GM is the "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

564.   Under Cal. Civ. Code § 1791.1(a), an "'[i]mplied warranty of merchantability' or 'implied warranty that goods are merchantable' means that the consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description. (2) Are fit for the ordinary purposes for which such goods are used. (3) Are adequately contained, packaged, and labeled. (4) Conform to the promises or affirmations of fact made on the container or label."

565.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

566.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

567.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

568.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

569.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class

Vehicles.

570. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

571. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

572. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

573. As a direct and proximate result of GM's breach of the implied

warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law, including but not limited to damages, any legal and equitable remedies, attorneys' fees, and costs under Cal. Civ. Code §§ 1791.1(d) & 1794.

**D.  Claims Brought on Behalf of the Connecticut Class**

**COUNT 12**
**VIOLATIONS OF THE CONNECTICUT**
**UNFAIR TRADE PRACTICES ACT**
**(Conn. Gen. Stat. Ann. §§ 42-110a, *et seq.*)**
**(Brought by Plaintiff Anthony Gargano individually and on behalf of the**
**Connecticut Class)**

574.    Plaintiff Anthony Gargano ("Plaintiff," for purposes of the Connecticut Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

575.    Plaintiff brings this claim individually and on behalf of the other members of the Connecticut Class (the "Class," for purposes of this Count).

576.    GM, Plaintiff, and other Class Members are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

577.    The Connecticut Unfair Trade Practices Act ("Connecticut UPTA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the Connecticut

201

UPTA as described herein.

578.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

579.   GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

580.   Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

581.   GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

      a.   Possessed exclusive knowledge about the L87 Engine Defect;

      b.   Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

      c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

582.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

583.   GM's omissions have deceived Plaintiff, and those same business

practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

584. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

585. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 13**
**BREACH OF EXPRESS WARRANTY**
**(Conn. Gen. Stat. Ann. §§ 42a-2-313 and 42a-2a-503)**
**(Brought by Plaintiff Anthony Gargano individually and on behalf of the**
**Connecticut Class)**

586.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

587.   Plaintiff brings this claim individually and on behalf of the other members of the Connecticut Class (the "Class," for purposes of this Count).

588.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

589.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

590.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

591.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

592.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

593.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

594.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

595.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

596.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

597.    As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 14**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Conn. Gen. Stat. Ann. §§ 42a-2-314 and 42a-2a-504)**
**(Brought by Plaintiff Anthony Gargano individually and on behalf of the Connecticut Class)**

598.    Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

599.    Plaintiff brings this claim individually and on behalf of the other members of the Connecticut Class (the "Class," for purposes of this Count).

600.    GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

601.    A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

602.    The Class Vehicles, when sold and at all times thereafter, were not

merchantable and are not fit for the ordinary purpose for which cars are used.

603.   GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

604.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

605.   Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

606.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

607.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

608.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

609.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**E.    Claims Brought on Behalf of the Florida Class**

**COUNT 15**
**VIOLATIONS OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT**
**(Fla. Stat. §§ 501.201, *et seq.*)**
**(Brought by Plaintiffs Brendan Kirk, Rocky Shankar, Scott Robinson, and**
**Charles Morlock individually and on behalf of the Florida Class)**

610.   Plaintiffs Brendan Kirk, Rocky Shankar, Scott Robinson, and Charles Morlock ("Plaintiffs," for purposes of the Florida Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

611.   Plaintiffs bring this claim individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

612.   Plaintiffs and Class Members are "consumers" and GM engaged in "trade or commerce" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA").

613.   The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." Fla. Stat. § 501.204(1). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

614.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

615.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

616.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

617.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

        a.   Possessed exclusive knowledge about the L87 Engine Defect;

b. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

618.    Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

619.    GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

620.    In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

621.    As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles

would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 16**
**BREACH OF EXPRESS WARRANTY**
**(Fla. Stat. §§ 672.313 and 680.21)**
**(Brought by Plaintiffs Brendan Kirk, Rocky Shankar, Scott Robinson, and Charles Morlock individually and on behalf of the Florida Class)**

622.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

623.   Plaintiffs bring this claim individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

624.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

625.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

626.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

627.    GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

628.    Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

629.    Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

630.    GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

631.    Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

632.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

633.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 17
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Fla. Stat. §§ 672.314 and 680.212)
### (Brought by Plaintiffs Brendan Kirk, Rocky Shankar, Scott Robinson, and Charles Morlcok individually and on behalf of the Florida Class)

634.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

635.   Plaintiffs bring this claim individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

213

636.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

637.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

638.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

639.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

640.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

641.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

642.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly

214

sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

643.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

644.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

645.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**F.    Claims Brought on Behalf of the Georgia Class**

**COUNT 18**
**VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT**
**(Ga. Code Ann. §§ 10-1-390, *et seq.*)**
**(Brought by Plaintiff Greg Munna individually and on behalf of the Georgia**
**Class)**

646.    Plaintiff Greg Munna ("Plaintiff," for purposes of the Georgia Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

647.    Plaintiff brings this claim individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

648.    Plaintiff and Class Members are "consumers" and GM engaged in "trade or commerce" within the meaning of the Georgia Fair Business Practices Act ("GFBPA").

649.    The GFBPA prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." Ga. Code Ann. §10-1-393. This includes, but is not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." *Id.* § 10- 1-393(b). By concealing the L87 Engine Defect in the Class

Vehicles, GM participated in unfair and deceptive trade practices that violated the ICFA as described herein.

650.    GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

651.    GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

652.    Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

653.    GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

      a.    Possessed exclusive knowledge about the L87 Engine Defect;

      b.    Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

      c.    Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

654.    Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

655.   GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

656.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

657.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

658.   On or about February 24, 2026, undersigned counsel for Plaintiff

Munna provided GM written notice of its violations of Ga. Code. Ann. § 10-1-393.

## COUNT 19
## BREACH OF EXPRESS WARRANTY
### (Ga. Code Ann. §§ 11-2-313 and 11-2a-210)
### (Brought by Plaintiff Greg Munna individually and on behalf of the Georgia Class)

659.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

660.   Plaintiff brings this claim individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

661.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

662.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

663.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

664.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

665.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide

the promised remedies within a reasonable time.

666.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

667.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

668.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

669.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class

Members' remedies would be insufficient to make them whole.

670.    As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 20**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ga. Code Ann. §§ 11-2-314 and 11-2a-212)**
**(Brought by Plaintiff Greg Munna individually and on behalf of the Georgia Class)**

671.    Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

672.    Plaintiff brings this claim individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

673.    GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

674.    A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

675.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

676.   GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

677.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

678.   Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

679.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed

between GM and Class Members, and GM knew of the Defect at the time of sale.

680.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

681.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

682.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**G.   Claims Brought on Behalf of the Illinois Class**

**COUNT 21**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS §§ 505/1, *et seq.*)**
**(Brought by Plaintiffs Anthony Carro and James Nelson individually and on behalf of the Illinois Class)**

683.   Plaintiffs Anthony Carro and James Nelson ("Plaintiffs," for purposes of the Illinois Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

684.   Plaintiffs bring this claim individually and on behalf of the other

members of the Illinois Class (the "Class," for purposes of this Count).

685.   Plaintiffs and Class Members are "consumers" and GM engaged in "trade or commerce" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

686.   The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or deployment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact. . ." 815 ILCS § 505/2. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the ICFA as described herein.

687.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

688.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

689.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

690.   GM owed Plaintiffs and Class Members a duty to disclose the true

safety and reliability of the Class Vehicles because GM:

    a.  Possessed exclusive knowledge about the L87 Engine Defect;

    b.  Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

    c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

691.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

692.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

693.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

694.   As a direct and proximate result of GM's unfair and deceptive trade

practices, Plaintiffs and Class Members have suffered ascertainable loss and actual

damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles

would not have purchased or leased the Class Vehicles, or, alternatively, would have

paid less for them had the truth about the L87 Engine Defect been disclosed.

Plaintiffs and Class Members have also suffered ascertainable loss and actual

damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are

entitled to recover actual damages, attorneys' fees and costs, and all other relief

allowable by law.

## COUNT 22
## BREACH OF EXPRESS WARRANTY
## (810 ILCS §§ 5/2-313 and 5/2a-210)
## (Brought by Plaintiffs Anthony Carro and James Nelson individually and on behalf of the Illinois Class)

695.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as

if fully set forth herein.

696.   Plaintiffs bring this claim individually and on behalf of the other

members of the Illinois Class (the "Class," for purposes of this Count).

697.   GM has sold and leased goods (the Class Vehicles) as defined by this

statutory scheme.

698.   In its Limited Warranty, GM expressly warranted that it would repair

or replace defects free of charge if they became apparent during the warranty period.

699.   GM's promise to repair or replace defects free of charge became part

of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

700.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

701.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

702.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

703.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

704.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because

it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

705. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

706. As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 23**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(810 ILCS §§ 5/2-314 and 5/2a-212)**
**(Brought by Plaintiffs Anthony Carro and James Nelson individually and on behalf of the Illinois Class)**

707. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

708.   Plaintiffs bring this claim individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

709.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

710.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

711.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

712.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

713.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

714.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

715.   Any attempt by GM to disclaim or limit the implied warranty of

merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

716.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

717.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

718.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**H.    Claims Brought on Behalf of the Kentucky Class**

**COUNT 24**
**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT**
**(Ky. Rev. Stat. §§ 367.110, *et seq.*)**
**(Brought by Plaintiff Jon Michael Jones individually and on behalf of the**
**Kentucky Class)**

719.    Plaintiff Jon Michael Jones ("Plaintiff," for purposes of the Kentucky Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

720.    Plaintiff brings this claim individually and on behalf of the other members of the Kentucky Class (the "Class," for purposes of this Count).

721.    Plaintiff and Class Members are "consumers" and GM engaged in "trade or commerce" within the meaning of the Kentucky Consumer Protection Act ("KCPA").

722.    The KCPA prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. . ." Ky. Rev. Stat. § 367.170. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the KCPA as described herein.

723.    GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

724.    GM intended for Plaintiff and Class Members to rely on GM's

231

omissions regarding the L87 Engine Defect.

725.   Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

726.   GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

   a.   Possessed exclusive knowledge about the L87 Engine Defect;

   b.   Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

   c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

727.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

728.   GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

729.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The

injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

730.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 25**
**BREACH OF EXPRESS WARRANTY**
**(Ky. Rev. Stat. §§ 355.2-313 and 355.2a-210)**
**(Brought by Plaintiff Jon Michael Jones individually and on behalf of the Kentucky Class)**

731.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

732.   Plaintiff brings this claim individually and on behalf of the other members of the Kentucky Class (the "Class," for purposes of this Count).

733.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

734.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

735.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

736.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

737.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

738.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

739.   GM was provided notice of the L87 Engine Defect through numerous

complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

740. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

741. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

742. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 26**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ky. Rev. Stat. §§ 355.2-314 and 355.2a-212)**
**(Brought by Plaintiff Jon Michael Jones individually and on behalf of the**
**Kentucky Class)**

743.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

744.   Plaintiff brings this claim individually and on behalf of the other members of the Kentucky Class (the "Class," for purposes of this Count).

745.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

746.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

747.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

748.   GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

749.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

750.   Privity is not required here because, in part, Plaintiff and Class

236

Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

751. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

752. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

753. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address

the Defect.

754.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

## I.   Claims Brought on Behalf of the Louisiana Class

### COUNT 27
### VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (La. Rev. Stat. §§ 51:1401, *et seq.*)
### (Brought by Plaintiffs Emanuelle Serrano and Danny Wingard and on behalf of the Louisiana Class)

755.   Plaintiffs Emanuelle Serrano and Danny Wingard ("Plaintiffs," for purposes of the Louisiana Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

756.   Plaintiffs bring this claim individually and on behalf of the other members of the Louisiana Class (the "Class," for purposes of this Count).

757.   Plaintiffs and Class Members are "consumers" and GM engaged in "trade or commerce" within the meaning of the Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL").

758.   The Louisiana CPL prohibits "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the Louisiana CPL as described herein.

759.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

760.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

761.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

762.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

  a.   Possessed exclusive knowledge about the L87 Engine Defect;

  b.   Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

  c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

763.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

764.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public

and the other members of the Class.

765.    In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

766.    As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 28
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY/WARRANTY AGAINST REDHIBITORY
## DEFECTS
### (La. Civ. Code Art. 2520, 2524)
### (Brought by Plaintiffs Emanuelle Serrano and Danny Wingard individually
### and on behalf of the Louisiana Class)

767.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

768.   Plaintiffs bring this claim individually and on behalf of the other members of the Louisiana Class (the "Class," for purposes of this Count).

769.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

770.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

771.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

772.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

773.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

241

774.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

775.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

776.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

777.   Alternatively, Plaintiffs and Class Members were excused from

providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

778.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**J.     Claims Brought on Behalf of the Maryland Class**

**COUNT 29**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code Ann. Com. Law §§ 13-101, *et seq.*)**
**(Brought by Plaintiffs Mark Kamholz and Danny Toliver individually and on behalf of the Maryland Class)**

779.   Plaintiffs Mark Kamholz and Danny Toliver ("Plaintiffs," for purposes of the Maryland Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

780.   Plaintiffs bring this claim individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

781.   The Maryland CPA prohibits "unfair, abusive, or deceptive trade practice. . ." Md. Code Com. Law § 13-303. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the Maryland CPA as described herein.

782.   GM's omissions regarding the L87 Engine Defect, described above, are

material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

783.  GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

784.  Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

785.  GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a.  Possessed exclusive knowledge about the L87 Engine Defect;

    b.  Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

    c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

786.  Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

787.  GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

244

788.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

789.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 30**
**BREACH OF EXPRESS WARRANTY**
**(Md. Code Ann. Com. Law §§ 2-313 and 2a-210)**
**(Brought by Plaintiffs Mark Kamholz and Danny Toliver individually and on behalf of the Maryland Class)**

790.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

791.   Plaintiffs bring this claim individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

792.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

793.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

794.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

795.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

796.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

797. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

798. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

799. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

800. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

801.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 31**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Md. Code Ann. Com. Law §§ 2-314 and 2a-212)**
**(Brought by Plaintiffs Mark Kamholz and Danny Toliver individually and on behalf of the Maryland Class)**

802.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

803.   Plaintiffs bring this claim individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

804.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

805.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

806.   The Class Vehicles, when sold and at all times thereafter, were not

248

merchantable and are not fit for the ordinary purpose for which cars are used.

807.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

808.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

809.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

810.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of

sale.

811.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

812.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

813.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

## K.   Claims Brought on Behalf of the Massachusetts Class

### COUNT 32
### DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
### (Mass. Gen. Laws Ch. 93A, §§ 1, *et seq.*)
### (Brought by Plaintiffs Marc Vaillette and Garvin Eastman individually and on behalf of the Massachusetts Class)

814.   Plaintiffs Marc Vaillette and Garvin Eastman (Plaintiffs," for purposes of the Massachusetts Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

815.   Plaintiffs bring this claim individually and on behalf of the other

members of the Massachusetts Class (the "Class," for purposes of this Count).

816.  Plaintiffs and Class Members are "persons" and GM engaged in "trade or commerce" within the meaning of this statutory scheme.

817.  This statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . ." Mass. Gen. Laws Ch. 93A, § 2. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated this statute as described herein.

818.  GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

819.  GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

820.  Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

821.  GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

      a.  Possessed exclusive knowledge about the L87 Engine Defect;

b. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

822.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

823.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

824.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

825.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles

would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

826. On or about February 24, 2026, undersigned counsel for the Massachusetts Plaintiffs provided GM written notice of its violations of Mass. Gen. Laws Ch. 93A, § 2.

**COUNT 33**
**BREACH OF EXPRESS WARRANTY**
**(Mass. Gen. Laws Ann. §§ 2-313 and 2a-210)**
**(Brought by Plaintiffs Marc Vaillette and Garvin Eastman individually and on behalf of the Massachusetts Class)**

827. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

828. Plaintiffs bring this claim individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

829. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

830. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

253

831.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

832.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

833.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

834.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

835.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

836.   Alternatively, Plaintiffs and Class Members were excused from

providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

837.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

838.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 34
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mass. Gen. Laws Ann. §§ 2-314 and 2a-212)
### (Brought by Plaintiffs Marc Vaillette and Garvin Eastman individually and on behalf of the Massachusetts Class)

839.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as

if fully set forth herein.

840.   Plaintiffs bring this claim individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

841.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

842.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

843.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

844.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

845.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

846.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

847.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

848.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

849.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

850.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an

amount to be proven at trial and seek all damages allowable by law.

## L.    Claims Brought on Behalf of the Michigan Class

### COUNT 35
### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
#### (Mich. Comp. Laws §§ 445.903, *et seq.*)
#### (Brought by Plaintiffs Adrienne Zeigler and Kevin Baird individually and on behalf of the Michigan Class)

851.    Plaintiffs Adrienne Zeigler and Kevin Baird (Plaintiffs," for purposes of the Michigan Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

852.    Plaintiffs bring this claim individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

853.    Plaintiffs and Class Members are "persons" and GM engaged in "trade or commerce" within the meaning of the Michigan Consumer Protection Act ("MCPA").

854.    The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including, "(c) Representing that goods or services have … characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material

258

to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the MCPA as described herein.

855.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

856.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

857.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

858.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

> a.   Possessed exclusive knowledge about the L87 Engine Defect;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or
>
> c.   Made incomplete representations about the safety and reliability

259

of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

859.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

860.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

861.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

862.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed.

Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 36
## BREACH OF EXPRESS WARRANTY
### (Mich. Comp. Laws §§ 440.2313 and 440.2860)
### (Brought by Plaintiffs Adrienne Zeigler and Kevin Baird individually and on behalf of the Michigan Class)

863.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

864.   Plaintiffs bring this claim individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

865.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

866.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

867.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

868.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

869.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

870.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

871.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

872.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

873.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and

consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

874.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 37
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mich. Comp. Laws §§ 440.2314 and 440.2862)
### (Brought by Plaintiffs Adrienne Zeigler and Kevin Baird individually and on behalf of the Michigan Class)

875.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

876.   Plaintiffs bring this claim individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

877.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

878.  A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

879.  The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

880.  GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

881.  Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

882.  Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

883.  Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate

to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

884.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

885.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

886.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**M.** **Claims Brought on Behalf of the Minnesota Class**

**COUNT 38**
**VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER**
**FRAUD ACT**
**(Minn. Stat. §§ 325F.68, *et seq.*)**
**(Brought by Plaintiff Stephen Wills individually and on behalf of the**
**Minnesota Class)**

887.   Plaintiff Stephen Wills ("Plaintiff," for purposes of the Minnesota

Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully

set forth herein.

888.   Plaintiff brings this claim individually and on behalf of the other

members of the Minnesota Class (the "Class," for purposes of this Count).

889.   Plaintiff and Class Members are "persons" within the meaning of the

Minnesota Prevention of Consumer Fraud Act ("Minnesota PCFA").

890.   The Minnesota PCFA prohibits "fraud, unfair or unconscionable

practice, false promise, misrepresentation, misleading statement or deceptive

practice, with the intent that others rely thereon in connection with the sale of any

merchandise, whether or not any person has in fact been misled, deceived, or

damaged thereby. . ." Minn. Stat. § 325F.69. By concealing the L87 Engine Defect

in the Class Vehicles, GM participated in unfair and deceptive trade practices that

violated the Minnesota PCFA as described herein.

891.   GM's omissions regarding the L87 Engine Defect, described above, are

material facts that a reasonable person would have considered in deciding whether

or not to purchase (or to pay the same price for) the Class Vehicles.

892.   GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

893.   Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

894.   GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

   a.  Possessed exclusive knowledge about the L87 Engine Defect;

   b.  Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

   c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

895.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

896.   GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

897.   In addition to being deceptive, the business practices of GM were unfair

because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

898.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 39**
**VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. §§ 325d.43-48,** *et seq.***)**
**(Brought by Plaintiff Stephen Wills individually and on behalf of the Minnesota Class)**

899.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

900.   Plaintiff brings this claim individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

901.   The Minnesota Uniform Deceptive Trade Practices Act ("Minnesota UDTPA") states that a "person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: (1) passes of goods or services as those of another; . . . (7) represents that goods or services are of a particular standard, quality, or grade, or that goods of a particular style or model, they are of another; . . ." Minn. Stat. § 325D.44. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the Minnesota UDTPA as described herein.

902.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

903.   GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

904.   Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

905.   GM owed Plaintiff and Class Members a duty to disclose the true safety

and reliability of the Class Vehicles because GM:

    a.  Possessed exclusive knowledge about the L87 Engine Defect;

    b.  Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

    c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

906.  Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

907.  GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

908.  In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

909.  As a direct and proximate result of GM's unfair and deceptive trade

practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 40**
**BREACH OF EXPRESS WARRANTY**
**(Minn. Stat. §§ 336.2-313 and 336.2A-210)**
**(Brought by Plaintiff Stephen Wills individually and on behalf of the Minnesota Class)**

910.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

911.   Plaintiff brings this claim individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

912.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

913.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

914.   GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of

271

the other Class Members, on the other.

915.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

916.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

917.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

918.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

919.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address

the L87 Engine Defect.

920. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

921. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 41
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. §§ 336.2-314 and 336.2A-212)
### (Brought by Plaintiff Stephen Wills individually and on behalf of the Minnesota Class)

922. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

923. Plaintiff brings this claim individually and on behalf of the other

members of the Minnesota Class (the "Class," for purposes of this Count).

924. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

925. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

926. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

927. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

928. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

929. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

930. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.

Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

931.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

932.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

933.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**N.     Claims Brought on Behalf of the Missouri Class**

**COUNT 42**
**VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Stat. §§ 407.010, *et seq.*)**
**(Brought by Plaintiffs Ronald Ward and Gage Yesbeck individually and on behalf of the Missouri Class)**

934.    Plaintiffs Ronald Ward and Gage Yesbeck (Plaintiffs," for purposes of the Missouri Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

935.    Plaintiffs bring this claim individually and on behalf of the other members of the Missouri Class (the "Class," for purposes of this Count).

936.    Plaintiffs and Class Members are "persons" and GM engaged in "trade or commerce" within the meaning of the Missouri Merchandising Practices Act ("MMPA").

937.    The MMPA prohibits the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Stat. § 407.020.  By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the MMPA as described herein.

938.    GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether

or not to purchase (or to pay the same price for) the Class Vehicles.

939.   GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

940.   Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

941.   GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a.   Possessed exclusive knowledge about the L87 Engine Defect;

    b.   Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

    c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

942.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

943.   GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

944.   In addition to being deceptive, the business practices of GM were unfair

because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

945.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 43**
**BREACH OF EXPRESS WARRANTY**
**(Mo. Stat. §§ 400.2-313 and 400.2A-210)**
**(Brought by Plaintiffs Ronald Ward and Gage Yesbeck individually and on behalf of the Missouri Class)**

946.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as

if fully set forth herein.

947. Plaintiffs bring this claim individually and on behalf of the other members of the Missouri Class (the "Class," for purposes of this Count).

948. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

949. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

950. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

951. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

952. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

953. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members

279

were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

954.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

955.   Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

956.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

957.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to

Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 44
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mo. Stat. §§ 400.2-314 and 400.2A-212)
### (Brought by Plaintiffs Ronald Ward and Gage Yesbeck individually and on behalf of the Missouri Class)

958.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

959.   Plaintiffs bring this claim individually and on behalf of the other members of the Missouri Class (the "Class," for purposes of this Count).

960.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

961.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

962.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

963.   GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

964.   Because of the L87 Engine Defect, the Class Vehicles were not in

merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

965.   Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

966.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

967.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the

Defect and resulting recall, and the complaints filed in this matter.

968.    Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

969.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**O.    Claims Brought on Behalf of the Nevada Class**

**COUNT 45**
**VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Nev. Rev. Stat. §§ 598.0903,** *et seq.***)**
**(Brought by Plaintiff Robert Houchin individually and on behalf of the Nevada Class)**

970.    Plaintiff Robert Houchin ("Plaintiff," for purposes of the Nevada Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

971.    Plaintiff brings this claim individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

972.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903*, et seq*. prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the

course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction." By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the Nevada DTPA as described herein.

973.   GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

974.   GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

975.   Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

976.   GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a.   Possessed exclusive knowledge about the L87 Engine Defect;

    b.   Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

    c.   Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

977.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

978.   GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

979.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

980.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 46**
**BREACH OF EXPRESS WARRANTY**
**(Nev. Rev. Stat. §§ 104.2313 and 104A.2210)**
**(Brought by Plaintiff Robert Houchin individually and on behalf of the Nevada Class)**

981.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

982.   Plaintiff brings this claim individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

983.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

984.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

985.   GM's promise to repair or replace defects free of charge became part

286

of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

986.   GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

987.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

988.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

989.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

990.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because

it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

991.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

992.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 47**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**
**(Brought by Plaintiff Robert Houchin individually and on behalf of the**
**Nevada Class)**

993.   Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

994.   Plaintiff brings this claim individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

995.   GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

996.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

997.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

998.   GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

999.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1000. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1001. Any attempt by GM to disclaim or limit the implied warranty of

merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1002. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1003. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1004. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**P.      Claims Brought on Behalf of the New Jersey Class**

**COUNT 48**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. §§ 56:8-1, *et seq.*)**
**(Brought by Plaintiff Ronald Beshel individually and on behalf of the New Jersey Class)**

1005. Plaintiff Ronald Beshel ("Plaintiff," for purposes of the New Jersey Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1006. Plaintiff brings this claim individually and on behalf of the other members of the New Jersey Class (the "Class," for purposes of this Count).

1007. Plaintiff and Class Members are "persons" and GM engaged in "sales" of "merchandise" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA").

1008. The New Jersey CFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. By concealing the L87 Engine Defect in the

291

Class Vehicles, GM participated in unfair and deceptive trade practices that violated the New Jersey CFA as described herein.

1009. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1010. GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1011. Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1012. GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

a. Possessed exclusive knowledge about the L87 Engine Defect;

b. Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1013. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1014. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1015.  In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1016. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 49**
**BREACH OF EXPRESS WARRANTY**
**(N.J. Stat. Ann. §§ 12a:2-313 and 12a:2a-210)**
**(Brought by Plaintiff Ronald Beshel individually and on behalf of the New Jersey Class)**

1017. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1018. Plaintiff brings this claim individually and on behalf of the other members of the New Jersey Class (the "Class," for purposes of this Count).

1019. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1020. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1021. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1022. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1023. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1024. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1025. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1026. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1027. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1028.  As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 50**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J. Stat. Ann. §§ 12a:2-314 and 12a:2a-212)**
**(Brought by Plaintiff Ronald Beshel individually and on behalf of the New Jersey Class)**

1029.  Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1030.  Plaintiff brings this claim individually and on behalf of the other members of the New Jersey Class (the "Class," for purposes of this Count).

1031.  GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1032.  A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1033.  The Class Vehicles, when sold and at all times thereafter, were not

296

merchantable and are not fit for the ordinary purpose for which cars are used.

1034. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1035. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1036. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1037. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1038. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1039. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1040. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**Q.    Claims Brought on Behalf of the New Mexico Class**

**COUNT 51**
**VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT**
**(N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**
**(Brought by Plaintiff Joshua Polson individually and on behalf of the New Mexico Class)**

1041. Plaintiff Joshua Polson ("Plaintiff," for purposes of the New Mexico Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1042. Plaintiff brings this claim individually and on behalf of the other members of the New Mexico Class (the "Class," for purposes of this Count).

1043. Plaintiffs and Class Members are "persons" and GM engaged in "trade or commerce" within the meaning of the New Mexico Unfair Practices Act ("New Mexico UPA").

1044. The New Mexico UPA prohibits "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale [or] lease . . . of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person." N.M. Stat. Ann. § 57-12-2(D). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the New Mexico UPA as described herein.

1045. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1046. GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1047. Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1048. GM owed Plaintiff and Class Members a duty to disclose the true safety

and reliability of the Class Vehicles because GM:

      a.  Possessed exclusive knowledge about the L87 Engine Defect;

      b.  Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

      c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1049. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1050. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1051. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1052. As a direct and proximate result of GM's unfair and deceptive trade

practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 52
## BREACH OF EXPRESS WARRANTY
### (N.M. Stat. Ann. §§ 55-2-313 and 55-2a-210)
### (Brought by Plaintiff Joshua Polson individually and on behalf of the New Mexico Class)

1053. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1054. Plaintiff brings this claim individually and on behalf of the other members of the New Mexico Class (the "Class," for purposes of this Count).

1055. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1056. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1057. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of

the other Class Members, on the other.

1058. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1059. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1060. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1061. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1062. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address

the L87 Engine Defect.

1063.  Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1064.  As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 53**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.M. Stat. Ann. §§ 55-2-314 and 55-2a-212)**
**(Brought by Plaintiff Joshua Polson individually and on behalf of the New Mexico Class)**

1065.  Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1066.  Plaintiff brings this claim individually and on behalf of the other

303

members of the New Mexico Class (the "Class," for purposes of this Count).

1067. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1068. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1069. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1070. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1071. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1072. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1073. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.

Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1074. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1075. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1076. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**R.     Claims Brought on Behalf of the New York Class**

**COUNT 54**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law §§ 349, *et seq.*)**
**(Brought by Plaintiffs Gregory Stewart and Andrew Schultz individually and**
**on behalf of the New York Class)**

1077. Plaintiffs Gregory Stewart and Andrew Schultz (Plaintiffs," for purposes of the New York Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1078. Plaintiffs bring this claim individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

1079. New York General Business Law § 349 statute ("N.Y. G.B.L. § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated § 349 as described herein.

1080. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1081. GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1082. Plaintiffs and Class Members justifiably acted or relied to their

detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

1083. GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

   a. Possessed exclusive knowledge about the L87 Engine Defect;

   b. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

   c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

1084. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1085. GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1086. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition

under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

1087. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 55
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. Gen. Bus. Law §§ 350, *et seq.*)
### (Brought by Plaintiffs Gregory Stewart and Andrew Schultz individually and on behalf of the New York Class)

1088. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1089. Plaintiffs bring this claim individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

1090. Section 349 prohibits "[f]alse advertising in the conduct of any

business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a(1). By falsely marketing the characteristics of the Class Vehicles, and failing to reveal the L87 Engine Defect, GM violated § 350.

1091. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1092. GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1093. Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

1094. GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

     a. Possessed exclusive knowledge about the L87 Engine Defect;

     b. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

     c. Made incomplete representations about the safety and reliability

of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

1095. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1096. GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1097. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

1098. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed.

Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 56**
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. §§ 2-313 and 2-a-210)**
**(Brought by Plaintiffs Gregory Stewart and Andrew Schultz individually and on behalf of the New York Class)**

1099. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1100. Plaintiffs bring this claim individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

1101. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1102. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1103. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

1104. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

311

1105. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1106. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1107. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1108. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1109. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and

consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

1110.  As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 57**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.Y. U.C.C. §§ 2-314 and 2-a-212)**
**(Brought by Plaintiffs Gregory Stewart and Andrew Schultz individually and on behalf of the New York Class)**

1111. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1112. Plaintiffs bring this claim individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

1113. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1114. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

1115. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1116. GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

1117. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1118. Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1119. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate

to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1120. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1121. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1122. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**S.      Claims Brought on Behalf of the North Carolina Class**

**COUNT 58**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE**
**ACTS AND PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**
**(Brought by Plaintiff Larry Churchwell individually and on behalf of the**
**North Carolina Class)**

1123. Plaintiff Larry Churchwell ("Plaintiff," for purposes of the North Carolina Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1124. Plaintiff brings this claim individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

1125. The North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the North Carolina UDTPA as described herein.

1126. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1127. GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1128. Plaintiff and Class Members justifiably acted or relied to their detriment

upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1129. GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

a. Possessed exclusive knowledge about the L87 Engine Defect;

b. Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1130. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1131. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1132. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition

under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1133. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 59**
**BREACH OF EXPRESS WARRANTY**
**(N.C. Gen. Stat. §§ 25-2-313 and 25-2a-210)**
**(Brought by Plaintiff Larry Churchwell individually and on behalf of the North Carolina Class)**

1134. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1135. Plaintiff brings this claim individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

1136. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

318

1137. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1138. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1139. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1140. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1141. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1142. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the

319

Defect and resulting recall, and the complaints filed in this matter.

1143. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1144. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1145. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 60
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. Gen. Stat. §§ 25-2-314 and 25-2a-212)
### (Brought by Plaintiff Larry Churchwell individually and on behalf of the North Carolina Class)

1146. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1147. Plaintiff brings this claim individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

1148. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1149. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1150. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1151. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1152. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1153. Privity is not required here because, in part, Plaintiff and Class

Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1154. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1155. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1156. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address

the Defect.

1157. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**T.     Claims Brought on Behalf of the Ohio Class**

**COUNT 61**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(Ohio Rev. Code Ann. §§ 1345.01,** *et seq.***)**
**(Brought by Plaintiffs Andrew Oser, Jason Rappaport, and Paul MacMillan**
**individually and on behalf of the Ohio Class)**

1158. Plaintiffs Andrew Oser, Jason Rappaport, and Paul MacMillan ("Plaintiffs," for purposes of the Ohio Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1159. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1160. Plaintiffs and Class Members are "consumers," GM is a "supplier," and GM engaged in a "consumer transaction" within the meaning of the Ohio Consumer Sales Practices Act ("OCSPA").

1161. The OSCSPA prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio Rev. Code Ann. § 1345.02. By falsely marketing the characteristics of the Class Vehicles, and failing to reveal the L87 Engine Defect, GM violated the OCSPA.

1162. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1163. GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1164. Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

1165. GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a. Possessed exclusive knowledge about the L87 Engine Defect;

    b. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

    c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

1166. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1167. GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public

and the other members of the Class.

1168. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

1169. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of GM in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

   a. *Mason v. Mercedes Benz USA, LLC*, (OPIF #10002382);

   b. *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.*, (OPIF #10002123);

   c. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.*, (OPIF #10002025);

d. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f. *State ex rel. Jim Petro v. Craftmatic Organization, Inc.*, (OPIF #10002347);

g. *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.*, (OPIF #10001586);

h. *State ex rel. William J. Brown v. Harold Lyons, et al.*, (OPIF #10000304);

i. *Brinkman v. Mazda Motor of America, Inc.*, (OPIF #10001427);

j. *Khouri v. Don Lewis*, (OPIF #100001995);

k. *Mosley v. Performance Mitsubishi aka Automanage*, (OPIF #10001326);

l. *Walls v. Harry Williams dba Butch's Auto Sales*, (OPIF #10001524); and

m. *Brown v. Spears*, (OPIF #10000403).

1170. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are

entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 62
### VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
### (Ohio Rev. Code Ann. §§ 4165.01, *et seq.*)
### (Brought by Plaintiffs Andrew Oser, Jason Rappaport, and Paul MacMillan individually and on behalf of the Ohio Class)

1171. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1172. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1173. Plaintiffs and Class Members are "persons" within the meaning of the Ohio Deceptive Trade Practices Act ("ODTPA").

1174. The ODTPA prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio Rev. Code Ann. § 4165.02. By falsely marketing the characteristics of the Class Vehicles, and failing to reveal the L87 Engine Defect, GM violated the ODTPA.

1175. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1176. GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1177. Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

1178. GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a.  Possessed exclusive knowledge about the L87 Engine Defect;

    b.  Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

    c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

1179. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1180. GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1181. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any

alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

1182. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 63
### BREACH OF EXPRESS WARRANTY
### (Ohio Rev. Code Ann. §§ 1302.26 and 1310.17)
### (Brought by Plaintiffs Andrew Oser, Jason Rappaport, and Paul MacMillan individually and on behalf of the Ohio Class)

1183. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1184. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1185. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1186. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1187. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

1188. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1189. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1190. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1191. GM was provided notice of the L87 Engine Defect through numerous

complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1192. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1193. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

1194. As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 64**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ohio Rev. Code Ann. §§ 1302.27 and 1310.19)**
**(Brought by Plaintiffs Andrew Oser, Jason Rappaport, and Paul MacMillan**
**individually and on behalf of the Ohio Class)**

1195. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1196. Plaintiffs bring this claim individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

1197. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1198. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

1199. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1200. GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

1201. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1202. Privity is not required here because, in part, Plaintiffs and Class

Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1203. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1204. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1205. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because

it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1206. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

U.    **Claims Brought on Behalf of the Oregon Class**

## COUNT 65
## VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (Or. Rev. Stat. §§ 646.605, *et seq.*)
### (Brought by Plaintiff Tracy Connor individually and on behalf of the Oregon Class)

1207. Plaintiff Tracy Connor ("Plaintiff," for purposes of the Oregon Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1208. Plaintiff brings this claim individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

1209. Plaintiffs and Class Members are "persons" and GM engaged in "trade and commerce" within the meaning of the Oregon Unlawful Trade Practices Act ("Oregon UTPA").

1210. The Oregon UTPA prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § 646.608(1). By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated

the Oregon UTPA as described herein.

1211.  GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1212.  GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1213.  Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1214.  GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

    a.  Possessed exclusive knowledge about the L87 Engine Defect;

    b.  Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

    c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1215.  Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1216.  GM's omissions have deceived Plaintiff, and those same business

practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1217.  In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1218. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 66**
**BREACH OF EXPRESS WARRANTY**
**(Or. Rev. Stat. §§ 72.3130 and 72a.2100)**
**(Brought by Plaintiff Tracy Connor individually and on behalf of the Oregon Class)**

1219. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1220. Plaintiff brings this claim individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

1221. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1222. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1223. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1224. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1225. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

337

1226. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1227. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1228. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1229. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1230. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 67**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Or. Rev. Stat. §§ 72.3140 and 72a.2120)**
**(Brought by Plaintiff Tracy Connor individually and on behalf of the Oregon Class)**

1231. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1232. Plaintiff brings this claim individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

1233. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1234. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1235. The Class Vehicles, when sold and at all times thereafter, were not

339

merchantable and are not fit for the ordinary purpose for which cars are used.

1236. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1237. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1238. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1239. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1240. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1241. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1242. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

## V.   Claims Brought on Behalf of the Pennsylvania Class

### COUNT 68
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 Pa. Stat. §§ 201-1, *et seq.*)
### (Brought by Plaintiffs Jerry Meyer, Gregory Owens, and Jonathan and Bonnie Stempien individually and on behalf of the Pennsylvania Class)

1243. Plaintiffs Jerry Meyer, Gregory Owens, and Jonathan and Bonnie Stempien ("Plaintiffs," for purposes of the Pennsylvania Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1244. Plaintiffs bring this claim individually and on behalf of the other members of the Pennsylvania Class (the "Class," for purposes of this Count).

1245. Plaintiffs and Class Members are "persons" and GM engaged in "trade and commerce" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL").

1246. The Pennsylvania UTPCPL prohibits a number of unfair or deceptive acts or practices as defined in 73 Pa. Stat. § 201-2(4). By falsely marketing the characteristics of the Class Vehicles, and failing to reveal the L87 Engine Defect, GM violated the Pennsylvania UTPCPL.

1247. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1248. GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1249. Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

1250. GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

  a. Possessed exclusive knowledge about the L87 Engine Defect;

  b. Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

342

c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

1251. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1252. GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1253. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

1254. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have

paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 69
## BREACH OF EXPRESS WARRANTY
### (13 Pa. Stat. §§ 2313 and 2a210)
### (Brought by Plaintiffs Jerry Meyer, Gregory Owens, and Jonathan and Bonnie Stempien individually and on behalf of the Pennsylvania Class)

1255. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1256. Plaintiffs bring this claim individually and on behalf of the other members of the Pennsylvania Class (the "Class," for purposes of this Count).

1257. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1258. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1259. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

1260. GM breached the express warranty because it has not repaired, and has

been unable to repair, the L87 Engine Defect.

1261. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1262. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1263. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1264. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1265. Moreover, much of the damage flowing from the Class Vehicles cannot

be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

1266. As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 70
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 Pa. Stat. §§ 2314 and 2a212)
**(Brought by Plaintiffs Jerry Meyer, Gregory Owens, and Jonathan and Bonnie Stempien individually and on behalf of the Pennsylvania Class)**

1267. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1268. Plaintiffs bring this claim individually and on behalf of the other members of the Pennsylvania Class (the "Class," for purposes of this Count).

1269. GM has sold and leased goods (the Class Vehicles) as defined by this

statutory scheme.

1270. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

1271. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1272. GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

1273. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1274. Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1275. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time

limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1276. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1277. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1278. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**W.    Claims Brought on Behalf of the Tennessee Class**

**COUNT 71**
**VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT**
**(Tenn. Code Ann. §§ 47-18-101, *et seq.*)**
**(Brought by Plaintiff Jennifer Hunter individually and on behalf of the**
**Tennessee Class)**

1279. Plaintiff Jennifer Hunter ("Plaintiff," for purposes of the Tennessee Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1280. Plaintiff brings this claim individually and on behalf of the other members of the Tennessee Class (the "Class," for purposes of this Count).

1281. Plaintiffs and Class Members are "persons" and "consumers," the Class Vehicles are "goods," and GM engaged in "trade and commerce" within the meaning of the Tennessee Consumer Protection Act ("TCPA").

1282. The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the TCPA as described herein.

1283. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1284. GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1285. Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1286. GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

   a.  Possessed exclusive knowledge about the L87 Engine Defect;

   b.  Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

   c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1287. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1288. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public

and the other members of the Class.

1289.  In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1290. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 72**
**BREACH OF EXPRESS WARRANTY**
**(Tenn. Code Ann. §§ 47-2-313 and 47-2a-210)**
**(Brought by Plaintiff Jennifer Hunter individually and on behalf of the**
**Tennessee Class)**

1291. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1292. Plaintiff brings this claim individually and on behalf of the other members of the Tennessee Class (the "Class," for purposes of this Count).

1293. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1294. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1295. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1296. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1297. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1298. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1299. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1300. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1301. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1302. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 73**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tenn. Code Ann. §§ 47-2-314 and 47-2a-212)**
**(Brought by Plaintiff Jennifer Hunter individually and on behalf of the Tennessee Class)**

1303. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1304. Plaintiff brings this claim individually and on behalf of the other members of the Tennessee Class (the "Class," for purposes of this Count).

1305. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1306. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1307. The Class Vehicles, when sold and at all times thereafter, were not

354

merchantable and are not fit for the ordinary purpose for which cars are used.

1308. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1309. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1310. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1311. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1312. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1313. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1314. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

## X.     Claims Brought on Behalf of the Texas Class

### COUNT 74
### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)
**(Brought by Plaintiff Frederick Cuffie individually and on behalf of the Texas Class)**

1315. Plaintiff Frederick Cuffie ("Plaintiff," for purposes of the Texas Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1316. Plaintiff brings this claim individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

1317.  Plaintiffs and Class Members are "persons" and "consumers," the Class Vehicles are "goods," and GM engaged in "trade and commerce" within the meaning of the Texas Deceptive Trade Practices Act ("Texas DTPA").

1318.  The Texas DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . ." Tex. Bus. & Com. Code. § 17.46. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the Texas DTPA as described herein.

1319.  GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1320.  GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1321.  Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1322.  GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

> a.  Possessed exclusive knowledge about the L87 Engine Defect;

      b.  Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

      c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1323. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1324. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1325. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1326. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles

would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

1327. On or about February 24, 2026, undersigned counsel for the Plaintiff Cuffie provided GM written notice of its violations of Tex. Bus. & Com. Code Ann. § 17.46.

## COUNT 75
## BREACH OF EXPRESS WARRANTY
### (Tex. Bus. & Com. Code §§ 2.313 and 2a.210)
### (Brought by Plaintiff Frederick Cuffie individually and on behalf of the Texas Class)

1328. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1329. Plaintiff brings this claim individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

1330. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1331. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1332. GM's promise to repair or replace defects free of charge became part

of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1333. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1334. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1335. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1336. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1337. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because

it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1338. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1339. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 76**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tex. Bus. & Com. Code §§ 2.314 and 2a.212)**
**(Brought by Plaintiff Frederick Cuffie individually and on behalf of the Texas Class)**

1340. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1341. Plaintiff brings this claim individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

1342. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1343. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1344. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1345. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1346. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1347. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1348. Any attempt by GM to disclaim or limit the implied warranty of

merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1349. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1350. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1351. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**Y.    Claims Brought on Behalf of the Utah Class**

**COUNT 77**
**VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT**
**(Utah Code Ann. §§ 13-11-1, *et seq.*)**
**(Brought by Plaintiff Benjamin McMurray individually and on behalf of the**
**Utah Class)**

1352. Plaintiff Benjamin McMurray ("Plaintiff," for purposes of the Utah Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1353. Plaintiff brings this claim individually and on behalf of the other members of the Utah Class (the "Class," for purposes of this Count).

1354. GM is a "supplier" and engaged in a "consumer transaction" with Plaintiffs and Class Members within the meaning of the Utah Consumer Sales Practices Act ("UCSPA").

1355. The UCSPA prohibits a number of false or deceptive acts as detailed in Utah Code Ann. § 13-11-4. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the UCSPA as described herein.

1356. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1357. GM intended for Plaintiff and Class Members to rely on GM's

364

omissions regarding the L87 Engine Defect.

1358. Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1359. GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

     a. Possessed exclusive knowledge about the L87 Engine Defect;

     b. Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

     c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1360. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1361. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1362. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The

injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1363. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 78**
**BREACH OF EXPRESS WARRANTY**
**(Utah Code Ann. §§ 70a-2-313 and 70a-2a-210)**
**(Brought by Plaintiff Benjamin McMurray individually and on behalf of the Utah Class)**

1364. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1365. Plaintiff brings this claim individually and on behalf of the other members of the Utah Class (the "Class," for purposes of this Count).

1366. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1367. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1368. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1369. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1370. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1371. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1372. GM was provided notice of the L87 Engine Defect through numerous

complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1373. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1374. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1375. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 79**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Utah Code Ann. §§ 70a-2-314 and 70a-2a-212)**
**(Brought by Plaintiff Benjamin McMurray individually and on behalf of the Utah Class)**

1376. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1377. Plaintiff brings this claim individually and on behalf of the other members of the Utah Class (the "Class," for purposes of this Count).

1378. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1379. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1380. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1381. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1382. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1383. Privity is not required here because, in part, Plaintiff and Class

369

Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1384. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1385. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1386. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address

the Defect.

1387. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

**Z.     Claims Brought on Behalf of the Virginia Class**

**COUNT 80**
**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code Ann. §§ 59.1-196, *et seq.*)**
**(Brought by Plaintiff Jacob Chapman individually and on behalf of the Virginia Class)**

1388. Plaintiff Jacob Chapman ("Plaintiff," for purposes of the Virginia Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1389. Plaintiff brings this claim individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

1390. Plaintiffs and Class Members are "persons," GM is a "supplier," and GM engaged in a "consumer transaction" with Plaintiffs and Class Members within the meaning of the Virginia Consumer Protection Act ("VCPA").

1391. The VCPA prohibits a number of false or deceptive acts, including "5. Misrepresenting that goods or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as

371

advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann.. § 59.1-200. By concealing the L87 Engine Defect in the Class Vehicles, GM participated in unfair and deceptive trade practices that violated the VCPA as described herein.

1392. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1393. GM intended for Plaintiff and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1394. Plaintiff and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and Class Members' purchases and leases of Class Vehicles.

1395. GM owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

     a. Possessed exclusive knowledge about the L87 Engine Defect;

     b. Intentionally concealed the foregoing from Plaintiff and Class Members; and/or

      c. Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members.

1396. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and Class Members, Plaintiff and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1397. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1398. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff and Class Members could have reasonably avoided.

1399. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and Class Members have suffered ascertainable loss and actual damages. Plaintiff and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have

paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiff and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiff and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

**COUNT 81**
**BREACH OF EXPRESS WARRANTY**
**(Va. Code Ann. §§ 8.2-313 and 8.2a-210)**
**(Brought by Plaintiff Jacob Chapman individually and on behalf of the Virginia Class)**

1400. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1401. Plaintiff brings this claim individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

1402. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1403. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1404. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiff and each of the other Class Members, on the other.

1405. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1406. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1407. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1408. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1409. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1410. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and

consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Class Members' remedies would be insufficient to make them whole.

1411. As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

## COUNT 82
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Va. Code Ann. §§ 8.2-314 and 8.2a-212)
### (Brought by Plaintiff Jacob Chapman individually and on behalf of the Virginia Class)

1412. Plaintiff repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

1413. Plaintiff brings this claim individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

1414. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1415. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class Members purchased or leased their Class Vehicles from GM.

1416. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1417. GM knew or had reason to know that Plaintiff and Class Members would use, consume, or be affected by the Class Vehicles.

1418. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1419. Privity is not required here because, in part, Plaintiff and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1420. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate

to protect Plaintiff and other Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1421. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1422. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1423. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial and seek all damages allowable by law.

## AA.   Claims Brought on Behalf of the Washington Class

### COUNT 83
### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
### (RCW §§ 19.86.010, *et seq.*)
### (Brought by Plaintiffs Jason Rittereiser and Justin Johnson individually and on behalf of the Washington Class)

1424. Plaintiffs Jason Rittereiser and Justin Johnson ("Plaintiffs," for

purposes of the Washington Class's claims) repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1425. Plaintiffs bring this claim individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

1426. Plaintiffs and Class Members are "persons" and GM engaged in "trade and commerce" within the meaning of the Washington Consumer Protection Act ("WCPA").

1427. The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ."  RCW § 19.86.020. By falsely marketing the characteristics of the Class Vehicles, and failing to reveal the L87 Engine Defect, GM violated the WCPA.

1428. GM's omissions regarding the L87 Engine Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

1429. GM intended for Plaintiffs and Class Members to rely on GM's omissions regarding the L87 Engine Defect.

1430. Plaintiffs and Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiffs' and Class Members' purchases and leases of Class Vehicles.

379

1431. GM owed Plaintiffs and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because GM:

a.  Possessed exclusive knowledge about the L87 Engine Defect;

b.  Intentionally concealed the foregoing from Plaintiffs and Class Members; and/or

c.  Made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs and Class Members.

1432. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiffs and Class Members, Plaintiffs and Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

1433. GM's omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

1434. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and Class Members vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and Class Members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiffs and Class Members could have reasonably avoided.

1435. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiffs and Class Members have suffered ascertainable loss and actual damages. Plaintiffs and Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and Class Members have also suffered ascertainable loss and actual damages related to the L87 Engine Defect recall. Plaintiffs and Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowable by law.

## COUNT 84
## BREACH OF EXPRESS WARRANTY
### (RCW §§ 62a.2-313 and 62a.2a-210)
### (Brought by Plaintiffs Jason Rittereiser and Justin Johnson individually and on behalf of the Washington Class)

1436. Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

1437. Plaintiffs bring this claim individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

1438. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1439. In its Limited Warranty, GM expressly warranted that it would repair or replace defects free of charge if they became apparent during the warranty period.

1440. GM's promise to repair or replace defects free of charge became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class Members, on the other.

1441. GM breached the express warranty because it has not repaired, and has been unable to repair, the L87 Engine Defect.

1442. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1443. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

1444. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1445. Alternatively, Plaintiffs and Class Members were excused from

providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the L87 Engine Defect.

1446. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and Class Members' remedies would be insufficient to make them whole.

1447. As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial. Also, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members or the purchase or lease price of all Class Vehicles currently owned or leased, and for such incidental and consequential damages as allowable by law.

**COUNT 85**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(RCW §§ 62a.2-314 and 62a.2a-212)**
**(Brought by Plaintiffs Jason Rittereiser and Justin Johnson individually and on behalf of the Washington Class)**

1448. Plaintiffs repeat and reallege all other paragraphs in this Complaint as

if fully set forth herein.

1449. Plaintiffs bring this claim individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

1450. GM has sold and leased goods (the Class Vehicles) as defined by this statutory scheme.

1451. A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class Members purchased or leased their Class Vehicles from GM.

1452. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1453. GM knew or had reason to know that Plaintiffs and Class Members would use, consume, or be affected by the Class Vehicles.

1454. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

1455. Privity is not required here because, in part, Plaintiffs and Class Members were and are third-party beneficiaries of GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Class Members. The dealers were not intended to be the ultimate users of the Class Vehicles.

1456. Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Class Members, and GM knew of the Defect at the time of sale.

1457. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, complaints by consumers to NHTSA, its own internal engineering knowledge, its investigations into the Defect and resulting recall, and the complaints filed in this matter.

1458. Alternatively, Plaintiffs and Class Members were excused from providing GM with notice and an opportunity to cure the breach of warranty because it would have been futile. GM still has not provided an adequate remedy to address the Defect.

1459. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an

amount to be proven at trial and seek all damages allowable by law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and the State Classes they respectively seek to represent, respectfully request that the Court enter judgment in their favor and against Defendant General Motors LLC, as follows:

1.     Declaring that this action is a proper class action, certifying the Nationwide and State Classes as requested herein, designating Plaintiffs as class representatives, and appointing Plaintiffs' attorneys as class counsel;

2.     Enjoining GM from continuing the unfair business practices alleged in this Complaint;

3.     Ordering GM to pay all damages the law allows to Plaintiffs and the other Class Members;

4.     Ordering GM to pay both pre- and post-judgment interest on any amounts awarded;

5.     Ordering GM to pay Plaintiffs' and the Class Members' attorneys' fees and costs; and

6.     Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

**DATED**: February 26, 2026

/s/ E. Powell Miller
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
Dana E. Fraser (P82873)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
Madeline E. Hill
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com
mhills@dicellolevitt.com

**HAGENS BERMAN SOBOL
  SHAPIRO LLP**
Steve W. Berman
Shelby R. Smith
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: 206-623-7292
steve@hbsslaw.com
shelbys@hbsslaw.com

Rachel E. Fitzpatrick
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: 602-840-5900

rachelf@hbsslaw.com

**LIEF CABRASER HEIMANN &
  BERNSTEIN, LLP**
David Stellings
Katherine McBride
Miranda Litwak
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone: 212-335-9500
dstellings@lchb.com
kmcbride@lchb.com
mlitwak@lchb.com

Kevin Budner
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: 415-956-1000
kbudner@lchb.com

*Interim Co-Lead Counsel for Plaintiffs and
the Proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 26, 2026, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
